# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:20-cv-25022-KMW

Ghada Oueiss,

      Plaintiff,

*vs.*

Mohammed Bin Salman Bin Abdulaziz Al
Saud, Mohammed Bin Zayed Al Nahyan,
DarkMatter, Faisal al Bannai, Saudi 24 TV, a
broadcast television station owned by the
Kingdom of Saudi Arabia, Al Arabiya, a
broadcast television station owned by the
Kingdom of Saudi Arabia, Prince Mohammed
Bin Salman Abdulaziz Foundation d/b/a
MiSK Foundation, Saud Al Qahtani Bader
Al-Asaker, Saudi Arabian Cultural Mission,
Terek Abou Zeinab, Turki Al-Owerde, Faisal
Al Menaia, Awwad Al Otaibi, Sharon Collins,
Christanne Schey, Hussam Al-Jundi, Annette
Smith, John Does 1-20,

      Defendants.

_____/

## USA DEFENDANTS' MOTION TO DISMISS COMPLAINT
## FOR FAILURE TO STATE A CLAIM

Defendants Sharon Van Rider (named as Sharon Collins), Christanne Schey, Sam Jundi
(named as Hussam Al-Jundi), and Annette Smith (collectively, "the USA Defendants")
respectfully move to dismiss Plaintiff's Complaint with prejudice for failure to state a claim under
Federal Rule of Civil Procedure 12(b)(6) and in support state as follows:

### INTRODUCTION

There is often an inverse correlation between the length of a complaint and whether it states
a claim. This is one of those cases. Plaintiff's 96-page tome attempts to paint a picture of

international intrigue, complete with multiple accusations about the murder of journalist Jamal Khashoggi. Plaintiff, a well-known journalist and political activist, frequently posts on Twitter and claims her phone was hacked, resulting in many people retweeting unauthorized content including photos of her in a hot tub. This alleged "hacking and leaking operation" forms the basis of the Complaint, which contains no plausible facts in support of the claims asserted against the four USA Defendants. They were added to this lawsuit simply to manufacture personal jurisdiction and venue before this Court, as almost all of the other 14 Defendants are from the Kingdom of Saudi Arabia ("KSA") and the United Arab Emirates ("UAE"), including the Crown Princes of each.

At bottom, Plaintiff, a Qatar-based anchor for Al Jazeera Media Network ("Al Jazeera"), wants this Court to adjudicate a political "Twitter war" primarily between individuals in the Middle East, simply because a few U.S. citizens retweeted some social media posts. The Court should decline the invitation.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The mere possibility that a "defendant acted unlawfully is insufficient to survive a motion to dismiss." *M.C. Dean*, *Inc. v. City of Miami Beach*, 199 F. Supp. 3d 1349, 1352 (S.D. Fla. 2016) (quotation omitted).

The *Twombly/Iqbal* "plausibility pleading standard makes particular sense when examining public figure defamation suits. In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet

groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). "Thus, a public figure bringing a defamation suit must plausibly plead actual malice in accordance with the requirements set forth in *Iqbal* and *Twombly*." *Id.*

The Court may consider material that is referred to in the Complaint and is central or integral to the Plaintiff's claims. *See Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002) (entire book should be considered on motion to dismiss to determine if statement in book is defamatory); *M.C. Dean*, *Inc.*, 199 F. Supp. 3d at 1352 (noting that "the Court considers the allegations of the complaint, exhibits attached or incorporated by reference, and exhibits attached to the motion to dismiss if they are central to the plaintiff's claim and undisputed"). However, the Court does not have to take as true allegations made on "information and belief." *See, e.g., Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (quoting *Twombly*, 550 U.S. at 551, 557) (declining to take as true the conclusory allegation "upon information and belief" that the companies had entered a conspiracy without enough facts to make that statement plausible).

## BACKGROUND

Plaintiff is a public figure: "an international journalist who has a significant presence in the U.S. and abroad, both as a journalist for Al Jazeera and as a frequent contributor to U.S. news agencies, such as The Washington Post." (Compl. ¶ 1.) She is the "principal anchor and presenter for Al Jazeera, which is headquartered in Doha, Qatar, and she regularly reports on human rights issues. (*Id.* ¶ 34.) "With a viewership of over 8,000,000 in the U.S., Ms. Oueiss derives a portion of her income from her work in the U.S." (*Id.* ¶ 35.) Indeed, Plaintiff has "millions of followers on social media" due to her "prominence as a journalist." (*Id.* ¶ 36.)

While Plaintiff describes herself as an aggrieved victim of attacks due to her "critical reporting of the Saudi and UAE regimes, and Defendant's MBS's involvement in the murder of

Mr. Khashoggi and others" (*id.* ¶ 62), her Twitter posts reveal that she is also a political activist who regularly engages in online feuds. Her political commentary ranges from negative comments about the KSA and its leader Defendant Mohammed Bin Salman ("MBS"), to praise for Che Guevara as an "inspiring and respected historical figure" whom the UAE today would have described as a "terrorist" and against whom UAE leader Defendant Mohammed Bin Zayed ("MBZ") would have mounted a "counter-revolution to betray and defame him, and Facebook would have prevented us from publishing any post about him under the pretext of promoting terrorism."[1] Even the Complaint describes Plaintiff as an aggressive adversary who retweets what her "attackers" post: "When Ms. Oueiss fought back instead, by retweeting her attackers' tweets with the goal of exposing them and continuing her reporting, the Saudi and UAE operatives escalated their attacks." (*Id.* ¶ 26.)

Indeed, Plaintiff has used Twitter as a means to repetitively taunt the Defendants on social media, often posting pictures of the summonses in this case with comments such as "See you in court" and "You've been served."[2] She repeatedly uses pejorative terms like "flies" and "criminal" on Twitter to describe the Defendants and her critics.[3] On December 29, 2020, she even posted a picture of a summons as her new profile picture on Twitter.[4]

Plaintiff alleges that Defendants MBS and MBZ, the Crown Princes of KSA and UAE, "spearheaded" a conspiracy to hack her phone and disseminate its content along with defamatory

---

[1] https://twitter.com/ghadaoueiss/status/1309419253615992834. (Copy of tweet attached as Motion Exhibit A.)

[2] *E.g.* (1) Ghada Oueiss غادة عويس (@ghadaoueiss) / Twitter. (Copies of tweets attached as Motion Exhibit B.)

[3] E.g. Ghada Oueiss غادة عويس on Twitter: "مقابل كل ذبابة بذيئة إعادة تأكيد على الدعوى المقدمة ضد معلمهم" وزمرته . See you in court :) https://t.co/9unMlOqMW8" / Twitter. (Copies of tweets attached as Motion Exhibit C.)

[4] https://twitter.com/ghadaoueiss/status/1343943803732975616?s=20.

commentary. (*Id.* ¶ 1.) Other high-level KSA officials (Defendants Al-Qahtani and Al-Asaker) also allegedly took part in "spearheading" this conspiracy. (*Id.* ¶ 123.) A UAE company with close ties to the UAE government, DarkMatter, allegedly did the actual hacking. (*Id.* ¶¶ 70-71, 126.) Although Plaintiff does not allege her residence in her Complaint, her Twitter profile lists her location as Doha, Qatar. *See* https://twitter.com/ghadaoueiss.

Most of the Defendants are from KSA or UAE. Defendants MBS and MBZ allegedly targeted Oueiss because her commentary was critical of KSA, and to a lesser extent, UAE. (Compl. ¶¶ 4, 15, 19, 22.) The allegedly hacked photos and derogatory messages went viral worldwide. Plaintiff alleges that the dissemination was driven by social media accounts in Arabic, including one affiliated with a Saudi journalist who works for the Saudi Ministry of Media. (*Id.* ¶¶ 189-99.) In Plaintiff's *Washington Post* article after the alleged hacking,[5] she referred to "the Saudi accounts attacking me." She stated that "Saudi and Emirati public figures . . . amplified these posts, which led to ordinary Saudis and Emiratis joining the assault. Within hours, the hashtag[] #Ghada_Jacuzzi . . . w[as] trending in Saudi Arabia."

As for the USA Defendants, the Complaint describes them as U.S. citizens who are active on Twitter and who express their "political views" in defense of Saudi Arabia and against dissidents of the "Saudi and UAE regimes." (*E.g. Id.* ¶¶ 41, 48, 50, 55, 58, 60.) While the Complaint contains much detail about the USA Defendants' interactions on those issues, it contains only conclusory allegations, many of which on "information and belief," when it seeks to link the USA Defendants to the alleged "hacking and leaking" operation. (*E.g. id.* ¶¶ 45, 212, 309.)

---

[5] Ghada Oueiss, *I'm a Female Journalist in the Middle East. I Won't Be Silenced by Online Attacks*, Wash. Post, July 8, 2020, *available at* https://www.washingtonpost.com/opinions/2020/07/08/im-female-journalist-middle-east-i-wont-be-silenced-by-online-attacks/ (hereafter "*Washington Post* Article").

Read in the light most favorable to Plaintiff, the Complaint alleges that *other Defendants* hacked her phone (*id.* ¶¶ 166-68) and then some but not all the USA Defendants, like many others around the world, retweeted the hacked content on Twitter. If that stated an actionable claim, the courts would be inundated with an untold number of lawsuits.

The alleged content taken from Plaintiff's device are so-called "Personal and Private Photos" of Plaintiff. (*Id.* ¶¶ 3, 28-29, 181-87, 193). There are three types of allegedly defamatory photos: (1) the "Doctored Financial Photo," which was first posted by Defendant Al Arabiya on February 17, 2020 (*id.* ¶¶ 185-87);[6] (2) "private photographs of Ms. Oueiss drinking alcohol and smoking with friends" (the "Smoking Photos"), which were first posted by "Twitter account @Uncareer1" on April 19, 2020, "at the behest of Defendant MBS and MBZ, together with assistance from Defendants Al Qahtani and Al-Asaker" (*id.* ¶¶ 182, 192-94); and (3) contents of a video of Ms. Oueiss in a hot tub, which were posted on June 2, 2020, on the social media accounts associated with @Uncareer20 (via Telegram) and @Uncareer1 (via Twitter)" (*id.* ¶¶ 28, 182, 196) (the "Hot Tub Photos"). Over the next few days, other "pro-Saudi Twitter accounts continued to repost and amplify the content until it reached a critical mass of thousands of negative tweets directed at Ms. Oueiss on June 9, 2020." (*Id.* ¶ 197). In other words, the Hot Tub Photos went viral.

First, Plaintiff does not allege that any of the USA Defendants tweeted or in any other way published the Doctored Financial Photo or the Smoking Photos. Second, the Complaint alleges only two of the four USA Defendants, Ms. Collins and Ms. Smith, had any connection to the Hot Tub Photos. The Complaint does not allege that the other two USA Defendants, Mr. Jundi or Ms. Schey, published the Hot Tub Photos.

---

[6] It is unclear whether that photo came from Plaintiff's mobile device. (*See* Compl. ¶¶ 185-86.)

With respect to Ms. Collins and Ms. Smith, the Complaint alleges only that they "re-tweeted" the Hot Tub Photos, meaning that someone else had *already* published the subject photos to the world. (*Id.* ¶ 205 (Defendant Collins on June 9, 2020, the same day the photos went viral), ¶¶ 222-24 (Defendant Smith on June 10 and 11, after the photos went viral).) Indeed, according to Plaintiff, in both her Complaint (*id.* ¶ 197) and in her previous article for the *Washington Post*, the offensive photos were retweeted tens of thousands of times:

> Private photos of me in a swimsuit had been stolen from my phone and posted on Twitter with offensive, misogynistic and false claims that the photos were taken at the private residence of Al Jazeera Media Network's Qatari chairman, Sheikh Hamad Bin Thamer Al-Thani. I watched aghast as the number of retweets increased by the hundreds each minute. Within just a few hours, photos of me in a hot tub — some of them pixelated to make people believe, incorrectly, that I was nude — were tweeted more than 40,000 times.[7]

Therefore, USA Defendants Collins and Smith allegedly did what many others did after the photos entered the public domain: retweeted them. Their actions and statements are not actionable, as explained below.

## ARGUMENT

### Federal Law Claims

Plaintiff asserts eight causes of action against the USA Defendants under federal statutory law and Florida state law.  All eight fail as a matter of law. The first three Counts focus on the alleged hacking of Plaintiff's mobile device and invoke federal statutory law:

- Count I: Hacking of Plaintiff's Mobile Device, ATS 28 U.S.C. § 1350

- Count II: Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C)

- Count III: Stored Communications Act, 18 U.S.C. §§ 2701-12

The Complaint repeatedly lays the blame for the hacking at the feet of Defendants *other*

---

[7] *Washington Post* Article, *supra* n.5.

*than* the USA Defendants.[8] All three Counts rest on the alleged "unlawful hacking operation carried out at the behest of Defendants MBZ and MBS." (*Id.* ¶ 261; *see id.* ¶¶ 260 & 262 ("hacking of Plaintiff's mobile device and the subsequent dissemination"), ¶ 267 ("compromised Plaintiff's mobile device in a deliberate and premeditated scheme, whereby Defendants MBS, MBZ, Al Qahtani, and Al-Asaker, among others, utilized sophisticated cyber hacking group Defendant DarkMatter"), ¶ 271 ("hacking of Plaintiff's personal mobile device"). The USA Defendants are not mentioned as participants in the alleged hacking.

The Complaint describes the USA Defendants as energetic Twitter users who had interactions with other individuals and themselves on that social media platform. Collins "is active on Twitter" (*id.* ¶ 39), Al-Jundi "routinely engages in interactions with the other named Defendants via Twitter" (*id.* ¶ 50), Smith "has had 4,251 interactions with the named Defendants via Twitter" (*id.* ¶ 55), and Schey "has tweeted over 240,000 times and has a Tweet frequency of approximately 340 tweets per day" (*id.* ¶ 58). The Complaint repeatedly describes their alleged affinity for Saudi Arabia and alleged hostility towards its critics. (*Id.* ¶ 41 ("Most, if not all, of these interactions relate to praising Saudi Arabia, UAE, MBS, or other acolytes of MBS, while consistently attacking dissidents of the Saudi and UAE regimes.").).

But the Complaint does not contain any plausible facts alleging that the USA Defendants participated in or knew about any hacking of Plaintiff's phone. Plaintiff cannot fix this fatal flaw by making conclusory, generalized allegations about "all Defendants" or by asserting all Counts

---

[8] For example: "Defendants MBS, MBZ and Tahnoun, among others, hatched a plan to invade Ms. Oueiss' privacy, steal her personal and private information, and disseminate such personal information to the public with a false narrative." (Compl. ¶ 166.). "Defendant DarkMatter, under the direction of Defendants MBS, MBZ, and with assistance from Defendants al Bannai, Al Qahtani and Bader Al-Asaker, among others, hacked Plaintiff's mobile device and unlawfully extracted personal and confidential photographs and content from Plaintiff's mobile device. (*Id.* ¶ 126; *see also id.* ¶¶ 167-68.)

against all Defendants. When a plaintiff names "multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86-87 (11th Cir. 2008) (rejecting fraud "pleading's generalized allegations that these voluminous documents contain 'examples' of false statements somewhere within them"). Recently, in *Embree v. Wyndham Worldwide Corp.*, the Eleventh Circuit rejected a 172-paragraph pleading that lumped together ten defendants because allegations "require[d] the court to spend valuable time sifting through it to determine which facts were relevant to each cause of action and against each defendant." 779 F. App'x 658, 664 (11th Cir. 2019). The court criticized the pleading's failure "to specify the exact conduct each defendant engaged in as to each count." *Id.*

Likewise, Plaintiff's attempt to sweep all Defendants under the three federal causes of action—without specific factual allegations tying the USA Defendants to those claims—fails.[9] Thus, the Court should dismiss Counts I through III asserted against the USA Defendants.

### State Law Claims

Counts IV through VIII invoke Florida law. The USA Defendants do not concede that Florida substantive law applies to these claims, as KSA, UAE, and Qatar each have a significant relationship to the claims. However, even if the Court agrees with Plaintiff and chooses Florida law, her claims fail, as explained below.

### Count IV: Intentional Infliction of Emotional Distress

As a threshold matter, Plaintiff cannot assert *both* a claim for intentional infliction of

---

[9] *See also Pouyeh v. Bascom Palmer Eye Inst.*, No. 12-23580-CV, 2013 WL 12177169, at *5 (S.D. Fla. Aug. 21, 2013) (noting that "complaint should contain specific allegations with respect to each defendant" and not lump them together).

emotional distress *and* a claim for libel because they are each predicated on the same tweets. Florida law is clear that "a single publication gives rise to a single course of action." *Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1278 (S.D. Fla. 2020). Accordingly, "a plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'" *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992).

Even if not barred under the single publication rule, Count IV fails as a matter of law. Under Florida law, the tort of intentional infliction of emotional distress has four elements: a plaintiff must show that "(1) [t]he wrongdoer's conduct was intentional or reckless . . .; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 954-55 (Fla. 3d DCA 2017).

For the second element, a court decides as a matter of law what constitutes outrageous conduct. *Id.* at 955. The test is objective; the plaintiff's "subjective response to the conduct" is irrelevant. *Id.* (quotation omitted); *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007) ("the court must evaluate the conduct as objectively as is possible to determine whether it is atrocious, and utterly intolerable in a civilized community") (quotation omitted). The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. 3d DCA 1998) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Generally, the allegations would lead an "average member of the community . . . to exclaim, 'Outrageous!'" *Id.*

10

Here, even Plaintiff's own account of the supposedly distressing social media activity shows that an "average member" of the Twitter community would not exclaim, "Outrageous!" Given that Plaintiff's photographs were "tweeted more than 40,000 times" within a few hours, thousands of Twitter users must have deemed the photographs to suitable for public viewing. Although the Complaint describes the Plaintiff as feeling "aghast" upon seeing such allegedly defamatory tweets, her subjective response is irrelevant to the Court's analysis.[10]

In fact, Florida courts have deemed far more egregious conduct to be insufficient for intentional infliction of emotional distress. For example, a minister's "being branded a thief in front of [his] parishioners," while "unsettling, embarrassing, and/or humiliating for a member of the clergy," was not legally outrageous. *LeGrande v. Emmanuel*, 889 So. 2d 991, 995 (Fla. 3d DCA 2004). Nor was a supervisor's calling an African-American employee the "n-word" and a "monkey" in public, as well as other epithets. *Williams v. Worldwide Flight SVCS, Inc.*, 877 So. 2d 869, 870 (Fla. 3d DCA 2004). By contrast, here Plaintiff points to "personal photographs of Ms. Oueiss smoking a cigarette and drinking alcohol with her friends," and doctored photographs that "make it falsely appear as though Ms. Oueiss were naked at the time of the video . . . with the false and repugnant narrative that Ms. Oueiss was engaged in sexual acts at the time of the video in exchange for financial incentives." (Compl. ¶¶ 182-83.) This conduct hardly meets Florida's "very high standard in evaluating whether the facts alleged are sufficiently outrageous to support a claim for intentional infliction of emotional distress." *Foreman v. City of Port St. Lucie*, 294 F. App'x 554, 557-58 (11th Cir. 2008) (citing *Metro. Life Ins. Co. v. McCarson,* 467 So. 2d 277, 278

---

[10] The Court should note that Plaintiff herself has retweeted at least portions of the objectionable images and even used the "bikini" emoji when taunting Defendant KSM in a tweet. *E.g. Ghada Oueiss* 🇱🇧 🇱🇧 *on Twitter: "@lourd_al @lamamtt @YouTube* 👙 *https://t.co/NZAiMIx6Wf" / Twitter.*  (Copies of tweets attached as Motion Exhibit D.)

(Fla. 1985)).

Moreover, public figures such as Plaintiff cannot recover for intentional infliction of emotional distress unless they establish culpability amounting to "actual malice." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56-57 (1988) (*Hustler Magazine* cartoon portrayed evangelist Falwell as having lost his virginity in an outhouse with his mother). The "actual malice" standard requires that the defendant make a false statement with knowledge that the statement was false or with reckless disregard of its falsity. *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964). The Supreme Court has often recognized that the First Amendment protects public criticism and commentary regarding public figures and officials. Thus, it imposed the *New York Times* "actual malice" standard on state actions for intentional infliction of emotional distress in order to give adequate "breathing space" to the freedoms protected by the First Amendment. *Falwell*, 485 U.S. at 56.

Here, Plaintiff's status as a public figure is what caused the Hot Tub Photos to go viral in the first place. The Complaint contains no plausible allegations that the USA Defendants acted with "actual malice,"[11] nor could there be. First, any un-doctored Hot Tub Photos do not themselves constitute a false statement of fact. To the extent the Hot Tub Photos depict Plaintiff in a swimsuit in a hot tub, they are simply not false, as Plaintiff herself admits in her Complaint and her *Washington Post* Article. With respect to any doctored Hot Tub Photos or accompanying false narrative, the Complaint does not allege that any of the USA Defendants retweeted or otherwise published any doctored photo or false narrative about them. (*See* Compl. ¶¶ 196, 205, 224 (defining screenshots of the allegedly stolen video as "Personal and Private Photos" and

---

[11] "Actual malice" means deliberate falsification or reckless disregard in the sense of entertaining serious doubts as to the truth of the assertion. *St. Amant v. Thomson*, 390 U.S. 727, 731 (1968).

alleging that USA Defendants Collins and Smith "retweeted" them).) Certainly, there is no plausible allegation that any USA Defendant retweeted the Hot Tub Photos with knowledge of their falsity or recklessly disregarded their falsity.

### Count V: Instrusion & Count VI: Public Disclosure of Private Facts

Counts V and VI are both Florida torts for invasion of privacy. *See Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 161 (Fla. 2003). The tort of intrusion means "physically or electronically intruding into one's private quarters." *Agency for Health Care Admin. v. Assoc. Indus. of Fla., Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996). The "intrusion" must be "into a 'place' in which there is a reasonable expectation of privacy." *Allstate Ins. Co.*, 863 So. 2d at 162.

Plaintiff's intrusion claim fails for the same reason as her federal claims. Plaintiff has not alleged any facts showing that the USA Defendants had anything to do with the intrusion at issue: the hacking of her mobile device. The intrusion claim fails for the additional reason that Plaintiff has not alleged an intrusion into a "private quarter" or "private place," rather only into her mobile device. Courts have held that analogous actions—specifically, accessing medical records, driver's license information, and a credit report—are not intrusions into a "place." *See Celestine v. Capital One*, No. 17-20237-Civ-Scola, 2017 WL 2838185, at *3 (S.D. Fla. June 30, 2017) (citing cases).

Next, the tort of public disclosure of private facts requires "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern. *Cape Pub'ns, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989). Section 652D of the Restatement (Second) of Torts explains that the publicized matter be "highly offensive to a reasonable person" and not be a legitimate concern to the public. *Id.* Obviously, the gist of the tort is the act of making public facts that are *true* and were previously private. Once information is public, there is no liability for further publication. *Faloona v. Hustler Mag., Inc.*, 799 F.2d 1000, 1006 (5th Cir. 1986) (photographs printed in *Hustler*

*Magazine* "had already been widely published elsewhere").

Plaintiff's private facts claim fails as a matter of law for several reasons. First, the material at issue, the Hot Tub Photos, are not highly offensive to a reasonable person, as explained above in the discussion of plaintiff's intentional infliction of emotional distress claim. Second, the photos address a matter of public concern: photographs of a well-known public figure who has thrust herself into the world spotlight through daily social media posts and commentary, including many self-published photographs. *See* https://twitter.com/ghadaoueiss. The Supreme Court of Florida has made clear that "the requirement of lack of public concern is a formidable obstacle" to a plaintiff, as "the 'newsworthiness' defense has been recognized by commentators as being so broad as to nearly swallow the tort." *Cape Pub'ns, Inc.*, 549 So. 2d at 1377-79 (finding publication of child abuse information after trial to be of public concern). Third, the Hot Tub Photos undoubtedly had been widely disseminated by the time two of the USA Defendants retweeted them. Because the photographs by that time were no longer private, Plaintiff has no private facts claim against the USA Defendants. *Faloona*, 799 F.2d at 1006.

## Count VII: Libel

The allegedly "defamatory" tweets by the USA Defendants do not constitute libel as a matter of law, for various reasons. The tweets either were not false, were constitutionally protected opinions or expressions, or lack the required malice for a public figure.[12] The Complaint describes Plaintiff as one of those quintessential public figures who "have thrust themselves to the forefront

---

[12] Under Florida law, a plaintiff claiming "defamation must prove five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *100 Plus Animal Rescue, Inc. v. Butkus*, No. 17-61893-Civ-COOKE/HUNT, 2020 WL 5514404, at *5 (S.D. Fla. Aug. 8, 2020) (quotation omitted).

of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

Under the First Amendment, "there is no such thing as a false idea." *Id.* at 339. Therefore, opinions, humor, parody, "rhetorical hyperbole," epithets, insults, name-calling, and the like are protected speech. *See, e.g.*, *Church of Scientology v. Cazares*, 638 F.2d 1272, 1286-88 (5th Cir. 1981); *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378-79 (S.D. Fla. 2006) (noting that "rhetorically hyperbolic statements . . . cannot reasonably be interpreted as stating actual facts about their target") (quotation omitted). These types of comment cannot be reasonably interpreted as stating actual facts or events and therefore cannot be proved false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 6, 20 (1990) (quoting *Falwell*, 485 U.S. at 50); *see also Curtis Publ'g Co. v. Birdsong*, 360 F.2d 344, 348 (5th Cir. 1966) (finding "bastard" not defamatory). Every federal circuit has held that opinion is constitutionally protected. *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985). Insults during political discourse are particularly nonactionable, to shield political speech. *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (holding "blackmail" to be "rhetorical hyperbole, a vigorous epithet"). This type of speech is fiercely protected when directed at public figures like Plaintiff, who have "sufficient access to means of counter-argument to be able to expose through discussion the falsehood and fallacies of the defamatory statements." *Buckley v. Littell*, 539 F.2d 882, 890 (2d Cir. 1976) (not defamatory to call journalist a "fascist"). Whether a statement is fact or opinion is a matter of law for court to decide. *Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018).

Moreover, custom and context are crucial in examining whether a statement is defamatory. *Keller*, 778 F.2d at 717 (stating that "the court must construe the statement in its totality" and "must consider the context in which the statement was published") (quoting *Hay v. Indep.*

*Newspapers Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984)). Messages on Twitter, known as a robust marketplace for ideas and expression, are much more likely to be viewed as opinion rather than actual statements of fact. No one can reasonably dispute that social media platforms like Twitter are "places where readers expect to see strongly worded opinions rather than objective facts." *Summit Bank v. Rogers*, 142 Cal. Rptr. 3d 40, 60 (Cal. Ct. App. 2012). Courts have recognized that social media sites "encourage a freewheeling, anything-goes writing style" and that "readers give less credence to allegedly defamatory remarks published on the Internet rather than to similar remarks made in other contexts." *Sandals Resorts Int'l, Ltd. v. Google, Inc.*, 86 A.D.3d 32, 43-44 (N.Y. App. Div. 2011).

Under these binding principles, the tweets by the USA Defendants mentioned in the Complaint are not defamatory as a matter of law. The USA Defendants have already addressed the Hot Tub Photos above. The other alleged defamatory statements by the USA Defendants are not placed in context and often are not set forth in their totality, warranting dismissal on that basis alone. For example, Plaintiff quotes snippets of the USA Defendants' statements rather than their complete statements in context. (*E.g.* Compl. ¶¶ 204, 206, 224-25.) In any event, the statements cited in the Complaint demonstrate that the USA Defendants were merely expressing their opinions or at worst directing epithets at a public figure. A reasonable reading of the challenged tweets or retweets shows them to be expressions of opinion, particularly given the nature of expression on Twitter. That is not libel.

More specifically, Plaintiff describes the following "defamatory attacks" by the USA Defendants: Plaintiff "'was in the position [she] is in' as a result of her own behavior" and "should blame herself" (*id.* ¶¶ 204, 224), "'sold [her]self to terrorists to get a story'" (*id.* ¶ 205), was "working for 'Qatar who ended up hiding the Master Mind behind 9/11 when America was

demanding for Justice" (*id.* ¶ 206), was a "traitor" (*id.* ¶ 218), chose "a 'mercenary path' against Saudi Arabia" (*id.* ¶ 223), "was a 'propagandist' who worked for 'the same bastards that fund terrorism around the globe'" (*id.* ¶ 225), and was a "low grade, beg-friend NOBODY" (*id.* ¶ 231 (retweet by USA Defendant Schey of a tweet by @KateStewart22)). These are clearly opinion statements, rhetorical hyperbole, and epithets, all of which are protected speech, particularly when directed at a public figure like Plaintiff who seeks to sway public opinion.

Plaintiff also emphasizes certain tweets or retweets by the USA Defendants containing comments about her father. (*Id.* ¶¶ 207, 216-17.) They are not actionable because there is no vicarious defamation. A defamatory statement must be about the plaintiff and not someone else. *McBeth v. United Press Int'l, Inc.*, 505 F.2d 959, 960 (5th Cir. 1974) (plaintiff may not recover "for a defamatory statement made about another, even if the statement indirectly inflicts some injury upon the party seeking recovery"); *see also Johnson v. KTBS, Inc.*, 889 So. 2d 329, 333 (La. Ct. App. 2004) (not defamatory of children to say their parents were twin siblings).

Plaintiff also claims that certain retweets by the USA Defendants, of either the Hot Tub Photos or other content, are defamatory. (*E.g.* Compl. ¶¶ 28, 215, 228.) Retweeting, even if defamatory—which the subject retweets are not—is immunized activity under the safe harbor provision of the Communications Decency Act,[13] which expressly protects a "provider" and a "user" of interactive computer services. 47 U.S.C. § 230(c)(1). Federal courts construe this statute broadly in favor of immunity "for information originating with a third-party user." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quotation omitted); *Roca Labs, Inc. v. Consumer Op. Corp.*, 140 F. Supp. 3d 1311, 1323 (M.D. Fla. 2015) ("[T]o enjoy immunity under

---

[13] Section 230 states, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

Section 230 of the CDA, a different information content provider must have provided the complained of information.").

In addition to immunizing Twitter as a social media platform, Section 230 also immunizes individuals who retweet on the platform. *See Roca Labs, Inc.*, 140 F. Supp. 3d at 1320 (stating generally that "reposting allegedly defamatory comments authored by third parties does not preclude Section 230 immunity"); *Barrett v. Rosenthal*, 146 P.3d 510, 525, 528-29 (Cal. 2006) (observing that "Congress intended to create a blanket immunity from tort liability for online republication of third party content" and that "the congressional purpose of fostering free speech on the Internet supports the extension of section 230 immunity to active individual 'users'"); *see also* Michael A. Cheah, *Section 230 and the Twitter Presidency*, 115 Nw. U.L. Rev. Online 192, 202 (2020) ("While Section 230(c)(1) certainly immunizes Twitter from liability for a user's defamatory tweet, it also protects the individuals who retweet it."). Here, Section 230 immunizes the USA Defendants' allegedly defamatory retweets.

Moreover, even if the USA Defendants retweets did not enjoy Section 230 protection, still Plaintiff has no libel claim against them because the retweets were a matter of public concern and there is no allegation of "actual malice." Any allegation regarding the USA Defendants' knowledge of falsity are mere conclusory statements that have no factual or logical support. (*See, e.g.*, Compl. ¶¶ 3, 215, 311.)

## Count VIII: Civil Conspiracy

Under Florida law, a civil conspiracy requires four elements: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

A conspiracy requires either (1) an underlying tort or wrong or (2) a "peculiar power of coercion possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess." *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (quotation omitted).

Here, not only does the Complaint lack a viable underlying tort or wrong asserted against the USA Defendants, but also there is no plausible allegation that they ever combined with other Defendants to generate a "peculiar power of coercion." Rather, the Complaint describes the USA Defendants as outspoken and protective of Saudi Arabia, "spread[ing] pro-Saudi and pro-UAE propaganda and ruthlessly attack[ing] anyone who dares to report on these regimes' human rights." (Compl. ¶ 37.) Their conduct on Twitter was theirs alone as individuals.

Anything to the contrary in the Complaint, such as allegations that the USA Defendants were "recruited" or "instructed" to do anything, have all the hallmarks of vague, conclusory statements that the Court should disregard. Many of them are made "on information and belief." In fact, the conspiracy count contains 11 of the 41 "information and belief" allegations made in the Complaint. (*Id.* ¶¶ 307-14.) In fact, almost *every* paragraph of the conspiracy count is based on "information and belief."

The Complaint itself confirms the speculative nature of the conspiracy claim, as shown by these three examples. First, Paragraph 113 claims that "members of the Network" were "direct[ed] . . . to promote pro-Saudi propaganda and to defame Ms. Oueiss." The following sentence claims that a Defendant issued an "instruct[ion] . . . to follow certain Twitter users," but the actual tweet by the Defendant merely asks his followers to "please" follow a "very talented writer" and has nothing to do with any effort to defame Plaintiff. (*Id.* ¶ 113.)

Second, the Complaint makes much of a pleasure trip that Ms. Collins took to Saudi Arabia

in December 2019, ending with rampant (and incorrect) speculation on "information and belief" that *no less than nine* other Defendants "funded" Ms. Collins' trip, an assertion that is unbelievable on its face. (*Id.* ¶ 45.) Third, Plaintiff also emphasizes a dinner that Ms. Collins had in Saudi Arabia with Defendant Awwad Al Otaibi (*id.* ¶¶ 44, 119), who generally interacted with other Defendants. (*Id.* ¶¶ 115-20.) The only allegations that tie him to the alleged conspiracy are allegations "on information and belief" that he "used the MiSK Foundation as a front to develop and coordinate relationships with networks of agents wiling to carry out discrete and unlawful operations" (whatever that means) (*id.* ¶ 117) and that he as one of four lumped-together "Recruiting Defendants" instructed the so-called "Network" to spread the content allegedly stolen from Plaintiff's mobile device (*id.* ¶¶ 201, 313). These "information and belief" allegations are mere conclusions devoid of any factual support and deserve no credence. So much for the conspiracy.

## <u>CONCLUSION</u>

Wherefore, Defendants Sharon Collins, Christanne Schey, Hussam Al-Jundi, and Annette Smith respectfully request an Order dismissing Plaintiff's Complaint with prejudice for failure to state a claim and any other relief the Court deems proper.

Dated: January 29, 2021

Respectfully submitted,
*/s/ Marcos Daniel Jiménez*
Marcos Daniel Jiménez
 Florida Bar No. 441503
**Marcos D. Jiménez, P.A.**
255 Alhambra Circle, 8th Floor
Miami, FL 33134
Tel:  305-570-3249
Fax:  305-437-8158
Email: mdj@mdjlegal.com

*Counsel for Defendants Sharon Collins, Christanne Schey, Hussam Al-Jundi, and Annette Smith*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2021, a copy of the foregoing pleading was automatically served upon filing via the CM/ECF portal to all counsel of record.

*<u>/s/ Marcos Daniel Jiménez</u>*
Marcos Daniel Jiménez
