**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| GHADA OUEISS,<br><br>     *Plaintiff*,<br><br>v.<br><br><br>MOHAMMED BIN SALMAN BIN<br>ABDULAZIZ AL SAUD, *et al*.,<br><br>     *Defendants*. | Case No. 20-CV-25022-KMM |

---

**DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S
MOTION TO DISMISS**

---

Michael K. Kellogg (*pro hac vice*)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

Benjamin H. Brodsky (Fla. Bar No. 73748)
**BRODSKY FOTIU-WOJTOWICZ,
  PLLC**
200 S.E. 1st Street, Suite 400
Miami, Florida 33131
(305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

*Attorneys for Defendant Mohammed bin Salman bin Abdulaziz Al Saud*

March 26, 2021

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ...................................................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS .....................................................................3

STANDARDS OF REVIEW ...................................................................................................7

ARGUMENT ..........................................................................................................................8

I.   Oueiss Fails To Establish Personal Jurisdiction over the Saudi Crown
     Prince ...........................................................................................................................8

     A.   Oueiss's Federal Statutory Claims Do Not Arise out of or Relate to
          Contacts Between the Saudi Crown Prince and the United States .........................8

          1.   The Alleged "Hacking Event" While Oueiss Was in the
               United States Does Not Support Personal Jurisdiction over
               the Saudi Crown Prince .........................................................................10

          2.   Tweets Sent by Other Defendants from the United States
               Do Not Support Personal Jurisdiction over the Saudi Crown
               Prince .....................................................................................................15

     B.   Oueiss's Non-Statutory Claims Do Not Arise out of or Relate to
          Contacts Between the Saudi Crown Prince and Florida .......................................18

     C.   Traditional Notions of Fair Play and Substantial Justice Weigh
          Against the Exercise of Personal Jurisdiction over the Saudi Crown
          Prince ................................................................................................................19

II.  Oueiss's Claims Against the Saudi Crown Prince Are Barred by Foreign
     Official Immunity ......................................................................................................20

     A.   The Saudi Crown Prince Is Entitled to Head-of-State Immunity .........................22

     B.   The Saudi Crown Prince Is Entitled to Conduct-Based Immunity .......................26

III. Oueiss Fails To State a Federal Statutory Claim Against the Saudi Crown
     Prince .........................................................................................................................29

     A.   Oueiss Fails To Establish Jurisdiction or State a Claim Under the
          ATS ...................................................................................................................29

     B.   Oueiss Fails To State a Claim Under the CFAA .................................................33

C.     Oueiss Fails To State a Claim Under the SCA ....................................................34

     1.     The SCA's Private Cause of Action Does Not Extend to Secondary Liability..................................................................................35

     2.     A Personal Phone Is Not a Facility Through Which an Electronic Communication Service Is Provided .......................................36

     3.     Data Stored on a Personal Phone Is Not in "Electronic Storage"..........................................................................................37

IV.     Oueiss Fails To State a Claim Under Florida Common Law ...........................................38

     A.     Oueiss Alleges No Plausible Basis To Attribute the Acts That Injured Her to the Saudi Crown Prince..................................................................38

     1.     Oueiss Does Not Plausibly Allege That the Saudi Crown Prince Directed the Alteration or Release of Files from Her Phone.............................................................................................39

     2.     Oueiss Does Not Plausibly Allege That the Saudi Crown Prince Directed Other Defendants To Make Derogatory Statements About Her .............................................................................42

     B.     Oueiss Fails Plausibly To Allege the Elements of Each Cause of Action.........................................................................................................44

     1.     Oueiss Fails To State a Claim for Intentional Infliction of Emotional Distress..................................................................44

     2.     Oueiss Fails To State a Claim for Intrusion Into a Private Quarter ................................................................................45

     3.     Oueiss Fails To State a Claim for Public Disclosure of Private Facts......................................................................................46

     4.     Oueiss Fails To State a Claim for Defamation ..........................................47

     5.     Oueiss Fails To State a Claim for Civil Conspiracy ..................................48

CONCLUSION.............................................................................................................48

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES

*Agency for Health Care Admin. v. Associated Indus. of Florida, Inc.*,
    678 So. 2d 1239 (Fla. 1996)....................................................................................45, 46

*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va.),
    *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019), *pet. for cert. pending*,
    No. 19-648 (U.S. Nov. 15, 2019)....................................................................................25

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)............31, 40, 43

*Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156 (Fla. 2003) ............................................................45

*Aluminum Warehousing Antitrust Litig.*, *In re*, 90 F. Supp. 3d 219
    (S.D.N.Y. 2015) ...............................................................................................................12

*Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102 (1987) ..........................19, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................ 7, 15, 16, 38, 40, 41, 43

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................7, 11, 12, 16, 17, 38, 41, 42

*Berisha v. Lawson*, 973 F.3d 1304 (11th Cir. 2020), *pet. for cert. pending*,
    No. 20-1063 (U.S. Feb. 1, 2021)....................................................................................47

*Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773 (2017) ...... 9-10, 15, 17, 19

*Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350 (D.D.C. Mar. 31, 2020),
    *appeal pending*, No. 20-7040 (D.C. Cir. argued Feb. 26, 2021) ......................................35

*Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020)......................27, 28, 323

*Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167 (11th Cir. 2017)........................................33

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)................................................................15

*Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009) ..................................................................7

*Cape Publ'ns, Inc. v. Hitchner*, 549 So. 2d 1374 (Fla. 1989)......................................................46

*Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185 (11th Cir. 2014)............................... 29-30

*Casado v. Miami-Dade Cty.*, 340 F. Supp. 3d 1320 (S.D. Fla. 2018) ..........................................44

*Celestine v. Capital One*, 2017 WL 2838185 (S.D. Fla. June 30, 2017)......................................46

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994).................................................................................35

*Clarity Servs., Inc. v. Barney*, 698 F. Supp. 2d 1309 (M.D. Fla. 2010) ........................................14

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
891 F. Supp. 2d 13 (D.D.C. 2012) ....................................................... 35-36

*Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*,
2011 WL 1232986 (S.D. Fla. Mar. 30, 2011)....................................................41

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) .........................................................9, 11

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837
(2d Cir. 1998)...............................................................................35

*Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) ..........................23

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, No. 19-368
(U.S. Mar. 25, 2021) .........................................................9, 13, 19

*Fraser v. Smith*, 594 F.3d 842 (11th Cir. 2010).................................................15

*Fridovich v. Fridovich*, 598 So. 2d 65 (Fla. 1992) ...............................................45

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009)..................................................................25

*Garback v. Lossing*, 2010 WL 3733971 (E.D. Mich. Sept. 20, 2010) ........................................36

*Garcia v. City of Laredo*, 702 F.3d 788 (5th Cir. 2012).........................................36, 38

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ...................................................47

*Google Inc. Cookie Placement Consumer Privacy Litig., In re*, 806 F.3d 125
(3d Cir. 2015)...........................................................................36, 38

*Grand Jury Proceedings, Doe No. 700, In re*, 817 F.2d 1108 (4th Cir. 1987)............................21

*Hall v. Sargeant*, 2019 WL 1359485 (S.D. Fla. Mar. 26, 2019) ........................................46

*Hamilton Grp. Funding, Inc. v. Basel*:

311 F. Supp. 3d 1307 (S.D. Fla. 2018) ...............................................14

2019 WL 3765340 (S.D. Fla. Aug. 7, 2019).........................................33

*Hammer v. Sorensen*, 824 F. App'x 689 (11th Cir. 2020).........................................45, 46

*Hanson v. Denckla*, 357 U.S. 235 (1958) ........................................................................9

*Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231
    (S.D. Fla. 2015)...........................................................................................................11

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................8, 9

*Holland Am. Line, Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450 (9th Cir. 2007) ............9

*Honig v. Kornfeld*, 339 F. Supp. 3d 1323 (S.D. Fla. 2018) ..........................................48

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................19

*iPhone Application Litig., In re*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012)....................36

*Jama v. INS*, 22 F. Supp. 2d 353 (D.N.J. 1998)...........................................................31

*Jensen v. Cablevision Sys. Corp.*, 2017 WL 4325829 (E.D.N.Y. Sept. 27, 2017) .......34

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) .....................................................29

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008) ..........................................47

*Jordan v. Miami-Dade Cty.*, 439 F. Supp. 2d 1237 (S.D. Fla. 2006) ..........................40

*Keeton v. Hustler Mag., Inc.*, 465 U.S. 770 (1984) .....................................................13

*Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio, Dec. 7, 1978) .............22

*Kim v. Jung Hyun Chang*, 249 So. 3d 1300 (Fla. 2d Dist. Ct. App. 2018)...................44

*Kline v. Kaneko*, 535 N.Y.S.2d 303 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom.*
    *Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989)...........21, 23

*Krinsk v. SunTrust Banks, Inc.*, 2010 WL 11475608 (M.D. Fla. Jan. 8, 2010) ............41

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156
    (2020) ........................................................................................................................20

*Madara v. Hall*, 916 F.2d 1510 (11th Cir. 1990)........................................................13

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009)...............................................................21

*McElmurray v. Consolidated Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244
    (11th Cir. 2007)...........................................................................................................7

*Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985) ....................44, 46

*Mohamed v. Palestinian Auth.*, 566 U.S. 449 (2012) ..................................................31

*Nayak v. Star Clippers, Ltd. Corp.*, 2014 WL 1406438 (S.D. Fla. Mar. 11, 2014),
    *report and recommendation adopted*, 2014 WL 1413497 (S.D. Fla. Apr.
    10, 2014) ........................................................................................................................41

*O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009) ............................................................7

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ...........................12

*Oginsky v. Paragon Props. of Costa Rica LLC*, 784 F. Supp. 2d 1353
    (S.D. Fla. 2011)................................................................................................................41

*Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2009)................8, 9, 17, 18, 19

*Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d 1303 (M.D. Fla.), *aff'd*,
    627 F.3d 833 (11th Cir. 2010) ........................................................................................46

*Papasan v. Allain*, 478 U.S. 265 (1986) ..............................................................................42

*Peiqing Cong v. ConocoPhillips Co.*, 250 F. Supp. 3d 229 (S.D. Tex. 2016)..............................31

*Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681 (Fla. 2015)................................................48

*Raney v. Aware Woman Ctr. for Choice, Inc.*, 224 F.3d 1266 (11th Cir. 2000)..........................11

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945)..................................................22, 26

*Resdev, LLC v. Lot Builders Ass'n, Inc.*, 2005 WL 1924743
    (M.D. Fla. Aug. 10, 2005) ..............................................................................................34

*Rubinson v. Rubinson*, 474 F. Supp. 3d 1270 (S.D. Fla. 2020) ......................................45

*S-Fer Int'l, Inc. v. Stonesheets, LLC*, 2016 WL 8808749 (S.D. Fla. July 22, 2016) ...................41

*Samantar v. Yousuf*, 560 U.S. 305 (2010)................................................................20, 22

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)......................................................................28

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014)........................................21

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009) ....................................31

*Snow v. DirecTV, Inc.*, 450 F.3d 1314 (11th Cir. 2006) ............................................7, 12

*Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, 2019 WL 462481
    (N.D. Ill. Feb. 6, 2019)....................................................................................................34

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)....................................................29, 30, 31, 32

*South Florida Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402 (11th Cir. 1996) ...........................40

*Spacil v. Crowe*, 489 F.2d 614 (5th Cir. 1974) ............................................................22

*Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724 (11th Cir. 2011) ..................................45

*Stoddard v. Wohlfahrt*, 573 So. 2d 1060 (Fla. 5th Dist. Ct. App. 1991) ......................46

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300
 (2d Cir. 1981) .............................................................................................................25

*Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327 (S.D. Fla. 2016) ........................8, 9

*Tyne ex rel. Tyne v. Time Warner Entm't Co.*, 204 F. Supp. 2d 1338 (M.D. Fla.
 2002), *aff'd*, 425 F.3d 1363 (11th Cir. 2005) ..................................................46, 47

*United States v. Noriega*:

 746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) ...................21

 117 F.3d 1206 (11th Cir. 1997) ...................................................................................22

*United States v. Steiger*, 318 F.3d 1039 (11th Cir. 2003) ............................................36

*United Techs. Corp. v. Mazer*, 556 F.3d 1260 (11th Cir. 2009) .....................................7

*Vista Mktg., LLC v. Burkett*, 999 F. Supp. 2d 1294 (M.D. Fla. 2014) ..........................35

*Walden v. Fiore*, 571 U.S. 277 (2014) .....................................................................13, 15

*Watts v. City of Hollywood*, 146 F. Supp. 3d 1254 (S.D. Fla. 2015) ............................46

*Williams v. City of Minneola*, 619 So. 2d 983 (Fla. 5th Dist. Ct. App. 1993) ..............44

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ..............9, 13, 19-20

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) .............................................21, 22, 23


INTERNATIONAL CASES

*Apex Global Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) .................................25

*Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct.
 Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments:*
 *Public International Law*, 53 Int'l & Comp. L.Q. 769 (July 2004) .......................26

*Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.),
 *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7
 (D.D.C. July 24, 2006) ..............................................................................................26

TREATIES, STATUTES, AND RULES

Convention on Cybercrime of the Council of Europe, Nov. 23, 2001, C.E.T.S. No. 185, *available at* https://www.coe.int/en/web/conventions/full-list/-/conventions/rms/0900001680081561 ............................................................17, 30, 31, 32

International Covenant on Civil and Political Rights, Dec. 16, 1999, 999 U.N.T.S. 171 ...............31

Alien Tort Statute, 28 U.S.C. § 1350 ...............................................................................2, 14, 29, 30, 31, 32

Computer Fraud and Abuse Act of 1986, Pub. L. No. 99-474, 100 Stat. 1213 .......................2, 14, 15, 29, 33

    18 U.S.C. § 1030(a)(2)(C) ..........................................................................................................14, 33

    18 U.S.C. § 1030(c)(4)(A)(i)(I) ........................................................................................................14

    18 U.S.C. § 1030(c)(4)(A)(i)(II)-(V) ................................................................................................14

    18 U.S.C. § 1030(g) ...................................................................................................................14, 33

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1330, 1602-1611) ...............................28

Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ........................2, 14, 29, 34, 35, 36, 37, 38

    § 2701(a) .....................................................................................................................................14

    § 2701(a)(1) .......................................................................................................................34, 36, 37

    § 2707(a) ...............................................................................................................................34, 35

18 U.S.C. § 2510(15) ...................................................................................................................36

18 U.S.C. § 2510(17)(A) ...............................................................................................................37

18 U.S.C. § 2510(17)(B) ...............................................................................................................37

Fla. Stat.:

    § 48.193 .........................................................................................................................................18

    § 48.193(1)(a)(2) ...........................................................................................................................18

State Immunity Act 1978, c. 33 (U.K.) ..........................................................................................25

Fed. R. Civ. P.:

    Rule 4(k)(2) .................................................................................................................8, 9, 12, 17, 18

Rule 8 ................................................................................................................41

Fed. R. Evid. 201(b)(1) ......................................................................................3


ADMINISTRATIVE MATERIALS

Br. for the United States as Amicus Curiae, *Mutond v. Lewis*, No. 19-185
    (U.S. May 26, 2020), 2020 WL 2866592 ..........................................26

Central Intelligence Agency, *The World Factbook:  Saudi Arabia*,
    https://www.cia.gov/the-world-factbook/countries/saudi-arabia/
    #government ..........................................................................................25

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
    Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice (Sept. 7,
    2012), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No.
    38-1 (D. Conn. Sept. 7, 2012) ...................................................26, 29

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
    Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice
    (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-
    03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012) ...............26, 29

Readout, *Secretary Pompeo's Call with Saudi Crown Prince Mohammed bin
    Salman Al Saud*, Office of the Spokesperson, U.S. Dep't of State (Mar. 25,
    2020), https://2017-2021.state.gov/secretary-pompeos-call-with-saudi-
    crown-prince-mohammed-bin-salman-al-saud-4/index.html ............................24

Readout, *Secretary Pompeo's Meeting with Saudi Crown Prince Mohammed bin
    Salman*, Office of the Spokesperson, U.S. Dep't of State (Feb. 21, 2020),
    https://2017-2021.state.gov/secretary-pompeos-meeting-with-saudi-
    crown-prince-mohammed-bin-salman-2/index.html ......................................24

*Readout of President Donald J. Trump's Meeting with Crown Prince Mohammed
    Bin Salman of Saudi Arabia*, The White House (Mar. 21, 2018),
    https://trumpwhitehouse.archives.gov/briefings-statements/readout-
    president-donald-j-trumps-meeting-crown-prince-mohammed-bin-salman-
    saudi-arabia/ ........................................................................................24

*Remarks by President Trump and Crown Prince Mohammad Bin Salman of the
    Kingdom of Saudi Arabia Before Working Breakfast | Osaka, Japan*,
    The White House (June 28, 2019), https://trumpwhitehouse.archives.
    gov/briefings-statements/remarks-president-trump-crown-prince-
    mohammad-bin-salman-kingdom-saudi-arabia-working-breakfast-osaka-
    japan/ ..................................................................................................24

U.S. Dep't of State:

    *Digest of United States Practice in International Law* (CarrieLyn D. Guymon ed., 2015), *available at* https://2009-2017.state.gov/documents/ organization/258206.pdf ..........................................................................................26

    Office of the Spokesperson, *Secretary Blinken's Call with Qatari Deputy Prime Minister and Minister of Foreign Affairs Al-Thani* (Mar. 2, 2021), https://www.state.gov/secretary-blinkens-call-with-qatari-deputy-prime-minister-and-minister-of-foreign-affairs-al-thani/ .............................................................3


OTHER MATERIALS

Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance................23, 24

John B. Bellinger III, *The Dog that Caught the Car:  Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819 (2011).......................................22

*Broidy Cap. Mgmt. LLC v. State of Qatar*, No. 2:18-cv-02421-JFW-E (C.D. Cal.):

    First Am. Compl., ECF No. 47 (May 24, 2018) ................................................28

    Notice of Dismissal, ECF No. 223 (Sept. 24, 2018)........................................28

Antonia Chayes, *Rethinking Warfare:  The Ambiguity of Cyber Attacks*, 6 Harv. Nat'l Sec. J. 474 (2015) ..........................................................................31, 32

Compl., *WhatsApp Inc. v. NSO Grp. Techs. Ltd., et al.*, No. 4:19-cv-07123-PJH, ECF No. 1 (N.D. Cal. Oct. 29, 2019)........................................................................37

Brian Corcoran, *A Comparative Study of Domestic Laws Constraining Private Sector Active Defense Measures in Cyberspace*, 11 Harv. Nat'l Sec. J. 1 (2020)...................................................................................................................30, 32

Council of Europe, Chart of Signatures and Ratifications of Treaty 185, https://www.coe.int/en/web/conventions/full-list/-/conventions/treaty/185/ signatures?p_auth=JuuaOGSX ...............................................................................31

Hazel Fox, *The Law of State Immunity* (2d ed. 2008) ..................................................22

https://twitter.com/ghadaoueiss ........................................................................................3

Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61 (2010)....................................................................................21

Ghada Oueiss, *I'm a female journalist in the Middle East. I won't be silenced by online attacks*, Wash. Post (July 8, 2020), https://www.washingtonpost.com/opinions/2020/07/08/im-female-journalist-middle-east-i-wont-be-silenced-by-online-attacks/....................................................................................................................5

Press Release, *Readout of PM's Call with Mohammed bin Salman: 2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020 ....................................................................................24

Restatement (Second) of Agency (1958) ....................................................................................11

Restatement (Second) of Torts (1965) ...............................................................................44, 46

Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) ....................................................23

Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD) ....................................................23

Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD) ....................................................24

Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) ....................................................23

Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) ....................................................23

*Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html..................24-25

Stanford Internet Observatory Cyber Policy Center, *The Ministry of Made-Up Pages: Yemen-Based Actors Impersonate Government Agencies to Spread Anti-Houthi Content* (Aug. 6, 2020), *available at* https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/20200806_yemen_report.pdf..................................40

*Transcript: ABC News' George Stephanopoulos Interviews President Joe Biden*, ABC News (Mar. 17, 2021), https://abcnews.go.com/Politics/transcript-abc-news-george-stephanopoulos-interviews-president-joe/story?id=76509669.........................................................................................................................25

Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018), https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-20180410-story.html ............................................................................................25

4A Charles A. Wright et al., *Federal Practice and Procedure* (4th ed. 2015)............................11

Vivian Yee & Megan Specia, *Gulf States Agree to End Isolation of Qatar*, N.Y. Times (Jan. 5, 2021), https://www.nytimes.com/2021/01/05/world/middleeast/gulf-qatar-blockade.html ......................................................................3

Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*,
    44 Vand. J. Transnat'l L. 911 (2011)..........................................................................21, 22

## INTRODUCTION

Plaintiff Ghada Oueiss ("Oueiss"), an *Al Jazeera* journalist living in Qatar, alleges that she is the victim of a so-called "hack and leak operation."  Compl. ¶ 1.  In that "operation," she alleges, her personal iPhone was accessed without her authorization, and photos and videos stored on that device were stolen, altered, and circulated on social media "in an attempt to defame, disparage and intimidate" her, *id.* ¶ 3.  Oueiss lays blame for this purported "attack" at the feet of the "Saudi regime," *id.* ¶ 164, but singles out His Royal Highness Mohammed bin Salman bin Abdulaziz Al Saud, the Crown Prince of Saudi Arabia ("the Saudi Crown Prince"), as the alleged mastermind – alongside His Royal Highness Mohammed bin Zayed Al Nahyan, the Crown Prince of the United Arab Emirates ("the Emirati Crown Prince").

Setting aside – as familiar principles require – its much-repeated conclusory assertions, the Complaint alleges no concrete facts from which the Court could reasonably infer that the Saudi Crown Prince personally gave directions to or formed an agreement with any of the Defendants who purportedly hacked Oueiss's phone, who purportedly altered her photographs, or who disparaged her on social media.  Such allegations may garner press coverage for Oueiss. But, as a legal pleading, the Complaint falls far short of supporting personal jurisdiction over the Saudi Crown Prince in this District (or anywhere else in the United States), establishing subject-matter jurisdiction, or stating any claim for relief.

**I.**     The Complaint does not allege any contact between the Saudi Crown Prince and the United States or Florida that is relevant to this lawsuit.  Oueiss's allegations that four American citizens sent disparaging tweets about her from the United States and that an Emirati company attempted to access her phone while she was in California are insufficient to establish jurisdiction because she alleges no plausible factual basis to impute either activity to the Saudi

Crown Prince and because she fails to show that her claims arise out of or relate to any alleged contacts.  Accordingly, this Court lacks personal jurisdiction over the Saudi Crown Prince.

II.     The Court also lacks subject-matter jurisdiction under the doctrine of foreign official immunity.  The Saudi Crown Prince is the son and designated successor of His Majesty King Salman bin Abdulaziz Al Saud ("King Salman").  Together with King Salman, the Saudi Crown Prince sits at the apex of Saudi Arabia's government.  He is entitled to status-based immunity from any suit in U.S. court.  He is also entitled to conduct-based immunity in this case because Oueiss's claims against him arise from alleged official acts.

III.    The Complaint fails to state a claim for relief as to any of its three federal statutory causes of action.  All of those claims rest on allegations that other Defendants accessed Oueiss's phone without her authorization.  The Complaint fails plausibly to allege that the Saudi Crown Prince is responsible for that alleged conduct.  That failure is fatal to Oueiss's attempt to state a claim under the Alien Tort Statute ("ATS"), the Computer Fraud and Abuse Act of 1986 ("CFAA"), or the Stored Communications Act ("SCA").  Oueiss's claims under the ATS, the CFAA, and the SCA also fail for other reasons as well.

IV.     The Complaint also fails to state a claim for relief as to any of its five common-law causes of action.  Those claims rest wholly on conclusory and vague assertions that the Saudi Crown Prince directed or agreed to the actions of other Defendants who allegedly circulated stolen and altered photographs, or who posted negative comments about Oueiss on social media.  Such assertions are not entitled to an assumption of truth on a motion to dismiss. For those reasons and others, all of Ouiess's claims should be dismissed.

## SUMMARY OF RELEVANT ALLEGATIONS

Oueiss is a Lebanese journalist who lives in Qatar, where she works as an anchor and reporter for *Al Jazeera*, a prominent Qatari television network and news organization.  Compl. ¶¶ 17, 34; *see also* https://twitter.com/ghadaoueiss (Twitter profile listing location as Doha, Qatar) (last visited Mar. 17, 2021).  Oueiss describes herself as "a critic of the Saudi and UAE regimes."  Compl. ¶ 143; *see also id.* ¶ 19 (discussing her writing criticizing the Saudi government).  Saudi Arabia and the UAE severed diplomatic relations with Qatar in 2017, recently reestablishing them in 2021.[1]

The Complaint alleges that, as a result of Oueiss's criticism of Saudi Arabia and the UAE, she was harassed on social media.  *Id.* ¶ 22.  Among other things, she claims that photographs and videos were unlawfully obtained from her mobile phone, in some cases altered, and used to harass her on social media, particularly Twitter.  *Id.* ¶¶ 28, 31.

The Complaint alleges that Oueiss's mobile phone was "hacked," *e.g.*, *id.* ¶¶ 3, 29, during a period from September 2019 to May 2020, *id.* ¶ 168.  The hackers allegedly accessed files on her phone, including personal photographs and videos.  *Id.* ¶¶ 177, 181.  Oueiss asserts that, "[d]uring the first identified hacking events, which began on or about October 1, 2019, [she] was physically present in the U.S."  *Id.* ¶ 169.  She does not allege that the hackers successfully accessed any files from her phone during those first "hacking events."  Instead, the Complaint alleges that Oueiss's files were accessed in April 2020, but does not give her location during that

---

[1] *See* Vivian Yee & Megan Specia, *Gulf States Agree to End Isolation of Qatar*, N.Y. Times (Jan. 5, 2021), https://www.nytimes.com/2021/01/05/world/middleeast/gulf-qatar-blockade.html; *see also* U.S. Dep't of State, Office of the Spokesperson, *Secretary Blinken's Call with Qatari Deputy Prime Minister and Minister of Foreign Affairs Al-Thani* (Mar. 2, 2021), https://www.state.gov/secretary-blinkens-call-with-qatari-deputy-prime-minister-and-minister-of-foreign-affairs-al-thani/.  This Court may take notice of the status of diplomatic relations as "generally known within [its] territorial jurisdiction."  Fed. R. Evid. 201(b)(1).

time. *See id.* ¶¶ 171-177. Oueiss alleges, "[u]pon information and belief," that her phone was accessed by a private company based in the UAE, DarkMatter, and an Emirati national, Faisal Al Bannai. *Id.* ¶ 167.

The Complaint identifies three sets of allegedly leaked images. *First*, on February 17, 2020, Defendant Al Arabiya posted on Twitter the "Doctored Financial Photo," which Oueiss describes as an "inauthentic" photo that "purported to show" that the Emir of Qatar paid financial bonuses to *Al Jazeera* journalists, including Oueiss. *Id.* ¶¶ 185-186. Oueiss does not allege that this image derived from materials accessed from her phone.

*Second*, on April 19, 2020, anonymous Arabic-language social media accounts published the "Smoking Photos," which showed Oueiss "drinking alcohol and smoking with friends." *Id.* ¶ 192. These photographs allegedly were "stolen from Ms. Oueiss' mobile device as a result of the Defendants' hacking efforts." *Id.* Oueiss does not allege that any of these photos were altered in any way.

*Third*, on June 2, 2020, the same anonymous social media accounts posted the "Personal and Private Photos," *id.* ¶ 196, which consist of "screenshots of a private and personal video of Ms. Oueiss in a hot tub that her husband had recorded on Ms. Oueiss' mobile device," *id.* ¶ 183. These photographs were allegedly "stolen from Ms. Oueiss' mobile device," and some allegedly "were doctored to make it falsely appear as though Ms. Oueiss were naked at the time of the video." *Id.* ¶¶ 181, 183.

The Complaint alleges that all three sets of images circulated widely on Twitter, along with messages from various Twitter users criticizing Oueiss. *Id.* ¶¶ 187, 193-194, 197. Some of the tweets about the Personal and Private Photos included a "false and repugnant narrative that

Ms. Oueiss was engaged in sexual acts at the time of the video in exchange for financial incentives." *Id.* ¶ 183.

The Complaint alleges that the harassment consisted of "tens of thousands of tweets." *Id.* ¶ 143.  Oueiss has stated in a *Washington Post* op-ed that she cites in her Complaint, *id.* ¶ 245, that her photographs were tweeted "more than 40,000 times."[2]  Most of these tweets originated from Saudi Arabia and the UAE.[3]  The Complaint does not allege that the Saudi Crown Prince has ever mentioned Oueiss in a Twitter post or in any other communication, nor does it allege that the Saudi Crown Prince even knew who she was.

The Complaint focuses many of its allegations on the Twitter activity of four Defendants (collectively, the "U.S.-based Defendants"), who are ordinary Americans with modest Twitter followings:  Sharon Collins (who resides in Florida), *id.* ¶¶ 38-45, 203-212; Hussam Al-Jundi (who resides in Florida), *id.* ¶¶ 46-50, 213-221; Annette Smith (who resides in California), *id.* ¶¶ 51-55, 222-229; and Christanne Schey (who resides in Texas), *id.* ¶¶ 56-59, 230-233.  Each of the U.S.-based Defendants mentioned Oueiss in a small number of tweets:  less than 100 among them.  *See id.* ¶¶ 203, 213, 222, 230.  Only a miniscule percentage of the tweets that Oueiss contends were part of a harassment campaign – no more than 0.23% – were posted by the U.S.-based Defendants.  An even tinier percentage – no more than 0.14% – were posted by the two Defendants who reside in Florida (Collins and Al-Jundi, the "Florida-based Defendants").[4]

---

[2] Ghada Oueiss, *I'm a female journalist in the Middle East. I won't be silenced by online attacks*, Wash. Post (July 8, 2020), https://www.washingtonpost.com/opinions/2020/07/08/im-female-journalist-middle-east-i-wont-be-silenced-by-online-attacks/.

[3] As Oueiss wrote, "Saudi and Emirati public figures . . . amplified these posts, which led to ordinary Saudis and Emiratis joining the assault.  Within hours, the hashtag[ ] #Ghada_Jacuzzi . . . w[as] trending in Saudi Arabia."  *Id.*

[4] Oueiss alleges that Collins mentioned her in 12 tweets, Compl. ¶ 203, Al-Jundi mentioned her in 42 tweets and retweets, *id.* ¶ 213, Smith mentioned her in 24 tweets, *id.* ¶ 222,

The Complaint alleges that other websites posted the Personal and Private Photos. *Id.* ¶ 253. Oueiss does not allege who operated those websites, which she calls the "John Doe Websites." *Id.* ¶ 252. Instead, she asserts "[u]pon information and belief" that "discovery will reveal that the websites are operated by, or were created at the direction of, several named Defendants." *Id.* ¶ 255.

The Complaint also alleges in conclusory form that the U.S.-based Defendants were part of a global "Network," under the direction of the Saudi Crown Prince and the Emirati Crown Prince, to attack and defame her and other critics of the Saudi and UAE governments. *E.g.*, *id.* ¶¶ 37, 166. It further makes the conclusory allegation that the entire harassment campaign, including the hacking of her phone and the dissemination of derogatory messages on Twitter, were part of a "Conspiracy" encompassing all Defendants that was "spearheaded" by the Saudi Crown Prince and the Emirati Crown Prince. *E.g.*, *id.* ¶¶ 1, 123, 307, 313. The Complaint repeatedly labels other Defendants as "agents" of the Saudi Crown Prince, *e.g.*, *id.* ¶¶ 3, 27, 32-33, 37, 67, 90, 117, and asserts that others acted at the Saudi Crown Prince's "direction" or "behest," *e.g.*, *id.* ¶¶ 28-29, 79, 84-85, 103, 126, 130, 168, 194. In the whole of the Complaint, Oueiss does not allege any specific, nonconclusory directive, communication, or meeting between the Saudi Crown Prince and any other Defendant.

---

and Schey mentioned her in 12 tweets, *id.* ¶ 230. Thus, out of more than 40,000 tweets, 90 were sent by the U.S.-based Defendants (90 / 40,000 = 0.23%), and 54 by the Florida-based Defendants (54 / 40,000 = 0.14%). Many of those tweets by the U.S.-based Defendants were sent before the alleged harassment campaign began in February 2020. *See*, *e.g.*, *id.* ¶ 203 (earliest tweet from Collins mentioning Oueiss was August 30, 2019); *id.* ¶ 214 (discussing tweets from Al-Jundi in 2019); *id.* ¶ 222 (earliest tweet from Smith mentioning Oueiss was June 24, 2019); *id.* ¶ 230 (earliest tweet from Schey mentioning Oueiss was August 24, 2018).

## STANDARDS OF REVIEW

This motion seeks dismissal for lack of personal jurisdiction on the face of the Complaint, lack of subject-matter jurisdiction on the face of the Complaint, and failure to state a claim.  The standards for all three grounds are familiar and similar.

As to personal jurisdiction, a "plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  "[V]ague and conclusory allegations" are "insufficient" to carry that burden. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006).

As to subject-matter jurisdiction, this motion points to a lack of sufficient allegations to support jurisdiction.  *See McElmurray v. Consolidated Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (discussing "facial" and "factual" challenges to jurisdiction). "[W]here [a] defendant asserts a facial attack on the subject-matter jurisdiction alleged in the complaint, 'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'"  *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313-14 (11th Cir. 2009) (quoting *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009)).

Finally, a motion to dismiss for failure to state a claim tests whether "a complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand such a motion.  *Id.*

**ARGUMENT**

I.   **Oueiss Fails To Establish Personal Jurisdiction over the Saudi Crown Prince**

Oueiss is a Lebanese journalist based in Qatar.  She claims (1) that she was harassed through social media posts that predominantly originated in Saudi Arabia and the UAE; (2) that an Emirati company unlawfully obtained information from her phone; and (3) that defamatory and private material obtained from her phone was posted to Twitter – again, through posts mostly originating in Saudi Arabia and the UAE.  Oueiss attributes this scheme to the Saudi Crown Prince (among others) but does not allege that he personally engaged in any tortious actions in the United States – or, indeed, anywhere in the world.  Under settled law, Oueiss has failed to plead the minimum contacts with the forum (either the United States or Florida) required by due process and by traditional notions of fair play and substantial justice.  Accordingly, this Court lacks personal jurisdiction over the Saudi Crown Prince.

A.   **Oueiss's Federal Statutory Claims Do Not Arise out of or Relate to Contacts Between the Saudi Crown Prince and the United States**

Due process requires that, for an American court to exercise jurisdiction over a nonresident defendant, that defendant must have "established 'certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  For her claims arising out of federal law, Oueiss asserts jurisdiction over the Saudi Crown Prince under Federal Rule of Civil Procedure 4(k)(2).  Compl. ¶ 125.  For such claims, "the applicable forum for the minimum contacts analysis is the United States."  *Oldfield*, 558 F.3d at 1220 (citation omitted).  As this Court explained in *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327 (S.D. Fla. 2016) (Moore, C.J.), "it is a rare occurrence when a court invokes jurisdiction

under" Rule 4(k)(2), and those rare cases have involved "'defendants with . . . extensive contacts

to this country.'" *Id.* at 1337 (quoting *Holland Am. Line, Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d

450, 462 (9th Cir. 2007)).

As Oueiss does not and cannot claim that this Court has general jurisdiction over the

Saudi Crown Prince,[5] the type of personal jurisdiction relevant here is specific jurisdiction.

> To permit the exercise of specific jurisdiction, there must first exist "some
> act by which the defendant purposefully avails itself of the privilege of
> conducting activities within the forum . . . , thus invoking the benefits and
> protections of its laws."  Secondly, the defendant's contacts with the forum must
> relate to the plaintiff's cause of action or have given rise to it.

*Oldfield*, 558 F.3d at 1220 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (footnote

omitted; alteration in original).  A forum contact that is "fortuitous" or results from the plaintiff's

"unilateral activity" does not qualify as purposeful availment; for example, the U.S. Supreme

Court has held that no personal jurisdiction over a car dealer existed in Oklahoma where a

plaintiff purchased a car in New York and drove it to Oklahoma before suffering a collision in

Oklahoma.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 298 (1980).

Even where minimum contacts exist, a plaintiff must go further and show "a strong

'relationship among the defendant, the forum, and the litigation,'" which the Supreme Court has

described as "the 'essential foundation' of specific jurisdiction."  *Ford Motor Co. v. Montana*

*Eighth Jud. Dist. Ct.*, No. 19-368, slip op. 12 (U.S. Mar. 25, 2021) (quoting *Helicopteros*

*Nacionales*, 466 U.S. at 414); *see Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S.

---

[5] General jurisdiction, which permits a court "to hear any and all claims against" a
defendant, is created by "only a limited set of affiliations with a forum," generally only an
individual's domicile and a corporation's place of incorporation and principal place of business.
*Daimler AG v. Bauman*, 571 U.S. 117, 122, 137 (2014) (citation omitted).  The Saudi Crown
Prince is not domiciled in the United States, and the Complaint does not allege that he is.

Ct. 1773, 1781 (2017) ("What is needed . . . is a connection between the forum and the specific claims at issue.").

Here, Oueiss alleges no contacts between the Saudi Crown Prince and the United States that are relevant to her claims. She does not allege that he personally entered the United States, communicated with anyone in the United States, or took any actions directed at the United States that are relevant to her claims. At most, Oueiss alleges that others committed a few peripheral acts in the United States, but alleges no basis either to attribute those acts to the Saudi Crown Prince as the minimum contacts or to establish the strong relationship between those acts and her claims that due process requires.

### 1. The Alleged "Hacking Event" While Oueiss Was in the United States Does Not Support Personal Jurisdiction over the Saudi Crown Prince

Oueiss's allegations that "the first identified hacking events, which began on or about October 1, 2019," occurred when Oueiss and her phone were in the United States, Compl. ¶ 169, do not support personal jurisdiction over the Saudi Crown Prince.

To begin with, Oueiss alleges no basis to attribute to the Saudi Crown Prince any unauthorized access to her phone. She instead asserts, in conclusory form and "[u]pon information and belief," that an Emirati company, DarkMatter, accessed her phone. *Id.* ¶ 167. To attribute DarkMatter's alleged actions to the Saudi Crown Prince for jurisdictional purposes, she relies on assertions that DarkMatter acted "under [his] direction." *Id.* ¶ 126. But she alleges no contact, communication, meeting, agreement, or relationship between the Saudi Crown Prince and DarkMatter except in purely conclusory terms. *See id.* ¶ 124 ("working in concert"); *id.* ¶ 126 ("under the direction of"); *id.* ¶ 129 ("directing"); *id.* ¶ 168 ("at [the] . . . behest"); *id.* ¶ 267 ("utiliz[ing]"); *id.* ¶ 309 ("conspir[ing]"). Such generic allegations do not "nudge[ ]" her

jurisdictional theory "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Generally speaking, "'[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Raney v. Aware Woman Ctr. for Choice, Inc.*, 224 F.3d 1266, 1268 (11th Cir. 2000) (per curiam) (quoting Restatement (Second) of Agency § 1(1) (1958)).  Though "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction," *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014), courts "will look closely to determine whether an agency relationship actually existed or whether it simply was alleged in an attempt to establish jurisdiction," 4A Charles A. Wright et al., *Federal Practice and Procedure* § 1069.4, at 334 (4th ed. 2015); *see also Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1241 (S.D. Fla. 2015) (in corporate context, "[a]gency-based personal jurisdiction" requires showing that the principal exercised a "high and very significant" level of "control") (citation omitted).

To attribute DarkMatter's purported actions to the Saudi Crown Prince using an agency theory, the Complaint would need to allege concrete facts that, if true, would show that he and DarkMatter each consented that DarkMatter would act on his behalf and subject to his control.  It does not and cannot do so.  To the contrary, its allegations concerning DarkMatter focus on purported ties between DarkMatter and the government of the UAE, such as overlapping office space and personnel, and past activities that DarkMatter has allegedly undertaken for the UAE. *See* Compl. ¶¶ 70-71, 150-154.  The Complaint then attempts to extend those ties to Saudi Arabia by alleging that the UAE and Saudi Arabia have "joint . . . interests," *id.* ¶ 150, and "joint objectives" *id.* ¶ 154; and that the UAE has "target[ed] groups and individuals opposed jointly by

11

the UAE and Saudi Arabia," *id.* ¶ 163.  Without conceding that those generalized allegations

plausibly suggest anything relevant, they certainly do not show that DarkMatter consented to act

for the Saudi Crown Prince personally or that he consented it would do so.

Nor can Oueiss attribute DarkMatter's alleged act to the Saudi Crown Prince by alleging

an overarching "Conspiracy" against her.  *Id.* ¶ 1.  As a threshold matter, Rule 4(k)(2) does not

authorize attribution of contacts based solely on allegations that a foreign defendant conspired

with others who acted in the United States.  *See In re Aluminum Warehousing Antitrust Litig.*, 90

F. Supp. 3d 219, 227 (S.D.N.Y. 2015) (reasoning that personal jurisdiction under Rule 4(k)(2)

depends on whether "an entity has in fact engaged in some affirmative act directed at the forum,"

without reference to "a separate and certainly nebulous 'conspiracy jurisdiction' doctrine"); *see

also Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *5 n.8 (D.D.C. Mar. 19, 2019)

("[A]s far as the Court is aware, no court to have considered the question has permitted the

assertion of conspiracy jurisdiction under Rule 4(k)(2).").

In any event, even if conspiracy jurisdiction were available under Rule 4(k)(2), the

Complaint fails to allege any factual basis supporting its assertions that the Saudi Crown Prince

and DarkMatter reached an unlawful agreement.  It is well settled that, to survive a motion to

dismiss, a plaintiff must make "allegations plausibly suggesting (not merely consistent with)

agreement," *Twombly*, 550 U.S. at 557, and that "vague and conclusory allegations" that a

defendant "conspired with and acted through . . . agents" are "insufficient to establish a prima

facie case of personal jurisdiction," *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006).

Again, the lack of any concrete contact, communication, meeting, agreement, or relationship

between the Saudi Crown Prince and DarkMatter is fatal to Oueiss's allegations here.  At most,

the Complaint suggests that Saudi Arabia and the UAE were political allies and had common

political interests due to their dispute with Qatar.  *See*, *e.g.*, Compl. ¶ 150 (alleging a "joint Saudi and UAE interest[]" in "diminishing the influence of *Al Jazeera* and its employees"); *id.* ¶ 162 (alleging that "Saudi Arabia has relied on the UAE as a close ally to conduct offensive cyber effects operations").  That is nowhere near enough to support blanket attribution to Saudi Arabia of anything the UAE allegedly does.  Still less can such allegations support Oueiss's attempts to attribute the alleged acts of a private Emirati company to the Saudi Crown Price personally.

Further, the Complaint alleges no facts to show that the alleged access attempts were "'purposefully directed'" at the United States.  *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).  Oueiss is a journalist based in Qatar, Compl. ¶ 34, who alleges her phone was hacked as part of a broader effort to target employees of the Qatari news organization *Al Jazeera*, *id.* ¶¶ 150, 154, 186, 191, 199.  Oueiss contends that this effort was motivated by political conflict between Qatar and a coalition of nations including Saudi Arabia and the UAE.  *Id.* ¶ 151.  If all that were true, it would show that the access to her phone was directed at Qatar, not at the United States.  Her allegation that she temporarily brought her phone into the United States is a mere "contact[] between the *plaintiff . . .* and the forum," *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis added) – the type of "fortuitous" circumstance deriving from Oueiss's own "unilateral activity" that cannot support personal jurisdiction, *World-Wide Volkswagen*, 444 U.S. at 295, 298.

Finally, the Complaint also fails to allege that any access or attempted access that occurred while Oueiss was in the United States had the "strong relationship" to her claims that due process requires as an "essential foundation" for personal jurisdiction.  *Ford Motor*, slip op. 12 (internal quotation marks omitted).  Each of Oueiss's federal statutory claims requires Oueiss to plead and prove not only that Defendants attempted to access her phone, but also that

13

Defendants obtained files from her phone.  For example, Oueiss's CFAA cause of action requires, among other things, that "the defendant . . . 'obtained information from [a] computer' " and " 'caused a loss of at least $5,000.00 to [Plaintiff].' "  *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1313 (S.D. Fla. 2018) (quoting *Clarity Servs., Inc. v. Barney*, 698 F. Supp. 2d 1309, 1313 (M.D. Fla. 2010)) (third alteration in original).[6]  Similarly, her SCA cause of action requires that Defendants "obtain[ed], alter[ed], or prevent[ed] authorized access to a[n] . . . electronic communication."  18 U.S.C. § 2701(a).  And although the elements of her purported ATS cause of action are murkier – because no such cause of action exists, *see infra* Part III.A – she contends that "obtaining personal and confidential information," Compl. ¶ 129, was the injury she suffered from the supposed tort.

Although the Complaint alleges generally that "hacking events" that "began on or about October 1, 2019," occurred while Oueiss was in the United States, it does not allege that the hackers actually accessed her phone during that time.  *Id.* ¶ 169; *see also id.* ¶ 195 (stating that certain "disparaging photographs" were "published" "approximately eight months after Defendants had first *attempted* to hack Ms. Oueiss' mobile device") (emphasis added).  Instead, the Complaint alleges that files were accessed between April 14 and April 20, 2020, including the megabytes of data allegedly taken, the number of files allegedly accessed, and the timing of the access down to the minute.  *See id.* ¶¶ 171-177.  There is no allegation that Oueiss was present in the United States during the April 2020 period in which she alleges that Defendants

---

[6] *Hamilton Group* discussed the elements of a private cause of action under 18 U.S.C. § 1030(g) for an alleged violation of § 1030(a)(2)(C), the same provision of the statute on which Oueiss relies.  *Compare* 311 F. Supp. 3d at 1313 *with* Compl. ¶¶ 266-271.  The $5,000 loss requirement comes from § 1030(c)(4)(A)(i)(I), which § 1030(g) cross-references and which ¶ 269 of the Complaint alleges.  A private cause of action may also rely on the factors set forth in § 1030(c)(4)(A)(i)(II)-(V), but the Complaint does not allege that any of those factors apply here.

obtained files from her device.  Accordingly, this is a case with "no . . . injury" in the forum and "no injury to residents of the forum," *Bristol-Myers Squibb*, 137 S. Ct. at 1782 – a classic example of a fatal disconnect between alleged contacts and a plaintiff's claims.[7]

### 2.   Tweets Sent by Other Defendants from the United States Do Not Support Personal Jurisdiction over the Saudi Crown Prince

Oueiss also alleges that four residents of the United States, including two Florida residents, sent derogatory tweets about her.  *See* Compl. ¶¶ 203-233.  She does not allege that the Saudi Crown Prince himself sent any relevant tweets, from the United States or elsewhere.  Contacts that other Defendants may have with the United States are irrelevant.  A court "may not ascribe the forum contacts of one co-defendant to another in determining the existence of personal jurisdiction." *Fraser v. Smith*, 594 F.3d 842, 852 (11th Cir. 2010).  That is because the relationship to the forum creating jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden*, 571 U.S. at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "[C]ontacts between the plaintiff (or third parties) and the forum" do not create jurisdiction.  *Id.*

Just as with DarkMatter, the Complaint's allegations that the individuals who tweeted about Oueiss in the United States did so as the Saudi Crown Prince's "agents," *e.g.*, Compl. ¶¶ 37, 165, 200, 249-250, are too vague and conclusory to support a prima facie case for personal jurisdiction.  The Complaint does not (and could not in good faith) set forth any concrete facts that could support a plausible inference that the Saudi Crown Prince and the U.S.-based Defendants personally agreed they would act on his behalf and subject to his control.  Instead, it

---

[7] Paragraph 266 of the Complaint, which recites the elements of Oueiss's CFAA claim, asserts that "access" occurred "during a time when Plaintiff and her mobile device were physically present in California, among other locations."  That statement is purely conclusory and is "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

relies on mere conclusory statements that the U.S.-based Defendants were "agents" of, *id.* ¶¶ 27, 32, 37, 121, 200, 249, were "instructed" or "directed" by, *id.* ¶¶ 208, 219, 226, 233, or acted "at the behest" of, *id.* ¶¶ 130, 243, the Saudi Crown Prince and others.[8]  Such "formulaic recitation[s] of the elements of a cause of action," *Twombly*, 550 U.S. at 555, are insufficient on their face.

The Complaint's theory that the U.S.-based Defendants were part of a "Conspiracy" against her likewise falls short.  Such allegations are not only irrelevant under Rule 4(k)(2), *see supra* p. 12, but also insufficiently pleaded.  The Complaint makes rhetorical assertions that the Saudi Crown Prince – among many others – was involved in a conspiracy against Oueiss, such as claims that he "spearheaded" an operation against her, Compl. ¶ 1; "orchestrated . . . [an] attack" on her, *id.* ¶ 164; and "hatched a plan" to invade her privacy and defame her, *id.* ¶ 166.  But those "'naked assertion[s]' [are] devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (second alteration added).  Nowhere does the Complaint plead facts to show agreement (or even communication), direct or indirect, between the Saudi Crown Prince and any Defendant who tweeted about Oueiss in the United States.

The Complaint's attempts to establish connections between the U.S.-based Defendants and the Saudi Crown Prince only underscore its deficiencies.  As to each such Defendant there is a boilerplate allegation that, since 2018, many of their "interactions" on Twitter relate to "praising Saudi Arabia, UAE, [the Saudi Crown Prince], or other acolytes of [the Saudi Crown Prince]," and "attacking dissidents of the Saudi and UAE regimes."  Compl. ¶¶ 41, 50, 55, 59. The Complaint contains no specific allegation that any of the U.S.-based Defendants have ever

---

[8] Several of these references use hedged phrasing that the U.S.-based Defendants were "instructed by [other] Defendants, operating under the directed strategy of" the Saudi Crown Prince, Compl. ¶¶ 208, 219, 226, 233, suggesting that Oueiss and her counsel know they have no good-faith basis to allege any personal direction from the Crown Prince.

met the Saudi Crown Prince, communicated with him, or reached any agreement with him or anyone acting on his behalf.  Nor are there allegations that the Saudi Crown Prince even knew who the U.S. Based-Defendants were.  Allegations that these individuals tweeted or retweeted positive messages about Saudi Arabia and the UAE – and negative messages about Qatar and Oueiss – do not support a plausible inference of a globe-spanning conspiracy involving the leaders of the two countries.  The "obvious alternative explanation," *Twombly*, 550 U.S. at 567, is that these Defendants tweeted, retweeted, or liked because they and their friends believed those messages and wished to endorse them.[9]

Oueiss's allegations based on tweets by the U.S.-based Defendants also fail to establish personal jurisdiction under Rule 4(k)(2) because she cannot show the "requisite connection between the forum and the *specific* claims at issue."  *Bristol-Myers Squibb*, 137 S. Ct. at 1781 (emphasis added).  Rule 4(k)(2) provides jurisdiction only for "a claim that arises under federal law," Fed. R. Civ. P. 4(k)(2); *see Oldfield*, 558 F.3d at 1218, and Oueiss's federal-law claims all arise from the alleged unauthorized access to her phone.[10]  The tweets may form the basis for some of Oueiss's common-law claims, but they did not and could not injure her in a way that

---

[9] For one U.S.-based defendant, Sharon Collins, the Complaint alleges that she visited Riyadh in December 2019, had dinner with another Defendant who is a private Saudi citizen (Awwad Al Otaibi), and tweeted favorably about Saudi Arabia during the meeting.  *See* Compl. ¶¶ 42-44.  Oueiss further alleges "[u]pon information or belief" that the Saudi Crown Prince, "Saudi 24 TV, Al Arabiya, Al Qahtani, Al-Asaker and the Recruiting Defendants," a defined term that includes four more individual Defendants, "funded" Collins's trip "as part of the Conspiracy."  *Id.* ¶ 45.  A nakedly speculative assertion that one or more of nine Defendants paid for travel is insufficient to support Oueiss's conspiracy allegations.

[10] *See* Compl. ¶¶ 128-129, 260-262 (Convention on Cybercrime purportedly made actionable under Alien Tort Statute); *id.* ¶¶ 266-268 (Computer Fraud and Abuse Act); *id.* ¶ 274 (Stored Communications Act).  The Complaint briefly mentions the "dissemination" of Oueiss's "confidential and sensitive information" to the "public" under her first cause of action, *id.* ¶ 260, but cites no provision of the Convention on Cybercrime that addresses dissemination of private information.  *See generally infra* Part III.A.

gave rise to any of her federal causes of action.  Further, according to Oueiss's own allegations, the tweets by U.S.-based Defendants amounted to a mere 0.23% of the total tweets disparaging her, *see supra* pp. 5-6 & n. 4 – a miniscule fraction that could not plausibly account for any perceptible part of her alleged emotional and reputational injuries.

### B. Oueiss's Non-Statutory Claims Do Not Arise out of or Relate to Contacts Between the Saudi Crown Prince and Florida

Because Rule 4(k)(2) applies only to federal claims, Oueiss must plead a separate basis of personal jurisdiction as to her non-statutory claims.  The only such basis mentioned in her Complaint is the Florida long-arm statute.  *See* Compl. ¶ 130 (citing Fla. Stat. § 48.193).  Specifically, she asserts that all Defendants "either personally, through an agent, and as a result of their participation in the Conspiracy . . . committed a tortious act within this state."  *Id.*  The only acts alleged within Florida are the tweets of two individual Defendants who live in Florida.  *See* Compl. ¶ 130.  Those tweets cannot support jurisdiction over the Saudi Crown Prince.

As set forth above, the Complaint does not allege that the Saudi Crown Prince personally committed any act within Florida, and its conspiracy and agency allegations are too vague and conclusory to make out a prima facie case.  Accordingly, it does not satisfy the statutory requirement of "a tortious act within this state."  Fla. Stat. § 48.193(1)(a)(2).  Because the same insufficiently pleaded conspiracy and agency theories are also the Complaint's sole basis for establishing the Saudi Crown Prince's minimum contacts with Florida and purposeful availment of or purposeful direction towards Florida, the Complaint also fails to meet those constitutional requirements.  *See Oldfield*, 558 F.3d at 1220; *supra* pp. 15-17.[11]

---

[11] The Complaint alleges that the Twitter username of Defendant Sharon Collins, which includes the 305 area code, is "further evidence" that she was "recruited . . . to disseminate harmful information about critics of the Saudi regime . . . in Florida."  Compl. ¶ 212.  Even if this strained contention were plausible on its face (which it is not), there would still be no allegation that the Saudi Crown Prince was even aware of Collins's username.

The Complaint also fails to plead the required "strong relationship," *Ford Motor*, slip op. 12 (internal quotation marks omitted), between the Saudi Crown Prince, Oueiss's claims, and the State of Florida. Tweets of Florida-based Defendants amounted to 0.14% – less than one-seventh of 1% – of the total number of tweets that allegedly harassed Oueiss. *See supra* pp. 5-6 & n.4. Further, although the Complaint alleges that Defendants' tweets were "also accessed by" other, unnamed "Florida residents on Twitter," *e.g.*, Compl. ¶ 302, it does not attempt to show that any such access was any greater or more significant than in any other state, or indeed any other jurisdiction anywhere else in the world. Taking all this as a whole, the facts alleged in the Complaint fail to establish any "affiliation between the forum and the underlying controversy" *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (citation omitted), that would make the exercise of jurisdiction here fair or reasonable.

### C.   Traditional Notions of Fair Play and Substantial Justice Weigh Against the Exercise of Personal Jurisdiction over the Saudi Crown Prince

The Court's inquiry can end by finding either that the Saudi Crown Prince has no relevant minimum contacts with the United States or with Florida or that Oueiss's claims do not arise from or relate to any such contacts. If the Court reaches the issue, it should also determine, applying the standards set forth by the Supreme Court and the Eleventh Circuit, that "traditional notions of 'fair play and substantial justice,'" *Oldfield*, 558 F.3d at 1221 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)), weigh against jurisdiction.

The starting point for the substantial-justice inquiry is "the burden placed on the defendant," which for an "international defendant[ ]" includes the "'unique burdens placed upon one who must defend oneself in a foreign legal system.'" *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 114 (1987)). Here, that burden is not offset by any interest of the "forum" in "adjudicating th[is] dispute." *World-Wide Volkswagen*, 444 U.S. at

292.  Neither the United States nor Florida has any substantial interest in resolving a quarrel between a Lebanese journalist working out of Qatar and a senior official of the Kingdom of Saudi Arabia.  Nor can Oueiss show that the United States or Florida offers particularly "convenient or effective relief" or promises an "efficient resolution" of this case.  *Id.*  Both Oueiss and most of the Defendants reside outside the United States.

Finally, "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction," as well as "the Federal interest in . . . foreign relations," *Asahi*, 480 U.S. at 115 (emphasis omitted), also weigh against the exercise of jurisdiction here. This case arises from a multi-year diplomatic dispute between Saudi Arabia, the UAE, Qatar, and several other nations, which has only recently calmed to the point of restoring diplomatic relations.  *See supra* p. 3 & n.1.  Although Oueiss styles herself a "dissident[]" of the Saudi and UAE "regimes," Compl. ¶ 163, she is in fact a loyal employee of a Qatari media company whose views favor Qatar in its disputes with its neighbors.  Neither the United States nor Florida has any interest in asserting jurisdiction over this politically charged case based on allegations that an unsuccessful hacking attempt occurred while Oueiss was visiting the United States or that a tiny fraction of the allegedly defamatory social media posts were tweeted or retweeted here.

## II.     Oueiss's Claims Against the Saudi Crown Prince Are Barred by Foreign Official Immunity

The immunity of foreign officials from suit in the United States is governed by the federal common law of foreign sovereign immunity.  *See Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).  "The doctrine of common law foreign immunity distinguishes between two types of immunity:  status-based and conduct-based immunity."  *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020).

Status-based immunity includes head-of-state immunity.  "Grounded in customary international law, the doctrine of head of state immunity provides that a head of state is not subject to the jurisdiction of foreign courts, at least as to official acts taken during the ruler's term of office."  *United States v. Noriega*, 746 F. Supp. 1506, 1519 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997).  Head-of-state immunity also protects other "'"holders of high-ranking office in a State" such as "the Head of Government and Minister of Foreign Affairs,"'" *Yousuf v. Samantar*, 699 F.3d 763, 769 n.2 (4th Cir. 2012) (quoting Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*, 44 Vand. J. Transnat'l L. 911, 921 n.42 (2011)), and "immediate members of their families," *Kline v. Kaneko*, 535 N.Y.S.2d 303, 304 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom. Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989).  "[D]uring their time in office," individuals entitled to head-of-state immunity "are absolutely immune from suit in the United States," *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C. 2014), "'regardless of the substance of the claim,'" *Lewis*, 918 F.3d at 145 (quoting Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61, 64 (2010)).  "[T]he rationale of head-of-state immunity is to promote comity among nations by ensuring that leaders can perform their duties without being subject to detention, arrest or embarrassment in a foreign country's legal system."  *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987).

Conduct-based immunity, by contrast, "does not depend on tenure in office."  *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009); *see Yousuf*, 699 F.3d at 769 (noting that conduct-based immunity "applies to current and former foreign officials").  This immunity for "foreign official[s] derives from the immunity of the State" and is based on the "'classical'" theory that "'any act performed by the individual as an act of the State enjoys the immunity which the State

21

enjoys.'" *Id.* at 774 (quoting Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008)); *see Samantar*, 560 U.S. at 322 ("[W]e do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity.").

In general, courts "look to the Executive Branch for direction" on foreign official immunity claims. *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). Where, however, the Executive Branch has not spoken on the issue, "courts should make an independent determination regarding immunity." *Id.* (discussing *Spacil v. Crowe*, 489 F.2d 614, 618-19 (5th Cir. 1974)); *see Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-35 (1945) ("In the absence of recognition of the claimed immunity by the political branch of the government, the courts may decide for themselves whether all the requisites of immunity exist.").

### A.     The Saudi Crown Prince Is Entitled to Head-of-State Immunity

"'Under customary international law, head of state immunity encompasses the immunity of not only the heads of state but also of other "holders of high-ranking office in a State" such as "the Head of Government and Minister of Foreign Affairs."'" *Yousuf*, 699 F.3d at 769 n.2 (quoting Yelin, *Head of State Immunity*, 44 Vand. J. Transnat'l L. at 921 n.42); *see* John B. Bellinger III, *The Dog that Caught the Car:  Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819, 830 (2011) (describing immunity as "absolute for sitting heads of state, heads of government, foreign ministers, and other high-ranking officials"). Such immunity also protects a head of state's immediate family, including a son or daughter who is that head's designated successor. *See, e.g.*, *Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419, at *3 (N.D. Ohio Dec. 7, 1978) (dismissing a case against the Prince of Wales; observing that, when a defendant is "the

22

Heir Apparent to the throne of the possibly offended nation, the foreign policy ramifications are extraordinary").[12]

The Saudi Crown Prince is the son of, and designated successor to, the King of Saudi Arabia. He has immunity based not only on his immediate familial relationship to the King, but also on his own "high-ranking office," *Yousuf*, 699 F.3d at 769 n.2 (citation omitted), as set out in Saudi Arabia's Basic Law of Governance (the "Basic Law").[13] Under the Basic Law, the Saudi Crown Prince is the only individual with the prerogative to exercise sovereign power alongside or on behalf of the King. *See* Basic Law art. 65 ("The King may delegate some powers of authority to the Crown Prince by Royal Decree."). Moreover, "[s]hould the King happen to travel abroad, he shall issue a Royal Decree to deputize the [Saudi] Crown Prince to manage the affairs of state and look after the interests of the people, as set out in the Royal Decree." *Id.* art. 66. That has happened several times since the Saudi Crown Prince assumed his current position.[14] In his capacity as "Acting King," the Saudi Crown Prince himself has issued a number of Royal decrees, including one appointing Her Royal Highness Princess Reema bint Bandar bin Sultan bin Abdulaziz Al Saud as Saudi Arabia's Ambassador to the United States.[15]

Upon the King's death, "the [Saudi] Crown Prince shall assume the Royal powers until a pledge of allegiance (bay'a) is given," at which point the Crown Prince would formally become

---

[12] *See also Kline*, 535 N.Y.S.2d at 304 (wife of President of Mexico); *Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) (wife of President of the Philippines).

[13] An English-language version of the Basic Law is available on the Embassy's website. *See* Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance.

[14] *See*, *e.g.*, Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) (instructing the Saudi Crown Prince "to manage state affairs, and to look after the interests of the people during [the King's] travel outside the Kingdom"); Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) (same); Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) (same).

[15] Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD).

the King.  *Id.* art. 5.  The Saudi Crown Prince currently occupies numerous high-ranking

positions in Saudi Arabia's government, serving as its Deputy Prime Minister, Minister of

Defense, Chairman of the Council for Economic and Development Affairs, and Chairman of the

Council of Political and Security Affairs.[16]  He thus exercises day-to-day control over critical

sectors of that government.

Consistent with his high-ranking status, the Saudi Crown Prince routinely engages

directly with the U.S. government's most senior officials, including the President[17] and the

Secretary of State.[18]  The leaders of other countries have also received him as a visiting head of

state.[19]  President Biden has not met personally with the Crown Prince, but has described him as

---

[16] *See* Ex. A (press release on Royal Orders "[s]electing Prince Mohammed bin Salman bin Abdulaziz Al Saud as [Saudi] Crown Prince, appointing him as Deputy Premier, and continuing as Minister of Defense"); Ex. B (press release on Royal Decree "appointing Prince Mohammed bin Salman bin Abdulaziz Al Saud as the Minister of Defense"); Ex. C (Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD) and appointing the Saudi Crown Prince as Chairman of the Council of Political and Security Affairs).  Exhibits A through C are submitted together with the accompanying Declaration of Gregory G. Rapawy.

[17] *See, e.g.*, *Remarks by President Trump and Crown Prince Mohammad Bin Salman of the Kingdom of Saudi Arabia Before Working Breakfast | Osaka, Japan*, The White House (June 28, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-crown-prince-mohammad-bin-salman-kingdom-saudi-arabia-working-breakfast-osaka-japan/; *Readout of President Donald J. Trump's Meeting with Crown Prince Mohammed Bin Salman of Saudi Arabia*, The White House (Mar. 21, 2018), https://trumpwhitehouse.archives.gov/ briefings-statements/readout-president-donald-j-trumps-meeting-crown-prince-mohammed-bin-salman-saudi-arabia/.

[18] *See, e.g.*, Readout, *Secretary Pompeo's Call with Saudi Crown Prince Mohammed bin Salman Al Saud*, Office of the Spokesperson, U.S. Dep't of State (Mar. 25, 2020), https://2017-2021.state.gov/secretary-pompeos-call-with-saudi-crown-prince-mohammed-bin-salman-al-saud-4/index.html; Readout, *Secretary Pompeo's Meeting with Saudi Crown Prince Mohammed bin Salman*, Office of the Spokesperson, U.S. Dep't of State (Feb. 21, 2020), https://2017-2021.state.gov/secretary-pompeos-meeting-with-saudi-crown-prince-mohammed-bin-salman-2/index.html.

[19] *See* Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/ government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020; *Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera (Feb. 17, 2019),

an "acting head of state" in public remarks.[20]  Moreover, Executive Branch agencies have

recognized that the Saudi Crown Prince, although second to the King, can properly be described

as a "chief of state" and "head of government" when discussing Saudi Arabia.[21]

The practice of other states confirms that the position of Crown Prince of Saudi Arabia is

entitled to status-based immunity.  In *Apex Global Management Ltd. v. Fi Call Ltd.*, [2013]

EWHC 587 (Ch), the High Court of Justice of England and Wales observed that, under

"customary international law," an "heir to the throne . . . undertaking the offices of state on

behalf of the sovereign or head of State" would be entitled to "immunity" from suit.  *Id.* ¶ 107.[22]

Although *Apex Global* held that two other members of Saudi Arabia's royal family were not

entitled to status-based immunity, the English court indicated that it would have reached a

different result for the Crown Prince of Saudi Arabia, who "can officially exercise power in

Saudi Arabia alongside or on behalf of the King."  *Id.* ¶ 122.  English courts have also extended

immunity under customary international law to the Defense Minister of the State of Israel and

---

https://www.aljazeera.com/news/2019/02/saudi-crown-prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html; Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018), https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-20180410-story.html.

[20] *Transcript:  ABC News' George Stephanopoulos Interviews President Joe Biden*, ABC News (Mar. 17, 2021), https://abcnews.go.com/Politics/transcript-abc-news-george-stephanopoulos-interviews-president-joe/story?id=76509669 (last visited Mar. 24, 2021).

[21] Central Intelligence Agency, *The World Factbook:  Saudi Arabia*, https://www.cia.gov/the-world-factbook/countries/saudi-arabia/#government (last visited Mar. 16, 2021).

[22] The *Apex Global* court was interpreting the United Kingdom's State Immunity Act, but explained that the Act was "intended to reflect the common law and customary international law position."  [2013] EWHC 587, ¶ 107.  Indeed, federal courts have looked to the Act, and British courts' interpretations of it, as indicative of international law.  *See, e.g., Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009); *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 956-57 (E.D. Va.), *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019), *pet. for cert. pending*, No. 19-648 (U.S. Nov. 15, 2019).

the Minister for Commerce and International Trade of the People's Republic of China – each less senior in their governments than is the Crown Prince of Saudi Arabia.[23]

### B.   The Saudi Crown Prince Is Entitled to Conduct-Based Immunity

In making an independent determination regarding conduct-based immunity, this Court should act "in conformity to the principles accepted by the department of the government charged with the conduct of our foreign relations." *Hoffman*, 324 U.S. at 35. That is, the Court should adjudicate the Saudi Crown Prince's claim of conduct-based immunity in accordance with the principles that the State Department has set out in other cases.

The settled policy of the State Department is that "acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity," so that such foreign officials are entitled to conduct-based immunity. Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 2 (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012).[24] Under that policy, the Saudi Crown Prince is entitled to immunity in this case.

---

[23] *See Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct. Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments: Public International Law*, 53 Int'l & Comp. L.Q. 769, 771-73 (July 2004); *Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.), *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7 (D.D.C. July 24, 2006).

[24] *See also* Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 1 (Sept. 7, 2012) ("In a case involving conduct-based immunity, . . . the Department of State generally presumes that actions taken by a foreign official exercising the powers of his office were taken in his official capacity."), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No. 38-1 (D. Conn. Sept. 7, 2012); Br. for the United States as Amicus Curiae at 10-11, *Mutond v. Lewis*, No. 19-185 (U.S. May 26, 2020), 2020 WL 2866592 (citing examples dating from 1794 to 2019); U.S. Dep't of State, *Digest of United States Practice in International Law* ch. 10, § B(3), at 426 (CarrieLyn D. Guymon ed., 2015), *available at* https://2009-2017.state.gov/documents/organization/258206.pdf.

As set forth in Parts I and III, the Complaint generally asserts – without any concrete factual allegations – that the Saudi Crown Prince was among those who "spearheaded" the alleged "hack and leak operation" against Oueiss, Compl. ¶ 1, and that others allegedly involved acted "at [his] behest" and "under [his] control," *e.g.*, *id.* ¶¶ 29, 84-85, 103, 130, 215.  The Saudi Crown Prince maintains as a matter of law that these allegations are insufficient and denies as a matter of fact that he directed anyone, at any time, to access Oueiss's personal smartphone. Assuming solely for purposes of the immunity analysis that he did so, however, any such actions would have been taken in his official government role.

As Saudi Arabia's Minister of Defense and the Chairman of its Council of Political and Security Affairs, the Saudi Crown Prince has broad authority to take actions to protect his country's national security and its interests in international relations.  Saudi Arabia's breakdown in diplomatic relations with Qatar from 2017 to 2021 unquestionably implicated those interests. If the Saudi Crown Prince had ordered an intelligence operation against Oueiss as part of Saudi Arabia's strategy in that dispute, he would have been exercising his official authority and acting in an official capacity on behalf of the Saudi Arabian government.  The Complaint itself acknowledges this, intertwining references to the "Saudi regime" with references to the Saudi Crown Prince and drawing no distinction between the actions of one and the other.  *See*, *e.g.*, Compl. ¶ 164 (alleging that the "Saudi regime . . . orchestrated a calculated and multi-faceted attack against" Oueiss); *see also id.* ¶¶ 27, 64, 76, 82 (similar references to the "Saudi regime").

The Ninth Circuit's recent decision in *Broidy Capital Management, LLC v. State of Qatar*, 982 F.3d 582, 595 (9th Cir. 2020), is instructive.  Like this case, *Broidy* centered on allegations of a "hack and leak operation" by foreign government agents against critics of that government.  Compl. ¶ 1.  In that case, the alleged agents worked for Qatar – rather than Saudi

Arabia or the UAE – but the allegations otherwise resemble those in Oueiss's Complaint.  *Broidy* involved an investment firm and its U.S.-based CEO (Broidy), who

> sued the State of Qatar and various other defendants after Qatari agents allegedly hacked into Plaintiffs' computer servers, stole their confidential information, and leaked it to the media in a retaliatory effort to embarrass Broidy and thereby to neutralize his ability to continue to effectively criticize the Qatari regime and its alleged support of terrorism.

982 F.3d at 586.  Describing Qatari agents' alleged conduct targeting Broidy and his firm as "forms of cyberespionage," *id.* at 592, and "espionage action," *id.* at 595, the Ninth Circuit concluded that the Foreign Sovereign Immunities Act of 1976 barred the claims against the State of Qatar.  *Id.* at 596.  In rejecting Broidy's arguments, the Ninth Circuit explained that a foreign government engaged in "clandestine surveillance and espionage against a national of another nation in that other nation" "is not exercising 'powers that can also be exercised by private citizens,' but rather is employing powers that . . . are 'peculiar to sovereigns.' "  *Id.* at 594 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)).  The Ninth Circuit further made clear that its ruling did not require it either to decide whether "the alleged conduct actually occurred" or to "endorse[] . . . any such conduct."  *Id.* at 596.

In *Broidy*, Qatar was named as the defendant.  But the result would have been the same if the plaintiffs had instead named senior Qatari officials and sought to hold them personally liable.[25]  A foreign official who allegedly directs a so-called "hack and leak operation" against an alleged government critic, Compl. ¶ 1, is exercising sovereign power – powers available to him only by virtue of the foreign official's government office.  An official sued for exercising such

---

[25] The *Broidy* plaintiffs initially named one of the younger brothers of the Emir of Qatar as a defendant accused of "specifically direct[ing] . . . the efforts to attack and discredit Plaintiff Broidy," First Am. Compl. ¶ 27, *Broidy Capital Mgmt. LLC v. State of Qatar*, No. 2:18-cv-02421-JFW-E, ECF No. 47 (C.D. Cal. May 24, 2018), but later voluntarily dismissed him, *see* Notice of Dismissal, *id.*, ECF No. 223 (C.D. Cal. Sept. 24, 2018).

powers is immune under the policy of the State Department as set forth in *Ragsdale* and *Zedillo*.
Here, the Saudi Crown Prince is entitled to conduct-based immunity, and all claims against him
should be dismissed.

## III.   Oueiss Fails To State a Federal Statutory Claim Against the Saudi Crown Prince

Oueiss fails to state a valid claim against the Saudi Crown Prince under any of her federal
statutory causes of action:  the Alien Tort Statute (ATS), the Computer Fraud and Abuse Act of
1986 (CFAA), or the Stored Communications Act (SCA).  Each of these claims is based on
alleged unauthorized access to Oueiss's phone, but Oueiss alleges no plausible basis to attribute
that access to the Saudi Crown Prince.  *See supra* Part I.A.1.  Each of her federal statutory
claims fails for that reason alone, and for independent reasons as well.

### A.   Oueiss Fails To Establish Jurisdiction or State a Claim Under the ATS

The Alien Tort Statute grants federal courts "jurisdiction of any civil action by an alien
for a tort only, committed in violation of the law of nations or a treaty of the United States."
28 U.S.C. § 1350.  It "creat[es] no new causes of action," but instead creates jurisdiction over
claims to enforce a "narrow set" of customary international law norms that are "specific,
universal, and obligatory" and have "definite content and acceptance among civilized nations."
*Sosa v. Alvarez-Machain*, 542 U.S. 692, 721, 724, 729-32 (2004).  Courts set "a high bar [for]
new private causes of action for violating international law" because "attempts by federal courts
to craft remedies for the violation of new norms of international law would raise risks of adverse
foreign policy consequences."  *Id*. at 727-28; *see also Jesner v. Arab Bank, PLC*, 138 S. Ct.
1386, 1403 (2018) ("[T]here is an argument that a proper application of *Sosa* would preclude
courts from ever recognizing any new causes of action under the ATS."); *Cardona v. Chiquita*

*Brands Int'l, Inc.*, 760 F.3d 1185, 1190 (11th Cir. 2014) ("*Sosa* counsels against recognizing a tort not previously recognized as within ATS jurisdiction.").

This Court does not have ATS jurisdiction, and Oueiss does not state a claim for a violation of the law of nations, because Oueiss has not alleged any conduct that violates "a binding customary norm" of international law. *Sosa*, 542 U.S. at 736. Oueiss invokes the ATS based on the alleged "hacking of [her] mobile device and the subsequent dissemination of [her] confidential and sensitive information to the public," Compl. ¶ 260, but there is no specific, universal, and obligatory norm of international law that prohibits such conduct. We are aware of no court that has even considered, much less accepted, the novel ATS cause of action for "hacking" or "cybercrime" that Oueiss invites this Court to create.

The Complaint errs in relying on the Convention on Cybercrime of the Council of Europe, Nov. 23, 2001, C.E.T.S. No. 185, commonly known as the Budapest Convention,[26] in an attempt to show "universally agreed upon legal principles" prohibiting unauthorized access of mobile devices. Compl. ¶¶ 128-129. The Budapest Convention does not establish norms that are "obligatory," "universal," or "specific." *Sosa*, 542 U.S. at 732. The Convention itself is not self-executing, and therefore its provisions are inherently non-obligatory. Instead, it calls on its signatories to "adopt such legislative and other measures as may be necessary" to criminalize a variety of computer-related conduct. *See* Budapest Convention arts. 2-13; *see also*, *e.g.*, Brian Corcoran, *A Comparative Study of Domestic Laws Constraining Private Sector Active Defense Measures in Cyberspace*, 11 Harv. Nat'l Sec. J. 1, 17-18 (2020) ("no formal source of international law directly bars" cyber-attacks because "the Budapest Convention is not self-executing"). Accordingly, the Budapest Convention does "not itself create obligations

---

[26] A copy of the Budapest Convention can be found at https://www.coe.int/en/web/conventions/full-list/-/conventions/rms/0900001680081561.

enforceable in the federal courts." *Sosa*, 542 U.S. at 735.  Non-self-executing treaties like the Budapest Convention are not a valid "basis in law" for recognizing ATS claims. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (per curiam); *see id.* (declining to recognize a "claim for cruel, inhuman, degrading treatment or punishment" under the International Covenant on Civil and Political Rights).[27]

The norms that the Budapest Convention endorses are also not "universally accepted," *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1262 (11th Cir. 2009), *abrogated on other grounds by Mohamed v. Palestinian Auth.*, 566 U.S. 449 (2012), and unauthorized computer access is not among the "handful of heinous actions," *Sosa*, 542 U.S. at 732 (citation omitted), like genocide and state-sponsored torture, that the ATS reaches.  Only 65 nations have ratified the Budapest Convention.[28]  Those 65 do not include Saudi Arabia, the UAE, or Qatar – the nations most relevant to this case.  They also do not include China, India, Brazil, Indonesia, Mexico, South Korea, or Russia.  As 8 of the world's 20 largest economies and 15 of its 20 largest countries by population have not yet joined the Budapest Convention, it cannot be said to reflect the views of the entire "civilized world." *Sosa*, 542 U.S. at 725; *see also* Antonia Chayes, *Rethinking Warfare:  The Ambiguity of Cyber Attacks*, 6 Harv. Nat'l Sec. J. 474, 512-13 (2015) (describing the Budapest Convention as "far from universal").

Any international norms about unauthorized access to computers also are not yet and may never be "sufficiently definite to support a cause of action." *Sosa*, 542 U.S. at 732; *see also*

---

[27] *See also Peiqing Cong v. ConocoPhillips Co.*, 250 F. Supp. 3d 229, 234 (S.D. Tex. 2016) ("A private party has no right of action for violations of United States treaties unless the treaty is self-executing and provides for a private right of action."); *Jama v. INS*, 22 F. Supp. 2d 353, 362 (D.N.J. 1998) (non-self-executing treaties "do not per se provide a basis for suit under the [ATS]").

[28] *See* Council of Europe, Chart of Signatures and Ratifications of Treaty 185, https://www.coe.int/en/web/conventions/full-list/-/conventions/treaty/185/signatures?p_auth=JuuaOGSX.

Corcoran, 11 Harv. Nat'l Sec. J. at 18 (explaining that Budapest Convention "only . . . hint[s] at an emerging set of norms").  For example, the Budapest Convention's signatories agreed to adopt legislation criminalizing "access to . . . a computer system without right," Budapest Convention art. 2, but the Convention does not define what "right" means, in the context of state actors or otherwise.  By embracing such ambiguities, the Convention eschewed "set[ting] clear standards."  Chayes, 6 Harv. Nat'l Sec. J. at 512.  Indeed, Oueiss's own allegations illustrate the vagueness of the norm she asserts.  She alleges that the "law of nations" was violated by "the hacking of [her] mobile device *and* the subsequent dissemination of [her] confidential and sensitive information to the public," Compl. ¶ 260 (emphasis added), but does not and cannot cite any provision of the Budapest Convention that relates to a norm against the dissemination of information to the public.

The Ninth Circuit's decision in *Broidy* is again relevant.  As set forth above, *supra* pp. 27-28, that case affirmed the dismissal of claims similar to those here, involving allegations that Qatar and its agents "hacked into Plaintiffs' computer servers, stole their confidential information, and leaked it to the media in a retaliatory effort to embarrass [one of the Plaintiffs] and thereby to neutralize his ability to continue to effectively criticize the Qatari regime." *Broidy Cap. Mgmt.*, 982 F.3d at 586.  As part of its analysis of Qatar's sovereign immunity, the Ninth Circuit considered whether such conduct "violate[d] either Qatari law or applicable international law," and held as a matter of law that it did not.  *Id.* at 592; *see id.* (citing *Sosa* and holding that the alleged conduct did not violate "any sufficiently clear rule of international law that would impose a mandatory and judicially enforceable duty").  That reasoning is correct, and this Court should follow it in dismissing Oueiss's claims under the ATS.

### B.      Oueiss Fails To State a Claim Under the CFAA

The CFAA prohibits "intentionally access[ing] a computer without authorization . . . and thereby obtain[ing]," among other things, "information from any protected computer."  18 U.S.C. § 1030(a)(2)(C).  A "person who suffers damage or loss by reason of a violation of [§ 1030] may maintain a civil action against the violator."  *Id.* § 1030(g).  The Complaint does not allege that the Saudi Crown Prince accessed Oueiss's phone or obtained any of her information.  Its assertions that he directed, or agreed with, others who do so rely on conclusory statements unsupported by facts.  *See supra* Part I.A.1.

In addition, the Complaint does not satisfy the CFAA's statutory loss threshold for bringing a private cause of action.  Under 18 U.S.C. § 1030(g), such an action may be brought "only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of [§ 1030](c)(4)(A)(i)."  The Complaint relies on subclause (I), which requires a loss of "at least $5,000 in value."  *See* Compl. ¶ 269; *supra* p. 14 & n.6.  As the Eleventh Circuit has explained, "loss" under the CFAA must fall into one of two categories:  "the direct costs of responding to the violation," and "consequential damages resulting from interruption of service."  *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); *see also Hamilton Grp. Funding, Inc. v. Basel*, 2019 WL 3765340, at *4 (S.D. Fla. Aug. 7, 2019) (rejecting a plaintiff's request for CFAA damages "not directly responsive to the breach itself").

Here, Oueiss alleges no service interruption and fails to plead that her direct response costs exceeded $5,000.  Instead, the Complaint alleges that she suffered

> losses, *including but not limited to* costs associated with repairing the integrity of [her] personal mobile device after the hacking, and *other consequential damages*, such as evaluating the intrusion, theft and *conduct relating to the theft*, as well as *damages related thereto* . . . in excess of $5,000.

33

Compl. ¶ 269 (emphases added).  That vague and conclusory assertion stops short of saying that Oueiss's costs of "repair[ ]"or "evaluating" the alleged "intrusion" or "theft" exceeded $5,000. Instead, it says only that her *total* damages, including "other consequential damages" arising from "evaluating" the "conduct relating to the theft" and other "damages related thereto," exceeded $5,000.  That is, the Complaint appears to be counting – or, at the very least, is impermissibly vague about whether it is counting – indirect and noneconomic forms of damage, such as alleged emotional and reputational injuries, in its effort to meet the $5,000 threshold.

Alleged damages for "invasion of . . . privacy are not cognizable economic losses under the CFAA."  *Jensen v. Cablevision Sys. Corp.*, 2017 WL 4325829, at *13 (E.D.N.Y. Sept. 27, 2017); *cf. Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, 2019 WL 462481, at *4 (N.D. Ill. Feb. 6, 2019) (same result for "loss in the form of stolen proprietary information"); *Resdev, LLC v. Lot Builders Ass'n, Inc.*, 2005 WL 1924743, at *4 (M.D. Fla. Aug. 10, 2005) (same for "a trade secret's exclusivity value").  Where, as here, a complaint cannot reach the statutory damage threshhold without counting losses that are not cognizable, it should be dismissed for failure to state a claim.  That was the result in *Jensen, see* 2017 WL 4325829, at *12-15, and in *Solutions Team*, 2019 WL 462481, at *4-5.  This Court should likewise dismiss the Complaint here.

### C.    Oueiss Fails To State a Claim Under the SCA

The SCA prohibits "intentionally access[ing] without authorization a facility through which an electronic communication service is provided" and "thereby obtain[ing] . . . a wire or electronic communication while it is in electronic storage in such system."  18 U.S.C. § 2701(a)(1).  A person "aggrieved" by a violation may recover damages if "the conduct constituting the violation is engaged in with a knowing or intentional state of mind."  *Id.* § 2707(a).  The Complaint fails to allege that the Saudi Crown Prince accessed Oueiss's phone

or obtained any of her information, or directed or agreed with others who did so.  *See supra* Part I.A.1.  Its SCA allegations also fall short for three more reasons.

### 1. The SCA's Private Cause of Action Does Not Extend to Secondary Liability

As discussed, the Complaint does not allege that the Saudi Crown Prince personally engaged in any conduct that violates the SCA.  Instead, it asserts in conclusory form that he conspired with or directed others who did so.  *See supra* Part I.A.1.  Even if those assertions were plausibly pleaded (which they are not), they would be legally insufficient because the SCA does not authorize secondary liability, such as aiding-and-abetting or conspiracy.

The text of the SCA authorizes "recover[y] from the person or entity . . . which engaged in [a] violation" of the statute.  18 U.S.C. § 2707(a).  It does not mention, and therefore does not impose, secondary liability.  "[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994); *see Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 841 (2d Cir. 1998) ("[T]he Supreme Court's reasoning in *Central Bank* applies not only to aiding and abetting claims, but to conspiracy claims as well.").

Numerous courts have concluded that "the SCA does not cover secondary liability, i.e., conspiracy claims."  *Vista Mktg., LLC v. Burkett*, 999 F. Supp. 2d 1294, 1296 (M.D. Fla. 2014); *see also Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *11 (D.D.C. Mar. 31, 2020) ("Every court to decide whether the [SCA] permits private actions under secondary liability theories . . . has held that it does not."), *appeal pending*, No. 20-7040 (D.C. Cir. argued Feb. 26, 2021); *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13,

27 (D.D.C. 2012) ("[I]n delineating the boundaries of criminal liability under Section 2701(a) and civil liability under Section 2707(a), Congress made no mention of conspiracy, aiding and abetting, or any other form of secondary liability."); *Garback v. Lossing*, 2010 WL 3733971, at *6 n.6 (E.D. Mich. Sept. 20, 2010) ("Congress did not expressly provide for secondary liability for violations of §§ 2701 and 2707 and [plaintiff] offers no persuasive authority for implying such liability.").  Those decisions are persuasive, and this Court should follow them.

      **2.**      **A Personal Phone Is Not a Facility Through Which an Electronic Communication Service Is Provided**

Under settled law, Oueiss's personal phone is not "a facility through which an electronic communication service is provided," 18 U.S.C. § 2701(a)(1), and so the data stored on it is not protected by the SCA.  The SCA defines an "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." *Id.* § 2510(15).  As the Third Circuit explained in *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125 (3d Cir. 2015), this language "most naturally describes network service providers," *id.* at 146, rather than end users of services.  Accordingly, a "facility" under the statute includes a third-party service provider's computer, but not a "personal computing device."  *Id.* (citation omitted).  Other courts have reached the same conclusion.  *See Garcia v. City of Laredo*, 702 F.3d 788, 790 (5th Cir. 2012) (SCA "does not apply to data stored in a personal cell phone"); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (SCA "does not appear to apply" to a person "hacking into [a] computer to download images and identifying information" where "there is no evidence to suggest that [the] computer maintained any 'electronic communication service' "); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1058 (N.D. Cal. 2012) (concluding that "iOS devices," such as iPhones,

"do not constitute 'facilit[ies] through which an electronic communication service is provided'")
(alteration in original) (quoting 18 U.S.C. § 2701(a)(1)).

Here, the specific files that the Complaint alleges Defendants obtained were files stored
on Oueiss's personal phone.  *See* Compl. ¶¶ 171-184.  Those allegations do not state a claim
under the SCA.  Some allegations also refer to "access[ ]" to "servers" belonging to the service
provider "WhatsApp," *id.* ¶¶ 170, 274, 309(c), but the Complaint does not allege that any
unlawfully obtained files were obtained from those servers.  The Complaint's references to
*WhatsApp Inc. v. NSO Group Technologies Limited, et al.*, No. 4:19-cv-07123-PJH (N.D. Cal.),
*cited in* Compl. ¶¶ 149 n.41, 170, crystallize the point.  The complaint in that case states that the
defendants there did not access content on WhatsApp's servers because the defendants were
"[u]nable to break WhatsApp's end-to-end encryption" and therefore accessed "messages and
other communications *after* they were decrypted on Target Devices."  Compl. ¶ 1, *WhatsApp*,
ECF No. 1 (N.D. Cal. Oct. 29, 2019) (emphasis added).  Taking at face value Oueiss's allegation
that similar methods were used against her, she does not state a claim under the SCA.

### 3.      Data Stored on a Personal Phone Is Not in "Electronic Storage"

Even if Oueiss's personal phone were a statutory "facility," the storage of data such as
photographs and videos on the iPhone XS would not fit within the SCA's definition of
"electronic storage."  The SCA contains a specific two-part definition of such storage:  "any
temporary, intermediate storage of a wire or electronic communication incidental to the
electronic transmission thereof," 18 U.S.C. § 2510(17)(A); and "any storage of such
communication by an electronic communication service for purposes of backup protection of
such communication," *id.* § 2510(17)(B).  As the Third and Fifth Circuits have explained, this
definition is an important piece of context showing that the statute protects information in the
context of a "third party network service provider[ ]" rather than on a "personal computing

device." *Google*, 806 F.3d at 146; *see Garcia*, 702 F.3d at 793.  Images and videos stored on Ouiess's phone were not in "temporary" or "immediate" storage incidental to any electronic transmission.  Nor was her phone an "electronic communication service" used "for purposes of backup protection."  For that reason as well, she fails to state a claim under the SCA.

## IV.    Oueiss Fails To State a Claim Under Florida Common Law

### A.    Oueiss Alleges No Plausible Basis To Attribute the Acts That Injured Her to the Saudi Crown Prince

Oueiss attempts to plead five causes of action under Florida common law:  intentional infliction of emotional distress, intrusion on private quarters, public disclosure of private facts, libel, and civil conspiracy.  For each of those causes of action, her Complaint fails to set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  As against the Saudi Crown Prince, the Complaint's primary, fatal defect is that it seeks to attribute a host of allegedly wrongful actions to him based on mere "[t]hreadbare recitals" of allegations that those actions were taken at his direction or at his behest.  *Id.*

Oueiss's allegations fall into three main categories:  (1) that her phone was accessed without authorization; (2) that files from her phone and other sources were publicly released, in some cases after being altered or doctored to cast her personal conduct in a false and derogatory light; and (3) that a group of Twitter users, who she refers to as the "Network," tweeted, retweeted, or commented on the publicly released files and made other derogatory statements about her.  For the reasons set forth in Part I.A.1, Oueiss has not alleged a basis to attribute to the Saudi Crown Prince any unauthorized access to her phone.  For the reasons that follow, she has also not alleged a basis to attribute to him any of the other allegedly tortious conduct.

### 1.   Oueiss Does Not Plausibly Allege That the Saudi Crown Prince Directed the Alteration or Release of Files from Her Phone

According to the Complaint, two sets of files were released after being obtained from Oueiss's phone:  the "Smoking Photos," which were "personal photographs of Ms. Oueiss smoking a cigarette and drinking alcohol with her friends," Compl. ¶ 182; and the "Personal and Private Photos," *id.* ¶ 196.  The "Personal and Private Photos" consisted of a video obtained from Oueiss's phone that was converted to "screenshots," "doctored to make it falsely appear as though Ms. Oueiss were naked at the time of the video," and then "disseminated . . . with the false and repugnant narrative that Ms. Oueiss was engaged in sexual acts at the time of the video in exchange for financial incentives." *Id.* ¶ 183.  The Complaint does not allege facts from which the Court can conclude that the Saudi Crown Prince engaged in that conduct – either by altering or releasing the photos, or by directing others to do so.  *See supra* Part I.A.1 (discussing agency and conspiracy theories).

The Complaint instead alleges that the photos were released by the Twitter account "@Uncareer1" and the Telegram account "@Uncareer20."  *See* Compl. ¶¶ 191-199.  The Complaint does not allege that any named or unnamed Defendant used the account @Uncareer1. Its attempt to support the claim that the activities of the @Uncareer accounts are attributable to the Saudi Crown Prince consists of alleging generally that "Saudi Arabia and the UAE routinely create and manage fake 'bot' accounts on social media as a means of engaging in cyber warfare with their enemies and critics," *id.* ¶ 188; that the alteration and release of Oueiss's photographs involved "the same means of cyber warfare," *id.*; and that "prominent Saudi journalists . . . encouraged Twitter users to follow @Uncareer1," including one whose account "displays a link to the Saudi Ministry of Media," *id.* ¶ 193.  To leap from those premises to the conclusion that the @Uncareer accounts were "part of [a] Conspiracy" involving, *id.* ¶ 188, or were deployed at

39

the personal "behest of," *id.* ¶ 194, the Saudi Crown Prince is a classic "'unwarranted deduction[]'" that a motion to dismiss does not "admit[] as true." *Aldana*, 416 F.3d at 1248 (quoting *South Florida Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 408 n.10 (11th Cir. 1996)).

The Complaint also alleges that unnamed persons posted the altered photos, together with a "false[] narrative" about them on a group of "John Doe Websites" operated by unnamed individuals.  Compl. ¶ 253.  The allegation that, "[u]pon information and belief, discovery will reveal that the websites are operated by, or were created at the direction of, several named Defendants," *id.* ¶ 255, cannot survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678-79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  Further, Oueiss's attempt to cite "[p]ublicly available information" to support her allegation, Compl. ¶¶ 256-257, is remarkably misleading.  She relies on a Stanford Internet Observatory report, which she says suggested that one of the websites, "Ahdathnet," had "potential connections to the Saudi Ministry of Labor."  *Id.* ¶ 257.  But she leaves out the title of that report – "The Ministry of Made-Up Pages" – and misdescribes its contents, which state that Ahdathnet was part of a "cluster of Pages [that] *pretended* to be the official Pages of the Saudi Ministry of Finance and the Ministry of Labor" but that "Facebook attributed . . . to individuals in Yemen."[29]  Nothing in the report even mentions the Saudi Crown Prince, much less attributes Ahdathnet and similar sites to him.

---

[29] Stanford Internet Observatory Cyber Policy Center, *The Ministry of Made-Up Pages: Yemen-Based Actors Impersonate Government Agencies to Spread Anti-Houthi Content* at 3, 20 (Aug. 6, 2020) (emphasis added), *available at* https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/20200806_yemen_report.pdf.  Because the Complaint "directly refer[s]" to the report, the Court may consider it on a motion to dismiss.  *Jordan v. Miami-Dade Cty.*, 439 F. Supp. 2d 1237, 1240 (S.D. Fla. 2006).

Nor does the Complaint plausibly allege any tie between the Saudi Crown Prince and the alteration or release of what Oueiss refers to as the "Doctored Financial Photo." The Complaint does not allege that the Financial Photo was obtained from Oueiss's phone. It alleges that this document contained false information purporting to show that Oueiss and other *Al Jazeera* journalists received money from the Emir of Qatar. The Complaint does not allege who altered the Financial Photo, but alleges it was released by Al Arabiya, Compl. ¶¶ 185-187, a Saudi news organization that Oueiss asserts is an "alter ego" of the Saudi Crown Prince, *id.* ¶¶ 85, 134. The Complaint's attempt to support that "alter ego" theory consists of an allegation that the Saudi Crown Prince owns 60% of Al Arabiya, *id.* ¶ 135, and conclusory assertions that he "dominate[s] and control[s]" it and that it is his "mere instrumentalit[y]," *id.* ¶¶ 134-135, 140.

It is well settled that "mere ownership . . . is an insufficient reason to pierce the corporate veil." *Oginsky v. Paragon Props. of Costa Rica LLC*, 784 F. Supp. 2d 1353, 1373 (S.D. Fla. 2011) (citation omitted). Likewise, mere recitations of the phrases "alter ego," "mere instrumentality," or "dominated and controlled" do not satisfy Rule 8 under *Twombly* and *Iqbal*. *Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd*., 2011 WL 1232986, at *6 (S.D. Fla. Mar. 30, 2011).[30] Such recitations are all that the Complaint presents here. Accordingly, the Court should disregard Oueiss's attempt to attribute Al Arabiya's alleged conduct to the Saudi Crown Prince.

---

[30] *See also*, *e.g.*, *S-Fer Int'l, Inc. v. Stonesheets, LLC*, 2016 WL 8808749, at *4 (S.D. Fla. July 22, 2016) (rejecting similar allegations as "conclusory"); *Nayak v. Star Clippers, Ltd. Corp.*, 2014 WL 1406438, at *6 (S.D. Fla. Mar. 11, 2014) (same), *report and recommendation adopted*, 2014 WL 1413497 (S.D. Fla. Apr. 10, 2014); *Krinsk v. SunTrust Banks, Inc.*, 2010 WL 11475608, at *6 (M.D. Fla. Jan. 8, 2010) (same).

### 2. Oueiss Does Not Plausibly Allege That the Saudi Crown Prince Directed Other Defendants To Make Derogatory Statements About Her

According to the Complaint, the release of the photos was preceded and followed by many disparaging statements about Oueiss on Twitter, including statements that "amplified" the release of the photos. The Complaint does not, however, allege that the Saudi Crown Prince made any disparaging statement – or, indeed, any statement at all – about Oueiss. Instead, it seeks to attribute those statements to him by making the conclusory allegation that the individuals who made such statements were his agents or co-conspirators. As shown in Part I.A.2, the Complaint fails to allege a plausible basis for its conclusory assertions that the U.S.-based Defendants made statements at the direction of, or under any agreement with, the Saudi Crown Prince. That same failure extends to the non-U.S.-based Defendants.

The Complaint's primary allegations concerning non-U.S.-based Defendants are, once again, mere labels. Those labels include repetitive assertions that those Defendants acted "at the instruction of," Compl. ¶ 88; as "agent[s]" of, *id.* ¶ 100; "at the direction of," *id.* ¶¶ 103, 240; "under the control of," *id.* ¶ 103; as "co-conspirators[ ]" with, *id.* ¶ 108; "under the directed strategy of," *id.* ¶¶ 208, 219, 226, 233; or "at the behest of," *id.* ¶ 243, the Saudi Crown Prince. But "'a legal conclusion couched as a factual allegation,'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), does not become factual through mere repetition.

The sparse and unpersuasive facts that the Complaint attempts to marshal as support for its agency and conspiracy theories only show the weakness of its claims. For example, it alleges that Defendant Tarek Zeinab is an employee of Defendant Saudi 24 TV and that Saudi 24 is an "alter ego" of the Saudi Crown Prince. Compl. ¶ 100. But the allegations that Saudi 24 is an "alter ego" are just as insufficient as the same allegations directed at Al Arabiya, *see supra* p. 41 & n.30, so the Complaint's two-step attribution attempt falls short. The Complaint alleges that

42

Defendant Faisal Al Menaia once "planned to meet for dinner" at an "Olive Garden" with U.S.-based Defendant Collins.  Compl. ¶ 106.[31]  It alleges that Defendant Awwad Al Otaibi received a certificate from Defendant MiSK Foundation "for completing an 'Interview Skills Program with Distinction,'" *id.* ¶ 117, also had dinner with Collins, *id.* ¶ 119, and had "multiple instances of direct interaction with Prince Sattam bin Khalid bin Nasser Al Saud," *id.* ¶ 120, the son of one of the Saudi Crown Prince's cousins.  It is an "unwarranted deduction[ ]" from such innocuous allegations, *Aldana*, 416 F.3d at 1248 (citation omitted), that any Defendant agreed with the Saudi Crown Prince to defame Oueiss.

The last source of allegedly disparaging statements is the Twitter account "@KateStewart22," which the Complaint attempts to attribute to Defendant Al Qahtani.  The Complaint alleges that Al Qahtani "created and manages" the account, but that it is "operated by at least two individuals," including "an unidentified person based in England" whose identity it speculates "discovery will reveal."  Compl. ¶ 80.  The Complaint further speculates that "it will be revealed that this account was created by or at the direction of [the Saudi Crown Prince] and Al Qahtani."  *Id.* ¶ 240.  As with the Complaint's attempt to attribute the "John Doe Websites" to Defendants, those "mere conclus[ions]" are not enough to "unlock the doors of discovery."  *Iqbal*, 556 U.S. at 678-79.

---

[31] The Complaint alleges that Al Menaia "previously worked for" the Saudi Arabian Cultural Mission ("SACM"), Compl. ¶ 104, which it also alleges, in conclusory form, is a "mere instrumentality" and "alter ego" of the Saudi Crown Prince, *e.g.*, *id.* ¶¶ 134, 138-140.  As the Complaint concedes, SACM has existed since 1951 and is a "part of the Saudi Embassy."  *Id.* ¶ 138.  There are no facts whatsoever to support the allegation that it is an instrumentality of the current Saudi Crown Prince, who has been in office since 2017.  And in any event there is no allegation that Al Menaia was an employee of SACM at the time he allegedly made any of the statement at issue in this case.

### B.  Oueiss Fails Plausibly To Allege the Elements of Each Cause of Action

Without a plausible basis for attributing any relevant acts to the Saudi Crown Prince, Oueiss fails to state any claim on which relief can be granted under Florida law.  In addition, several of her Florida claims have other defects that independently warrant dismissal.  This motion assumes that (as the Complaint alleges) Florida law governs Oueiss's common-law claims.  The Saudi Crown Prince reserves the right to assert in any other phase of this proceeding that the law of another jurisdiction controls.

### 1.  Oueiss Fails To State a Claim for Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, a plaintiff must plead conduct that (1) is "'intentional or reckless,'" (2) is "'outrageous,'" and (3) caused "'emotional distress'" that was (4) "'severe.'"  *Casado v. Miami-Dade Cty.*, 340 F. Supp. 3d 1320, 1332 (S.D. Fla. 2018) (quoting *Williams v. City of Minneola*, 619 So. 2d 983, 986 (Fla. 5th Dist. Ct. App. 1993)).  To meet the requirement that conduct be "outrageous," the conduct in question must "'go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  A plaintiff must also show "emotional distress . . . so severe that no reasonable person could be expected to endure it."  *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1306 (Fla. 2d Dist. Ct. App. 2018).

Although the Complaint fails to specify which particular acts allegedly constituted "outrageous" conduct, *see* Compl. ¶ 279, the only conduct here that would even colorably qualify would be the alleged alteration of photographs in a way that falsely suggested nudity or sexual activity.  There is no well-pleaded allegation that the Saudi Crown Prince engaged in or directed such acts.  *See supra* pp. 39-41.  There is also no well-pleaded allegation that he knew

of or recklessly disregarded any allegedly wrongful conduct.  Further, Oueiss also fails to allege, in other than conclusory form, that she suffered "severe" emotional distress under the extremely demanding standard set by Florida law.  *Cf. Hammer v. Sorensen*, 824 F. App'x 689, 695 (11th Cir. 2020) (per curiam) (affirming dismissal for failure to allege "severe" distress where "[n]othing prevented" the plaintiff from "closing the emails as quickly as she opened them").

Finally, Florida does not permit a plaintiff to allege intentional infliction of emotional distress based solely on defamatory statements.  *See Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1278-79 (S.D. Fla. 2020) (dismissing an emotional-distress claim as overlapping entirely with a defamation claim); *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) ("[A] plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'").  Here, as in *Rubinson*, Oueiss fails to allege any meaningful distinction between the actions that allegedly caused her distress and the ones that allegedly defamed her.

## 2.    Oueiss Fails To State a Claim for Intrusion Into a Private Quarter

To state a claim for intrusion, Oueiss must allege "physical[] or electronic[] intru[sion]" into a "private quarter."  *Agency for Health Care Admin. v. Associated Indus. of Florida, Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996).  The "private quarter" must be a "'place.'"  *Allstate Ins. Co. v. Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003) (per curiam); *see also Spilfogel v. Fox Broad. Co.*, 433 F. App'x 724, 727 (11th Cir. 2011) (per curiam) ("Florida law explicitly requires an intrusion into a private place and not merely into a private activity.").  Here, Oueiss alleges that the "act[] of accessing . . . electronic files from her personal mobile device" was an "intru[sion]." Compl. ¶ 283.  Her allegations that the Saudi Crown Prince directed or agreed to any such access are conclusory and insufficient.  *See supra* pp. 10-13.  In any event, a mobile device is not the

kind of physical "place" that Florida law requires for this tort.  *See Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015) (unauthorized access to driver's license information was not intrusion into a "place"); *Celestine v. Capital One*, 2017 WL 2838185, at *3 (S.D. Fla. June 30, 2017) (same for unauthorized access to a credit report); *see also Hall v. Sargeant*, 2019 WL 1359485, at *8 (S.D. Fla. Mar. 26, 2019) ("[F]ederal courts considering this issue have concluded that Florida's tort does not extend to non-physical places.").

In addition, a claim for tortious intrusion requires "outrageous and unacceptable conduct" that would be "highly offensive to a reasonable person."  *Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d 1303, 1309 (M.D. Fla.), *aff'd*, 627 F.3d 833 (11th Cir. 2010) (per curiam).  This standard mirrors the outrageousness standard that Florida courts apply to claims for intentional infliction of emotional distress.  *See id.* (citing *Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062-63 (Fla. 5th Dist. Ct. App. 1991)); *see also Hammer*, 824 F. App'x at 695.  Here, the alleged unauthorized access to Oueiss's phone might have been unlawful, but would not rise to the level of being "atrocious, and utterly intolerable in a civilized community."  *Metropolitan Life*, 467 So. 2d at 278-79; *see id.* at 278 (explaining that "tortious or even criminal" intent is "not . . . enough") (citation omitted).  Accordingly, Oueiss's intrusion claim fails for that reason as well.

### 3.    Oueiss Fails To State a Claim for Public Disclosure of Private Facts

To state a claim for public disclosure of private facts, Oueiss must allege (1) "the publication" (2) "of private facts" (3) that are "offensive" and (4) "are not of public concern."  *Cape Publ'ns, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989).  The facts disclosed must be "truthful."  *Agency for Health Care*, 678 So. 2d at 1252 n.20; *see Tyne ex rel. Tyne v. Time Warner Entm't Co.*, 204 F. Supp. 2d 1338, 1344 (M.D. Fla. 2002) (under the Restatement (Second) of Torts, which Florida follows, "an essential element of the tort of public disclosure of

private facts is that the facts at issue be true"), *aff'd*, 425 F.3d 1363 (11th Cir. 2005) (per curiam).

Here, Oueiss fails to allege that the Saudi Crown Prince published any facts about her or that he

directed or agreed that anyone would do so. *See supra* pp. 39-43. In addition, she alleges that

the offensive facts published were false, not true. *See* Compl. ¶ 294 ("The photographs . . . were

offensive . . . because Defendants utilized such photographs to create a false narrative . . . ."). As

a result, her public-disclosure claim should be dismissed. *See Tyne*, 204 F. Supp. 2d at 1344.

### 4.  Oueiss Fails To State a Claim for Defamation

To state a claim for defamation (here, libel), Oueiss must allege (1) "publication";

(2) "falsity"; (3) "knowledge or reckless disregard" if the matter "concern[s] a public official"

and "at least negligen[ce]" if it "concern[s] a private person"; (4) "actual damages"; and (5) a

"defamatory" statement. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008).

Where, as here, the plaintiff is a "public figure" and the statements concern a matter of "public

concern," she must also allege "actual malice," which requires a showing that "the defendants

published a defamatory statement either with actual knowledge of its falsity or with a 'high

degree of awareness' of its 'probable falsity.'" *Berisha v. Lawson*, 973 F.3d 1304, 1311-12

(11th Cir. 2020) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)), *pet. for cert. pending*,

No. 20-1063 (U.S. Feb. 1, 2021).[32] As with her public-disclosure claim, Oueiss's claims fail at

the first element because she cannot attribute any act of publication to the Saudi Crown Prince.

*See supra* pp. 39-43. In addition, she also fails to allege facts showing that he knew (or even that

---

[32] The questions whether Oueiss is a public figure and whether the alleged attacks against her are matters of public concern, though not necessary to this motion, are also not subject to serious dispute. For example, her Complaint cites an opinion piece that she wrote and the *Washington Post* published, "titled: 'I'm a female journalist in the Middle East. I won't be silenced by online attacks.'" Compl. ¶ 245 n.10.

he recklessly disregarded or should have known) that any of the statements at issue were false – or, for that matter, that he knew about them at all.

### 5.    Oueiss Fails To State a Claim for Civil Conspiracy

To state a claim for civil conspiracy, Oueiss must allege:  "'(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.'"  *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (quoting *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015)).  Here, Oueiss fails to allege plausibly that the Saudi Crown Prince agreed with anyone else to commit any of the acts for which she seeks relief, including the unauthorized access of her phone, the alteration of pictures obtained from her phone, or the disparaging statements about her on Twitter.  *See supra* pp. 10-13, 39-43.  Her civil conspiracy claim thus fails.

### CONCLUSION

The Court should dismiss all of Oueiss's claims against the Saudi Crown Prince.

Dated:    March 26, 2021

Respectfully submitted,

*/s/ Benjamin H. Brodsky*
Benjamin H. Brodsky (Fla. Bar No. 73748)
**BRODSKY FOTIU-WOJTOWICZ,**
   **PLLC**
200 S.E. 1st Street, Suite 400
Miami, Florida 33131
(305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

Michael K. Kellogg (*pro hac vice*)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL**
   **& FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

*Attorneys for Defendant Mohammed bin Salman bin Abdulaziz Al Saud*

48

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on March 26, 2021, I electronically filed the foregoing DEFENDANT

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S MOTION TO DISMISS,

using the ECF system, which sent notice of filing in this matter to all counsel of record.


<u>*/s/ Benjamin H. Brodsky*</u>
Benjamin H. Brodsky, Esq.
*Attorney for Defendant*
*Mohammed bin Salman bin Abdulaziz*
*Al Saud*