**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO. 1:20-CV-25022-KMM

GHADA OUEISS,

     Plaintiff,

v.

MOHAMMED BIN SALMAN BIN
ABDULAZIZ AL SAUD, MOHAMED BIN
ZAYED AL NAHYAN, DARKMATTER,
FAISAL AL BANNAI, SAUDI 24 TV, *a
broadcast television station owned by the
Kingdom of Saudi Arabia*, AL ARABIYA, *a
broadcast television station owned by the
Kingdom of Saudi Arabia*, PRINCE
MOHAMMED BIN SALMAN ABDULAZIZ
FOUNDATION *doing business as MiSK
Foundation*, SAUD AL QAHTANI, BADER
AL-ASAKER, SAUDI ARABIAN
CULTURAL MISSION, TAREK ABOU
ZEINAB, TURKI-AL-OWERDE, FAISAL AL
MENAIA, AWWAD AL OTAIBI, SHARON
COLLINS, CHRISTANNE SCHEY, HUSSAM
AL-JUNDI, ANNETTE SMITH, JOHN DOES
1-20,

     Defendants.[*]

_____/

**DEFENDANT H.H. SHEIKH MOHAMED BIN ZAYED AL NAHYAN'S**
**MOTION TO DISMISS COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

---

[*] Defendant H.H. Sheikh Mohamed Bin Zayed Al Nahyan has corrected the misspelling of his name as "Mohammed" in the caption of Plaintiff's complaint.

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

LEGAL STANDARD ...........................................................................................................4

ARGUMENT ........................................................................................................................4

    I.      H.H. SHEIKH MOHAMED IS IMMUNE FROM SUIT.......................................4

           A.     The FSIA Requires Dismissal Because The UAE Is The Real Party
                 In Interest ......................................................................................................4

           B.     Common-Law Foreign Sovereign Immunity Bars This Suit.......................5
                 1.      *H.H. Sheikh Mohamed is protected by status-based*
                       *immunity.* .............................................................................................5
                 2.      *H.H. Sheikh Mohamed is protected by conduct-based*
                       *immunity.* .............................................................................................7

    II.     TWITTER SERVICE ON H.H. SHEIKH MOHAMED WAS
          INAPPROPRIATE...............................................................................................10

    III.    THE COURT LACKS PERSONAL JURISDICTION OVER H.H.
          SHEIKH MOHAMED.........................................................................................12

           A.     Oueiss Fails To Allege Ties Between H.H. Sheikh Mohamed And
                 The United States Sufficient To Satisfy Rule 4(k)(2) ...............................13

            B.     Oueiss Fails To Allege Ties Between H.H. Sheikh Mohamed And
                 Florida Sufficient To Satisfy Florida's Long-Arm Statute .......................14

           C.     Exercising Jurisdiction Over H.H. Sheikh Mohamed Would Violate
                 Due Process..................................................................................................15

    IV.    THE COMPLAINT FAILS TO STATE ANY PLAUSIBLE CLAIM
          AGAINST H.H. SHEIKH MOHAMED .............................................................16

           A.     Oueiss's Allegations About H.H. Sheikh Mohamed Are
                 Insufficiently Pleaded ................................................................................16

            B.     Other Deficiencies Doom Oueiss's Claims ..............................................18

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

**CASES:**

*AcryliCon USA, LLC v. Silikal GmbH,*
    985 F.3d 1350 (11th Cir. 2021) ..............................................................................4

*Advantus, Corp. v. Sandpiper of Cal., Inc.,*
    No. 3:18-cv-1368, 2019 WL 4751725 (M.D. Fla. Sept. 30, 2019)........................15

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
    416 F.3d 1242 (11th Cir. 2005) ............................................................................18

*Alhassid v. Bank of Am., N.A.,*
    60 F. Supp. 3d 1302 (S.D. Fla. 2014) ...................................................................18

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................4, 16, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................16

*Bennett v. United States,*
    102 F.3d 486 (11th Cir. 1996) ................................................................................4

*Bickel v. City of Coral Springs,*
    No. 0:17-cv-60606, 2017 WL 3336722 (S.D. Fla. Aug. 4, 2017) .........................17

*Blessing v. Chandrasekhar,*
    Nos. 20-5850/5852, slip op. (6th Cir. Feb. 23, 2021) ...........................................15

*Bradley v. City of St. Cloud,*
    No. 6:12-cv-1348, 2013 WL 3270403 (M.D. Fla. June 26, 2013) .........................20

*Butera & Andrews v. International Bus. Macs. Corp.,*
    456 F. Supp. 2d 104 (D.D.C. 2006) .......................................................................19

*Carlson v. Armstrong World Indus., Inc.,*
    693 F. Supp. 1073 (S.D. Fla. 1987) .......................................................................18

*Celestine v. Capital One,*
    No. 1:17-cv-20237, 2017 WL 2838185 (S.D. Fla. June 20, 2017).........................20

*Collins v. Marsh,*
    No. 2:12-cv-51, 2012 WL 1058998 (M.D. Ala. Mar. 6, 2012) ..............................18

*Doe I v. State of Israel,*
    400 F. Supp. 2d 86 (D.D.C. 2005)...........................................................................9

*Force v. Sein*,
　　No. 1:15-cv-7772, 2016 WL 1261139 (S.D.N.Y. Mar. 30, 2016) ............................................6

*Fraser v. Smith*,
　　594 F.3d 842 (11th Cir. 2010) ...........................................................................................13, 14

*Fridovich v. Fridovich*,
　　598 So. 2d 65 (Fla. 1992)..........................................................................................................19

*Hall v. Sargeant*,
　　No. 9:18-cv-80748, 2019 WL 1359485 (S.D. Fla. Mar. 26, 2019) ..........................................20

*In re Google Assistant Privacy Litig.*,
　　457 F. Supp. 3d 797 (N.D. Cal. 2020) .......................................................................................19

*In re Managed Care Litig.*,
　　No. 1:00-md-1334, 2009 WL 7848517 (S.D. Fla. Mar. 27, 2009) ...........................................17

*In re Terrorist Attacks on September 11, 2001*,
　　714 F.3d 118 (2d Cir. 2013)......................................................................................................18

*International Underwriters AG v. Triple I: Int'l Invs., Inc.*,
　　No. 9:06-cv-80966, 2007 WL 9701852 (S.D. Fla. May 30, 2007)...........................................15

*JCorps Int'l, Inc. v. Charles & Lynn Schusterman Family Found.*,
　　828 F. App'x 740 (2d Cir. 2020) ...............................................................................................12

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
　　511 U.S. 375 (1994)....................................................................................................................4

*Louis Vuitton Malletier, S.A. v. Mosseri*,
　　736 F.3d 1339 (11th Cir. 2013) ...........................................................................................14, 15

*Madara v. Hall*,
　　916 F.2d 1510 (11th Cir. 1990) .................................................................................................15

*Mamani v. Berzain*,
　　654 F.3d 1148 (11th Cir. 2011) .................................................................................................18

*Moriah v. Bank of China Ltd.*,
　　107 F. Supp. 3d 272 (S.D.N.Y. 2015)....................................................................................9, 10

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
　　558 F.3d 1210 (11th Cir. 2009) ...........................................................................................13, 14

*Ortega Trujillo v. Banco Cent. Del Ecuador*,
　　17 F. Supp. 2d 1340 (S.D. Fla. 1998) ........................................................................................20

*Randall v. Offplan Millionaire AG*,
No. 6:17-cv-2103, 2019 WL 5188368 (M.D. Fla. June 17, 2019) ...................................15, 16
2019 WL 5388200 (M.D. Fla. Oct. 22, 2019) ....................................................................15

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004)...........................................................................................................6

*Republic of Philippines v. Pimentel*,
553 U.S. 851 (2008)...........................................................................................................5

*Rincon v. Miami-Dade Cnty.*,
No. 1:16-cv-22254, 2020 WL 7344633 (S.D. Fla. Mar. 31, 2020) .......................................17
2020 WL 6536417 (S.D. Fla. Nov. 6, 2020)........................................................................17

*Samantar v. Yousuf*
560 U.S. 305 (2010)................................................................................... *passim*

*Sisso v. Islamic Republic of Iran*,
448 F. Supp. 2d 76 (D.D.C. 2006) .....................................................................................12

*Snow v. DirecTV, Inc.*,
450 F.3d 1314 (11th Cir. 2006) .........................................................................................19

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)..........................................................................................................18

*The Schooner Exch v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812)..........................................................................................6

*Tyne ex rel. Tyne v. Time Warner Ent. Co., L.P.*,
204 F. Supp. 2d 1338 (M.D. Fla. 2002)............................................................................20
425 F.3d 1363 (11th Cir. 2005) .......................................................................................20

*United States v. Steiger*,
318 F.3d 1039 (11th Cir. 2003) .......................................................................................19

*United Techs. Corp. v. Mazer*,
556 F.3d 1260 (11th Cir. 2009) .......................................................................................14

*Watts v. City of Hollywood*,
146 F. Supp. 3d 1254 (S.D. Fla. 2015) ............................................................................20

*Weil v. Phillips*,
816 F. App'x 339 (11th Cir. 2020) ...................................................................................16

*Wildes v. Bitconnect Int'l PLC*,
No. 9:17-cv-80086, 2018 WL 4864836 (S.D. Fla. Mar. 20, 2018) ....................................12

iv

*Winston v. Walsh*,
   829 F. App'x 448 (11th Cir. 2020) ................................................................4, 12

*Ye v. Zemin*,
   383 F.3d 620 (7th Cir. 2004) ...............................................................................11

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) .......................................................... *passim*

STATUTES:

18 U.S.C.
   § 2701(a)(1) ........................................................................................................19

28 U.S.C.
   § 1604.....................................................................................................................4

FLA. STAT.
   § 48.193(2).............................................................................................................14

OTHER AUTHORITIES:

Council of Europe, *Convention on Cybercrime* (Nov. 23, 2001) .................................19

FED. R. CIV. P.
   19(a)(1)(B) ..............................................................................................................4
   4(k)(2) ............................................................................................................12, 13

KATZMAN, KENNETH, CONG. RES. SERV., RS21852, THE UNITED ARAB EMIRATES
   (UAE):  ISSUES FOR U.S. POLICY (2020) ........................................................6

Markay, Lachlan, *DOJ Pressed to Enforce* Al Jazeera *Foreign Agent Ruling*,
   AXIOS (Mar. 3, 2021) ..........................................................................................10

Burson-Marsteller, *Twitter Is the Prime Social Media Network for World Leaders*,
   PRNEWSWIRE (May 31, 2017) ............................................................................12

Notification Pursuant to Article 31 of the Convention (Jan. 28, 2020) .........................11

Restatement (Second) of Foreign Relations Law of the United States § 66(f)
   (1965)..........................................................................................................7, 8, 9

U.S. Dep't of Justice, Service of Judicial Documents on the United States
   Government Pursuant to the Hague Service Convention (Jan. 12, 2018) ................11

Working Group of the ABA, *Report on the U.S. Foreign Sovereign Immunities
   Act* (2001).............................................................................................................6

## INTRODUCTION

Plaintiff Ghada Oueiss, a journalist for *Al Jazeera* (headquartered in Doha, Qatar) who resides outside of the United States, alleges a far-flung operation carried out by individual Twitter users and foreign officials (among others) to hack her mobile device and defame her online. Sprinkled sparsely throughout Oueiss's complaint are generalized assertions that H.H. Sheikh Mohamed Bin Zayed Al Nahyan—the leader of the United Arab Emirates (UAE)—was somehow involved in the supposed operation. Oueiss seeks to parlay those scattered references into a judgment (including an injunction and monetary damages) against the head of an allied sovereign nation.

Oueiss's allegations against H.H. Sheikh Mohamed, lacking any specificity or basis in reality, are untrue. As most pertinent to the motion to dismiss, however, the complaint as to H.H. Sheikh Mohamed fails to satisfy threshold requirements that prevent federal courts from being misused for suits that lack a meaningful connection to the United States, impinge on foreign sovereignty, and undermine international comity.

One such threshold issue is immunity. Oueiss's tactic of naming H.H. Sheikh Mohamed but not the UAE as defendant, without any specific allegations about his actions individually, is an attempt to end-run the Foreign Sovereign Immunities Act (FSIA). But the Supreme Court has made clear that a plaintiff may not avoid the FSIA through such artful pleading where, as here, the state is the real party in interest. Even if Oueiss could skirt the FSIA, H.H. Sheikh Mohamed is himself immune from suit under the common law. The United States treats H.H. Sheikh Mohamed as the functional head of state. Given his position as the actual leader of the UAE, which Oueiss admits, H.H. Sheikh Mohamed possesses status-based immunity. Conduct-based immunity also bars Oueiss's claims, as Oueiss alleges that H.H. Sheikh Mohamed purportedly participated in the claimed conspiracy through his official control of the UAE government.

A second threshold barrier to Oueiss's claims against H.H. Sheikh Mohamed is service. Oueiss has purported to serve H.H. Sheikh Mohamed via Twitter. But that manner of delivering a summons and complaint flouts sovereignty and international comity considerations, which Oueiss seeks to circumvent. The United States has made clear that service from abroad on its own officials must occur through diplomatic channels, and it has recognized that service on heads of state is especially likely to interfere with diplomatic relations. Those concerns are particularly salient for

1

Twitter service on a foreign leader such as H.H. Sheikh Mohamed—essentially, the equivalent of service of a foreign suit on the verified Twitter account of the President of the United States.

A third threshold obstacle is a lack of personal jurisdiction. The Court cannot exercise jurisdiction over H.H. Sheikh Mohamed under Federal Rule of Civil Procedure 4(k)(2), which provides for personal jurisdiction for federal claims when there is adequate connection to the United States, because the hacking allegations underlying the federal claims involve no tie between H.H. Sheikh Mohamed and the United States. Nor may the Court exercise jurisdiction over H.H. Sheikh Mohamed under Florida's long-arm statute, given the threadbare nature of her allegations regarding H.H. Sheikh Mohamed's specific involvement. Further, due process blocks any attempt to hale H.H. Sheikh Mohamed into this Court without any clear allegation that he purposefully directed the purported conduct into the United States generally—let alone Florida specifically.

Beyond those threshold defects, Oueiss's assertions are legally insufficient. Her vague references to H.H. Sheikh Mohamed's purported role in a conspiracy fall short of the plausibility requirement—which the Supreme Court has emphasized when it comes to allegations against high-ranking government officials—needed to withstand a motion to dismiss. Oueiss's strategy of tacking on H.H. Sheikh Mohamed to assertions about others' conduct should not evade dismissal. For a variety of reasons, Oueiss's substantive counts fail as a matter of law on the merits as well, such that she has failed to state a claim upon which relief can be granted.

In sum, whatever the merits of her suit against other defendants, Oueiss's claims against H.H. Sheikh Mohamed cannot circumvent sovereign immunity, service prerequisites, personal jurisdiction, and basic pleading and other legal requirements. This Court should dismiss the complaint as to H.H. Sheikh Mohamed.

## BACKGROUND

Plaintiff Ghada Oueiss is an *Al Jazeera* employee who resides outside the United States. ECF No. 1 ("Compl.") ¶¶ 1, 35. Oueiss claims that she was the subject of an alleged "hack and leak operation *** spearheaded" by foreign "rulers" and carried out by other actors across the globe. *Id.* ¶¶ 1, 2, 4. According to Oueiss, that operation involved a "coordinated effort to hack her mobile device and subsequently defame her," and resulted in "Saudi attacks meant to disparage and embarrass her in online public forums." *Id.* ¶¶ 28-29.

Oueiss filed this suit against 19 named defendants and 20 unnamed "John Doe" defendants, asserting eight causes of action (three under federal law and five under Florida law). Compl.

¶¶ 259-316.  Most named defendants are either U.S. citizens or Saudi officials, individuals, and entities—including the Crown Prince of Saudi Arabia (Mohammed bin Salman Bin Abdulaziz Al Saud), the Crown Prince's former royal court advisor (Saud Al Qahtani), the head of the Crown Prince's Private Office (Bader Al-Asaker), and several Saudi news networks.  *Id.* ¶¶ 38-67, 73-120.  Oueiss also named H.H. Sheikh Mohamed—the "de facto ruler[]" of the UAE who resides in Abu Dhabi.  *Id.* ¶¶ 4, 33, 68.  Only two defendants—Collins and Al-Jundi—have any connection to the State of Florida.  *Id*. ¶¶ 38, 46.  Oueiss herself has not visited Florida in seven years and visits the United States only occasionally.  *Id.* ¶ 35.

The complaint alleges three stages to the supposed conspiracy.  First, "the Saudi government" recruited the USA Defendants to "proliferate[] and promote[]" a *pro*-Saudi" agenda online.  *Id*. ¶¶ 30, 40; *see also, e.g.*, *id.* ¶¶ 49, 51, 58, 60.  Second, "[u]pon [Oueiss's] information and belief," certain "state-sponsored" actors "hacked into Ms. Oueiss's personal mobile device" and stole "personal photographs and videos" while she was physically present in California.  *Id.* ¶¶ 167-168, 181, 266.  Third, "[d]octored" and "disparaging" photos from Oueiss's phone storage were disseminated by Saudi defendants and the USA Defendants.  *Id.* ¶¶ 186, 195.

Oueiss states throughout her complaint that this alleged three-stage operation occurred at the "behest of" the Crown Prince of Saudi Arabia.  Although the complaint sprinkles in references to H.H. Sheikh Mohamed, it does not articulate the nature of his purported involvement with the alleged conspiracy or other defendants.  *E.g.* Compl. ¶¶ 29, 168, 194.  Instead, the complaint asserts generally that "[t]he UAE, at the direction of Defendant [H.H. Sheikh Mohamed], has *** leveraged its mature offensive cyber effects operations capabilities against dissidents," and "[m]ore recently *** has ramped up its spying and hacking operations against dissidents."  *Id.* ¶¶ 3, 150, 155.  Moreover, the complaint often discusses the Crown Prince of Saudi Arabia's involvement without even mentioning H.H. Sheikh Mohamed.  *See, e.g.*, *id.* ¶ 128 (describing "conduct carried out by Defendant MBS"); *id.* ¶ 200 ("Defendant MBS had a Network of foreign and domestic agents prepared to disseminate defamatory information[.]"); *id.* ¶¶ 208, 226, 233 (alleging certain USA Defendants "operat[ed] under the directed strategy of Defendant MBS").

Oueiss filed a sealed *ex parte* motion requesting authorization to serve the foreign defendants by alternative means, including service on H.H. Sheikh Mohamed by Twitter.  The Court granted the motion based on Oueiss's representation that H.H. Sheikh Mohamed's "'Twitter account contains a link to the Crown Prince Court's website in its bio' and *** 'has been verified

3

by Twitter, and thus, Twitter has confirmed that MBZ (or a close confidant to MBZ) operates [the] specific account [cited in the Motion].'"  Order at 5, ECF No. 22 (alterations in original).  Oueiss filed a process server's affidavit representing that a copy of the summons and complaint had been served on H.H. Sheikh Mohamed via Twitter.  ECF No. 29-2.

## LEGAL STANDARD

Under Rule 12(b)(1), a plaintiff bears the burden of establishing subject matter jurisdiction, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), including with respect to immunity, *Bennett v. United States*, 102 F.3d 486, 488 n.1 (11th Cir. 1996).  Under Rule 12(b)(5), a plaintiff also bears the burden of establishing proper service in accordance with Rule 4.  *Winston v. Walsh*, 829 F. App'x 448, 450 (11th Cir. 2020).  Under Rule 12(b)(2), a plaintiff must make a *prima facie* showing that the court has personal jurisdiction over each defendant, based on the complaint and any affidavit evidence.  *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364-1365 (11th Cir. 2021).  Under Rule 12(b)(6), the complaint must plead facts that, if accepted as true, would state a claim for relief that is "plausible on its face"—a standard that "asks for more than a sheer possibility that a defendant has acted unlawfully" and is "especially important" in suits involving "Government-official defendants" entitled to assert immunity.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 685 (2009).

## ARGUMENT

I.    **H.H. SHEIKH MOHAMED IS IMMUNE FROM SUIT**

A.    **The FSIA Requires Dismissal Because The UAE Is The Real Party In Interest**

Oueiss's suit against H.H. Sheikh Mohamed is in reality one against the UAE and thus subject to the FSIA's jurisdiction-stripping immunity bar.  Although the FSIA refers to a "foreign state" and not individual foreign officials, 28 U.S.C. § 1604, the Supreme Court's decision in *Samantar v. Yousuf* warns that a plaintiff's "artful pleading" cannot sidestep the FSIA simply by naming "an individual official alone" as the defendant, 560 U.S. 305, 324 (2010).  "[S]ome actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest."  *Id.* at 325.  "Even when a plaintiff names only a foreign official, it may be the case that the foreign state itself *** is a required party"—*i.e.*, "because that party has 'an interest relating to the subject of the action' and 'disposing of the action in the person's absence may *** as a practical matter impair or impede the person's ability to protect the interest.'"  *Id.* at 324 (second ellipsis in original) (quoting FED. R. CIV. P. 19(a)(1)(B)).

4

Accordingly, when the foreign state would be immune from suit under the FSIA, "the district court may have to dismiss the suit." *Id*. at 325 (citing *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008)).

This is such a case. While Oueiss brings suit only against H.H. Sheikh Mohamed himself, the complaint's sparse and conclusory allegations concerning H.H. Sheikh Mohamed are tantamount to alleging actions taken or sponsored by the UAE government. In addition to alleging that the "UAE" has developed its "cyber effects operations and its intelligence services through the Signals Intelligence Agency," the complaint's assertions regarding H.H. Sheikh Mohamed all involve actions purportedly taken by "UAE operatives" and "state-sponsored" agents to further a "UAE agenda" and "UAE interests." *E.g.*, Compl. ¶¶ 26, 30, 70, 150, 155-156, 163, 167-168, 188, 248-249, 309(a), 313(c). Indeed, Oueiss's stated purpose in bringing suit is "to address the unlawful conduct by the de facto ruler[] of the *** UAE." *Id.* ¶ 33. Those allegations necessarily create the "potential for injury to the interests of the absent sovereign" and compel dismissal. *Samantar*, 560 U.S. at 325.

## B.      Common-Law Foreign Sovereign Immunity Bars This Suit

"Even if a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324. In applying common-law immunity principles, the United States has recognized that "suits against foreign officials— whether they are heads of state or lower-level officials—implicate many of the same considerations of comity and respect for other Nations' sovereignty as suits against foreign states." Suggestion of Immunity at 7, *Doğan v. Barak*, No. 2:15-cv-08130 (C.D. Cal. Jun. 10, 2016). Here, even as styled against H.H. Sheikh Mohamed, two independent forms of common-law immunity preclude this case from proceeding against him: (1) status-based immunity and (2) conduct-based immunity.[2]

### 1.      *H.H. Sheikh Mohamed is protected by status-based immunity.*

Courts have long recognized that "status-based immunities" shield certain high-level foreign officials from legal proceedings in the United States. *Yousuf v. Samantar*, 699 F.3d 763,

---

[2] Under the two-step process for deciding immunity, courts at the first step have "give[n] absolute deference to the State Department's position on status-based immunity doctrines" and at least "substantial weight" to its position on conduct-based immunity. *Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012). In the absence of a suggestion of immunity from the U.S. State

772 (4th Cir. 2012).  In *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), the Supreme Court held "that as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign."  *Republic of Austria v. Altmann*, 541 U.S. 677, 688 (2004).  Although sometimes "misleading[ly]" referred to as "head of state immunity," status-based immunity "has been applied to family members of a head of state and to prime ministers and other members of the 'government.'"  Working Group of the ABA, *Report on the U.S. Foreign Sovereign Immunities Act* 56 (2001)[3]; *see, e.g.*, Suggestion of Immunity at 6, *You v. Japan*, No. 3:15-cv-03257 (N.D. Cal. 2016) ("Although the doctrine is referred to as 'head of state immunity,' it applies to heads of government and foreign ministers as well."); Suggestion of Immunity, *Sikhs for Justice v. Singh*, No. 1:13-cv-01460 (D.D.C. May 2, 2014) (same).  Consistent with that understanding, U.S. courts have repeatedly recognized the immunity of the head of government and other high-ranking officials, such as prime ministers and foreign ministers.  *See, e.g.*, Order, *"American Justice Ctr." (AJC), Inc. v. Modi*, No. 1:14-cv-7780 (S.D.N.Y Jan. 14, 2015) (Prime Minister of India); *Force v. Sein*, No. 1:15-cv-7772, 2016 WL 1261139, at *1 (S.D.N.Y. Mar. 30, 2016) (Foreign Minister of Burma).

Here, whatever the outer limits of status-based immunity, H.H. Sheikh Mohamed lies at its core as the functional head of state and leader of the UAE.  That the allegations in the complaint pertaining to H.H. Sheikh Mohamed are really about the UAE government's actions, which could not be challenged in this Court because of the FSIA, only strengthens that conclusion.  Assuming Oueiss avoids the FSIA by suing H.H. Sheikh Mohamed instead, the complaint makes a further attempt to plead around status-based immunity by alleging that he "is neither the head of state for the UAE, nor is he the head of the UAE's government."  Compl. ¶ 68.  But even the complaint ultimately acknowledges that H.H. Sheikh Mohamed is the "de facto ruler[] of the UAE."  *Id.* ¶¶ 4, 33.

The United States has treated H.H. Sheikh Mohamed as a head of state since 2014, when H.H. Sheikh Khalifa, the President of the UAE, was afflicted by a serious health condition after suffering a stroke.  KENNETH KATZMAN, CONG. RES. SERV., RS21852, THE UNITED ARAB

_____

Department, this Court at the second step should decide on its own that H.H. Sheikh Mohamed is immune from suit.  *See Samantar*, 560 U.S. at 311-312.

   [3] http://uniset.ca/terr/docs/aba_fsia_report.pdf.

EMIRATES (UAE):  ISSUES FOR U.S. POLICY 1-2 (2020).[4]  This status was recently reaffirmed when the White House announced on August 13, 2020, that Israel and the UAE were normalizing relations during a call between President Trump, Israeli Prime Minister Benjamin Netanyahu, and H.H. Sheikh Mohamed.  Both President Trump and Secretary of State Pompeo referred to H.H. Sheikh Mohamed as the "leader" of the UAE.  Moreover, on September 15, 2020, during a signing ceremony at the White House for the UAE-Israel peace treaty (the Abraham Accords), President Trump thanked H.H. Sheikh Mohamed multiple times for his leadership of the UAE in entering into that agreement.

The United States has treated H.H. Sheikh Mohamed as a head of state in other contexts as well.  In the course of his official duties, H.H. Sheikh Mohamed has met bilaterally on several occasions with Presidents Barack Obama and Donald Trump, and received approximately a dozen phone calls from these Presidents to discuss bilateral relations and cooperation between the two countries.  Further, H.H. Sheikh Mohamed has met bilaterally and regularly with the heads of state or heads of government of over 95 countries, including with British Prime Ministers David Cameron, Theresa May, and Boris Johnson; German President Frank-Walter Steinberger and Chancellor Angela Merkel; Russian President Vladimir Putin; French Presidents Emmanuel Macron, Nicolas Sarkozy, and François Hollande; Indian President Shri Pranab Mukherjee and Prime Minister Narendra Modi; Japanese Prime Minister Shinzo Abe; Brazilian President Jair Bolsonaro; Chinese President Xi Jinping and Premier of the State Council Li Keqiang; and his Holiness Pope Francis, Head of the Catholic Church and Sovereign of Vatican City State.  Since 2014, H.H. Sheikh Khalifa has not met with any foreign heads of state or senior officials, and does not make public appearances in the course of official duties.

    2. *H.H. Sheikh Mohamed is protected by conduct-based immunity.*

In addition to status-based immunity, H.H. Sheikh Mohamed is immune from suit by virtue of conduct-based immunity.  Under the Restatement (Second) of Foreign Relations Law of the United States § 66(f) (1965)—a framework courts have used to analyze conduct-based immunity under the common law—there are three requisites to dismissal: (1) the defendant is a "public minister, official, or agent of the foreign state"; (2) the alleged "acts [were] performed in his official capacity"; and (3) "the effect of exercising jurisdiction would be to enforce a rule of law against

---

[4] https://crsreports.congress.gov/product/pdf/RS/RS21852/129.

the state." RESTATEMENT § 66(f). The United States has argued, however, that "[r]eliance on the Second Restatement's provisions on foreign-official immunity as a conclusive statement of current law" would be "misplaced," and that the Supreme Court has never adopted Restatement § 66(f). Amicus Br. of the U.S. in support of Pet. for Cert., *Mutond v. Lewis*, 141 S. Ct. 156 (2020), 2020 WL 2866592, at *14; *see Samantar*, 560 U.S. at 321 n.15 ("We express no view on whether Restatement § 66 correctly sets out the scope of the common-law immunity[.]"). Instead, the United States has taken the position that courts should consider whether the foreign official would be immune from suit under principles accepted by the Executive Branch, by which "acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity." Suggestion of Immunity at 9, *Doğan*, No. 2:15-cv-08130; *see also* Suggestion of Immunity at 5, *Doe v. Zedillo*, No. 3:11-cv-01433 (D. Conn. Sept. 7, 2012) ("In determining whether certain acts were taken in an official capacity, the Department of State generally presumes that allegations relating to the official's exercise of the powers of his or her office fall into that category."); Suggestion of Immunity at 10, *Rosenberg v. Lashkar-e-Taiba*, No. 1:10-cv-05381-DLI-CLP (E.D.N.Y. Dec. 17, 2012) (explaining defendants are immune because "plaintiffs' claims challenge defendants['] *** exercise of their official powers as officials of the Government of Pakistan"). These principles entail an analysis more supportive of immunity that "generally turns on whether the challenged *action* was taken in an official capacity" (*i.e.*, the second Restatement § 66(f) factor). Amicus Br. of the U.S., *Mutond*, 2020 WL 2866592, at *10.

H.H. Sheikh Mohamed satisfies both conduct-based immunity tests.

Regarding the second prong of the Restatement test that the Executive Branch essentially treats as dispositive, the complaint repeatedly indicates that H.H. Sheikh Mohamed acted in his "official capacity." RESTATEMENT § 66(f). According to the complaint, "[t]his case is brought to address the unlawful conduct by the de facto ruler[] of the *** UAE." Compl. ¶ 33. As context for that conduct, the complaint alleges that under H.H. Sheikh Mohamed's "influence, *the UAE* has matured its offensive cyber effects operations capabilities and its intelligence services through the Signals Intelligence Agency, which is the UAE's equivalent of the CIA," and that "*[t]he UAE*, at the direction of [H.H. Sheikh Mohamed], has also leveraged its mature offensive cyber effects operations capabilities *** in support of *** UAE interests." *Id.* ¶¶ 70, 150 (emphases added). The complaint then states that the alleged hacking of Oueiss's phone was "consistent with prior hacking operations carried out *at the behest of the UAE regime* and Defendant [H.H. Sheikh

Mohamed]," and involved "state-sponsored" actors and "agents of foreign principals," including the UAE. *Id.* ¶¶ 167-168, 248-249 (emphasis added); *see Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 279-280 (S.D.N.Y. 2015) (recognizing conduct-based immunity because "it was the government who instigated the [action], and the government who was interested in the outcome").

Those allegations are irreconcilable with a conclusion that H.H. Sheikh Mohamed acted in his personal capacity. *See Doe I v. State of Israel*, 400 F. Supp. 2d 86, 104 (D.D.C. 2005) ("[S]uits against officers in their personal capacities must pertain to private action—that is, to actions that exceed the scope of authority vested in that official so that the official cannot be said to have acted on behalf of the state."). Indeed, they underscore that even though Oueiss brought suit against H.H. Sheikh Mohamed, the UAE government is functionally the defendant and is protected by the FSIA. *See Samantar*, 560 U.S. at 325 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.") (alteration in original). Given that Oueiss's (threadbare and conclusory) allegations are directed squarely at the UAE government's activities, there is no reason to eschew the United States' official-act-focused approach to analyzing conduct-based immunity here.

In any event, H.H. Sheikh Mohamed satisfies the Restatement's two other factors as well. There can be no question that H.H. Sheikh Mohamed is a "public minister, official, or agent of the foreign state." RESTATEMENT § 66(f). The complaint alleges that H.H. Sheikh Mohamed is not only a senior UAE official, Compl. ¶ 68 ("[H.H. Sheikh Mohamed] is the current Crown Prince of the UAE and Deputy Supreme Commander of its Armed Forces."), but its "de facto ruler[]," *id.* ¶ 4.

In addition, "the effect of exercising jurisdiction [over H.H. Sheikh Mohamed in this case] would be to enforce a rule of law against the [UAE]." RESTATEMENT § 66(f). The gravamen of the complaint is that the UAE government itself has used "UAE operatives" to engage in hacking, in order to advance a "UAE agenda" and "UAE interests." Compl. ¶¶ 26, 30, 309(a), 313(c); *see id.* ¶¶ 155-156 (alleging that "the UAE has ramped up its spying and hacking operations against dissidents" through non-defendant "[i]ndividuals such as Tahnoun bin Zayed Al Nahyan (the son of the founder of the UAE and Defendant MBZ's brother [and the National Security Advisor of the UAE]), Hamad Al-Shamsi (the Attorney General of the UAE), and Khaldoun Khalifa Al Mubarak (Chairman of Abu Dhabi's Executive Affairs Authority)," who "have been instrumental

in these efforts"); *id.* ¶ 163 ("The UAE uses its offensive cyber effects operations capabilities, which have been maturing for years, to target groups and individuals opposed *** by the UAE."); *id.* ¶ 188 ("UAE routinely create[s] and manage[s] fake 'bot' accounts on social media as a means of engaging in cyber warfare with their enemies and critics."). In fact, the complaint suggests a violation of the Foreign Agents Registration Act (FARA), which applies to "persons acting as agents of foreign principals" and having a purpose of disclosing "political communications that are sponsored by a foreign state" and "prevent[ing] foreign states from concealing their attempts to influence U.S. government policy." *Id.* ¶ 248. Yet it is *Al Jazeera*'s U.S.-based affiliate that the Department of Justice has ordered to register under FARA, as it acts "at the direction and control" of the Qatari government.[5]

In adjudicating Oueiss's suit against H.H. Sheikh Mohamed, this Court would necessarily pass judgment on the propriety of UAE government action, thereby enforcing a rule of law against the UAE. *See Moriah*, 107 F. Supp. 3d at 279-280 ("The effect of this Court issuing a subpoena to elicit this testimony—and then using the testimony in order for this Court to pass judgment on the propriety of Israel's actions—would enforce a rule of law against Israel."). No amount of "artful pleading" can mask that reality. *Samantar*, 560 U.S. at 325.

## II.   TWITTER SERVICE ON H.H. SHEIKH MOHAMED WAS INAPPROPRIATE

This Court authorized service of the summons and complaint via Twitter because H.H. Sheikh Mohamed's "'Twitter account contains a link to the Crown Prince Court's website in its bio and *** has been verified by Twitter, and thus, Twitter has confirmed that MBZ (or a close confidant to MBZ) operates [the] specific account [cited in the Motion].'" Order at 5, ECF No. 22 (alterations in original) (internal quotation marks omitted). That authorization—which Oueiss obtained based on a sealed, *ex parte* motion and without any opportunity for opposing briefing— fails to account for a critical fact: H.H. Sheikh Mohamed is not just any defendant, but the functional head of state and leader of the UAE.

The United States itself recognizes that service on foreign officials cannot be divorced from sovereignty and international comity concerns. In the context of the Hague Service Convention, for example, the U.S. government has indicated that foreign plaintiffs must use different modalities

---

[5] *See* Lachlan Markay, *DOJ Pressed to Enforce* Al Jazeera *Foreign Agent Ruling*, Axios (Mar. 3, 2021), https://www.axios.com/doj-enforce-al-jazeera-foreign-agent-ruling-a5a58129-5a12-4aee-8a2b-cbfbb7d8f900.html.

to effect "service on private individuals" and "service on the United States Government itself, which includes its officials." Notification Pursuant to Article 31 of the Convention (Jan. 28, 2020).[6] Whereas service on the former can be performed via a private contractor, service on the latter cannot, and requires the direct involvement of the Department of Justice's Office of International Judicial Assistance. Even where a treaty between nations is not in place, "service on the U.S. Government is only proper when transmitted through diplomatic channels." U.S. Dep't of Justice, Service of Judicial Documents on the United States Government Pursuant to the Hague Service Convention 2 (Jan. 12, 2018).[7]

Those diplomatic concerns are most pressing when it comes to high-ranking foreign officials like H.H. Sheikh Mohamed. "[S]ervice of process on a head of state" implicates "the effective conduct of this nation's foreign affairs." *Ye v. Zemin*, 383 F.3d 620, 628 (7th Cir. 2004). Indeed, the United States has "represented *** that permitting service of process is often viewed by foreign governments and their heads of state 'as an affront to the dignity of both the leader and the state.'" *Id.*

Given that service on a foreign leader inherently risks offending international comity, permitting such service via Twitter is untenable. Such a casual and publicized method of delivering a summons and complaint by social media flies in the face of the diplomatic formalities that the United States requires for its own officials generally, let alone a head of state. It should go without saying that the United States would never countenance a foreign court's decision to authorize a foreign plaintiff to serve the President of the United States (or any other high-ranking government official) through a tweet. Applying a different standard to H.H. Sheikh Mohamed would harm the mutual respect of sovereigns.

Making matters worse, Oueiss's sealed, *ex parte* request to effect service by Twitter appears to be supported by nothing more than the statement that H.H. Sheikh Mohamed has a verified Twitter account. And that limited statement equivocates between whether H.H. Sheikh Mohamed or a close confidant manages the account. Even setting aside the paramount sovereignty and comity concerns, Oueiss's showing fails on its own terms. In light of the ubiquity of social media use—including by governments and their officials—such a bare allegation should not be sufficient

---

[6] https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=428& disp=resdn.

[7] https://www.justice.gov/civil/page/file/1036571/download.

to establish that "the proposed method of service is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Wildes v. Bitconnect Int'l PLC*, No. 9:17-cv-80086, 2018 WL 4864836, at *2 (S.D. Fla. Mar. 20, 2018); *see also Winston*, 829 F. App'x at 450 ("When service of process is challenged, [the plaintiff] must bear the burden of establishing its validity.") (alteration in original); Burson-Marsteller, *Twitter Is the Prime Social Media Network for World Leaders*, PRNEWSWIRE (May 31, 2017) ("President Trump is among a very small group of leaders who manage their own Twitter accounts[.]").[8]

## III.   THE COURT LACKS PERSONAL JURISDICTION OVER H.H. SHEIKH MOHAMED

Oueiss attempts to invoke two bases for personal jurisdiction that are at odds with one another and inadequate on their own terms. On the one hand, Oueiss alleges that personal jurisdiction over H.H. Sheikh Mohamed is "proper" under Rule 4(k)(2), which requires that "the defendant is *not* subject to jurisdiction in any state's courts of general jurisdiction." Compl. ¶ 125 (emphasis added). On the other hand, Oueiss alleges that personal jurisdiction over "all Defendants" "also" exists under Florida's long-arm statute. *Id.* ¶ 130. H.H. Sheikh Mohamed, however, cannot simultaneously be subject and *not* subject to suit in Florida courts. *See, e.g.*, *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Nor may plaintiffs resort to the District of Columbia long-arm statute because, as they have conceded by invoking Rule 4(k)(2) *** [the defendant] 'is not subject to the jurisdiction of the courts of general jurisdiction of any state' or the District of Columbia.") (quoting FED. R. CIV. P. 4(k)(2)); *JCorps Int'l, Inc. v. Charles & Lynn Schusterman Family Found.*, 828 F. App'x 740, 745 n.3 (2d Cir. 2020) (noting challenge to plaintiff's reliance on Rule 4(k)(2) given that plaintiff expressly alleged defendants were subject to specific jurisdiction in particular state).

At any rate, neither Rule 4(k)(2) nor Florida's long-arm statute provides a sufficient basis for personal jurisdiction. Oueiss fails to allege relevant ties between H.H. Sheikh Mohamed and the United States in general or Florida in particular. Even if Oueiss had asserted adequate contacts, the exercise of personal jurisdiction over H.H. Sheikh Mohamed would not comport with the "purposeful availment" and "fair play and substantial justice" mandates of due process.

---

[8]  https://www.prnewswire.com/news-releases/twitter-is-the-prime-social-media-network-for-world-leaders-300466300.html.

### A.   Oueiss Fails To Allege Ties Between H.H. Sheikh Mohamed And The United States Sufficient To Satisfy Rule 4(k)(2)

"[W]here a defendant is not amenable to the jurisdiction of any state's courts of general jurisdiction, Rule 4(k)(2) allows a federal district court to exercise personal jurisdiction over a foreign defendant" if two requirements are met:  "(1) the claim at issue arises under federal law, and (2) exercising jurisdiction is consistent with the Constitution and laws of the United States." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 (11th Cir. 2009) (footnote omitted). The contacts between the defendant and the United States must be adequate to satisfy the constitutional right to due process of law under the familiar framework for determining general and specific jurisdiction.  *Id.* at 1220; *see Fraser v. Smith*, 594 F.3d 842, 849-850 (11th Cir. 2010).

The complaint contains no allegations that come close to showing that H.H. Sheikh Mohamed has the "pervasive, continuous, and systematic" contacts with the United States necessary to support general jurisdiction.  *Fraser*, 594 F.3d at 850.  The complaint acknowledges that H.H. Sheikh Mohamed resides in Abu Dhabi, Compl. ¶ 68, and in support of personal jurisdiction references only the alleged "tortious conduct" at issue, *e.g.*, *id.* ¶¶ 125-126.  But for general personal jurisdiction to exist under Rule 4(k)(2), "[a] party's contacts with the [United States] *that are unrelated to the litigation* must be pervasive."  *Fraser*, 594 F.3d at 850 (first alteration in original) (emphasis added).

Oueiss's efforts to assert specific personal jurisdiction over H.H. Sheikh Mohamed under Rule 4(k)(2) fare no better.  Specific personal jurisdiction is claim-specific:  "[T]he defendant must have contacts related to or giving rise to the plaintiff's cause of action."  *Fraser*, 594 F.3d at 850. Moreover, Rule 4(k)(2)—as noted—is limited by its terms to claims arising under *federal* law and "does not establish personal jurisdiction if the only claims are those arising under state law or the law of another country."  FED. R. CIV. P. 4(k)(2) advisory committee notes to 1993 amendment.

Here, Oueiss fails to connect H.H. Sheikh Mohamed's alleged contacts with the United States to the federal claims (Counts One, Two, and Three).  Those claims relate only to the hacking phase of the alleged scheme.  *See, e.g.*, Compl. ¶¶ 261, 266, 274 (alleging "unlawful hacking operation," that "Defendants utilized hacking technology," and that "Defendants hacked Plaintiff's mobile device").  The lone statement purporting to tie that conduct to the United States is that "Defendants utilized hacking technology to access the contents of Plaintiff's personal mobile device (and all files physically located in her mobile device), during a time when Plaintiff and her mobile device were physically present in California, among other locations, without

13

authorization." *Id.* ¶ 266.  But the personal jurisdiction question aims to ascertain the geographical contacts of the foreign *defendant*, not the plaintiff.  *See Oldfield*, 558 F.3d at 1216.  Whether Oueiss was hacked while physically present in California does not establish an adequate connection between H.H. Sheikh Mohamed and the United States.  To the contrary, in alleging that Defendants accessed Oueiss's mobile device via "WhatsApp's servers located around the world, and *possibly* servers located in California," Compl. ¶ 170 (emphasis added), the complaint suggests that Oueiss's location was immaterial to any hacking.

For similar reasons, even accepting Oueiss's conclusory allegations about H.H. Sheikh Mohamed's participation in the asserted scheme, H.H. Sheikh Mohamed's alleged contacts with the United States do not demonstrate that he "purposefully availed [him]self of forum benefits" or that he "could reasonably anticipate being haled into court" in the United States—the remaining elements of the specific jurisdiction analysis.  *Fraser*, 594 F.3d at 850; *see also* Part III.C, *infra*. Thus, Oueiss has failed to allege ties between H.H. Sheikh Mohamed and the United States sufficient to support personal jurisdiction under Rule 4(k)(2).

## B.     Oueiss Fails To Allege Ties Between H.H. Sheikh Mohamed And Florida Sufficient To Satisfy Florida's Long-Arm Statute

Despite Oueiss's invocation of Rule 4(k)(2), which requires that no personal jurisdiction exist in Florida courts, she contends that "all Defendants" are subject to personal jurisdiction pursuant to Florida's long-arm statute.  Compl. ¶ 130.  Under Florida's long-arm statute, a non-resident defendant may be subject to personal jurisdiction either through "substantial and not isolated activity" in Florida, FLA. STAT. § 48.193(2), or by virtue of conduct "arising from" certain specific acts, *id.* § 48.193(1)(a).  Oueiss has satisfied neither standard.

"Florida courts have held th[e] 'substantial and not isolated activity' requirement to mean, and subsume, the 'continuous and systematic general business contacts' standard sufficient to satisfy the due process requirement of minimum contacts for general jurisdiction[.]"  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1275 n.16 (11th Cir. 2009).  As already discussed, Oueiss has alleged no facts sufficient to support general jurisdiction over H.H. Sheikh Mohamed in the United States—let alone in *Florida*.

Nor has Oueiss adequately alleged that her "claims arose from [H.H. Sheikh Mohamed] committing 'a tortious act within' Florida"—*i.e.*, specific jurisdiction.  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013).  Oueiss has not alleged, for instance, that H.H. Sheikh Mohamed carried out any of the allegedly illegal behavior while present in Florida,

or even that he has ever set foot in Florida. And she cannot rely on alleged co-conspirators' activity in Florida, for "if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy, then Florida courts decline to apply the co-conspirator theory to extend personal jurisdiction over a non-resident defendant." *Advantus, Corp. v. Sandpiper of Cal., Inc.*, No. 3:18-cv-1368, 2019 WL 4751725, at *23 (M.D. Fla. Sept. 30, 2019) (internal quotation marks omitted). As explained below (Part IV.A, *infra*), Oueiss's allegations about H.H. Sheikh Mohamed's participation in the claimed conspiracy are vague and conclusory, even for purposes of evaluating personal jurisdiction under Florida's long-arm statute.

## C. Exercising Jurisdiction Over H.H. Sheikh Mohamed Would Violate Due Process

Even if Oueiss had alleged adequate contacts between H.H. Sheikh Mohamed and either the United States or Florida, Oueiss would still need to show that H.H. Sheikh Mohamed "purposefully availed" himself of the forum and that "the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355. As to purposeful availment, Oueiss fails to allege sufficiently that H.H. Sheikh Mohamed possessed "the knowledge that overt acts in furtherance of the conspiracy would and did take place in Florida." *International Underwriters AG v. Triple I: Int'l Invs., Inc.*, No. 9:06-cv-80966, 2007 WL 9701852, at *5 (S.D. Fla. May 30, 2007). Without such knowledge, H.H. Sheikh Mohamed's purported availment of Florida cannot be "purposeful." *See Blessing v. Chandrasekhar*, Nos. 20-5850/5852, slip op. at 23 & n.17 (6th Cir. Feb. 23, 2021) (rejecting specific personal jurisdiction based on defendants' social media posts because plaintiffs "'would have experienced th[e] same' harm 'wherever else they might have traveled'" and "happened to be located").

As to fair play and substantial justice, courts consider a variety of factors that conflict with the exercise of personal jurisdiction over H.H. Sheikh Mohamed. *See Randall v. Offplan Millionaire AG*, No. 6:17-cv-2103, 2019 WL 5188368, at *10 (M.D. Fla. June 17, 2019), *report and recommendation adopted*, 2019 WL 5388200 (M.D. Fla. Oct. 22, 2019) (citing *Madara v. Hall*, 916 F.2d 1510, 1517 (11th Cir. 1990), and finding no personal jurisdiction over German citizen resident in Switzerland in case alleging racketeering conspiracy). "[I]t would be a great burden to force [H.H. Sheikh Mohamed] to defend this lawsuit in Florida as he lives in [the UAE] and does not conduct business in Florida." *Id.* Further, because Oueiss "do[es] not reside in [Florida] and most of the parties involved are located outside the United States," Florida "has little

to no interest in adjudicating this controversy." *Id.* And it is far from clear that, given the sovereign interests involved, Oueiss's suit furthers the interest in "obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental substantive societal policies." *Id.*

In sum, Oueiss seeks to force a foreign leader from a distant nation to defend himself in Florida against conclusory allegations about his role in a controversy with scant ties to the United States in general, let alone Florida in particular. This Court should decline the invitation.

## IV.   THE COMPLAINT FAILS TO STATE ANY PLAUSIBLE CLAIM AGAINST H.H. SHEIKH MOHAMED

Even if Oueiss could surmount the threshold immunity, service, and personal jurisdiction grounds for dismissal, her complaint should be dismissed for failure to state a claim.

### A.   Oueiss's Allegations About H.H. Sheikh Mohamed Are Insufficiently Pleaded

To survive a motion to dismiss under Rule 12(b)(6), the allegations in a complaint must "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Neither "labels and conclusions" nor "naked assertion[s]" suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). That requirement is "especially important" where, as here, claims are brought against "Government-official defendants." *Iqbal*, 556 U.S. at 685. Those basic pleading requirements apply to each named defendant separately: plaintiffs have a "responsibility to plead[] factual content that allows the court to draw the reasonable inference that [*each*] defendant is liable for the misconduct alleged." *Weil v. Phillips*, 816 F. App'x 339, 341 (11th Cir. 2020) (alterations in original) (emphasis added) (internal quotation marks omitted). With respect to H.H. Sheikh Mohamed, Oueiss's allegations fail to "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

To start, the complaint is devoid of facts that plausibly connect H.H. Sheikh Mohamed to the various federal and state claims comprising the alleged "unlawful hack and leak operation." Compl. ¶ 1. Oueiss does not claim that H.H. Sheikh Mohamed personally hacked her phone or distributed stolen content. Rather, Oueiss alleges only that *other* Defendants committed those acts at H.H. Sheikh Mohamed's and others' "behest." *Id.* ¶¶ 28-29, 167-168, 194, 243, 261.

The allegations supporting that assertion, however, are all vague, conclusory, and ultimately implausible as to H.H. Sheikh Mohamed's supposed involvement. With respect to hacking, Oueiss alleges simply that: (i) "[t]he UAE, at the direction of Defendant [H.H. Sheikh Mohamed], has *** leveraged its mature offensive cyber effects operations capabilities against

dissidents, its own citizens, and in support of joint Saudi and UAE interests, such as diminishing the influence of *Al Jazeera* and its employees," Compl. ¶ 150; and (ii) "[m]ore recently, the UAE has ramped up its spying and hacking operations against dissidents," *id.* ¶¶ 155, 162, 163. Similarly, Oueiss merely states that her mobile device was hacked using Pegasus—a spyware tool that, according to the complaint, was developed by an Israeli company called NSO Group Technologies Ltd. and sold to numerous countries, and is alleged by her to have been used in the past by the Saudi government. Compl. ¶¶ 147-148. Those generalized allegations do not come close to specifying H.H. Sheikh Mohamed's involvement with the alleged hacking of Oueiss's mobile device. Accordingly, Oueiss's hacking-related claims—*i.e.*, the federal claims (Counts One, Two, and Three) and the Florida intrusion claim (Count Five)—must fail as to H.H. Sheikh Mohamed.

The same is true of the "leak"-related allegations. Although the complaint states that "Defendants MBS, MBZ, and with assistance from [others] *** instructed the U.S. Defendants *** to disseminate th[e] stolen content, with the intent of disparaging and intimidating Plaintiff," Compl. ¶ 126, a naked reference to an "instruction" is insufficient to state a plausible claim. In addition, Oueiss does not allege dissemination or "leaking" by a single individual or entity with an identifiable connection to the UAE or to H.H Sheikh Mohamed. Thus, Oueiss's claims against H.H. Sheikh Mohamed for intentional infliction of emotional distress ("IIED"), public disclosure of private facts, and libel (Counts Four, Six, and Seven) should be dismissed as well.[9]

Beyond the substantive claims, Oueiss fails to allege facts sufficient to show that H.H. Sheikh Mohamed *conspired* to commit any of the alleged acts (Count Eight). To allege a conspiracy under Florida law, Oueiss must "provide [some] specific factual allegations regarding exactly how and when Defendants *agreed* to" commit the alleged unlawful acts. *In re Managed Care Litig.*, No. 1:00-md-1334, 2009 WL 7848517, at *10 (S.D. Fla. Mar. 27, 2009). But Oueiss offers no concrete allegations about how or when H.H. Sheikh Mohamed agreed with other

---

[9] The IIED claim is also deficient because Oueiss's emotional stress is pleaded in conclusory fashion. *See* Compl. ¶¶ 280-281 (Oueiss "has suffered severe emotional distress."); *see also Rincon v. Miami-Dade Cnty.*, No. 1:16-cv-22254, 2020 WL 7344633, at *11 (S.D. Fla. Mar. 31, 2020), *report and recommendation adopted*, 2020 WL 6536417 (S.D. Fla. Nov. 6, 2020). Oueiss's statement that she "is now scared to visit her family in Florida, as several Defendants (e.g. Collins and Al-Jundi) reside in Florida," Compl. ¶ 247, does not rise to the level of "nightmares, paranoia, and extreme daily anxiety" necessary to support an IIED claim, *Bickel v. City of Coral Springs*, No. 0:17-cv-60606, 2017 WL 3336722, at *2-3 (S.D. Fla. Aug. 4, 2017).

Defendants "to carry out a multi-faceted conspiracy and attack on Ms. Oueiss." Compl. ¶ 2. Instead, the complaint provides the highly qualified and broad-brush statement that, "*[u]pon information and belief*, each Defendant named herein entered into an agreement (either explicitly or *tacitly*) whereby they conspired to commit the [alleged] acts." *Id.* ¶ 309 (emphases added); *see Carlson v. Armstrong World Indus., Inc.*, 693 F. Supp. 1073, 1078 (S.D. Fla. 1987) (ordering dismissal where "[n]owhere in the complaint [wa]s there mention of any particular act in furtherance of a conspiracy [but where t]he conspiracy claims [were] vague, general, and conclusory"). It is not enough to allege that H.H. Sheikh Mohamed and the other defendants "engaged in the same 'scheme,'" for "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014); *see Collins v. Marsh*, No. 2:12-cv-51, 2012 WL 1058998, at *2 (M.D. Ala. Mar. 6, 2012) (dismissing civil conspiracy claim where plaintiff merely alleged common goal, scheme, or purpose).

At bottom, when it comes to the claims against H.H. Sheikh Mohamed, Oueiss's unsupported allegations amount to nothing "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The claims against him should be dismissed.

**B.     Other Deficiencies Doom Oueiss's Claims**

Besides the vague, conclusory, and implausible nature of Oueiss's allegations against H.H. Sheikh Mohamed, several claim-specific defects support dismissal.

**1.** For each of the federal claims, Oueiss cannot satisfy (at least) one essential element. Under the Alien Tort Statute (ATS) (Count One), Oueiss must show that the tort alleged was "committed in violation of international law," *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005), or "a treaty of the United States," *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013). But the tort Oueiss alleges—the "hacking of [a] mobile device and the subsequent dissemination of *** confidential and sensitive information to the public," Compl. ¶¶ 260-261—has never been found to violate international law. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 727-728 (2004) (stressing "high bar" to creating a new private cause of action under ATS and need for courts to exercise "great caution" in doing so); *Mamani v. Berzain*, 654 F.3d 1148, 1152 (11th Cir. 2011) (similar). Nor does it violate the only treaty Oueiss identifies (the Convention on Cybercrime, Compl. ¶ 261), which obligates the United

States to enact certain laws related to hacking and does not itself prohibit hacking.  *See generally* Council of Europe, *Convention on Cybercrime* (Nov. 23, 2001) (discussing requirements for *nations*, not *individuals*).[10]

 The Computer Fraud and Abuse Act (CFAA) (Count Two) and Stored Communications Act (SCA) (Count Three) claims fall short as well.  Both claims require intentional conduct.  *See Butera & Andrews v. International Bus. Macs. Corp.*, 456 F. Supp. 2d 104, 109 (D.D.C. 2006) ("The language of the [CFAA and SCA] *** require 'intentional' conduct before giving rise to a statutory violation.").  The complaint, however, fails to allege any specific intention by H.H. Sheikh Mohamed to hack Oueiss's phone.  And the Court may not draw that inference from the bare assertion that others acted at H.H. Sheikh Mohamed's "behest," especially when H.H. Sheikh's involvement in the alleged hacking rests on generalized and implausible assertions.  *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir. 2006) ("[W]e will not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint[.]") (first alteration in original).

Oueiss's SCA claim fails for a further reason:  the allegations preclude a determination that the alleged hacking involved a "facility through which an electronic communication service is provided."  18 U.S.C. § 2701(a)(1).  As courts have made clear, the SCA is directed to the facilities of centralized service providers, not personal mobile devices.  *See United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (concluding that "SCA *** does not appear to apply to *** hacking into [someone's] computer to download images and identifying information stored on [a] hard-drive" when "there is no evidence to suggest that [the] computer maintained any 'electronic communication service'"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 821 (N.D. Cal. 2020) (citing cases and noting that "courts in this Circuit and others have interpreted 'facility' to exclude users' personal devices").

**2.**  Oueiss cannot succeed on her Florida state law claims either.  *First*, several of Oueiss's claims are barred as duplicative.  Because Florida law provides that a single publication supports only a single cause of action, Oueiss can bring a claim for libel (Count Seven) or for IIED (Count Four), but not both.  *See Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) (successful invocation of defamation privilege precludes cause of action for IIED if sole basis for latter is same

---

[10] https://www.coe.int/en/web/conventions/full-list/-/conventions/rms/ 0900001680081561.

publication); *see also Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1340, 1343 (S.D. Fla. 1998) ("The claim for intentional infliction of emotional distress must stem from outrageous conduct separate from the defamation and not merely '[re]describe the tort of libel while characterizing it as outrageous conduct.'") (alteration in original).

Likewise, Oueiss cannot claim libel while also asserting public disclosure of private facts (Count Six).  Libel involves a falsehood, while "an essential element of the tort of public disclosure of private facts is that the facts at issue be true." *Tyne ex rel. Tyne v. Time Warner Ent. Co., L.P.*, 204 F. Supp. 2d 1338, 1344 (M.D. Fla. 2002), *aff'd*, 425 F.3d 1363 (11th Cir. 2005).  Oueiss alleges that Defendants "doctored," Compl. ¶ 183, and "attached a false narrative" to her photographs, *id.* ¶ 292.

*Second*, a virtual location like a phone's storage is not a "place" that can be the basis for an intrusion claim under Florida law (Count Five).  "Florida's tort does not extend to non-physical places." *Hall v. Sargeant*, No. 9:18-cv-80748, 2019 WL 1359485, at *7-8 (S.D. Fla. Mar. 26, 2019).  As a result, courts have held that there can be no common-law intrusion with respect to email accounts and the digital files within them, *id.*; credit reports, *Celestine v. Capital One*, No. 1:17-cv-20237, 2017 WL 2838185, at *3 (S.D. Fla. June 20, 2017); driver's license databases, *Watts v. City of Hollywood*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015); and medical records, *Bradley v. City of St. Cloud*, No. 6:12-cv-1348, 2013 WL 3270403, at *4 (M.D. Fla. June 26, 2013).  Although Oueiss claims that her hacked files were "physically" stored on her mobile device and servers, that attempt to avoid the limitations of Florida law cannot be squared with the fact that any intrusion was into an "electronic" place.  Compl. ¶ 170; *see id.* ¶ 168 (alleging that DarkMatter "exploit[ed] vulnerabilities associated with WhatsApp, iMessage, Apple Mail, and Safari, establishing remote access through malicious executables delivered via WhatsApp, iMessage, or email, as well as accessing Ms. Oueiss' Apple account and attempting to use the iCloud backup functionality to access media and other content remotely"); *id.* ¶ 177 (alleging that "on April 20, 2020, at least 5,207 individual files (images, videos, documents) were accessed on the file system of Ms. Oueiss' mobile device").

## CONCLUSION

For the foregoing reasons, this Court is respectfully requested to dismiss the complaint against H.H. Sheikh Mohamed with prejudice.

Dated: March 26, 2021
        Miami, Florida

Z.W. Julius Chen (*pro hac vice* pending)
chenj@akingump.com
Pratik A. Shah (*pro hac vice* pending)
pshah@akingump.com
Hal S. Shapiro (*pro hac vice* pending)
hshapiro@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 887-4500

Stephen M. Baldini (*pro hac vice* pending)
sbaldini@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park. 44th Floor
New York, NY 10036-6745
Telehone:  (212) 872-1000

Respectfully submitted,

*/s/ Mark J. Heise*
Mark J. Heise
Florida Bar No. 771090
mheise@hsmpa.com
HEISE SUAREZ MELVILLE
1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, Florida 33134
Telephone:  (305) 800-4476

*Counsel for Defendant H.H. Sheikh Mohamed Bin Zayed Al Nahyan*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 26, 2021, a true and correct copy of the foregoing document was filed using the Court's CM/ECF filing system.  Copies of the foregoing document will be served on all counsel of record via transmission of the Notice of Electronic Filing generated by CM/ECF.

<u>     /s/ Mark J. Heise     </u>
Mark J. Heise