**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-CV-25022-KMM**

GHADA OUEISS,

      Plaintiff,

         v.

MOHAMMED BIN SALMAN BIN
ABDULAZIZ AL SAUD, *et al.*,

      Defendants.

_____/

**PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 4

I.   MBS Spearheads the Conspiracy in His Personal Capacity ...................................... 4

II.  The Leaders of the Conspiracy Acted at the Behest of MBS .................................... 5

   A.  Al Qahtani and Al-Asaker Played Central Roles in Formulating and Furthering All
Stages of the Conspiracy ...................................................................................... 5

   B.  The Development and Execution of the Hacking Stage ........................................ 6

   C.  The Dissemination (or "Leak"), Amplification, and Defamation Stage of the
Conspiracy ........................................................................................................... 8

      1.  The Role of Al Arabiya and Masharea in the Dissemination, Amplification, and
Defamation Stage of the Conspiracy ............................................................... 8

      2.  The Timeline of the Dissemination Events That Took Place in Furtherance of the
Conspiracy ..................................................................................................... 9

III. The Foreign Nodes ("Recruiting Defendants") Acted at the Behest of MBS and In
Conjunction with the Leaders of the Conspiracy to Recruit the American Nodes and
Amplify False and Defamatory Information .......................................................... 10

   A.  The Recruiting Defendants' Connections to the Leaders of the Conspiracy and
Online Interactions with Members of the Network Reveal the Existence of the
Conspiracy ......................................................................................................... 10

   B.  The Coordinated Conduct of the Recruiting Defendants ................................... 11

   C.  The Involvement of the USA Defendants in the Conspiracy ............................ 12

      1.  A Drastic and Unprecedented Shift in the USA Defendants' Activity Reveals the
Existence of the Conspiracy .......................................................................... 12

      2.  The Coordinated Conduct of the USA Defendants .......................................... 13

      3.  The USA Defendants' Acts in Furtherance of the Conspiracy ....................... 14

   D.  Ms. Oueiss Suffered Significant Harm as a Result of the Conspiracy ............. 16

LEGAL STANDARD ......................................................................................................... 16

ARGUMENT ....................................................................................................................... 17

I.   None of the Foreign Defendants Are Entitled to Sovereign Immunity ................... 18

   A.  None of the Foreign Defendants Are Entitled to Status-Based Sovereign Immunity ...... 18

   B.  None of the Foreign Defendants Are Entitled to Conduct-Based Sovereign Immunity... 20

   C.  None of the Foreign Defendants Are Entitled to Derivative Sovereign Immunity .......... 25

i

II. All Foreign Defendants Are Within the Jurisdiction of This Court........................................ 26

   A. The Federal and State Law Claims Arise out of or Relate to Contacts Between Each of the Foreign Defendants and Florida ................................................................................. 26

      1. Florida's Long-Arm Statute.................................................................................... 27

      2. The Due Process Clause......................................................................................... 30

   B. The Federal Claims Arise out of or Relate to Contacts Between Each of the Foreign Defendants and the United States ........................................................................................ 34

III. The Amended Complaint States a Claim Under Federal Law.............................................. 36

   A. Ms. Oueiss States a Claim Under the ATS ........................................................................ 36

   B. Ms. Oueiss States a Claim Under the CFAA ..................................................................... 39

      1. The Amended Complaint Establishes MBS, Al Qahtani, Al-Asaker, and DarkMatter's Involvement in the Unlawful Hacking .................................................. 40

         a. MBS, Al Qahtani, Al-Asaker, and DarkMatter Indirectly Accessed the Contents of Ms. Oueiss's Mobile Device ................................................... 40

         b. Ms. Oueiss Adequately Alleges MBS, Al Qahtani, Al-Asaker, and DarkMatter Entered into a Conspiracy Under the CFAA.................................... 42

      2. Defendants' Hacking Harmed Ms. Oueiss................................................................. 43

IV. The Amended Complaint States Claims Under Florida Common Law ............................... 44

   A. Ms. Oueiss Has Plausibly Alleged IIED Claims Against All Defendants....................... 44

      1. The Conduct Giving Rise to Ms. Oueiss's IIED Claim is Not the Same Conduct as that of Her Libel Claim................................................................................... 45

      2. Ms. Oueiss's Allegations Exceed Her Burden to State a Claim of IIED.................. 45

      3. The Conduct Alleged Is Outrageous........................................................................ 46

      4. Ms. Oueiss Suffered Severe Emotional Distress ...................................................... 47

      5. Ms. Oueiss Has Sufficiently Alleged Actual Malice ................................................ 48

   B. Ms. Oueiss Has Plausibly Alleged Intrusion Claims ......................................................... 48

   C. Ms. Oueiss Has Plausibly Alleged Defamation Claims..................................................... 49

      1. The USA Defendants and the Recruiting Defendants Published False Statements Not Protected by the First Amendment .................................................................. 50

      2. The USA and Recruiting Defendants' Statements are Defamatory *Per Se* and Under a Standard Interpretation................................................................................ 52

         a. The Defendants' Statements Are Defamatory as Libel *Per Se* ............................. 52

         b. The Defendants' Statements Are Defamatory Under a Standard Interpretation .. 53

      3. The USA Defendants and the Recruiting Defendants Acted with Actual Malice ...... 53

4.   The Communications Decency Act Does Not Immunize the Defendants' False Statements ............................................................................................................ 54

D.   Ms. Oueiss Has Plausibly Alleged Civil Conspiracy Claims Against All Defendants .... 54

1.   The Defendants' Conduct Rose to the Level of Tortious Activity Individually and Collectively ............................................................................................................ 55

2.   The Amended Complaint Sufficiently Alleges a Conspiracy When Considered in its Entirety ............................................................................................................... 57

3.   Alleging Conspiracy under the CFAA Does Not Limit Ms. Oueiss's Ability to Proceed with Conspiracy Claims Under State Law ................................................... 59

CONCLUSION ...................................................................................................................... 59

# **TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Abdullahi v. Pfizer, Inc.*,
   562 F.3d 163 (2d Cir. 2009) ........................................................................................38, 39

*Adhikari v. Daoud & Partners*,
   697 F. Supp. 2d 674 (S.D. Tex. 2009) .............................................................................39

*Advanced Fluid Sys., Inc. v. Huber*,
   28 F. Supp. 3d 306 (M.D. Pa. 2014) ...............................................................................41

*Al Shimari v. CACI Premier Tech., Inc.*,
   263 F. Supp. 3d 595 (E.D. Va. 2017) ..............................................................................39

*Alan v. Wells Fargo Bank, N.A.*,
   604 F. App'x 863 (11th Cir. 2015) ..................................................................................53

*Albert v. Nat'l Cash Register Co.*,
   874 F. Supp. 1328 (S.D. Fla. 1994) ................................................................................47

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
   416 F.3d 1242 (11th Cir. 2005) .......................................................................................39

*Aldossari ex rel. Aldossari v. Ripp*,
   No. 20-3187, -- F. Supp. 3d ---, 2021 WL 1819699 (E.D. Pa. May 6, 2021) ..............19, 20, 24

*Aljabri v. Mohammed Bin Salman Abdulaziz Al Saud*,
   No. 1:20-cv-02146, ECF No. 58 (D.D.C., filed Dec. 7, 2020) ................................20

*Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*,
   480 U.S. 102 (1987) .........................................................................................................34

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................................................................................18

*Becker v. Pro Custom Solar LLC*,
   No. 2:19-cv-535, 2020 WL 474647 (M.D. Fla. Jan. 29, 2020) ................................24

*Belik v. Carlson Travel Grp., Inc.*,
   864 F. Supp. 2d 1302 (S.D. Fla. 2011) ...........................................................................58

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................................................................18

i

*Bickel v. City of Coral Springs*,
  No. 17-cv-60606, 2017 WL 3336722 (S.D. Fla. Aug. 4, 2017) ........................................48, 49

*Brand Energy & Infrastructure Servs., Inc. v. Irex Contr. Grp.*,
  No. 16-2499, 2017 WL 1105648 (E.D. Pa. Mar. 24, 2017) ....................................................41

*Broberg v. Carnival Corp.*,
  303 F. Supp. 3d 1313 (S.D. Fla. 2017) ................................................................................47

*Broidy Cap. Mgmt. LLC v. Muzin*,
  No. 1:19-cv-00150, -- F.4th --, 2021 WL 3950185 (D.C. Cir. Sept. 3, 2021)............22, 26, 27

*Broidy Cap. Mgmt., LLC v. State of Qatar*,
  982 F.3d 582 (9th Cir. 2020), *cert. denied*, No. 20-1547 (U.S. June 1, 2021) .................23, 38

*Broidy v. Glob. Risk Advisors LLC*,
  No. 1:19-cv-11861, 2021 WL 1225949 (Mar. 31, 2021 S.D.N.Y.)........................................25

*Brown Jordan Int'l, Inc. v. Carmicle*,
  846 F.3d 1167 (11th Cir. 2017) ..........................................................................................44

*Brown-Criscuolo v. Wolfe*,
  601 F. Supp. 2d 441 (D. Conn. 2009)..................................................................................47

*Buckley v. Littell*,
  539 F.2d 882 (2d Cir. 1976)................................................................................................54

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)...........................................................................................................34

*Butters v. Vance Int'l, Inc.*,
  225 F.3d 462 (4th Cir. 2000) ..........................................................................................26, 27

*Calendar Research LLC v. StubHub, Inc.*,
  No. 2:17-cv-04062, 2020 WL 4390391 (C.D. Cal. May 13, 2020)........................................42

*United States S.E.C. v. Carrillo*,
  115 F.3d 1540 (11th Cir. 1997) ......................................................................................32, 35

*Charest v. Sunny-Aakash, LLC*,
  No. 8:16-cv-2048, 2016 WL 5719588 (M.D. Fla. Sept. 30, 2016)........................................45

*Churruca v. Miami Jai-Alai, Inc.*,
  353 So. 2d 547 (Fla. 1977)..................................................................................................57

*Coll Builders Supply, Inc. v. Velez*,
  No. 6:17-cv-933, 2017 WL 4158661 (M.D. Fla. Aug. 31, 2017)...........................................43

*Cont'l Ins. Co. v. Lopez-Castro*,
  No. 06-cv-21368, 2008 WL 11333415 (S.D. Fla. Mar. 14, 2008) .........................................34

*Deeb v. Saati*,
  778 F. App'x 683 (11th Cir. 2019) ...................................................................................51, 52

*Doe v. Drummond Co.*,
  782 F.3d 576 (11th Cir. 2015) ........................................................................................37, 40

*In re Doe*,
  860 F.2d 40 (2d Cir. 1988).....................................................................................................21

*Doğan v. Barak*,
  932 F.3d 888 (9th Cir. 2019) .................................................................................................26

*Dresdner Bank AG v. M/V Olympia Voyager*,
  463 F.3d 1210 (11th Cir. 2006) .............................................................................................23

*Duffy v. Fox News Networks, LLC*,
  No. 6:14-cv-1545, 2015 WL 2449576 (M.D. Fla. May 21, 2015) .........................................52

*In re Estate of Ferdinand Marcos, Human Rights Litig.*,
  25 F.3d 1467 (9th Cir. 1994) .................................................................................................21

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
  752 So. 2d 582 (Fla. 2000).....................................................................................................31

*Fla. Atl. Univ. Bd. of Trs. v. Parsont*,
  465 F. Supp. 3d 1279 (S.D. Fla. 2020) ..................................................................................41

*Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*,
  616 So. 2d 562 (Fla. 5th DCA 1993) .....................................................................................57

*Ford v. Rowland*,
  562 So. 2d 731 (Fla. 5th DCA 1990) .....................................................................................53

*Georgetown Trading Co. v. Venturi Spirits, LLC*,
  No. 14-cv-62277, 2015 WL 11197790 (S.D. Fla. Mar. 16, 2015) .........................................18

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)................................................................................................................51

*Grayson v. No Labels, Inc.*,
  No. 6:20-cv-1824, 2021 WL 2869870 (M.D. Fla. Jan. 26, 2021) ..........................................54

*Groover v. Polk Cty. Bd. of Cty. Comm'rs*,
  460 F. Supp. 3d 1242 (M.D. Fla. 2020)..................................................................................56

iii

*Hall v. Sargeant*,
No. 18-80748, 2020 WL 1536435 (S.D. Fla. Mar. 30, 2020)................................................43

*Hall v. Sargeant*,
No. 18-cv-80748, 2019 WL 1359485 (S.D. Fla. Mar. 26, 2019) ...........................................49

*Hamilton Grp. Funding, Inc. v. Basel*,
No. 16-61145, 2019 WL 3765340 (S.D. Fla. Aug. 7, 2019) ..................................................44

*Hammes Co. Sports Dev., Inc. v. City of Miami, Fla*.,
No. 06-cv-20363, 2006 WL 8433471 (S.D. Fla. Sept. 27, 2006) ...........................................34

*Hassen v. Nahyan*,
No. 09-cv-01106, 2010 WL 9539408 (C.D. Cal. Sept. 17, 2010) ..........................................19

*Hoefling v. City of Miami*
811 F.3d 1271 (11th Cir. 2016) .............................................................................................23

*Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*,
No. 06-cv-80966, 2007 WL 9701852 (S.D. Fla. May 30, 2007)...........................................34

*Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*,
No. 19-cv-62412, 2020 WL 3078531 (S.D. Fla. June 10, 2020)...........................................17

*Jara v. Nunez*,
878 F.3d 1268 (11th Cir. 2018) .............................................................................................40

*John Roe I v. Bridgestone Corp.*,
492 F. Supp. 2d 988 (S.D. Ind. 2007) ...................................................................................38

*Johnson v. Thigpen*,
788 So. 2d 410 (Fla. 1st DCA 2001) .....................................................................................46

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984)...............................................................................................................33

*Keller v. Miami Herald Publ'g Co.*,
778 F.2d 711 (11th Cir. 1985) ...................................................................................51, 52, 54

*Kilma v. Carnival Corp.*,
No. 08-cv-20335, 2008 WL 4559231 (S.D. Fla. Oct. 10, 2008) ..........................................37

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013)...............................................................................................................40

*Kyle K. v. Chapman*,
208 F.3d 940 (11th Cir. 2000) ...............................................................................................45

iv

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020)..................................................................................................55

*In re Lenovo Adware Litig.*,
  No. 15-md-02624, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016)..........................................43

*Lewis v. Mutond*,
  918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, *Mutond v. Lewis*, 141 S. Ct. 156
  (2020)..................................................................................................19, 22, 23, 24

*Louis Vuitton Malletier, S.A. v. Mosseri*,
  736 F.3d 1339 (11th Cir. 2013) .................................................................31, 32, 33, 36

*Mak, LLC v. Vuozzo*,
  No. 17-cv-23310, 2017 WL 4476369 (S.D. Fla. Oct. 6, 2017) ............................................17

*United States v. Massey*,
  89 F.3d 1433 (11th Cir. 1996) ...........................................................................................58

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*,
  501 F.3d 1244 (11th Cir. 2007) .........................................................................................17

*McMahon v. Presidential Airways, Inc.*,
  502 F.3d 1331 (11th Cir. 2007) .........................................................................................26

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
  288 F.3d 1264 (11th Cir. 2002) .........................................................................................27

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) ...........................................................................................54

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990)...............................................................................................................51

*Nance v. Maxwell Fed. Credit Union (MAX)*,
  186 F.3d 1338 (11th Cir. 1999) .........................................................................................60

*Nims v. Harrison*,
  768 So. 2d 1198 (Fla. 1st DCA 2000) ................................................................................48

*United States v. Noriega*,
  117 F.3d 1206 (11th Cir. 1997) ....................................................................................19, 20

*Novell v. Bank of Am. Corp.*,
  No. 14-cv-80672, 2014 WL 7564678 (S.D. Fla. Dec. 3, 2014)............................................56

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
  558 F.3d 1210 (11th Cir. 2009) .............................................................................34, 35, 36

v

*Pike v. Trinity Indus., Inc.*,
No. 5:12-cv-146, 2012 WL 12909901 (M.D. Fla. June 22, 2012) ........................................28

*Posner v. Essex Ins.*,
178 F.3d 1209 (11th Cir. 1999) .....................................................................................28

*Republic of Arg. v. NML Cap., Ltd.*,
573 U.S. 134 (2014)........................................................................................................27

*Rincon v. Miami-Dade Cty.*,
No. 16-cv-22254, 2020 WL 7344633 (S.D. Fla. Mar. 31, 2020) ...........................................48

*Rubinson v. Rubinson*,
474 F. Supp. 3d 1270 (S.D. Fla. 2020) ..................................................................................53

*S.Y. v. Wyndham Hotels & Resorts, Inc.*,
No. 2:20-cv-628, 2021 WL 678594 (M.D. Fla. Feb. 22, 2021)............................................45

*Sakab Saudi Holding Comp. v. Saad Khalid S Aljabri*,
No. 1:21-cv-10529 (D. Mass. Mar. 29, 2021) ........................................................34

*Samantar v. Yousuf*,
560 U.S. 305 (2010)...........................................................................................18, 22, 26, 27

*SBM Site Servs., LLC v. Garrett*,
No. 10-cv-00385, 2012 WL 628619 (D. Colo. Feb. 27, 2012)..............................................42

*Schrier v. Qatar Islamic Bank*,
No. 0:20-cv-60075, ECF No. 74 (S.D. Fla. Sept. 30, 2020)...................................................37

*Se. Mech. Servs., Inc. v. Brody*,
No. 8:08-cv-1151, 2008 WL 4613046 (M.D. Fla. Oct. 15, 2008)..........................................42

*Shah v. Warrick & Boyn, LLP*,
No. 3:13-cv-103, 2019 WL 1324606 (N.D. Ind. Mar. 25, 2019) ...........................................43

*Shaw v. R.J. Reynolds Tobacco Co.*,
818 F. Supp. 1539 (M.D. Fla. 1993) *aff'd*, 15 F.3d 1097 (11th Cir. 1994) ...........................55

*Sieger v. Philipp*,
735 F. App'x 635 (11th Cir. 2018) .......................................................................................24

*Sikhs for Justice v. Singh*,
64 F. Supp. 3d 190 (D. D.C. 2014)...........................................................................19, 20, 21

*Sonic Momentum B, LP v. Motorcars of Distinction, Inc.*,
No. 11-cv-8591, 2011 WL 4738190 (S.D. Fla. Oct. 7, 2011) ..........................................58, 59

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004)....................................................................................37, 38

*St. Johns Vein Ctr. v. StreamlineMD LLC*,
  347 F. Supp. 3d 1047 (M.D. Fla. 2018)............................................................44

*Stembridge v. Mintz*,
  652 So. 2d 444 (Fla. 3d DCA 1995) ...................................................................52

*Stern v. O'Quinn*,
  No. 07-cv-60534, 2008 WL 11401794 (S.D. Fla. Aug. 8, 2008) ....................52, 55

*Stirling Int'l Realty, Inc. v. Soderstrom*,
  No. 14-cv-1109, 2015 WL 403318 (M.D. Fla. Jan. 28, 2015) ...............................50

*Synthes, Inc. v. Emerge Med., Inc.*,
  No. 11–1566, 2012 WL 4205476 (E.D. Pa. Sept. 19, 2012) .................................42

*Tavakoli v. Doronin*,
  No. 18-cv-21592, 2019 WL 124266 (S.D. Fla. Mar. 18, 2019) ..........................27, 28, 29, 30

*Trademotion, LLC v. Marketcliq, Inc.*,
  857 F. Supp. 2d 1285 (M.D. Fla. 2012)..............................................................43

*Turner v. Wells*,
  879 F.3d 1254 (11th Cir. 2018) .........................................................................51

*United Techs. Corp v. Mazer*,
  556 F.3d 1260 (11th Cir. 2009) ..............................................................34, 36, 37

*Vacation Club Servs., Inc. v. Rodriguez*,
  No. 6:10-cv-247, 2010 WL 1645129 (M.D. Fla. Apr. 22, 2010) ..........................43

*Van Der Linden v. Khan*,
  535 S.W.3d 179 (Tex. App.-Fort Worth 2017)....................................................53

*Ward v. Casual Rest. Concepts Inc.*,
  No. 10-cv-2640, 2011 WL 2600511 (M.D. Fla. June 29, 2011) .......................50, 51

*Weiland v. Palm Beach Cty. Sheriff's Office*,
  792 F.3d 1313 (11th Cir. 2015) .........................................................................45

*WhatsApp Inc. v. NSO Group Techs. Ltd.*,
  20-16408, 2020 WL 7693729 (9th Cir. 2020) ...............................................25, 27

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
  472 F. Supp. 3d 649 (N.D. Cal. 2020) ....................................................... *passim*

vii

*Wiegand v. Royal Caribbean Cruises Ltd.*,
   No. 19-cv-25100, 2020 WL 4187816 (S.D. Fla. Mar. 16, 2020) ...........................................18

*Wilcox v. Stout*,
   637 So. 2d 335 (Fla. 2d DCA 1994) ......................................................................................28

*Williams Elec. Co. v. Honeywell, Inc.*,
   854 F.2d 389 (11th Cir. 1988) .........................................................................................28, 30

*Wolfson v. Kirk*,
   273 So. 2d 774 (Fla. 4th DCA 1973) ....................................................................................53

*Xcentric Ventures, LLC v. Stanley*,
   No. 07-cv-00954, 2007 WL 2177216 (D. Ariz. July 27, 2007)..............................................53

## Statutes and Codes

United States Code
   Title 18, Section 1030(a)(2)(C)...........................................................................................40
   Title 18, Section 1030(a)(4)(A)(i)(I)....................................................................................40
   Title 18, Section 1030(b) ...............................................................................................41, 43
   Title 18, Section 1030(e)(11) .........................................................................................43, 44
   Title 18, Section 1030(g) .....................................................................................................43
   Title 22, Section 611(b)(2)...................................................................................................25
   Title 22, Section 611(b)(3)...................................................................................................25
   Title 22, Section 611 *et seq.*................................................................................................25

Communications Decency Act
   Section 230...........................................................................................................................55

Florida Statute
   Section 48.193(1)(a) .............................................................................................................28
   Section 48.193(1)(a)(2)........................................................................................................28

## Rules and Regulations

Federal Rules of Civil Procedure
   Rule 4(k)(2).........................................................................................................................34
   Rule 8(d) ..............................................................................................................................34
   Rule 8(d)(3)..........................................................................................................................34
   Rule 12(b)(1)........................................................................................................................17
   Rule 12(b)(2)........................................................................................................................17
   Rule 12(b)(6)..................................................................................................................18, 55

## Other Authorities

Harold Hongju Koh, *Foreign Official Immunity After Samantar: A United States*
   *Government Perspective,* 44 Vand. J. Transnat'l L. 1141 (2011) ...............................22, 23, 24

Restatement of Foreign Relations Law of the United States
    Section 66.........................................................................................................................22

**<u>CITATION CONVENTIONS</u>**

**<u>Parties</u>**

"Ms. Oueiss": Plaintiff Ghada Oueiss

"MBS": Defendant Mohammed Bin Salman Bin Abdulaziz Al Saud

"Al Qahtani": Defendant Saud Al Qahtani

"Al-Asaker": Defendant Bader Al-Asaker

"DarkMatter": Defendant DarkMatter

"Masharea": Defendant Masharea wa Enjazat IT Corporation LLC

"Middle East News": Defendant Middle East News FZ-LLC

"MiSK": Defendant Mohammed bin Abdulaziz Al Saud Foundation d/b/a MiSK Foundation

"Zeinab": Defendant Tarek Abou Zeinab

"Al-Owerde": Defendant Turki Al-Owerde

"Al Menaia": Defendant Faisal Al Menaia

"Al Otaibi": Defendant Awwad Al Otaibi

"Recruiting Defendants": Defendants Bader Al-Asaker, Tarek Abou Zeinab, Turki Al-Owerde, Faisal Al Menaia, and Awwad Al Otaibi, collectively

"Van Rider": Defendant Sharon Van Rider

"Schey": Defendant Christanne Schey

"Jundi": Defendant Sam Jundi

"Smith": Defendant Annette Smith

"USA Defendants": Defendants Sharon Van Rider, Christanne Schey, Sam Jundi, and Annette Smith, collectively

**<u>Docket Entries</u>**

"AC": Ms. Oueiss's First Amended Complaint, dated June 14, 2021, ECF No. 135

i

"MBS MTD": Defendant Mohammed bin Abdulaziz Al Saud's Motion to Dismiss, dated August 2, 2021, ECF No. 161

"USA Defs. MTD": USA Defendants' Motion to Dismiss, dated August 2, 2021, ECF No. 162

"Rec. Defs. MTD": Defendants Faisal Al Menaia, Awwad Al Otaibi, Turki Al-Owerde, and Tarek Abou Zeinab's Motion to Dismiss, dated August 2, 2021, ECF No. 163

"Al Qahtani MTD": Defendant Saud Al Qahtani's Motion to Dismiss, dated August 2, 2021, ECF No. 164

"DarkMatter MTD": Defendant DarkMatter's Motion to Dismiss, dated August 2, 2021, ECF No. 165

"MiSK MTD": Defendant Mohammed bin Abdulaziz Al Saud Foundation d/b/a MiSK Foundation's Motion to Dismiss, dated August 2, 2021, ECF No. 166

"Al-Asaker MTD": Defendant Bader Al-Asaker's Motion to Dismiss, dated August 2, 2021, ECF No. 167

"Masharea MTD": Defendant Masharea wa Enjazat IT Corporation LLC's Motion to Dismiss, dated August 2, 2021, ECF No. 168

Middle East News MTD": Defendant Middle East News FZ-LLC's Motion to Dismiss, dated August 2, 2021, ECF No. 169

## **Additional Terms**

"Conspiracy": The unlawful hack and leak operation against Ms. Oueiss

"King Salman": Defendant MBS's father, King Salman bin Abdulaziz Al Saud

"Leaders of the Conspiracy": Defendants Mohammed bin Abdulaziz Al Saud, DarkMatter, Masharea wa Enjazat IT Corporation LLC, Middle East News FZ-LLC, and Mohammed bin Abdulaziz Al Saud Foundation d/b/a MiSK Foundation, collectively

"Network":  U.S. agents, together with other foreign actors on Twitter, that have formed a cohesive network on Twitter, to spread pro-Defendant MBS propaganda and ruthlessly attack anyone who dares to report on his human rights abuses

"NSO": NSO Group

"UAE": United Arab Emirates

## PRELIMINARY STATEMENT

Ghada Oueiss has had her life threatened, has been called a prostitute, and she now lives in fear every day.  Her private photos are on the internet.  It is because of MBS's cruelty and vindictiveness that is so.  As he has before and as he will again, MBS orchestrated an attack on Ms. Oueiss in concert with both known and unknown conspirators in the United States and abroad. MBS and his accomplices hacked into Ms. Oueiss's phone, leaked her personal data onto the internet, and then coordinated with one another to spread disinformation and abuse of Ms. Oueiss on social media.

No one can deny what happened, and Ms. Oueiss knows who did it:  This attack follows MBS's pattern, and Ms. Oueiss has both forensic and circumstantial evidence of the Defendants' involvement.  Whether he is going after Jeff Bezos, Jamal Khashoggi, or the head of *Al Jazeera*, MBS hacks the personal devices of a chosen enemy, leaks the contents of the device, and orchestrates a social media campaign that includes both defamation and threats of harm.  So, Ms. Oueiss has good reason to be scared:  MBS orchestrated the murder of Mr. Khashoggi, and there is no reason to believe he will not do it again.  As discussed below, notwithstanding that Ms. Oueiss has been denied the opportunity to conduct any discovery, including jurisdictional discovery, in this case, the allegations in the Amended Complaint are corroborated by concrete and electronic evidence against the Defendants.[1]  For example, even in the absence of discovery, Ms. Ouiess' allegations provide evidence that establish the Foreign Defendants' *modus operandi* and signatures, and that they avail themselves of the United States in the interest of promoting MBS and criticizing his enemies.

---

[1] *See infra* note 9.

Defendants call Ms. Oueiss's allegations "wholly conclusory." Over almost two hundred pages, they move to dismiss the Amended Complaint on every ground imaginable. One Defendant even moved to dismiss a claim that was not made against it. These attempts to avoid discovery, much less accountability, are baseless. Ms. Oueiss pleads in particularized detail about every stage of Defendants' Conspiracy. She (1) uses forensic evidence obtained from analysis of her phone to demonstrate when and how her phone was hacked, and who hacked it; (2) cites publicly available communications between Defendants, the social media history of each relevant Defendant, and pre-existing relationships among the Defendants to show how both the Foreign and the USA Defendants were recruited into the Conspiracy; and (3) uses the barrage of attacks on social media by the Defendants to demonstrate the harassment she has sustained and the harm she has incurred. None of this is "conclusory." Moreover, the extent of the evidence on which Ms. Oueiss relies is particularly substantive and surely sufficient to establish plausibility given the sheer amount of information about the Conspiracy that is in the unique control of the Defendants.

The Foreign Defendants argue that the Court does not have personal jurisdiction over them, and that they are entitled to foreign immunity even if it did. This is false. MBS is not the head of state for Saudi Arabia, and he launched this Conspiracy in his personal capacity; Saudi Arabia itself has disclaimed all responsibility for it. MBS is trying to have it both ways. Everyone acting in furtherance of the Conspiracy is doing so in their personal capacity or in connection with their employment at a private company. All of the conspirators availed themselves of the laws of the state of Florida when they deliberately recruited members who live and reside in Florida and who acted in furtherance of the Conspiracy in Florida. Those acts were done because the Foreign Defendants *wanted* them done. If the Foreign Defendants wished to avoid suit in Florida, they

should not have illegally conspired with Florida residents to harass, defame, and intimidate Ms. Oueiss.

Ms. Oueiss states a plausible claim under two federal statutes. She sufficiently alleges that she is a foreign national bringing a tort for a violation of international law in response to conduct that touches and concerns the United States, all that is required under the Alien Tort Statute ("ATS"). No one can deny the international community's overriding interest in preventing cybercrime; it is the subject of the Budapest Convention on Cybercrime. Like almost all civilized nations, Saudi Arabia itself prohibits the very conduct at issue; such a prohibition is surely an international norm. And because of the large number of attacks that took place in the United States, the conduct alleged in the complaint rebuts the ATS's presumption of extraterritoriality. In addition, the unlawful access to Ms. Oueiss's personal cell phone is exactly the kind of behavior for which the Computer Fraud and Abuse Act ("CFAA") was meant to provide a remedy, and the Amended Complaint easily meets the standard at the motion to dismiss stage in demonstrating how the Defendants conspired to unlawfully gain access to her device and attests to the damages Ms. Oueiss has incurred as a result of that illegal access.

Finally, Ms. Oueiss states a plausible claim for each of the four causes of action under Florida common law. The emotional distress that Ms. Oueiss has suffered, and continues to suffer, at the hands of MBS and his accomplices constitutes intentional inflection of emotional distress ("IIED") under Florida law, and the access to her cell phone is textbook common law intrusion. The false statements disseminated by the Defendants are not just libel but libel *per se*. And the Amended Complaint contains, in exhaustive detail, all of the factual allegations necessary to plead common law civil conspiracy.

Given the Defendants' purposefully outrageous conduct, and MBS's personal history and behavior, Ms. Oueiss was not expecting the Defendants to simply confess.  Their denials at this stage of litigation, however, are not sufficient to dismiss all the claims brought against them.  This is a complicated, carefully planned, and covert conspiracy, and the Defendants have gone to great lengths to conceal their illegal and appalling behavior.  As with most well-funded and well-orchestrated conspiracies, this one spearheaded by one of the world's richest men, cracking such a scheme is naturally challenging, if ever successful.  Ms. Oueiss, a lone journalist, has more than met that challenge against the toughest odds and MBS's unlimited resources, at least at this pleading stage.

Accordingly, Ms. Oueiss opposes each of the Defendants' nine motions to dismiss in full on the basis of the sufficiency of her Amended Complaint and the prevailing law.

## STATEMENT OF FACTS[2]

### I.    MBS Spearheads the Conspiracy in His Personal Capacity

MBS, in his personal capacity, coordinates, directs, and supervises a Network of agents to silence his critics and brutally attack his personal enemies.  AC ¶ 68.  Obsessed with maintaining a polished public image, MBS has committed his personal resources to pursue this goal.  *Id.* ¶ 4. Notably, the Kingdom of Saudi Arabia has categorically disclaimed responsibility for any of the conduct attributable to MBS, underscoring the personal nature of MBS's conduct.  *Id.* ¶ 75. Although MBS has deputized the Network to act at his behest, MBS's fingerprints are on several hacking operations against perceived critics, including several journalists and the current owner of *The Washington Post*—Mr. Jeff Bezos.  *Id.* ¶ 70.  Mr. Bezos became a personal target of MBS because of Mr. Bezos' ownership stake in *The Washington Post*, a U.S. news outlet that published

---

[2]  Abbreviations and defined terms used in the Amended Complaint, ECF No. 135, are continued herein and defined in the Citation Conventions glossary.

articles about MBS's human rights abuses, including his central role in the murder of journalist Jamal Khashoggi.  *Id.* ¶¶ 69, 72.  In the attack against Mr. Bezos, MBS used his ***own personal*** WhatsApp account to infiltrate Mr. Bezos' personal mobile device.  *Id.* ¶ 72.  In 2018, MBS sent two text messages to Mr. Bezos via WhatsApp, which, unbeknownst to Mr. Bezos, contained malware that infected Mr. Bezos' mobile device.  *Id.* ¶¶ 72, 73, 145.

MBS's direct messages to Mr. Bezos are indicative of a *modus operandi* and are exemplary of the hack and leak operations that MBS personally directed the Conspiracy to carry out against Ms. Oueiss and other perceived critics.  *Id.* ¶¶ 145–46.  Further evidence of MBS's personal involvement is his central role in Mr. Khashoggi's brutal murder, which was precipitated by a cyber-attack campaign similar to the campaign described by Ms. Oueiss.  *Id.* ¶¶ 9, 13.

## II.  <u>The Leaders of the Conspiracy Acted at the Behest of MBS</u>

The Leaders of the Conspiracy (MBS, Al Qahtani, Al-Asaker, DarkMatter, and MBS's Middle East News and Masharea) have developed a sophisticated network of foreign and domestic agents to carry out various cyber-attack campaigns, including the Conspiracy against Ms. Oueiss.

### A.  **Al Qahtani and Al-Asaker Played Central Roles in Formulating and Furthering All Stages of the Conspiracy**

MBS enlisted Al Qahtani and Al-Asaker to act on his behalf and in furtherance of the Conspiracy.  They have held positions that publicly reflect their fidelity to MBS, Al Qahtani as former advisor and media consultant to MBS and Al-Asaker as former head of the Private Office of MBS and currently the Secretary General of the MiSK Foundation.  *Id.* ¶¶ 77, 85.

MBS deployed Al Qahtani and Al-Asaker's unique skills to further the Conspiracy and advance his personal vendettas.  Al Qahtani's supervisory role in social media and surveillance operations and extensive use of bots has been documented by investigative reports, and he has made statements on hacking platforms implicating himself in MBS's schemes.  *Id.* ¶¶ 81–82.

Likewise, Al-Asaker has been directly implicated by two former Twitter employees who were charged by the U.S. Department of Justice for spying on behalf of Saudi Arabia.  *Id.* ¶ 86.

Al Qahtani and Al-Asaker were key partners in the execution of the hack and leak operation and played pivotal roles at each stage.  Al Qahtani orchestrated the procurement of sophisticated hacking tools which were used multiple times to hack Ms. Oueiss's mobile device, led the creation and management of large botnets on Twitter, and led the recruitment and establishment of the Network, which facilitated the dissemination of private photographs of Ms. Oueiss in a concerted plan to ridicule and defame her.  *Id.* ¶¶ 78, 83.  Like Al Qahtani, in his capacity as Secretary General for the MiSK Foundation, Al-Asaker has played an integral role in recruiting the co-conspirators who helped carry out the attacks on Ms. Oueiss.  *Id.* ¶ 87.

In short, Al Qahtani and Al-Asaker leverage their influence and access to technical resources to target and hack mobile devices using sophisticated mobile spyware, obtain sensitive and personal information about their targets through the hackings, and then use the stolen content to lodge online attacks that are amplified using networks of real and fake social media accounts. *Id.* ¶ 30.  This strategy has been carried out against numerous journalists, activists, and dissidents, including Jamal Khashoggi and Mr. Bezos.  *Id.*  As a result of this strategy, MBS's agents used Pegasus spyware, discussed further, *infra* Statement of Facts, Section II.B, to hack at least 36 personal phones belonging to journalists and executives at *Al Jazeera* throughout July and August 2020.  AC ¶ 30.

B.      **The Development and Execution of the Hacking Stage**

Around September 2019, MBS, Al Qahtani, and Al-Asaker, in direct response to Ms. Oueiss's coverage of MBS's involvement in the hacking of Mr. Bezos' mobile device and his orchestration of Mr. Khashoggi's murder, hatched a plan to hack Ms. Oueiss's personal mobile device to obtain confidential information.  *Id.* ¶ 158.  From October 2019 through August 2020,

MBS, Al Qahtani, and Al-Asaker (along with DarkMatter) purposely gained unauthorized access to Ms. Oueiss's mobile device using multiple attack vectors. *Id.*

To upgrade their previously limited cybercrime capabilities, MBS, with Al Qahtani's coordination, procured advanced hacking tools from cyber firms NSO and Hacking Team. *Id.* ¶ 144. In 2018, MBS acquired NSO's Pegasus spyware and used it to access over 400 WhatsApp messages between Mr. Khashoggi and another individual in order to track Mr. Khashoggi during the weeks leading up to his murder. *Id.*

DarkMatter controls the sophisticated hacking group known as "Project Raven," which also conducts offensive cyber effects operations. *Id.* ¶ 76. DarkMatter has a history of conducting targeted hacking campaigns against MBS's critics and was responsible for the targeted hacking of the chairman of *Al Jazeera*'s personal iPhone (along with other journalists' iPhones). *Id.* MBS and DarkMatter are known for utilizing Pegasus spyware to engage in offensive cyber effects operations against MBS's critics and have conducted offensive cyber effects operations in concert. *Id.* ¶¶ 30, 76, 144–45, 152–53.

There were four major hacking events relevant to this lawsuit, which occurred on or around November 20, 2019, April 14, 2020, July 6, 2020, and July 15, 2020, and three of those events utilized similar methods to obtain access to Ms. Oueiss's mobile device. *Id.* ¶¶ 159–60. Ms. Oueiss alleges in particularized detail the timeline and methodology that was employed to compromise Ms. Oueiss's mobile device and leverage her device's vulnerabilities to retrieve sensitive private information. *Id.* ¶¶ 160–74. On November 20, 2019, July 6, 2020, and July 15, 2020, a threat actor group working at the behest of MBS, Al Qahtani, and Al-Asaker compromised Ms. Oueiss's mobile device three separate times, and they maintained access for at least several days thereafter. *Id.* In addition, on April 14, 2020, MBS and DarkMatter coordinated to gain

access to Ms. Oueiss's device.  *Id.* ¶ 16–68.  Ms. Oueiss received a WhatsApp message from an unknown Moroccan phone number and subsequently experienced unusual processes on her device and a system crash.  *Id.* ¶¶ 168–69.  Additionally, in the days leading up to and after this event, greater-than-average count of file access events occurred.  *Id.* ¶ 172.  Further analysis revealed thousands of files were accessed during hours when Ms. Oueiss was sleeping, confirming the hack by the Defendants.  *Id.*

As a result of these hacking events, the Defendants disseminated at least two separate groups of personal photographs and videos stolen from Ms. Oueiss's mobile device.  *Id.* ¶ 175.

- <u>Group 1</u>: Personal photographs of Ms. Oueiss smoking a cigarette and drinking alcohol with her friends (the "Smoking Photos").  *Id.* ¶ 176.

- <u>Group 2</u>: A personal video of Ms. Oueiss in a hot tub that her husband had recorded on Ms. Oueiss's mobile device, screenshots of which were subsequently doctored to make it falsely appear as though Ms. Oueiss was naked (the "Personal and Private Photos").  *Id.* ¶ 177.

While these are the only groups of photographs leaked thus far, the amount of data accessed indicates that there are additional items that were stolen but have not yet been leaked.  *Id.* ¶ 178.

### C.    The Dissemination (or "Leak"), Amplification, and Defamation Stage of the Conspiracy

Equipped with the information stolen from Ms. Oueiss's mobile device, the final stage of the Conspiracy involved the deployment of the carefully cultivated network organized by MBS, Al Qahtani, and Al-Asaker to disseminate the images and attack Ms. Oueiss.

#### 1.    The Role of Al Arabiya and Masharea in the Dissemination, Amplification, and Defamation Stage of the Conspiracy

Middle East News and Masharea were critical actors in the dissemination and amplification phase of the Conspiracy.  Middle East News owns and operates news network Al Arabiya, which has offices in Saudi Arabia and the U.S.  *Id.* ¶ 89.  Similarly, Masharea owns and operates news network Saudi 24 TV, which has offices in Saudi Arabia and the U.S.  *Id.* ¶ 91.  MBS directs and

controls the commercial activities and employees of Al Arabiya and Saudi 24 TV, making Middle East News and Masharea mere instrumentalities of MBS. *Id.* ¶¶ 89, 91, 136, 139.

Acting in concert with MBS, Al Arabiya and Saudi 24 TV published content consistent with his personal goal of snuffing out critics. Al Arabiya posted false and doctored documents from *Al Jazeera*, intending to defame and disparage Ms. Oueiss. *Id.* ¶¶ 89–90. In its role in the amplification and defamation aspect of the Conspiracy, Saudi 24 TV, through Zeinab, recruited various American citizens (including the USA Defendants) to join a propaganda campaign intended attack MBS's critics, including Ms. Oueiss. *Id.* ¶ 92.

### 2. The Timeline of the Dissemination Events That Took Place in Furtherance of the Conspiracy

The stolen content and other defamatory disinformation were initially disseminated by the Defendants using instrumentalities like Al Arabiya and fake "bot" accounts on social media created specifically by the Leaders of the Conspiracy, with the express goal of disseminating attacks against MBS's critics. *Id.* ¶¶ 183–84, 190. The dissemination occurred as follows:

- February 17, 2020: Al Arabiya tweeted a supposed leaked document that purported to show financial rewards paid in bonuses to *Al Jazeera* journalists, including Ms. Oueiss (the "Doctored Financial Photo"). *Id.* ¶ 179. The post of the Doctored Financial Photo stated on Twitter that it revealed "hundreds of thousands in bonuses" were paid by the Emir of Qatar to Ms. Oueiss (and others) in an effort to harm her journalistic integrity by making it appear as if she is paid by Qatari officials to further a specific agenda. *Id.* ¶ 180.

- April 19, 2020: MBS and his agents, through the use of a fake "bot" accounts on the social messaging apps Telegram and Twitter (using usernames @Uncareer20 and @Uncareer1, respectively), released the Smoking Photos. *Id.* ¶ 187.

- June 2, 2020: @Uncareer20 and @Uncareer1 posted the contents of a video stolen from Ms. Oueiss's mobile device, which the Defendants had broken down into various screenshots (the Personal and Private Photos). *Id.* ¶ 191.

Although Twitter suspended the @Uncareer1 account in June 2020, the related Telegram account (@Uncareer20) claimed to have established another account with the handle @almhnah1. *Id.*

9

¶ 193.  This new Twitter account has claimed to be the origin of the leaked photographs of Ms. Oueiss and further claims that it has "only leaked 1% of what it has."  *Id.*  The biography of this Twitter account states, "we return to renew the pain."  *Id.*

**III.  The Foreign Nodes ("Recruiting Defendants") Acted at the Behest of MBS and in Conjunction with the Leaders of the Conspiracy to Recruit the American Nodes and Amplify False and Defamatory Information**

As discussed *supra* Statement of Facts, Section II.A, MBS, Al Qahtani, and Al-Asaker cultivated a Network to further disseminate and amplify defamatory attacks against MBS's critics, including Ms. Oueiss, at a moment's notice.  *Id.* ¶ 195.  Accordingly, the Recruiting Defendants played an important role in recruiting their American counterparts, the USA Defendants, personally disseminating disinformation, and mobilizing them to circulate the same defamatory content.  *See e.g.*, *id* ¶ 216 (instructing Jundi); *id.* ¶¶ 223, 225 (instructing Smith); *id.* ¶ 232 (instructing Schey); *see also id.* ¶ 122.

**A.  The Recruiting Defendants' Connections to the Leaders of the Conspiracy and Online Interactions with Members of the Network Reveal the Existence of the Conspiracy**

The Recruiting Defendants' commitment to the Conspiracy is evinced by their connections to its leaders (MBS, Al Qahtani, and Al-Asaker), as described below, and by their online activity:

*Zeinab*: Zeinab is an employee of Saudi 24 TV.  *Id.* ¶¶ 91–92.  Upon information and belief, Zeinab, in his capacity as a Saudi 24 TV employee, and at the instruction of MBS and officers of Saudi 24 TV, recruited various American citizens to join the propaganda campaign intended to attack MBS's critics, including Ms. Oueiss.  *Id.* ¶ 92.  Zeinab has instructed numerous members of the Network to post pro-MBS propaganda videos, including Van Rider, who publicly thanked him for his "help and edits."  *Id.* ¶ 102.

*Al Menaia*: Al Menaia has also instructed several of the USA Defendants to spread disinformation and has assisted them in the production of videos posted on Twitter.  *Id.* ¶ 104.  Al

Menaia has personally harassed Ms. Oueiss, mentioning her Twitter account in 11 tweets between October 8, 2018 and January 25, 2020. *Id.* ¶ 106. In a tweet on January 25, 2020, Al Menaia referred to Ms. Oueiss as a "dog" and threatened that "we will surround you" in response to her coverage of MBS's orchestration of the hack of Mr. Bezos' mobile device. *Id.*

*Al-Owerde*: Al-Owerde is the Editor-in-Chief of *The Herald Report*, a news agency based in the UAE, and a contributor to *The Milli Chronicle*, through which he spreads pro-MBS disinformation. *Id.* ¶ 108. Al-Owerde has maintained a leadership role in the Network and engaged the USA Defendants throughout the fall of 2018. *Id.* ¶ 109. Al-Owerde has taken part in directing members of the Network to promote pro-MBS propaganda and defame Ms. Oueiss. Additionally, *The Herald Report*'s Twitter account, operated by Al-Owerde, has instructed members of the Network, including Van Rider, to follow certain Twitter users. *Id.* ¶ 112.

*Al Otaibi*: Al Otaibi was recruited by MBS and Al-Asaker through MiSK and has since maintained a leadership role in the Network. *Id.* ¶ 114. He regularly interacts with members of the Network, including the USA Defendants. *Id.* ¶ 117.

### B.     The Coordinated Conduct of the Recruiting Defendants

The Recruiting Defendants' ties to the Leaders of the Conspiracy are conspicuous and their efforts to disseminate the hacked personal and private images obtained unlawfully are evinced by the frequency of their interactions with the Network. The Recruiting Defendants' online activity and contacts with members of the Network is summarized in detail below:

- Zeinab interacted with the USA Defendants and Al Qahtani over ***2,400 times*** between August 27, 2018 and September 29, 2020. *Id*. ¶ 101.

- Al Menaia interacted with the USA Defendants, Al Qahtani, and Al-Owerde over ***1,100 times*** between June 13, 2018 and September 29, 2020. *Id*. ¶ 105.

- Al-Owerde has interacted with the USA Defendants, Al Qahtani, and other Defendants over ***11,000 times*** as of September 29, 2020. *Id*. ¶ 110.

11

- Al Otaibi has interacted with the USA Defendants, Al Qahtani, and other Defendants approximately **4,500 times** as of September 29, 2020.  *Id*. ¶ 117.

Most, if not all, of the Recruiting Defendants' interactions with other members of the Network relate to praising MBS, Saudi Arabia, or other acolytes of MBS, while consistently attacking critics of MBS.  *Id.* ¶¶ 101, 105, 110, 117.

### C.   The Involvement of the USA Defendants in the Conspiracy

#### 1.   A Drastic and Unprecedented Shift in the USA Defendants' Activity Reveals the Existence of the Conspiracy

Prior to 2018, the USA Defendants' conduct on Twitter was that of ordinary American citizens, but their behavior changed drastically following their contact with the Recruiting Defendants.   Their unprecedented and incessant praise of MBS, without any apparent prior connection to these issues, must be the result of their agreement to participate in the Conspiracy:

*Van Rider*: Prior to the summer of 2018, Van Rider, an active Twitter user since July 2011, made absolutely no reference to MBS, Saudi Arabia, or even the Middle East, with the exception of one lone tweet *opposing* Saudi Arabia.  *Id.*  ¶¶ 39–40.  However, in the summer of 2018, Van Rider's activity on Twitter abruptly changed, and she repeatedly and consistently engaged in pushing a pro-MBS narrative while attacking his critics.  *Id.*  ¶¶ 40–41.

*Jundi*: From approximately November 2011 to early 2018, Jundi operated a Twitter account in which he tweeted primarily in English, with little to no mention of Saudi Arabia.  *Id.* ¶ 48.  However, in May 2018 Jundi's behavior changed dramatically.  *Id.* ¶ 49.  Jundi began tweeting almost exclusively in a colloquial form of the Arabic language and devoted his time on Twitter to praising MBS and Saudi Arabia.  *Id.*

*Smith*:  Smith operated the same Twitter account from 2009 to September 2018 without once mentioning MBS or Saudi Arabia.  *Id.* ¶¶ 52–53.  However, beginning in October 2018, Smith's Twitter account became a pro-MBS propaganda outlet.  *Id.* ¶¶ 54–55.

*Schey*: Between 2010 to 2013, Schey tweeted approximately 100 times total and never mentioned MBS.  *Id.* ¶ 58.  Now, Schey tweets approximately ***340 times per day***—the vast majority of which has been pro-MBS propaganda—all since April 2018.  *Id.* ¶ 59.

These dramatic changes in activity—all between May and October 2018—were not coincidental.  The USA Defendants were each recruited by the Recruiting Defendants at the behest of a strategy spearheaded by MBS and the Leaders of the Conspiracy to whitewash MBS's image in the eyes of the American public.  *Id.*  ¶¶ 4, 27.

## 2. The Coordinated Conduct of the USA Defendants

The USA Defendants interact with each other, Al Qahtani, and the Recruiting Defendants regarding MBS and Saudi Arabia on a daily basis.  For example:

- Van Rider interacted with Al Qahtani, other USA Defendants, and Recruiting Defendants over ***6,000 times*** between June 27, 2018 and September 29, 2020.  *Id.* ¶ 42.

- Jundi interacted with Al Qahtani, other USA Defendants, and Recruiting Defendants almost ***2,000 times*** between November 3, 2018 and September 29, 2020.  *Id.* ¶ 51.

- Smith interacted with Al Qahtani, other USA Defendants, and Recruiting Defendants over ***4,000 times*** between October 22, 2018 and September 29, 2020.  *Id.* ¶ 56.

- Schey interacted with Al Qahtani, other USA Defendants, and Recruiting Defendants over ***33,000 times*** between June 13, 2018 and September 29, 2020.  *Id.* ¶ 60.

The vast majority of the USA Defendants' interactions with other members of the Network relate to praising MBS, Saudi Arabia, or other acolytes of MBS, while consistently attacking critics of MBS.  *Id.* ¶¶ 42, 51, 56, 60.

Again, these interactions are far from fortuitous.  Zeinab's tweets in late 2018 confirm the coordinated efforts of the USA Defendants and other members in the Network.  On November 25, 2018, Zeinab *expressly acknowledged* the establishment of an initiative aimed at amplifying pro-MBS content, involving direct attacks on the media coverage of MBS after the murder of Mr. Khashoggi.  *Id.* ¶ 99.  The timing of Zeinab's tweet is not a coincidence, as the USA Defendants and the Recruiting Defendants interacted significantly via Twitter then; Zeinab even instructed Van Rider to post videos on Twitter.  *Id.* ¶ 102.  Other Recruiting Defendants, such as Al Menaia and Al-Owerde, instructed the USA Defendants to post videos on Twitter as well.  *Id.* ¶¶ 104, 112.

Aside from coordinating on Twitter, Van Rider even traveled to Saudi Arabia to meet with Al Otaibi, chronicling the experience publicly on Twitter.  *Id.* ¶¶ 43–46.  Indeed, on December 9, 2019, Van Rider—a resident of Miami, Florida, with no apparent connections to MBS or Saudi Arabia prior to the Conspiracy—stayed at a five-star hotel and ate dinner with Al Otaibi, further evincing the extent of this scheme.  *Id.*  Van Rider's trip was funded by several of the Defendants in furtherance of the Conspiracy.  *Id.* ¶ 46.

### 3.     The USA Defendants' Acts in Furtherance of the Conspiracy

Once the @Uncareer accounts had posted the stolen photographs of Ms. Oueiss, the Recruiting Defendants instructed the Network, and the USA Defendants in particular, to spread the stolen content to defame, injure, and humiliate Ms. Oueiss.  *Id.* ¶ 196.  Accordingly, shortly after the Personal and Private Photos of Ms. Oueiss were released on social media on June 2, 2020, the USA Defendants moved quickly to attack Ms. Oueiss, thereby committing several acts in furtherance of the Conspiracy:

<u>*Van Rider*</u>: Just five days after the Personal and Private Photos were initially posted online, Van Rider began to harass and defame Ms. Oueiss.  *Id.* ¶ 199.  On June 7, 2020, Van Rider stated that Ms. Oueiss "[sold her]self for a story" and that is why she is "in the position [she is] in[.]"  *Id.*

On June 9, 2020, Van Rider retweeted the Personal and Private Photos of Ms. Oueiss and separately posted another tweet regarding Ms. Oueiss, in which Van Rider stated that Ms. Oueiss engaged in prostitution with terrorists in exchange for information.  *Id.* ¶ 200.  Van Rider has launched other defamatory attacks at Ms. Oueiss.  *Id.* ¶ 202.  Van Rider's attacks were directed, in part, at audiences and followers within the vicinity of her primary location, including Miami, Florida.  Van Rider's Twitter handle—then @305local—is further evidence that she was recruited to disseminate harmful information about critics of MBS to a Florida-based audience.  *Id.* ¶ 208.

*Jundi*: On June 9, 2020, Jundi retweeted an image of a fabricated tweet in which Ms. Oueiss purportedly accused her own colleague at *Al Jazeera* of participating in the Conspiracy.  *Id.* ¶ 211.  Two days later, Jundi attacked a Twitter user for defending Ms. Oueiss, stating that her father was the "largest Israeli agent in the Army of Lahd[.]"  *Id.* ¶ 212.  On June 14, 18, and 23, 2019, Jundi posted further disparaging statements about Ms. Oueiss.  *Id.*  ¶¶ 213–15.

*Smith*: On June 10 and 11, 2020, Smith posted the Personal and Private Photos of Ms. Oueiss.  *Id.* ¶ 221.  Smith falsely suggested that Ms. Oueiss "should blame herself" for their release, implying that Ms. Oueiss was engaged in prostitution at the time the photos were taken.  *Id.*  Smith continued her defamatory attacks on Ms. Oueiss throughout June 2020.  *Id.* ¶ 222.  Smith's defamatory comments—similar in nature and temporal proximity to Van Rider's defamatory comments—were made under the influence of the Recruiting Defendants.  *Id.* ¶¶ 223–26.

*Schey*: Schey has tweeted numerous defamatory statements that were originally published by the @KateStewart22 account, which is operated by Al Qahtani.  *Id.* ¶¶ 229, 233.  On December 13, 2020, Schey tweeted that Ms. Oueiss was a "troll" for "terrorists."  *Id.* ¶ 230.

The USA Defendants agreed to disseminate the stolen photographs of Ms. Oueiss on Twitter with the intent to disparage and defame Ms. Oueiss and they did so in furtherance of the

Conspiracy.  *See id.*  ¶¶ 197, 206–07, 217, 223–25, 232.  They posted approximately 87 *uniquely*

defamatory or disparaging tweets targeting Ms. Oueiss that have been retweeted hundreds of times:

- <u>*Van Rider*</u>: Mentioned Ms. Oueiss in 12 tweets between August 30, 2019 and June 11, 2020, which have been retweeted 493 times.  *Id.* ¶ 198.

- <u>*Jundi*</u>: Mentioned Ms. Oueiss in at least 39 original tweets, which have been retweeted at least 646 times in total, and retweeted three posts mentioning Ms. Oueiss.  *Id.* ¶ 209

- <u>*Smith*</u>: Posted 24 original tweets mentioning Ms. Oueiss between June 24, 2019 and June 11, 2020.  *Id.* ¶ 219.  Smith posted 17 of these 24 tweets following the publication of the Personal and Private Photos of Ms. Oueiss in June 2020.  *Id.*

- <u>*Schey*</u>: Posted 12 tweets mentioning Ms. Oueiss between August 24, 2018 and June 19, 2020.  *Id.* ¶ 228.  On June 19, 2020, Schey interacted with @KateStewart22 (Al Qahtani) on Twitter, congratulating him for getting blocked by Ms. Oueiss on Twitter.  *Id.*

## D.    Ms. Oueiss Suffered Significant Harm as a Result of the Conspiracy

Despite best efforts to compose herself, Ms. Oueiss has been continuously attacked by a

concerted campaign to defame and humiliate her.  As a professional female journalist in the Middle

East, the nature of the Personal and Private Photos and Smoking Photos are particularly harmful.

As a result of the Conspiracy, she has suffered reputational harm and loss of business opportunities

and income.  *Id.* ¶ 245.  Ms. Oueiss is not "taunt[ing]" the USA Defendants with the filing of this

lawsuit.  USA Defs. MTD at 4.  She is simply committed to standing up to MBS and his henchmen,

accessing the remedies available to her as a result of the Conspiracy, and will not be deterred.

## LEGAL STANDARD

A Rule 12(b)(1) factual challenge "on the complaint requires the court merely to look and

see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations

in his complaint are taken as true."  *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501

F.3d 1244, 1251 (11th Cir. 2007) (internal quotation marks and citations omitted).

Similarly, under Rule 12(b)(2), "[t]he district court must accept the facts alleged in the complaint as true to the extent they are uncontroverted by the defendant's affidavits." *Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*, No. 19-cv-62412, 2020 WL 3078531, at *7 (S.D. Fla. June 10, 2020) (internal citations omitted).  If a plaintiff pleads sufficient facts to support a *prima facie* case of personal jurisdiction, the burden shifts to the defendant to make a *prima facie* showing of the inapplicability of the state's long-arm statute.  *Mak, LLC v. Vuozzo*, No. 17-cv-23310, 2017 WL 4476369, at *4 (S.D. Fla. Oct. 6, 2017).

"Dismissal of a complaint under Rule 12(b)(6) is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Wiegand v. Royal Caribbean Cruises Ltd.*, No. 1:19-cv-25100, 2020 WL 4187816, at *1 (S.D. Fla. Mar. 16, 2020) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (internal quotation marks omitted)).  A "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wiegand*, 2020 WL 4187816, at *1 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint only needs to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  Allegations made "upon information and belief" are not fatal to a complaint, especially where information at issue is within the unique control and possession of the defendants.  *See Georgetown Trading Co. v. Venturi Spirits, LLC*, No. 14-cv-62277, 2015 WL 11197790, at *2 (S.D. Fla. Mar. 16, 2015).

## ARGUMENT

Despite their protestations that Ms. Oueiss's "lawsuit simply does not belong in this Court," DarkMatter MTD at 1, the Defendants' attempt to evade any culpability for the harm that Ms. Oueiss has suffered apparently requires nine motions to dismiss amounting to over 180 pages.  This attempt at obfuscation is meritless.  Ms. Oueiss has pled facts sufficient to demonstrate that:

(1) none of the Foreign Defendants qualify for sovereign immunity, (2) this Court has personal jurisdiction over all of the Foreign Defendants; (3) the Amended Complaint states a claim under the ATS, (4) the Amended Complaint states a claim under the CFAA, and (5) the Amended Complaint states a claim for four causes of action under Florida common law.

## I.    None of the Foreign Defendants Are Entitled to Sovereign Immunity

Federal common law governs claims of immunity made by foreign officials. *Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).  Federal common law "distinguishes between two types of immunity:  status-based and conduct-based immunity." *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019), *cert. denied*, *Mutond v. Lewis*, 141 S. Ct. 156 (2020).  "Status-based immunity is reserved for diplomats and heads of state and attaches "regardless of the substance of the claim." *Lewis*, 918 F.3d at 145 (internal quotations and citations omitted).  Conduct-based immunity is reserved for other foreign officials acting within "their official capacity." *See, e.g.*, *Hassen v. Nahyan*, No. 09-cv-01106, 2010 WL 9539408, at *5 (C.D. Cal. Sept. 17, 2010).  Because MBS is not the head of state of Saudi Arabia, and because none of the conduct alleged in the Amended Complaint was committed within the official capacity of any Defendant, no Defendant is entitled to any claim of sovereign immunity.

### A.    None of the Foreign Defendants Are Entitled to Status-Based Sovereign Immunity

When determining whether a defendant is immune from suit as head of state, courts defer to the Executive Branch, because "[w]hether to recognize a head of state is best left to the Executive." *Aldossari ex rel. Aldossari v. Ripp*, No. 20-3187, -- F. Supp. 3d ---, 2021 WL 1819699 ("*Aldossari*"), at *17 (E.D. Pa. May 6, 2021).  As a result, "courts generally give dispositive weight to that branch's suggestion of immunity for a sitting head of state." *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 194 (D.D.C. 2014).  Absent that suggestion, "a district court has the authority to

decide for itself whether the defendant has satisfied the prerequisites for immunity." *Hassen*, 2010 WL 9359408, at *5.  As indicated by the Eleventh Circuit, "absent a formal suggestion of immunity, a putative head of state should receive no immunity."  *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997).

The Prime Minister and head of state of Saudi Arabia is King Salman.  AC ¶ 66.  Because MBS nonetheless wishes to receive status-based immunity in the face of a myriad of lawsuits against which he must defend himself, he has asked the State Department for a Suggestion of Immunity.  *See Aljabri v. Mohammed Bin Salman Abdulaziz Al Saud*, No. 20-cv-02146, ECF No. 58 (D.D.C., filed Dec. 7, 2020); MBS MTD at 27 n.19 (noting the "request was sent on October 8, 2020, and the State Department has advised that it remains under consideration.").  Subsequent to that request, MBS did not seek a Suggestion of Immunity in *Aldossari*, 2021 WL 1819699, at *13, nor in this case.  There is no "formal suggestion of immunity."  *Noriega*, 117 F.3d at 1212.

MBS omits mention of any of this in his motion to dismiss; he skips past this analysis to argue he is entitled to status-based foreign immunity because he "occupies numerous high-ranking positions in Saudi Arabia's government."  MBS MTD at 15.  However, "there is no suggestion that the Executive has yet extended this immunity" to "positions that the Crown Prince currently holds."  *Aldossari*, 2021 WL 1819699, at *17.  Just as he did in *Aldossari*, MBS "relies on a 1978 case wherein the District of Ohio declined to exercise jurisdiction over the Prince of Wales . . . [b]ut in that case the court had the benefit of the State Department's suggestion of immunity" and the court "decided to defer to the Executive's suggestion."  *Id.*; *see* MBS MTD at 14–15.  As discussed, there is no suggestion here; if anything, the Executive has suggested the opposite, stating multiple times that the President will not speak to MBS.  AC ¶ 67.  MBS resorts to a one-off, extemporaneous statement by the President and language buried on a CIA fact page that seems

to indicate MBS will follow his father as the King of Saudi Arabia.  *See* MBS MTD at 15–16. That is not enough, and certainly not enough to dismiss a well-pled complaint.

In the *Sikhs for Justice* case cited by MBS, a defendant claimed head-of-state immunity for acts taken as Finance Minister before ascending to Prime Minister.  After he vacated the government, the court held that his "alleged acts as Finance Minister . . . are not encompassed within the purview of head-of-state immunity" because "they did not occur in the course of his official duties as head of state" even though he subsequently held that title.  *Sikhs for Justice*, 64 F. Supp. 3d at 194.  The court reached this holding even though the Executive filed a Suggestion of Immunity in that case while the defendant was still Prime Minister because to grant immunity on that basis would be "overly formal" because "Plaintiff would simply refile his suit" since he had vacated the government.  *Id*. at 195.  Here, where there is no Suggestion of Immunity (because MBS knows he would not receive it), and where the Executive has stated that King Salman is the head of state for Saudi Arabia, "there is respectable authority for denying head-of-state immunity" for "private or criminal acts in violation of American law."  *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988) (denying claim of status-based immunity for former head-of-state).

## B.    None of the Foreign Defendants are Entitled to Conduct-Based Sovereign Immunity

In addition to MBS's claim of status-based foreign immunity, each Foreign Defendant also claims conduct-based foreign immunity.  Immunity "is extended to an individual only when acting on *behalf of* the state . . . A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts."  *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994) (emphasis in original).  As with status-based foreign immunity, courts first look to the Executive for guidance, and then, absent any Suggestion of Immunity, "a

district court has authority to decide for itself whether all the requisites for immunity exist." *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 664 (N.D. Cal. 2020) (internal quotations and citations omitted).  In this case, the Executive has not filed a Suggestion of Immunity for any Foreign Defendant.  *See* AC ¶ 67.

Ignoring that, the Defendants promote as the "settled policy" of the Executive that "acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity" on the basis of two letters and one brief.  MBS MTD at 17; MiSK MTD at 14.  Defendants understand this to mean that any exercise of government power by a foreign official is immune, regardless of motive, but the same State Department Legal Advisor cited for that assertion has acknowledged that "[a] government official's legitimate authority has not generally been thought to encompass a right to commit 'official acts' that violate both international and domestic law," as Ms. Oueiss alleges here.  Harold Hongju Koh, *Foreign Official Immunity After Samantar:  A United States Government Perspective,* 44 Vand. J. Transnat'l L. 1141, 1154 (2011) ("*After Samantar*").  Moreover, those letters were not just letters—They are the very Suggestions of Immunity missing from this case.  And the brief cited by MBS was an attempt to overturn a D.C. Circuit Court of Appeals opinion that conduct-based sovereign immunity was inapplicable in a particular case.  It was not.  *See Mutond*, 141 S.Ct. 156 (denying appellant's petition for writ of certiorari).  There, the D.C. Circuit held that the defendant was not entitled to immunity, noting "the State Department did not accede to the plea of the DRC, and never issued a request that the District Court surrender its jurisdiction."  *Lewis*, 918 F.3d at 146.

Absent a Suggestion of Immunity, courts must consider whether "Defendants satisfy the requisites for conduct-based immunity".  *Id.*  While the Supreme Court has "express[ed] no view on whether" the Second Restatement of Foreign Relations Law of the United States § 66

21

("Restatement § 66") "correctly sets out the scope of the common-law immunity applicable" to foreign officials, *Samantar*, 560 U.S, at 322 n.15, courts have followed its three-part test "to determine conduct-based immunity." *WhatsApp*, 472 F. Supp. 3d at 664; *Lewis*, 918 F.3d at 146; *see also Broidy Cap. Mgmt. LLC v. Muzin*, No. 1:19-cv-00150, -- F.4th --, 2021 WL 3950185, at *10 (D.C. Cir. Sept. 3, 2021) ("It is unclear whether the Restatement articulates the correct standard . . . If the Restatement furnished a relevant standard, however, our application of section 66(f) . . . illustrates why the immunity claim of the defendants here would likewise be foreclosed."). "To establish conduct-based immunity, a defendant must establish all three factors." *Lewis*, 918 F.3d at 146. "First, whether the actor is a public minister, official, or agent of the foreign state. . . . Second, whether the acts were performed in her official capacity. . . . And third, whether exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Id.* (citations omitted).

Here, while some Foreign Defendants (such as MBS) are public ministers or agents of the state, none of the alleged acts were performed in their *official* capacity and exercising jurisdiction would not enforce a rule of law against the foreign state. The Foreign Defendants overread "official capacity" to include any exercise of "powers available only by virtue of the foreign official's government office." MBS MTD at 19.[3] But "[w]hether or not an act is 'official' does not turn on whether the act is attributable to the state." *After Samantar*, at 1161 n.49. "Under international law, attribution to a state for purposes of state responsibility is a question distinct

---

[3] The Foreign Defendants read *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 594 (9th Cir. 2020), *cert. denied*, No. 20-1547 (U.S. June 1, 2021) to hold that any "'hack and leak operation' against a government critic" is conduct entitled to foreign immunity. MBS MTD at 19; Middle East News MTD at 16. This is a misstatement of the law. That case applied the Foreign Sovereign Immunities Act to claims against the nation of Qatar. The Court analyzed the "commercial activity" exception, which required it to determine whether "a foreign government's conduct of clandestine surveillance and espionage" is "one in which commercial actors typically engage." *Qatar*, 982 F.3d at 594. Setting aside whether "clandestine surveillance and espionage" is in fact atypical for private companies in 2021, especially when the Foreign Defendants needed technology from private companies to commit their crimes in this case, the question is relevant to a statute not at issue. *Id.*

from the question of an individual's responsibility for that act." *Id*. Here, Ms. Oueiss alleges conduct "to further personal vendettas" and "attack any of the Crown Prince's critics." AC ¶ 3.[4] That conduct was committed by the Defendants, who "utilized their positions in privately owned corporations (which conduct business in the U.S.)." *Id*. The Kingdom of Saudi Arabia has categorically disclaimed responsibility for the class of conduct at issue, underscoring that the conduct at issue is about MBS's own revenge, not state action. *Id.* ¶ 75. Ms. Oueiss is not requesting that the Court "adjudicate the Crown Prince's exercise of alleged authority to arrest pursuant to a Royal Decree," *Aldossari*, 2021 WL 1819699, at *16, because any exercise of the Crown Prince's power (and that of his agents) was in his personal capacity and with the intent of harassing a foreign national.

Not only was the conduct at issue not committed by any Defendant in their "official capacity," the Court's exercise of jurisdiction would not "serve to enforce a rule of law against the foreign state." *Lewis*, 918 F.3d at 146. Ms. Oueiss seeks a declaration, a permanent injunction preventing the Defendants and their agents from continuing to engage in the behavior at issue, and

---

[4] When an amended complaint is filed, the previous complaint becomes "a legal nullity." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277–78 (11th Cir. 2016) (citing *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F.3d 1210, 1215 (11th Cir. 2006)). Nevertheless, throughout their motions to dismiss, the Defendants make a point of drawing the Court's attention to allegations that were added or removed in the process—noting, in particular, changes to allegations that bear on whether the alleged conduct of MBS and the Foreign Defendants was carried out in their official capacities as opposed to their personal capacities—in an apparent attempt to call into question whether the amendments were made in good faith. The Court should disregard the Defendants' arguments in this regard, as Ms. Oueiss's amendments are wholly legitimate. Without the benefit of any discovery to date, the allegations reflect Ms. Oueiss's understanding of the Defendants' roles in the alleged conspiracy and the motivations for their conduct, and Defendants only highlight superficial amendments that amount to semantics. Regardless, Ms. Oueiss is permitted to revise her allegations *even if* her revisions are deemed inconsistent with earlier allegations. *See Sieger v. Philipp*, 735 F. App'x 635, 637–38 (11th Cir. 2018) (holding district court abused its discretion by denying leave to amend on the basis that the complaint and the proposed amended complaint contradicted each other, explaining "the Federal Rules do not prohibit contradictory pleadings"); *Becker v. Pro Custom Solar LLC*, No. 19-cv-535, 2020 WL 474647, at *3 (M.D. Fla. Jan. 29, 2020) (rejecting defendants' argument that the court should disregard allegations that "run[] directly against" plaintiff's original allegations, because it "appears to conflict with the well-established rule that an original pleading is abandoned by [its] amendment, and is no longer a part of the pleader's averments against his adversary") (internal quotations mark and citations omitted). Indeed, a complaint can survive dismissal at the pleading stage even when it pleads inconsistent claims or theories of relief. *See infra* note 7.

monetary damages.  AC ¶¶ 97–98.  "Defendants in this case are being sued in their individual capacities and Plaintiff is not seeking compensation out of state funds."  *Lewis*, 918 F.3d at 147.  Ms. Oueiss is not asking anything of Saudi Arabia.  Moreover, "the court can craft injunctive relief that does not require a foreign sovereign to take an affirmative action."  *WhatsApp*, 472 F. Supp. at 665; *see also Broidy v. Glob. Risk Advisors LLC*, No. 1:19-cv-11861, 2021 WL 1225949, at *7 (S.D.N.Y. Mar. 31, 2021) ("any judgment would not affect Qatar").

MBS argues that MBS "has broad powers to protect his country's national security and international relations," and that Ms. Oueiss alleges conduct within with the scope of those powers.  MBS MTD at 17.  Ms. Oueiss entirely disagrees.  To the extent that leaking fake naked photos of an ordinary citizen of another country is a matter of national security, and not, as Ms. Oueiss alleges, a matter of revenge, the Foreign Defendants will have every opportunity to argue accordingly.  *See Glob. Risk Advisors*, 2021 WL 1225949, at *6 ("[M]ore facts are needed to confirm that actions taken at the direction of a government are, indeed, 'official acts.'").[5]

Finally, even if conduct-based sovereign immunity applied to the individual Foreign Defendants, as counsel for MBS has noted, corporations are not "entitled to common-law conduct-based immunity because such immunity applies only to natural persons," and, like counsel for MBS, Ms. Oueiss is "not aware of any authority for the proposition that such conduct-based

---

[5] One fact not relevant to this determination is Ms. Oueiss's allegation that the Foreign Defendants violated the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*  AC ¶¶ 246–47.  The Foreign Defendants argue this allegation "is explicitly premised" on the notion that violators of FARA are "acting as an agent of the Saudi government."  *See, e.g.*, Al Qahtani MTD at 7.  This assertion is false and misstates the law.  Under FARA, "[t]he term 'foreign principal' includes . . . a person outside of the United States" except for American citizens or "combination of persons organized under the laws of or having its principal place of business in a foreign country."  22 U.S.C. § 611(b)(2)–(3).  "Political activities" include "any activity that [the Foreign Defendants believe will] influence any agency or official of the Government of the United States. . . ."  *Id.* § 622(o).  It cannot be in dispute that influencing the *American* government is a "power[] that can also be exercised by private citizens."  MBS MTD at 19 (internal quotation marks and citation omitted).  To the extent the Foreign Defendants believe FARA applies only to "actions taken on behalf of Saudi Arabia, not the Crown Prince personally," DarkMatter MTD at 18 (citation omitted), their decision not to register demonstrates the conduct at issue was committed in their personal capacities.

immunity extends to corporations or other entities under either international law or federal common law." Motion of Foreign Sovereign Immunity Scholars, *WhatsApp Inc. v. NSO Group Techs. Ltd.*, 20-16408, 2020 WL 7693729, at *16 (9th Cir. 2020) ("*WhatsApp* Scholars Motion"), *NSO Grp. Techs Ltd. v. WhatsApp, Inc.,* No. 20-16408, 2020 WL 7693729, at *16; *see also Samantar*, 560 U.S. at 322 ("in some circumstances the immunity of the foreign state extends to an *individual* for acts taken in his official capacity") (emphasis added); *Doğan v. Barak*, 932 F.3d 888, 893–94 (9th Cir. 2019) ("Common-law foreign sovereign immunity extends to *individual* foreign officials for acts performed in their official capacity") (emphasis added) (internal quotation marks and citation omitted).

### C.   None of the Foreign Defendants Are Entitled to Derivative Sovereign Immunity

Nine of the Foreign Defendants claim they are entitled to derivative sovereign immunity. *See* Rec. Defs. MTD at 16; Al Qahtani MTD at 10 n.8; MiSK MTD at 14; Al-Asaker MTD at 18; Middle East News MTD at 17-18; Masharea MTD at 14-15. Because no Defendant is entitled to sovereign immunity in the first instance, *see supra* Argument, Sections I.A-B, there is no source of immunity from which those Defendants may derive it. However, in the alternative, several courts—including the Eleventh Circuit—have declined to apply the doctrine of derivative sovereign immunity. *See, e.g.*, *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1343 (11th Cir. 2007) ("We have never upheld a claim of derivative sovereign immunity, although the theory has been presented to us on several occasions. We have, however, imposed a limitation on derivative sovereign immunity, if it in fact exists."); *WhatsApp Inc.*, 472 F. Supp. 3d at 667 n.3 (noting that cases cited by the defendants do not "involve the application of derivative sovereign immunity to foreign entities" and "did not discuss the distinction between derivative sovereign immunity and foreign official immunity"); *Muzin*, 2021 WL 3950185, at *10 ("We do not suggest

25

that we would apply a derivative immunity theory in the foreign official immunity context.  But the allegations here could not support that defense in any event.").

While some of the Defendants cite to *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) for the proposition that they are entitled to "derivative immunity," *see, e.g.*, Al Qahtani MTD at 16, Ms. Oueiss again agrees with counsel for MBS that *Butters* "contradicts Congress's clear intent" and that its rule "has now been superseded by [*Republic of Arg. v. NML Cap., Ltd.*, 573 U.S. 134 (2014)]."  *WhatsApp* Scholars Motion, 2020 WL 7693729, at *10–11; *see also Muzin*, 2021 WL 3950185, at *9 ("*Butters* is out-of-circuit precedent and not binding on us, and this court has never suggested a derivative immunity doctrine might apply in the foreign immunity context.  Moreover, *Butters* predates *Samantar* . . . The Supreme Court foreclosed [*Butters*'] approach in *Samantar.*").

## II.    **All Foreign Defendants are Within the Jurisdiction of This Court**

Each of the Foreign Defendants claim that the conduct alleged in the Amended Complaint is beyond the jurisdiction of this Court.  However, because each of the Foreign Defendants (1) committed a tortious act within the state of Florida personally or through an agent and (2) engaged in intentional tortious conduct which was directed at and occurred in the United States, they are subject to this Court's jurisdiction.  AC ¶¶ 124, 129.  Finally, traditional notions of fair play and substantial justice dictate the exercise of personal jurisdiction.

### A.    **The Federal and State Law Claims Arise out of or Relate to Contacts Between Each of the Foreign Defendants and Florida**

The Foreign Defendants are subject to this Court's jurisdiction if "Defendants' activities satisfy the Florida long-arm statute and, if satisfied," if the exercise of jurisdiction "comports with

the due process requirements of the Fourteenth Amendment." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).

### 1.    Florida's Long-Arm Statute

Under the Florida long-arm statute, "a court may exercise specific personal jurisdiction over a non-resident defendant . . . for any cause of action arising from . . . committing a tortious act within this state." *Tavakoli v. Doronin*, No. 18-cv-21592, 2019 WL 124266, at *5 (S.D. Fla. Mar. 18, 2019) (quoting Fla. Stat. § 48.193(1)(a)(2)).   A defendant is subject to personal jurisdiction in Florida even when they do not commit a tortious act "personally" but instead "through an agent." Fla. Stat. § 48.193(1)(a).   A plaintiff "need only allege sufficient facts in the complaint to make out a prima facie case of jurisdiction." *Pike v. Trinity Indus., Inc.*, No. 5:12-cv-146, 2012 WL 12909901, at *1 (M.D. Fla. June 22, 2012) (quoting *Posner v. Essex Ins.*, 178 F.3d 1209, 1214 (11th Cir. 1999)).

"For personal jurisdiction to attach under the 'tortious activity' provision," a plaintiff "must demonstrate that the non-resident defendant[s] committed a substantial aspect of the alleged tort in Florida." *Tavakoli*, 2019 WL 1242669, at *6 (quoting *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 394 (11th Cir. 1988)).   Moreover, "[w]here a civil conspiracy to commit tortious acts has been successfully alleged, and some of those acts are alleged to have been accomplished within the state of Florida . . . every act and declaration of each member of the conspiracy [are] the act and declaration of them all." *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994) (reversing the trial court's dismissal of the complaint and explaining that well-pled allegations of a civil conspiracy among defendant co-conspirators subject *all* co-conspirators to jurisdiction under Florida's long-arm-statute so long as any member of the alleged conspiracy committed a tortious act in Florida in furtherance of the conspiracy).

Here, Ms. Oueiss alleges in particularized detail that the USA Defendants each "committed a tortious act within this state" while part of the Conspiracy with the Foreign Defendants.  AC ¶ 129.  For an example of one such detail, Van Rider attended a dinner with Al Otaibi in Saudi Arabia.  *Id*. ¶ 118.  Al Otaibi asserts that "there is no basis on which the Court plausibly could infer that" this conduct "shows the existence of an agreement to do anything unlawful."  Rec. Defs. MTD at 8–9.  However, it is *more* than plausible, it is likely:  Al Otaibi is a Saudi Arabian citizen who "agreed, at the behest of Defendant Al-Asaker, to take part in the Conspiracy and Network of spreading pro-MBS disinformation."  AC ¶ 298.  Taken together with the fact that "most, if not all," of Al Otaibi's "4,495 interactions with members of the [Conspiracy] via Twitter" relate "to praising Saudi Arabia, Defendant MBS, or other acolytes of MBS," the *most* plausible conclusion is that this dinner between two people with no discernible nexus to one another were interacting in furtherance of the criminal conspiracy against Plaintiff.  *Id.* ¶ 117.

Al Otaibi has every right to dispute this (more than plausible) interpretation of the facts, but his "statement that he did not have any agreement with [Van Rider] is not unlike a denial of wrongdoing, which is a legal conclusion," and Ms. Oueiss "is not required to refute conclusory statements."  *Tavakoli*, 2019 WL 1242669, at *9.  As a result, the allegations "are sufficient to establish personal jurisdiction under Florida's long-arm statute" over Al Otaibi, as Ms. Oueiss plausibly alleges a conspiracy in which Al Otaibi is a participant and acts by Van Rider (and others) were committed in furtherance of the conspiracy in Florida.  *Id.*

Notwithstanding the Defendants' denials, Ms. Oueiss plausibly alleged jurisdiction under Florida's long-arm statute against each of the other Foreign Defendants:[6]

- *MBS*:  Independent media reports have described the conspiracy against Plaintiff as "an effort led by Crown Prince [MBS] to target any online critics."  AC ¶ 142.  The Amended

---

[6] These examples are not meant to be comprehensive.  *See generally* AC.

28

Complaint is replete with particularized descriptions of MBS's conduct in furtherance of the conspiracy. For example, "MBS . . . attempted to, and did in fact, gain unauthorized access to the contents of Ms. Oueiss's mobile device." *Id.* ¶ 158. Van Rider then committed subsequent acts in furtherance of the conspiracy by retweeting personal and private photos, an act in Florida only possible because of MBS's hacking operation. *See e.g.*, *id.* ¶ 200.

- *DarkMatter*: DarkMatter worked "in concert with Defendants Al Qahtani, Al-Asaker" and MBS to target "Ms. Oueiss in various locations and orchestrated the hacking of her personal mobile device." *Id.* ¶ 123. DarkMatter itself "hacked Ms. Oueiss's mobile device and unlawfully extracted personal and confidential photographs" that were later retweeted by at least one Florida Defendant in furtherance of the Conspiracy. *Id.* ¶ 125.

- *Al Qahtani and MiSK Foundation*: Al Qahtani has had 1,691 interactions with Florida co-conspirator Van Rider and 186 interactions with Florida co-conspirator Jundi on Twitter. *Id.* ¶¶ 42, 51. He "has been instrumental in facilitating and overseeing hack and leak campaigns at the behest of" MBS. *Id.* ¶ 78. His actions in furtherance of the Conspiracy were "through his position as a board member of the MiSK Foundation." *Id.* ¶ 83.

- *Al-Asaker*: Al-Asaker is the head of MBS's Private Office and has been implicated in illicitly using Twitter in connection with that title previously. *Id.* ¶¶ 86-87, 95. Ms. Oueiss alleges that "Van Rider and Jundi, while present in Florida, acted at the behest of Defendants MBS, Al Qahtani and Al-Asaker (among others) in posting stolen photographs of, and defamatory narratives about, Ms. Oueiss on Twitter." *Id.* ¶ 129.

- *Al Menaia*: Al Menaia has interacted with Van Rider 346 times and Jundi 12 times on Twitter. *Id.* ¶ 105. He himself has targeted defamatory tweets at Ms. Oueiss and threatened her personally. *Id.* ¶ 106. Al Menaia personally instructed participants in the conspiracy, including Van Rider and Jundi, to spread stolen content. *Id.* ¶¶ 196, 216.

- *Al-Owerde*: Al-Owerde has interacted with Van Rider 479 times and Jundi 176 times on Twitter. *Id.* ¶ 110. He also directly instructed Van Rider to follow certain Twitter users. *Id.* ¶ 112. In addition, he has personally defamed Ms. Oueiss. *Id.* ¶ 113.

- *Zeinab and Masharea*: Zeinab has interacted with Van Rider 944 times and Jundi 745 times on Twitter. *Id.* ¶ 101. He has directly targeted defamatory tweets at Ms. Oueiss. *Id.* ¶ 98. Zeinab has personally instructed co-conspirators to post content in furtherance of the conspiracy and has personally assisted Van Rider in editing such videos. *Id.* ¶ 102. Saudi 24 TV employs Zeinab, and his acts in furtherance of the conspiracy was "through his position at, and through direction of several officers of, Saudi 24 TV." *Id.* ¶ 295.

- *Middle East News*: Al Arabiya posted a doctored photo intended to defame Ms. Oueiss. *Id.* ¶ 179. That act of defamation "led to a significant spike in negative Twitter activity aimed at Ms. Oueiss" in which Van Rider and Jundi participated and incited. *Id.* ¶ 182.

29

As a result, each of the Foreign Defendants is alleged to have either (1) personally directed a Florida Defendant to commit acts in furtherance of the Conspiracy, (2) personally harassed Ms. Oueiss in furtherance of the Conspiracy, or (3) personally acted to effectuate harassment in furtherance of the Conspiracy. Jundi and Van Rider then acted as co-conspirators, committing a "substantial aspect of the alleged tort" in Florida. *Williams Elec. Co.*, 854 F.2d at 394. The Defendants' protestation that Ms. Oueiss's place of injury was suffered elsewhere is irrelevant. *Tavakoli*, 2019 WL 1242669, at *8 ("Florida's long-arm statute only requires a plaintiff's place of injury be Florida if the tortious act was wholly committed *outside* the state.") (emphasis in original).

To the extent the Defendants contend that the allegations "show nothing more than the occasionally sharp-elbowed commentary that characterizes social media use," Rec. Defs. MTD at 9, they are free to make that argument. However, it is clearly plausible that the connections between the Foreign Defendants and USA Defendants (particularly the Florida residents) are explained by the criminal conspiracy that Ms. Oueiss methodically alleges. In fact, given the lack of any obvious connection between Van Rider and Saudi Arabia and Jundi's abrupt change in behavior at the time the Conspiracy began, AC ¶¶ 42–43, 49, the Conspiracy is the *best* explanation for their criminal conduct, sharp-elbows and all.

## 2.    The Due Process Clause

Once the requirements of Florida's long-arm statute have been met, personal jurisdiction is only proper if it complies with the Due Process Clause of the Fourteenth Amendment. *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582 (Fla. 2000). The Eleventh Circuit follows a three-part due process test "which examines (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum

state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (internal quotation marks and citations omitted).

First, Ms. Oueiss's claims relate to Defendants' contacts with Florida. As discussed, *supra* Argument, Section II.A.1, each of the Foreign Defendants is alleged to have personally participated in the conspiracy alleged under Florida law, and their co-conspirators are Florida residents. For example, Al Qahtani (a MiSK Foundation board member), Al Otaibi, Al Menaia, Al-Owerde, and Zeinab (and, therefore, Zeinab's employer, Saudi 24 TV) all personally interacted with their Florida co-conspirators. *See, e.g.*, AC ¶¶ 42, 51, 101, 110, 112–13, 117. In the Amended Complaint, Ms. Oueiss also alleges "Defendants MBS, Al Qahtani [and] Al-Asaker . . . intended to recruit members to the Network who were from major U.S. cities, such as Miami, Florida to disseminate disinformation" and her Twitter handle's inclusion of Miami's area code put the Foreign Defendants on notice. *Id.* ¶ 208. "There is a direct causal relationship" between Florida and the Defendants and so the "requirement is easily satisfied." *Louis Vuitton*, 736 F.3d at 1356.

Second, all the Foreign Defendants purposely availed themselves of the state of Florida. "Under the minimum contacts test for purposeful availment," the Defendants' contacts with the state of Florida must be (1) "related to the plaintiff's cause of action," (2) "involve some act by which the defendant purposefully availed himself of the privileges of doing business within" Florida, and (3) "are such that the defendant should reasonably anticipate" being sued in Florida. *Id.* at 1357 (citing *United States S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997)). As discussed above, the Defendants' contacts relate to the cause of action. In addition, their contacts constitute purposeful availment—the Foreign Defendants actively sought the participation of

Florida residents in their scheme, either directly or through other Defendants, and knowingly helped disseminate misinformation throughout Florida. *See, e.g.*, AC ¶¶ 204, 216. The smear campaign against Ms. Oueiss has resulted in "tens of thousands of tweets intended" to defame and harass her, and the Foreign Defendants consciously sought the benefit of using Florida residents to get those numbers as high as possible. *Id.* ¶ 142. Defendants argue that "Courts have consistently rejected the idea that posting on the Internet can establish personal jurisdiction in every jurisdiction in which the post may be read," Al Qahtani MTD at 13, but the Foreign Defendants are alleged to have targeted Florida *co-conspirators* as well as Florida readers. Ms. Oueiss is "not saying that the mere operation of an interactive website alone gives rise to purposeful availment *anywhere* the website can be accessed," but because the Foreign Defendants "had other contacts with Florida . . . *and the cause of action here derives directly from those contacts,*" this Court has jurisdiction over the Foreign Defendants. *Louis Vuitton*, 736 F.3d at 1357–58 (emphasis in original).

Defendants also argue that because Ms. Oueiss suffered so much abuse from people *outside* of Florida, contacts *within* Florida are insufficient to establish personal jurisdiction. MBS MTD at 10; Al Qahtani MTD at 4. In other words, Defendants argue that because the harm inflicted upon Ms. Oueiss from outside Florida borders was so great, the harm inflicted from within should be minimized. Defendants are wrong. Even assuming all of the harm not yet specifically alleged to have taken place in Florida did not take place in Florida (an assumption that must be examined during discovery), the harm already alleged to have occurred within Florida is sufficient. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773–74, 780–81 (1984) (holding all the requisites for personal jurisdiction under the Due Process Clause were satisfied, even though it was "undoubtedly true that the bulk of the harm done to petitioner occurred outside" the forum state

and only "a small proportion" of the total harm occurred within the forum state, and explaining that tort victims "may choose to bring suit in any forum with which the defendant has 'certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice . . . .'") (quotation marks and citations omitted). Holding otherwise would lead to the absurd result of allowing the Foreign Defendants to avoid jurisdiction simply by increasing the proportion of the harassment they carry out against Ms. Oueiss in other places.

Finally, it would not offend traditional notions of "fair play and substantial justice" to subject the Foreign Defendants to the jurisdiction of this Court. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Florida "has a legitimate interest in providing redress for persons inside or outside the state who are injured by tortious activity emanating from this state." *Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, No. 06-cv-80966, 2007 WL 9701852, at *6 (S.D. Fla. May 30, 2007). Moreover, Florida provides "the most efficient resolution of controversies," *Burger King*, 471 U.S. at 477, and the Defendants have "failed to identify any other [forum] where it would be amenable to suit." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 n.18 (11th Cir. 2009) (internal quotations and citation omitted). This Conspiracy was hatched on behalf of one of the most powerful individuals in the world; while for another foreign defendant there might be "unique burdens placed upon one who must defend oneself in a foreign legal system," *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102, 114 (1987), Ms. Oueiss is confident that MBS will be able to easily navigate the American legal system. Indeed, MBS is currently availing himself of it as a plaintiff in separate litigation. *See generally Sakab Saudi Holding Comp. v. Saad Khalid S Aljabri*, No. 21-cv-10529 (D. Mass. Mar. 29, 2021).

**B.      The Federal Claims Arise out of or Relate to Contacts Between Each of the Foreign Defendants and the United States**

The Foreign Defendants' contacts with Florida are sufficient such that they are subject to this Court's jurisdiction.[7]  However, even if they were not, Ms. Oueiss relies "on Federal Rule of Civil Procedure 4(k)(2), which, in cases where a defendant is not subject to jurisdiction in any state's courts of general jurisdiction, authorize a district court to aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claims must arise under federal law, and (2) the exercise of jurisdiction must be consistent with the Constitution and laws of the United States."  *Oldfield*, 558 F.3d at 1216 (internal quotation marks and citations omitted).

The first condition is easily satisfied, as Ms. Oueiss pleads two causes of action under federal law.  The second condition requires a "finding that [the Foreign Defendants'] contacts with the United States were sufficient."  *Id.* at 1217.  Because Ms. Oueiss has alleged sufficient contacts between this case and Florida, that burden has also been met.  However, the Defendants' contacts with the United States (other than Florida) deserve mention.  Jamal Khashoggi (who is mentioned just once[8] in the Defendants' 186 pages of briefing) was murdered on October 2, 2018, at the

---

[7] Defendants argue that "Plaintiff cannot rely both on Rule 4(k)(2) and the Florida long-arm statute as they are mutually exclusive." Al Qahtani MTD at 11 n.10; DarkMatter MTD at 8.  However, "Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims." *United Techs. Corp v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see e.g.*, *Cont'l Ins. Co. v. Lopez-Castro*, No. 06-cv-21368, 2008 WL 11333415, at *8 (S.D. Fla. Mar. 14, 2008) ("[A] party may set forth inconsistent or alternative claims in a single complaint[.]"); *Hammes Co. Sports Dev., Inc. v. City of Miami, Fla.*, No. 06-cv-20363, 2006 WL 8433471, at *3 (S.D. Fla. Sept. 27, 2006) ("[U]nder the Federal Rules of Civil Procedure a plaintiff is permitted to plead inconsistent or alternative theories of relief.").

[8] That one mention is a complete mischaracterization by MBS of the alleged facts in the Amended Complaint.  MBS argues that Ms. Oueiss's allegations "are incoherent" because "the Amended Complaint asserts that the Crown Prince hatched a scheme to pursue her after she began reporting on the death of Jamal Khashoggi," but also asserts that the U.S.-based Defendants were recruited in or around May 2018," before he died.  MBS MTD at 10 (internal quotation marks and emphasis omitted).  While the intricacies of MBS's criminal conspiracy are complicated, the timing is not:  MBS and his co-conspirators "hatched a plan to invade Ms. Oueiss's privacy" with "a Network of American citizens *already in place*" because of his earlier efforts to disseminate misinformation.  AC ¶ 156 (emphasis added).

direction of MBS.  AC ¶ 6.  He was targeted specifically because of his criticism of MBS, including in American news outlets.  *Id.* ¶ 8.  Afterwards, "MBS and his agents targeted U.S. news agencies, including *The Washington Post*, in which the accounts sought to deflect blame from Defendant MBS onto others," conduct that "aligns with the work of" [Al Qahtani]."  *Id.* ¶ 13.  Not only do these allegations—corroborated by news reports from across the world—establish the Foreign Defendants' *modus operandi*, they also provide evidence that they have availed themselves of the United States in the interest of promoting MBS and criticizing his enemies.  *See Carrillo*, 115 F.3d at 1545 ("we find that [Defendant] purposely availed itself of the privileges and benefits of conducting its activities in the forum because [the conduct was] reasonably calculated to reach the forum").  The hacking software at issue was used by MBS *personally* in his communications with Jeff Bezos, owner of *The Washington Post*, a clear and purposeful availment of the "benefits and protections" of the United States.  *Id.* ¶ 72–73; *see also Oldfield*, 558 F.3d at 1220.  Given the repetition of the Foreign Defendants' methodology, there is a "direct causal relationship" between the availment and the United States.  *Louis Vuitton*, 736 F.3d at 1356.

Also direct is the relationship that the Foreign Defendants have with the two USA Defendants not based in Florida.  Smith "posted the stolen Personal and Private Photos of Ms. Oueiss" as a direct result of the hack and leak operation directed by Defendants MBS, Al Qahtani and Al-Asaker, and was personally instructed by Zeinab, Al-Owerde, Al Menaia and Al Otaibi.  AC ¶¶ 221, 223.  The same is true of Schey, *id.* ¶ 232, who also interacted directly with Al Qahtani on Twitter multiple times.  *Id.* ¶¶ 228–29.

*     *     *

Defendants argue that Ms. Oueiss's allegations are "wholly conclusory."  *See, e.g.*, DarkMatter MTD at 13.  That is false—Ms. Oueiss alleges many particularized facts that directly

35

tie the Foreign Defendants to illegal conduct in Florida and in the United States.  "Furthermore, it is hard to imagine how [Plaintiff] could have pled [her] case with greater specificity or accuracy at this stage.  The intricacies of the scope of [the Foreign Defendants' conspiracy]" "are peculiarly within the[ir] knowledge."  *United Techs. Corp.*, 556 F.3d at 1274.  "Should discovery reveal that" the Foreign Defendants were "outside the scope" of this Court's authority, then they "may be entitled to summary judgment or judgment as a matter of law.  At the initial pleading stage,[9] however," these allegations are "sufficient to state a claim."  *Id.*

## III.  The Amended Complaint States a Claim Under Federal Law

### A.   Ms. Oueiss States a Claim Under the ATS

Ms. Oueiss's allegations are sufficient to state a claim under the ATS, which requires that a plaintiff be "(1) an alien, (2) suing for a tort, which was (3) committed in violation of international law."  *Doe v. Drummond Co.*, 782 F.3d 576, 583-84 (11th Cir. 2015).  MBS, Al Qahtani, and Al-Asaker argue incorrectly that Ms. Oueiss does not allege a violation of international law, and that the allegations do not "touch and concern" the United States.  MBS MTD at 24–26.[10]

---

[9]  The primary reason, if not the only reason, Ms. Oueiss is not in possession of more information relevant to personal jurisdiction at this stage is that the Defendants have "refused to participate in any merits discovery" and even "objected to Ms. Oueiss's attempts to engage in *third-party* discovery."  *See* Oueiss Mot. for Expedited Jurisdictional Discovery, ECF No. 129, at 2 n.5.  Defendants moved to stay discovery pending the resolution of their motions to dismiss.  *See generally* ECF Nos. 83–90, 93, 107.  On April 5, 2021, the Court granted the Defendants' motions to stay and ordered all pretrial obligations in this matter, including discovery, are stayed until the Court resolves the motions to dismiss, ECF No. 130, and denied as moot Plaintiff's Motion for an Order Authorizing Expedited Jurisdictional Discovery Against the Foreign Defendants, ECF No. 131.  Even if Defendants believe "it is unlikely" that personal "jurisdiction exists based on the facts pleaded, the possibility is no[t] so remote so as to justify a finding that jurisdictional discovery is unwarranted."  *Kilma v. Carnival Corp.*, No. 08-cv-20335, 2008 WL 4559231, at *3 (S.D. Fla. Oct. 10, 2008) (Moore, J.).  Defendants cannot stand in opposition to personal jurisdiction on the basis that Ms. Oueiss lacks the relevant facts to demonstrate its plausibility after denying her the opportunity to obtain this discovery.  While the Amended Complaint is sufficient to demonstrate personal jurisdiction over the Foreign Defendants, in the alternative, Ms. Oueiss is at least entitled to jurisdictional discovery and thus renews her request for such discovery.  *See Schrier v. Qatar Islamic Bank*, No. 0:20-cv-60075, ECF No. 74 (S.D. Fla. Sept. 30, 2020) (Altman, J.) (ordering, in relevant part, that plaintiff has 60 days after service of the amended complaint to conduct jurisdictional discovery and requiring the defendant's prompt compliance with plaintiff's discovery requests).

[10]  Al Qahtani and Al-Asaker adopt and incorporate MBS's arguments as to the ATS.  Al Qahtani MTD at 19; Al-Asaker MTD at 19 n.12.

First, Ms. Oueiss alleges the Conspiracy orchestrated by MBS "was in violation of the law of nations and treaties of the U.S."  AC ¶ 127.  At the time of its enactment, violations that met the criteria for ATS's international law requirement "correspond[ed] to Blackstone's three primary offenses:  violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004).  Because "Congress has not in any relevant way amended [the ATS] or limited civil common law power by another statute," federal courts can recognize another "claim under the law of nations."  *Id*. at 724–25.  Accordingly, plaintiffs may bring actions under the ATS if they "show a violation of an international norm that is 'specific, universal, and obligatory.'"  *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1009 (S.D. Ind. 2007) (quoting *Sosa*, 542 U.S. at 732).  The determination as to whether an international norm meets those criteria is a "fulsome and nuanced inquiry" because "norms of customary international law are discerned from myriad decisions made in numerous and varied international and domestic arenas and do not stem from any single, definitive, readily-identifiable source."  *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176-77 (2d Cir. 2009) (internal quotation marks omitted).

MBS argues that international norms against cybercrime do not qualify simply because some countries have not yet signed the Budapest Convention on Cybercrime (the "Convention").  MBS MTD at 24–25.  However, that does not mean the norm it memorializes is not reflected in "the views of the entire civilized world," as MBS concludes.  *Id*. at 25 (internal quotation marks and citations omitted).  For example, MBS notes that Saudi Arabia, Qatar,[11] and the UAE have not signed the Convention, but he neglects to mention that all three countries prohibit the very conduct

---

[11] Again, MBS's reliance on *Broidy Cap. Mgmt., LLC v. State of Qatar* to say the opposite is very misleading.  MBS MTD at 26.  In that case, the nation of Qatar was a defendant and "t[]he parties d[id] not dispute that, under Qatari law, the various criminal prohibitions . . . do not bind government agents acting in accordance with official orders."  *Qatar*, 982 F.3d at 592.  Its reasoning is irrelevant because the claims here implicate conduct only committed in the personal capacity, no foreign governments or heads of state are defendants, and the ATS was not at issue in *Qatar*.

at issue in this case.[12]  "The existence of a norm or customary international law is one determined, in part, by reference to the custom or practices of many states and the broad acceptance of that norm by the international community." *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 686 (S.D. Tex. 2009).  The harm alleged by Ms. Oueiss is one for which there is "an expectation of adherence, and insofar as the expectation is gradually justified by State practice, a declaration may by custom become recognized as laying down rules binding upon the States." *Abdullahi*, 562 F.3d at 177 (internal quotation marks and citations omitted).  The international community is certainly expected to adhere to this norm, as the Convention and the local laws of countries who have yet to sign make clear.

Ms. Oueiss also argues that the Convention is not self-executing, but "whether a treaty that embodies a norm of customary international law is self-executing is relevant to, but is not determinative of, the question." *Id.* at 176 (internal quotation marks and citations omitted).  MBS "fail[s] to credit the fact that even declarations of international norms that are not in and of themselves binding may, with time and in conjunction with state practice, provide evidence that a norm has developed the specificity, universality, and obligatory nature required for ATS jurisdiction." *Id*. at 177.  While MBS cites an Eleventh Circuit case to argue that self-execution is a requirement, MBS MTD at 25 (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)), that case "cannot be squared with either prior or subsequent decisions of the Eleventh Circuit, nor does it reflect the prevailing view among district courts outside the Eleventh Circuit . . . [the Supreme Court] confirmed that courts have authority to recognize new

---

[12] *See* Saudi Arabia Anti-Cyber Crime Law (8 Rabi 11428 / 26 March 2007) (prohibiting "the unlawful access to computers with the intention…leak, damage, alter, or redistribute private data"); Qatar Cybercrime Prevention Law No. (14) of 2014 (prohibiting "illegal[] access" and doubling the sentence "if such access results in . . . publishing or republishing electronic data or information"); United Arab Emirates Federal Decree Law Number 5/2012 (prohibiting "access…without authorization" and increasing the sentence if such access "resulted in . . [the] disclosure [of] . . . copying, publication or re-publishing" of any data).

common law causes of action." *Al Shimari v. CACI Premier Tech., Inc.*, 263 F. Supp. 3d 595, 602–03 (E.D. Va. 2017) (internal citations omitted).

In addition, MBS argues that "all of the conduct alleged to be relevant" occurred outside of the United States. MBS MTD at 26. This is false. Rather, "claims based on aiding and abetting, and conspiracy liability are cognizable under the ATS" and will "displace the presumption against extraterritoriality if enough of the relevant conduct occurs domestically and if the allegations of domestic conduct are supported by a minimum factual predicate." *Drummond Co.*, 782 F.3d at 597–98. "This 'relevant domestic conduct' may include both primary tortious conduct and affirmative involvement in the torts of others." *Jara v. Nunez*, 878 F.3d 1268, 1273 (11th Cir. 2018) (citation omitted). Here, the relevant domestic conduct is both "extensive and specific." *Id*. (citation omitted). Ms. Oueiss alleges a Conspiracy that includes United States citizens acting in furtherance of the Conspiracy in the United States. The allegations specifically identify conduct by several Americans, who were in communication with the Foreign Defendants and acting pursuant to their directives, to contribute greatly to the harm suffered by Ms. Oueiss. As a result, the "presumption against extraterritorial application" of the ATS is rebutted. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 123–25 (2013).

**B.      Ms. Oueiss States a Claim Under the CFAA**

In the Amended Complaint, Ms. Oueiss alleges that MBS, Al Qahtani, Al-Asaker, and DarkMatter violated the CFAA because they accessed and conspired to access Ms. Oueiss's mobile device. AC ¶¶ 258–68. The CFAA provides for a civil claim against whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer[.]" 18 U.S.C. § 1030(a)(2)(C).

Defendants argue that (1) Ms. Oueiss does not establish that the hacking events were carried out at the behest of MBS or with the involvement of Al Qahtani, Al-Asaker, and

DarkMatter, and (2) that Ms. Oueiss has not stated a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]"  18 U.S.C. § 1030(a)(4)(A)(i)(I); *see also* MBS MTD at 21; Al Qahtani MTD at 18–19; Al-Asaker MTD at 8, 19; DarkMatter MTD at 20–22. Both arguments are incorrect.

   1. **The Amended Complaint Establishes MBS, Al Qahtani, Al-Asaker, and DarkMatter's Involvement in the Unlawful Hacking**

  Liability for the unauthorized access (or "hacking") of Ms. Oueiss's personal mobile device extends to MBS, Al Qahtani, Al-Asaker, and DarkMatter on two bases: indirect access and conspiracy to access under CFAA.  *See* 18 U.S.C. § 1030(b).

   a. **MBS, Al Qahtani, Al-Asaker, and DarkMatter Indirectly Accessed the Contents of Ms. Oueiss's Mobile Device**

  The CFAA "does not limit its own reach to personal or direct access," "[t]o the contrary, it penalizes even indirect access to a protected computer."  *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1291 (S.D. Fla. 2020) (emphasis and citations omitted).  That "access" may be achieved through other people "is especially true in our current era, and to hold otherwise would be to ignore the nature of technological communication."  *Brand Energy & Infrastructure Servs., Inc. v. Irex Contr. Grp.*, No. 16-2499, 2017 WL 1105648, at *15 (E.D. Pa. Mar. 24, 2017).

  MBS, Al Qahtani, Al-Asaker, and DarkMatter "knowingly instigated and conspired" with one another to gain unauthorized access to Ms. Oueiss's mobile device.  *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 327 (M.D. Pa. 2014).  Specifically, Ms. Oueiss alleges the following facts in support of each of the Defendants' participation in the hacking:

- Forensic evidence obtained from Ms. Oueiss's mobile device reveals that the Defendants were responsible for the hacking.  AC ¶¶ 29, 158 (describing the various attack vectors used to exploit vulnerabilities associated with WhatsApp, iMessage, and Webkit).

- The hack follows the same pattern and tactics used in other hack and leak attacks by MBS, Al Qahtani, and Al-Asaker.  *Id.* ¶¶ 30, 70, 72, 146.

- MBS *personally* utilized the Pegasus spyware to hack Mr. Bezos' mobile device in the same manner Ms. Oueiss alleges. *Id.* ¶ 145.

- MBS used NSO's Pegasus spyware to access over 400 WhatsApp messages between Mr. Khashoggi and another individual. *Id.* ¶ 144. One of the alleged hacking attempts against Ms. Oueiss involved a WhatsApp message attack as well. *Id.* ¶¶ 167–68.

- Allies of MBS have identified Ms. Oueiss as an enemy of MBS. *See, e.g.*, *id.* ¶ 23.

- Al Qahtani has been instrumental in facilitating hack and leak campaigns at the behest of MBS and orchestrated the procurement of hacking tools from Hacking Team and NSO. *Id.* ¶ 78. The malicious processes on Ms. Oueiss's mobile device can be directly attributed to NSO's Pegasus spyware. *Id.* ¶¶ 164–65.

- Al Qahtani has made statements on various hacking platforms implicating himself in MBS's schemes. He has tried to hire hackers for $500 per month. *Id.* ¶ 81.

- Al-Asaker assisted in the coordination of the various (successful) campaigns (with Al Qahtani) to unlawfully hack Ms. Oueiss's mobile device. *Id.* ¶ 88.

- DarkMatter, through its sophisticated hacking group, "Project Raven" was responsible for a similar targeted hacking of the chairman of *Al Jazeera*'s personal iPhone (along with other journalists' iPhones). *Id.* ¶¶ 76, 147–48, 151.

Ms. Oueiss further asserts that the preexisting relationships between Al Qahtani and Al-Asaker with MBS are evidence of their loyalty to MBS and consistent willingness to act at his behest and orchestrate hacking operations such as the one against her. *Id.* ¶¶ 77–83, 85–88; *see e.g.*, *Se. Mech. Servs., Inc. v. Brody*, No. 08-cv-1151, 2008 WL 4613046, at *14 (M.D. Fla. Oct. 15, 2008) (finding that employer induced employees to misuse information in violation of CFAA); *SBM Site Servs., LLC v. Garrett*, No. 10-cv-00385, 2012 WL 628619, at *6 (D. Colo. Feb. 27, 2012) (same); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11–1566, 2012 WL 4205476, at *17 (E.D. Pa. Sept. 19, 2012) ("one's act of inducing another to access a computer that he or she is otherwise not authorized to use constitutes 'access' for purposes of CFAA liability").

### b.   Ms. Oueiss Adequately Alleges MBS, Al Qahtani, Al-Asaker, and DarkMatter Entered into a Conspiracy Under the CFAA

Although the CFAA is primarily a criminal statute, the operative liability provisions under § 1030(a) have been interpreted similarly in both the criminal and civil context. *See Calendar Research LLC v. StubHub, Inc.*, No. 2:17-cv-04062, 2020 WL 4390391, at *15 (C.D. Cal. May 13, 2020).[13]   A CFAA conspiracy claim "generally requires specific allegations of an agreement and common activities." *In re Lenovo Adware Litig.*, No. 15-md-02624, 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016) (internal quotation marks omitted).

Ms. Oueiss has adequately pled a conspiracy to violate the CFAA.   As outlined *supra* Statement of Facts, Section III.B.1.a, the facts demonstrate an agreement among the Defendants to engage in a pattern of hacking operations, including against Ms. Oueiss, with the objective of gaining unauthorized access to her mobile device.  AC ¶¶ 71, 157.  Ms. Oueiss has demonstrated the Defendants' roles in the hacking by pleading as to their relationships with one another and their prior identical attacks.  *See e.g.*, *Shah v. Warrick & Boyn, LLP*, No. 3:13-cv-103, 2019 WL 1324606, at *2–3 (N.D. Ind. Mar. 25, 2019) (conspiracy under the CFAA was adequately plead where the defendant served as counsel to a co-conspirator and lied on behalf of a co-conspirator).

---

[13] Courts in the Eleventh Circuit have tacitly accepted that conspiracy under § 1030(b) of the CFAA can be alleged in the civil context.  *Hall v. Sargeant*, No. 18-80748, 2020 WL 1536435, at *28 (S.D. Fla. Mar. 30, 2020) (in a malicious prosecution case where the original plaintiff alleged, but then voluntarily dismissed CFAA civil conspiracy claims, the court found the original plaintiff had probable cause for pursuing civil conspiracy claims under the CFAA); *Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1294 (M.D. Fla. 2012) (denying motion to dismiss before addressing conspiracy but noting that the theory is cognizable); *Vacation Club Servs., Inc. v. Rodriguez*, No. 10-cv-247, 2010 WL 1645129, at *2 (M.D. Fla. Apr. 22, 2010) (same); *see also Coll Builders Supply, Inc. v. Velez*, No. 17-cv-933, 2017 WL 4158661, at *6 (M.D. Fla. Aug. 31, 2017) ("[W]hile a criminal defendant may be held liable for attempting or conspiring to commit a violation of one of those seven subsections, § 1030(b), it remains a somewhat unsettled question of law as to whether a civil defendant may be held liable for attempting or conspiring to violate the CFAA.").

### 2.   Defendants' Hacking Harmed Ms. Oueiss

Because the Defendants' actions caused Ms. Oueiss to incur a loss as defined by Section 1030(e)(11), the CFAA authorizes Ms. Oueiss to pursue civil remedies.  *See* 18 U.S.C. § 1030(g) (civil remedy extends to "[a]ny person who suffers damage or loss by reason of a violation of this section.").

"Loss" includes both "(1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1173–74 (11th Cir. 2017) (citing 18 U.S.C. § 1030(e)(11)).  If a plaintiff is able to establish a loss of at least $5,000 in value, whether that be composed solely of costs identified in one category, or solely costs identified in the second category, or a combination of both, then he or she may recover under the statute.  *Id.*

Ms. Oueiss has met her burden.  AC ¶ 266.  Her costs include the cost of investigating the hacking and repairing the integrity of her personal device.  *Id.*; *see e.g.*, *Hamilton Grp. Funding, Inc. v. Basel*, No. 16-61145, 2019 WL 3765340, at *3 (S.D. Fla. Aug. 7, 2019) ("Courts have generally construed the meaning of 'responding to an offense' as remedial actions taken in response to the breach giving rise to the CFAA claim.") (collecting cases).  DarkMatter conveniently disregards the allegations that painstakingly detail the measures that were taken to assess and analyze the damage done by Defendants.  AC ¶¶ 160–72.

Contrary to DarkMatter's suggestion, it would not "follow the lead of courts around the country [to] dismiss the CFAA claim" on this basis because the harms articulated by Ms. Oueiss relating to her efforts to respond to the damage caused by Defendants are sufficiently plead under the law in this Circuit.  *See e.g.*, *Brown Jordan Int'l*, 846 F.3d at 1174–75 (affirming the district

court's finding that the plaintiff sustained a loss where the plaintiff alleged "extensive forensic and physical review of [its] systems to determine the extent of [defendant's] hacking activity"); *St. Johns Vein Ctr. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1062–63 (M.D. Fla. 2018) (even where allegations of loss were "sparse" the Court found that at this stage, "where the Court is required to draw all reasonable inferences in the non-moving plaintiff's favor . . . [plaintiff] has sufficiently, albeit narrowly, asserted losses as required under the CFAA. Courts within the Eleventh Circuit, as well as in other jurisdictions . . . have determined those allegations to be sufficient") (collecting cases).

## IV.   The Amended Complaint States Claims Under Florida Common Law

### A.   Ms. Oueiss Has Plausibly Alleged IIED Claims Against All Defendants[14]

The Defendants argue that Ms. Oueiss's IIED claim should be dismissed because (1) it is based on the same conduct giving rise to her libel claim, (2) it is based on "threadbare recitals," (3) her injuries do not constitute "severe emotional distress," and (4) she has not sufficiently alleged "actual malice" as to the USA Defendants, DarkMatter, and Middle East News. Each argument fails. USA Defs. MTD at 2; DarkMatter MTD at 23–24; Middle East News MTD at 19.

To state a claim for IIED under Florida law, a plaintiff must plead: (1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) that the conduct

---

[14] Recruiting Defendants argue that the Amended Complaint constitutes a shotgun pleading. Rec. Defs. MTD at 4–5. However, the allegations as to each Recruiting Defendant's role and participation in the Conspiracy, and their underlying acts supporting her claims, are outlined such that they have "adequate notice of the claims against them and the grounds upon which each claim rests[,]" which is the "unifying characteristic of all shotgun pleadings." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). Ms. Oueiss may allege that the Recruiting Defendants all served the same function in the Conspiracy. The complaint can be fairly read to aver that all Recruiting Defendants are responsible for the same conduct. *See Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000); *see also S.Y. v. Wyndham Hotels & Resorts, Inc*., No. 2:20-cv-628, 2021 WL 678594, at *3 (M.D. Fla. Feb. 22, 2021) ("[E]ach of these defendants was involved in the identified conduct attributed to the 'Ramada Defendants.' While defendants may disagree that such allegations are accurate, that dispute is for another day.").

caused the plaintiff severe emotional distress. *Charest v. Sunny-Aakash, LLC*, No. 16-cv-2048, 2016 WL 5719588, at \*4 (M.D. Fla. Sept. 30, 2016). "The viability of a claim for intentional infliction of emotional distress is highly fact-dependent and turns on the sum of the allegations in the specific case at bar." *Johnson v. Thigpen*, 788 So. 2d 410, 413 (Fla. 1st DCA 2001). Ms. Oueiss addresses each element to the extent they intersect with arguments raised by the Defendants.

### 1. The Conduct Giving Rise to Ms. Oueiss's IIED Claim is Not the Same Conduct as that of Her Libel Claim

It is clear from the face of the Amended Complaint that the conduct giving rise to Ms. Oueiss's IIED claim is not the same conduct giving rise to her libel claim. Specifically, Ms. Oueiss alleges that the USA Defendants engaged in a "multi-faceted campaign against Ms. Oueiss[,]" AC ¶ 38, in the form of repeated harassment and intimidation. *See, e.g.*, *id.* ¶¶ 278, 308–09 (alleging all the Defendants' efforts to "harass" and "intimidate" Ms. Oueiss); *id.* ¶¶ 210, 217 (alleging Jundi agreed to post false tweets about Ms. Oueiss for the purpose of "intimidating" and "harassing" Ms. Oueiss); *id.* ¶ 308(f) (alleging Van Rider repeatedly harassed Ms. Oueiss). The intent behind the Conspiracy was not only to defame Ms. Oueiss, but also to hack her personal device, obtain private content, and intimidate her. *Id.* ¶ 122. The Defendants made false statements about Ms. Oueiss, but their conduct went far beyond that as well.

### 2. Ms. Oueiss's Allegations Exceed Her Burden to State a Claim of IIED

The Defendants argue (with little more than conclusory statements) that Ms. Oueiss only pleads "threadbare recitals." *See* MBS MTD at 27. However, the Amended Complaint outlines the Defendants' efforts to intimidate and harass Ms. Oueiss as part of the Conspiracy in detail. *See supra* Statement of Facts. It extensively chronicles MBS, Al Qahtani, Al-Asaker, and DarkMatter's roles in unlawfully hacking Ms. Oueiss's mobile device, and MBS, Al Qahtani, and Al-Asaker's efforts to recruit other Defendants. *See supra* Statement of Facts, Section II.B.

Moreover, while the Amended Complaint contains specific instances of each Defendants' tortious conduct, these examples are by no means exhaustive.  The USA Defendants have mentioned Ms. Oueiss in approximately 340 tweets and the Recruiting Defendants have mentioned her in approximately 107 tweets as of September 29, 2020.  AC ¶ 242.  Ms. Oueiss is not complaining about one or two tweets—this is a multi-faceted conspiracy, whereby the USA Defendants agreed, at the behest of the Foreign Defendants, to sway the narrative on Twitter through publication of a consistent and coordinated barrage of misinformation.

Finally, MiSK, Middle East News, and Masharea are each an alter ego and mere instrumentality of MBS, specifically employed to execute schemes in the United States, including the campaign intended at promoting disinformation and attacking Defendant MBS's critics, such as Ms. Oueiss.  AC ¶¶ 133–40.

### 3.    The Conduct Alleged Is Outrageous

The Defendants argue that the conduct is not sufficiently "outrageous."  A concerted campaign to harass and intimidate, resulting in the leak of several private photographs (including one doctored to make Ms. Oueiss appear nude), combined with hundreds of attacks by social media accounts constitutes conduct "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Broberg v. Carnival Corp.*, 303 F. Supp. 3d 1313, 1317 (S.D. Fla. 2017).  The pervasive pattern of unlawful conduct and coordinated harassment, coupled with the hacking of Ms. Oueiss's mobile device, is more than sufficient to state a claim.  *See, e.g.*, *Albert v. Nat'l Cash Register Co.*, 874 F. Supp. 1328, 1329, 1331 (S.D. Fla. 1994) (denying defendants' motion to dismiss where plaintiff alleged a pervasive pattern of constant harassment); *accord Brown-Criscuolo v. Wolfe*, 601 F. Supp. 2d 441, 455 (D. Conn. 2009) (unauthorized access to emails was sufficiently outrageous for an IIED claim).

Threats of violence increase the "outrageousness" of conduct.  *See Nims v. Harrison*, 768 So. 2d 1198, 1201 (Fla. 1st DCA 2000).   The specter of Ms. Oueiss's friend's brutal and premeditated murder and overt threats on her life by members of the Network, *see, e.g.*, AC ¶¶ 23, 32, 243, render this conduct outrageous.  Al Menaia's tweet referring to Ms. Oueiss as a "dog" and threatening to "surround [her]," *id.* ¶ 106, can hardly be characterized as a "garden-variety tweet." *See* Rec. Defs. MTD at 18.

The USA Defendants' arguments also fail.  The argument that the Personal and Private Photos were tweeted "40,000 times" by other Twitter users does not render the USA Defendants' conduct any less outrageous, especially because the "large number of Twitter users" who "deemed the photographs suitable for public viewing," as the USA Defendants put it, were thousands of bot accounts created as part of the Conspiracy.  USA Defs. MTD at 9; AC ¶ 142.  The USA Defendants further argue that their other tweets are protected expressions of opinion, USA Defs. MTD at 11, however, the USA Defendants' statements are at best expressions of mixed opinion not entitled to First Amendment protections.  *See infra* Argument, Section IV.C.1 (discussing libel claim).

### 4.      Ms. Oueiss Suffered Severe Emotional Distress

Courts have dismissed claims as pleading insufficiently severe emotional distress only where conclusory allegations of emotional distress were alleged.  *Rincon v. Miami-Dade Cty.*, No. 16-cv-22254, 2020 WL 7344633, at *11 (S.D. Fla. Mar. 31, 2020), *report and recommendation adopted*, 2020 WL 6536417 (S.D. Fla. Nov. 6, 2020); *Bickel v. City of Coral Springs*, No. 17-cv-60606, 2017 WL 3336722, at *2 (S.D. Fla. Aug. 4, 2017) (dismissing complaint with leave to amend for failure to offer "specific allegations as to any mental suffering [plaintiff] has endured, let alone the degree of such mental suffering") (internal quotation marks omitted).  Here, Ms. Oueiss has made specific allegations concerning mental suffering, including a particularized fear to travel to Florida to visit her family as a result of the Defendants' conduct.  *Bickel*, 2017 WL

3336722, at *3 (denying dismissal of amended complaint containing statements that conduct caused "great embarrassment and extreme shame" and that plaintiff "will continue to be grief stricken") (citation omitted).

### 5.   Ms. Oueiss Has Sufficiently Alleged Actual Malice

Finally, Ms. Oueiss's status as a public figure does not change the outcome of her IIED claim.  Ms. Oueiss has sufficiently alleged actual malice against the USA Defendants and the Recruiting Defendants with regards to their defamatory and harassing statements.  *See infra* Argument, Section IV.C.3 (discussing actual malice standard for libel claim).  MBS, Al Qahtani, Al-Asaker, DarkMatter, Middle East News, and Masharea are liable for all acts committed in furtherance of the Conspiracy, *see infra* Argument, Section IV.D.2, even where, as DarkMatter argued, a particular defendant has not been alleged to have directly made a defamatory statement. *See* DarkMatter MTD at 23.  DarkMatter's argument that actual malice is required is nonsensical. DarkMatter would require Ms. Oueiss to show that DarkMatter made a false statement when the tortious conduct alleged against it is an act in a conspiracy where *others* made false statements.

### B.   Ms. Oueiss Has Plausibly Alleged Intrusion Claims

Ms. Oueiss alleges that MBS, DarkMatter, Al Qahtani, and Al-Asaker, in accessing her personal files from her personal mobile device, electronically intruded into her private quarters. AC ¶ 276.  Ms. Oueiss plausibly alleges each of the three elements of intrusion.  *See Hall v. Sargeant*, No. 18-cv-80748, 2019 WL 1359485, at *7 (S.D. Fla. Mar. 26, 2019) ("First, there must be a private quarter. Second, there must be some physical or electronic intrusion into that private quarter. Third, the intrusion must be highly offensive to a reasonable person.") (internal quotation marks and citation omitted).

With little specificity, the Defendants argue that the Amended Complaint fails to state a claim for intrusion because it relies on mere "[t]hreadbare recitals" as to each of their specific

conduct and participation.  MBS MTD at. 27.  Al Qahtani and Al-Asaker argue that while Ms. Oueiss alleges her phone was hacked, and insulting, defamatory, or private material was disseminated over social media and news outlets, she has not alleged any facts showing that Al Qahtani or Al-Asaker personally hacked her phone or disseminated any images.  Al Qahtani MTD at 18; Al-Asaker MTD at 19.  Defendants are incorrect.  Plaintiff has alleged sufficient facts to demonstrate a *prima facie* claim for intrusion.  As discussed herein, the Amended Complaint alleges in detail each of the overt acts committed by the Defendants.  *See infra* Argument, Section IV.D.1 (listing in detail relevant allegations as to each individual defendant).

Next, the Defendants argue that under Florida law, a virtual location like Ms. Oueiss's phone is not a "place" that can be the basis for an intrusion claim.  *See e.g.*, DarkMatter MTD at 25.  Defendants' arguments are inaccurate.  Courts within the Eleventh Circuit have repeatedly found that "electronic" intrusion, i.e., into one's privately owned electronics, constitutes an intrusion into a private quarter or place.  *See, e.g.*, *Stirling Int'l Realty, Inc. v. Soderstrom*, No. 14-cv-1109, 2015 WL 403318, at *6 (M.D. Fla. Jan. 28, 2015) (collecting cases); *Ward v. Casual Rest. Concepts Inc.*, No. 10-cv-2640, 2011 WL 2600511, at *4 (M.D. Fla. June 29, 2011).

Lastly, DarkMatter argues that the alleged conduct does not rise to the "outrageous" standard set forth under Florida law. DarkMatter MTD at 23.  However, the Defendants are incorrect that the conduct Ms. Oueiss alleges (i.e., multiple successful attempts at hacking her mobile device as part of a conspiracy to defame), fails to meet this "extremely high" standard.  *See supra* Argument, Section IV.A.3 (arguing the outrageousness standard is met with regard to IIED).

### C.    Ms. Oueiss Has Plausibly Alleged Defamation Claims

Ms. Oueiss alleges that the Recruiting Defendants and USA Defendants made knowingly false statements, including that she engaged in sexual acts for favors and that she works for terrorists and/or engages in sexual acts with terrorists for notoriety.  AC ¶ 283–84.  The required

elements of a defamation claim involving a public figure are: (1) publication; (2) of a false statement about the plaintiff; (3) that is defamatory; (4) with knowledge or reckless disregard as to the falsity (i.e., actual malice); (5) that results in actual damages.  *Deeb v. Saati*, 778 F. App'x 683, 687 (11th Cir. 2019) (citing *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018)).

The USA Defendants and Recruiting Defendants advocate for dismissal for three reasons: *First*, the USA Defendants' tweets were "constitutionally protected opinions."  USA Defs. MTD at 11.  *Second*, the USA Defendants' conduct in retweeting the Personal and Private Photos is "immunized activity under the safe harbor provision of the Communications Decency Act."  *Id*. at 15–16.  *Third*, the retweets at issue "were a matter of public concern and there is no allegation of 'actual malice.'"  *See id*. at 16; *see also* Rec. Defs. MTD at 17–18.  Each argument fails.

> **1.    The USA Defendants and the Recruiting Defendants Published False Statements Not Protected by the First Amendment**

The USA Defendants' first argument fails because the statements at issue are not protected expressions of opinion.  Although true statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected by the First Amendment, *see Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985), a statement that can be reasonably interpreted as stating or implying actual facts about a plaintiff is "actionable even if it is phrased as an opinion."  *Deeb*, 778 F. App'x at 687.   "The reference to 'opinion' in dictum in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–340 [1974] . . . was not intended to create a wholesale defamation exemption for 'opinion.'"  *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 2 (1990).  When assessing speech, a court should construe statements in their totality.  *Keller*, 778 F.2d at 717.

A "mixed" expression of opinion is actionable and occurs when a statement is based on facts regarding a plaintiff that remain unstated or are assumed to exist by the recipients to the

communication. *Id.* at 718; *Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995). Here, the USA Defendants' statements undoubtedly represent actionable "mixed" expressions of opinion that are readily proven false. *See Stern v. O'Quinn*, No. 07-cv-60534, 2008 WL 11401794, at *6 (S.D. Fla. Aug. 8, 2008). The Defendants' statements imply there is more beneath the surface of their bold assertions of Ms. Oueiss's involvement in terrorism and that they have information not available to the reader. *Deeb*, 778 F. App'x at 688 ("These statements could reasonably be interpreted not as impassioned rhetoric . . . but as asserting or implying facts susceptible to being proved true or false—that [plaintiff] had either committed or been accused of committing [felonious] acts . . . .") (internal quotation omitted). Further, statements that Ms. Oueiss used her "[n]atural [t]alent" to "obtain [her] current position[,]" AC ¶ 203, and that she worked for "the same bastards that fund terrorism around the globe[,]" *id.* ¶ 222, are clear averments that she is engaged in prostitution and terrorism.

The USA Defendants' statements are not "rhetorical hyperbole." *See Duffy v. Fox News Networks, LLC*, No. 14-cv-1545, 2015 WL 2449576, at *3 (M.D. Fla. May 21, 2015) ("[Defendant's] argument that the Statements are non-actionable as pure opinion or rhetorical hyperbole is unpersuasive at the motion to dismiss stage."). The assertion that Ms. Oueiss engaged in prostitution with terrorists is neither opinion nor hyperbole; it is a statement capable of being proven false.

Finally, the USA Defendants argue that the context of the publication of these statements on Twitter mitigates their defamatory nature. *See* USA Defs. MTD at 12–13. However, courts have rejected making such an assessment at this stage of litigation. *See Stern*, 2008 WL 11401794, at *7 (declining to take into consideration at pleading stage the fact that defendants' statements were made on "tabloid television").

2.      **The USA and Recruiting Defendants' Statements are Defamatory *Per Se* and Under a Standard Interpretation**

Although the Defendants attempt to diminish the severity of their statements, they are defamatory as libel *per se*.  Indeed, their statements are defamatory under any interpretation.

a.      **The Defendants' Statements Are Defamatory as Libel *Per Se***

Defamation or libel *per se* is a tort against a non-media defendant.  *Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1274–75 (S.D. Fla. 2020).  "A written publication constitutes libel per se under Florida law if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession."  *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015).  For *per se* claims, "its victim need not plead or prove malice (except where a privilege is involved) or special damage because [they] are both presumed."  *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. 4th DCA 1973).

The statements suggesting that Ms. Oueiss engaged in prostitution are textbook examples of defamatory statements.  *See, e.g.*, *Ford v. Rowland*, 562 So. 2d 731, 735 (Fla. 5th DCA 1990) (reversing dismissal of libel claim where a general public figure was called a "hooker" in a poem and holding that "[s]tatements which impute unchastity on the part of a woman plaintiff are libelous per se.").  And Van Rider's, Smith's, Schey's, and Al-Owerde's statements directly stating or implying that Ms. Oueiss aids and abets terrorism are not "political speech," *see* USA Defs. MTD at 11-12, but libelous *per se*.  *See, e.g.*, *Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App.-Fort Worth 2017) ("[Plaintiff] alleges that falsely accusing someone of having admitted that he provided financial support to terrorists constitutes defamation per se. We agree."); *see also Xcentric Ventures, LLC v. Stanley*, No. 07-cv-00954, 2007 WL 2177216, at *4 (D. Ariz. July 27, 2007).

Finally, Jundi's statement that Ms. Oueiss was a hypocrite who was "paid" to further a political agenda is defamatory as a matter of law because it imputes a lack of impartiality and bias in Ms. Oueiss's reporting, injuring her standing as a journalist. *See Buckley v. Littell*, 539 F.2d 882, 895–98 (2d Cir. 1976) (assertion of fact that journalist, a public figure, had lied about and implicitly libeled several people was constitutionally as well as tortiously defamatory).

### b.     The Defendants' Statements Are Defamatory Under a Standard Interpretation

Alternatively, the Defendants' statements are also clearly defamatory under a traditional interpretation. A statement is defamatory if it is reasonably capable of a defamatory interpretation, that is, if the "gist" or "sting" of the statement is defamatory. *Keller*, 778 F.2d at 714–15. Accordingly, while Ms. Oueiss avers that these statements are explicit and not subject to interpretation, their gist is clear: The Defendants published statements alleging she was engaged in prostitution and terrorism. Further, as this is not a matter of law but only fact, any such determination is inappropriate when considering a motion to dismiss.

### 3.     The USA Defendants and the Recruiting Defendants Acted with Actual Malice

Ms. Oueiss also alleges that the Defendants acted with actual malice. The "plausibility pleading standard applies to the actual malice standard in defamation proceedings." *Grayson v. No Labels, Inc.*, No. 20-cv-1824, 2021 WL 2869870, at *2 (M.D. Fla. Jan. 26, 2021) (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)). To plead actual malice, a plaintiff must allege sufficient facts to give rise to a reasonable inference that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *Grayson*, 2021 WL 2869870, at *2.

The Amended Complaint is replete with facts establishing that the central aim of the Conspiracy was to disseminate and amplify false information and that the USA Defendants and

the Recruiting Defendants acted with the knowledge that their statements were false.  AC ¶¶ 156,

177, 197, 283, 284, 308 (alleging the USA Defendants and the Recruiting Defendants knowingly

disseminated false information).  Moreover, the inquiry for actual malice is inappropriate on a

motion to dismiss, and general allegations that the Defendants acted with actual malice are

sufficient.  *Stern*, 2008 WL 11401794, at *7; *see also Shaw v. R.J. Reynolds Tobacco Co.*, 818 F.

Supp. 1539 (M.D. Fla. 1993) *aff'd*, 15 F.3d 1097 (11th Cir. 1994).

> **4.      The Communications Decency Act Does Not Immunize the
> Defendants' False Statements**

Finally, while Section 230 of the Communications Decency Act ("CDA") protects

retweeting, the USA Defendants did more than retweet, they added their own false statements to

the Personal and Private Photos of Ms. Oueiss, as described *supra* Statement of Facts, Section

III.C.3.  Consequently, the USA Defendants cannot shield themselves from liability under the

CDA.  *See, e.g.*, *La Liberte v. Reid*, 966 F.3d 79, 89 (2d Cir. 2020) ("[The defendant] went way

beyond her earlier retweet of Vargas in ways that intensified and specified the vile conduct that

she was attributing to [the plaintiff].  She accordingly stands liable for any defamatory content.").

> **D.      Ms. Oueiss Has Plausibly Alleged Civil Conspiracy Claims Against All
> Defendants**

Although MBS, MiSK, and Al-Asaker argue that the Amended Complaint contains

"rhetorical," "vague," and "conclusory" assertions, it is the Defendants who make blanket

statements that Ms. Oueiss has failed to allege a civil conspiracy without any support for their

contention.[15]  *See* MBS MTD at 9; MiSK MTD at 15; Al-Asaker MTD at 10–11.  The USA and

Recruiting Defendants' arguments are also vague and unsupported.  *See* USA Defs. MTD at 17;

Rec. Defs. MTD at 15.  And DarkMatter argues that even if Ms. Oueiss had adequately pleaded

---

[15] Ms. Oueiss has already addressed the Defendants' jurisdictional arguments as they relate to her civil conspiracy claim, *see supra* Argument, Section II.A.1, and she now addresses Defendants' Rule 12(b)(6) arguments.

conspiracy, the claim could not proceed to the extent it asserts violations of the CFAA. *See* DarkMatter MTD at 27–28. These arguments have no merit.

Ms. Oueiss has plausibly alleged the elements of a civil conspiracy under Florida law: "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in furtherance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Groover v. Polk Cty. Bd. of Cty. Comm'rs*, 460 F. Supp. 3d 1242, 1258 (M.D. Fla. 2020).

### 1. The Defendants' Conduct Rose to the Level of Tortious Activity Individually and Collectively

The Defendants argue that Ms. Oueiss has not alleged a basis to attribute tortious conduct to any of the Defendants or that the tortious conduct alleged is in and of itself implausible or conclusory. However, the conduct described above, *see supra* Argument, Section II.A.1, and in the Amended Complaint demonstrates that *all* of the Defendants committed numerous torts against Ms. Oueiss sufficient to support a conspiracy claim. *See Novell v. Bank of Am. Corp.*, No. 14-cv-80672, 2014 WL 7564678, at *9 (S.D. Fla. Dec. 3, 2014). Each of the Defendants' overt acts in pursuance of the Conspiracy is alleged in detail, including:

- *MBS*: AC ¶ 144 (the procurement of hacking tools); *id.* ¶¶ 158–65, 167–68 (four separate attempts to gain unauthorized access to the contents of Ms. Oueiss's mobile device); *id.* ¶ 84 (directing the other Defendants to create and utilize multiple social media accounts to spread disinformation about Ms. Oueiss).

- *Al Qahtani and Al-Asaker*: *Id.* ¶ 144 (the procurement of hacking tools); *id.* ¶¶ 158–65, 167-68 (attempts to gain unauthorized access to the contents of Ms. Oueiss's mobile device); *id.* ¶¶ 189, 191–92, 194 (creating the @Uncareer social media accounts and posting the Personal and Private Photos); *id.* ¶¶ 233–34, 237 (Al Qahtani's operation of the @KateStweart22 account which has disseminated libelous and harassing content).

- *DarkMatter*: *Id.* ¶¶ 158–65, 167–68, 171 (describing attempts to gain unauthorized access to the contents of Ms. Oueiss's mobile device).

- *Middle East News and Masharea*: *Id.* ¶¶ 179–80 (Al Arabiya disseminates the Doctored Financial Photo with knowledge of its falsity).

- *Recruiting Defendants*: *Id.* ¶¶ 196, 204, 216, 223, 225, 232 (recruiting and instructing the USA Defendants to spread the stolen content to defame, injure and humiliate Ms. Oueiss).

- *USA Defendants*: *Id.* ¶¶ 198–203, 206–07 (describing Van Rider's defamatory statements); *id.* ¶¶ 209–15 (describing Jundi's defamatory statements); *id.* ¶¶ 219–22, 224, 226 (describing Smith's defamatory statements); *id.* ¶¶ 229–30 (describing Schey's defamatory statements).

Even if one of their actions did not rise to the level of tortious activity, the Defendants certainly joined throughout various stages of the Conspiracy to generate a "peculiar power of coercion" that culminated in harm to Ms. Oueiss. *See e.g.*, *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*, 616 So. 2d 562, 565 (Fla. 5th DCA 1993) ("Such a tort is actionable where a plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual could not possess.") (citations omitted).

"The essential elements of this tort are a malicious motive and coercion through numbers or economic influence." *See Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977). Here, Ms. Oueiss alleges that the Leaders of the Conspiracy conspired to hack her mobile device to obtain personal information, and the Recruiting Defendants along with the USA Defendants conspired to disseminate and amplify that stolen content on Twitter, which could not have been accomplished on this large of a scale without the numbers they possessed. Al Menaia's tweet responding to Ms. Oueiss's coverage of MBS's involvement in the hacking of Jeff Bezos' cell phone says it all: "we will surround you." AC ¶ 106. The USA Defendants were specifically recruited "to disseminate disinformation in major U.S. markets and cities." *Id.* ¶ 208. These were not isolated acts, but rather "a coordinated effort to hack [Ms. Oueiss's] mobile device and subsequently defame her." *Id.* ¶ 29.

### 2.      The Amended Complaint Sufficiently Alleges a Conspiracy When Considered in its Entirety

The USA Defendants attempt to paint the conspiracy claim as "speculative" by pointing to just three examples of allegations in the Complaint.  *See* USA Defs. MTD at 17.  This attempt to place several allegations in a vacuum is misleading.  Read in its entirety, the Amended Complaint details a conspiracy among the Defendants to harass, intimidate, and defame Ms. Ouiess.  While Ms. Ouiess alleges many particularized facts as to the conspiracy, there is more information "peculiarly within the possession and control of the defendant[s]."  *Belik v. Carlson Travel Grp., Inc.*, 864 F. Supp. 2d 1302, 1311 (S.D. Fla. 2011).  MBS avers that the "obvious alternative explanation" for the USA and Recruiting Defendants' concerted online statements is that these Defendants "tweeted, retweeted, or liked messages because they and their friends believed those messages and wished to endorse them."  MBS MTD at 11.  While that explanation *is* alternative, it is far from obvious.  It does not explain the simultaneously recent frequency of the USA Defendants' tweets nor their abrupt pivot to MBS-related content.  *See supra* Statement of Facts, Section III.C.2.  To the extent that the Defendants wish to assert their alternative explanation, the procedurally correct time to do so is at the summary judgment stage.

The allegations in the Amended Complaint sufficiently demonstrate the existence of a conspiracy.  Ms. Ouiess "need not, as [the Defendants] suggest[], allege the terms of the agreement, when it was entered, what benefit [the Defendants] expected to obtain from the conspiracy, or other particularities."  *See Sonic Momentum B, LP v. Motorcars of Distinction, Inc.*, No. 11-cv-8591, 2011 WL 4738190, at *5 (S.D. Fla. Oct. 7, 2011); *United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996) ("Direct evidence of an agreement . . . is unnecessary: proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence.") (internal quotation marks and citations omitted).  Rather,

Ms. Oueiss need only plead "facts which raise a reasonable expectation that discovery will reveal evidence of the agreement." *Sonic Momentum*, 2011 WL 4738190, at *5.

Ms. Oueiss has certainly met her burden.  Ms. Oueiss provides specific allegations that are strong circumstantial evidence of the Conspiracy, including:

- Details regarding the hack of Ms. Oueiss's phone which demonstrate it follows the same pattern and tactics used in other documented hack and leak attacks by Defendants.  AC ¶¶ 159–74.

- Forensic evidence connecting the hack to Defendants.  *Id.* ¶¶ 15, 29.

- MBS, Al Qahtani, and Al-Asaker's acquisition of the hacking spyware, Pegasus, and documented examples of its use by Defendants.  *Id.* ¶¶ 167–68.

- Al Qahtani and Al-Asaker's prior similar hack and leak campaigns.  *Id.* ¶¶ 81, 88, 164–65.

- DarkMatter's acquisition of Pegasus and prior unlawful use of the hacking spyware.  *Id.* ¶¶ 76, 147–48, 151.

- The Recruiting and USA Defendants' abundant and unprecedented contacts, including Van Rider's trip to Saudi Arabia.  *Id.* ¶¶ 43–46.

Viewed in their entirety, these allegations are neither speculative nor conclusory.  Zeinab even acknowledged the creation of this Network in November 2018 and instructed Van Rider to post videos.  *Id.* ¶¶ 99, 102.

Finally, once a conspiracy is sufficiently pled, each conspirator is liable for the acts of their co-conspirators, regardless of whether that individual committed an underlying tort in furtherance of the conspiracy.  *See, e.g.*, *Sonic Momentum*, 2011 WL 4738190, at *4.  Thus, the Defendants' argument that their involvement in the Conspiracy is limited to one element of the Conspiracy fails.  Even if this Court finds that an underlying tort was not sufficiently pled for any one Defendant, each Defendant is still held liable for their co-conspirators' tortious acts.

### 3.      Alleging Conspiracy under the CFAA Does Not Limit Ms. Oueiss's Ability to Proceed with Conspiracy Claims Under State Law

DarkMatter cites one out-of-circuit district court decision to argue that the CFAA provides a federal remedy for conspiring to violate it and that any private suit alleging conspiracy to violate the CFAA must proceed under that statute alone.  DarkMatter MTD at 27.  However, this decision is not persuasive.  DarkMatter participated in a conspiracy in which some conspirators violated the CFAA, and others *broke other laws*.  This renders DarkMatter's citation of an Eleventh Circuit case completely inapposite; there, a plaintiff only used a common law claim as an "end run" around the statutory scheme for age discrimination suits.  *Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338, 1342–43 (11th Cir. 1999).  Here, Ms. Oueiss does not allege a state law conspiracy claim to violate the CFAA.  She alleges the Conspiracy to hack and to defame, harass, and intimidate her, not just to access sensitive information unlawfully.

## CONCLUSION

For the foregoing reasons, Ms. Oueiss respectfully requests that this Court hear oral argument on the Defendants' motions to dismiss and deny the motions to dismiss; in the alternative, Ms. Oueiss renews her request for jurisdictional discovery.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Ms. Oueiss requests a hearing on the Defendants' Motions to Dismiss and Plaintiff's Omnibus Response in Opposition, which involve serious allegations made in the 98-page, 311-paragraph Amended Complaint and the host of complex factual and legal issues, including issues of personal and subject-matter jurisdiction and immunity, that the Defendants' motions implicate.  Ms. Oueiss believes a hearing will conserve judicial resources and the resources of the Parties.  The Request for Hearing is made in good faith and will not prejudice the Parties in any way.  Ms. Oueiss estimates that two hours is needed for a hearing.

Dated:   September 20, 2021

Respectfully submitted,
*/s/ Jeffrey E. Marcus*
JEFFREY E. MARCUS
Fla. Bar No.  310890
jmarcus@mnrlawfirm.com
DANIEL L. RASHBAUM
Fla. Bar No. 75084
drashbaum@mnrlawfirm.com
JASON L. MAYS
Fla. Bar No. 106495
jmays@mnrlawfirm.com
Marcus Neiman & Rashbaum LLP
One Biscayne Tower
2 South Biscayne Blvd., Suite 1750
Miami, Florida 33131
Telephone: (305) 400-4260

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2021, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court for the Southern District of Florida using the CM/ECF document filing system, which will send transmissions of Notices of Electronic Filing on all Counsel of Record.

By:   */s/ Jeffrey E. Marcus*
Jeffrey E. Marcus
Florida Bar No. 310890