# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GHADA OUEISS,<br>    *Plaintiff*,<br>v.<br><br>MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD, *et al*.,<br>    *Defendants*. | Case No. 20-CV-25022-KMM |

## DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS AMENDED COMPLAINT

Michael K. Kellogg (*pro hac vice*)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL**
  **& FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

Benjamin H. Brodsky (Fla. Bar No. 73748)
**BRODSKY FOTIU-WOJTOWICZ,**
  **PLLC**
200 S.E. 1st Street, Suite 400
Miami, Florida 33131
(305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

*Attorneys for Defendant Mohammed bin Salman bin Abdulaziz Al Saud*

October 14, 2021

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT ..........................................................................................................................1

I.    Oueiss Pleads No Plausible Basis for Personal Jurisdiction Over the Crown Prince ..........................................................................................................1

      A.    Oueiss Fails To Allege the Requisite Contacts Between the Crown Prince and the United States or Florida ..................................................1

      B.    Personal Jurisdiction Would Conflict with Traditional Notions of Fair Play and Substantial Justice ...............................................................3

II.   The Crown Prince Is Immune from Suit...............................................................3

      A.    Status-Based Immunity Bars Oueiss's Claims Against the Crown Prince .................................................................................................3

      B.    Conduct-Based Immunity Bars Oueiss's Claims Against the Crown Prince .........................................................................................4

III.  The Amended Complaint Fails To State a Federal Statutory Claim ..................7

      A.    The Amended Complaint Fails To Allege Plausibly That the Crown Prince Was Responsible for Accessing Oueiss's Phone ............7

      B.    Oueiss Fails To State a Valid ATS Claim for Additional Reasons .........8

IV.  Oueiss Fails To State Common-Law Claims Against the Crown Prince ...........9

CONCLUSION ....................................................................................................................10

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES

*Aldossari ex rel. Aldossari v. Ripp*, --- F. Supp. 3d ---, 2021 WL 1819699
   (E.D. Pa. May 6, 2021), *appeal pending*, No. 21-2080 (3d Cir.) ..................4, 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................8

*Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773 (2017) ...........................3

*Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021) ........................................6

*Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020),
   *cert. denied*, 141 S. Ct. 2704 (2021) ..................................................................5, 9

*Doe, In re*, 860 F.2d 40 (2d Cir. 1988) ..........................................................................4

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ..............................................................7

*Edwards v. Prime, Inc.*, 602 F.3d 1276 (11th Cir. 2010) ..................................................8

*Estate of Amergi ex rel. Amergi v. Palestinian Auth.*, 611 F.3d 1350
   (11th Cir. 2010) ..........................................................................................................9

*Fernandez v. School Bd. of Miami-Dade Cty.*, 201 F. Supp. 3d 1353
   (S.D. Fla. Aug. 19, 2016) ............................................................................................5

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) ....................2

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..........................................3

*International Underwriters AG v. Triple I: Int'l Invs., Inc.*, 2007 WL 9701852
   (S.D. Fla. May 30, 2007) .............................................................................................3

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ..................................................2

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) ............................................8

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156
   (2020) ...................................................................................................................4, 6, 7

*Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021) .............................................................9

*Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2009) .......................3

*Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241 (11th Cir. 2007) .......................5

*Prince Hotel, SA v. Blake Marine Grp.*, 433 F. App'x 706 (11th Cir. 2011) ..................9

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) ......................................................6

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ..................................................................................6

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014) ...................................................4

*Snow v. DirecTV, Inc.*, 450 F.3d 1314 (11th Cir. 2006) ............................................................2

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)........................................................................8

*United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997) ........................................................4

*Walden v. Fiore*, 571 U.S. 277 (2014)........................................................................................2


TREATIES, STATUTES, AND RULES

Convention on Cybercrime of the Council of Europe, Nov. 23, 2001, C.E.T.S.
  No. 185, *available at* https://www.coe.int/en/web/conventions/full-list/-
  /conventions/rms/0900001680081561 ..............................................................................8, 9

Alien Tort Statute, 28 U.S.C. § 1350...................................................................................7, 8, 9

Computer Fraud and Abuse Act of 1986, Pub. L. No. 99-474, 100 Stat. 1213 ..............................7

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
  (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) ............................................5

Fed. R. Civ. P. 4(k)(2)....................................................................................................................2


ADMINISTRATIVE MATERIALS

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
  Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice
  (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-
  03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012) ......................................... 4-5, 6


OTHER MATERIALS

Br. for the United States as Amicus Curiae, *Mutond v. Lewis*, No. 19-185
  (U.S. May 26, 2020), 2020 WL 2866592 ..............................................................................6

Florence Dixon, *Al Jazeera journalists targeted in misogynistic 'Saudi-linked'
  Twitter smear campaign*, The New Arab (June 10, 2020),
  https://english.alaraby.co.uk/news/al-jazeera-journalists-targeted-
  misogynistic-saudi-linked-smear-campaign .........................................................................2

Louise Matsakis & Lily Hay Newman, *Everything We Know About the Jeff Bezos Phone Hack*, Wired (Jan. 22, 2020), https://www.wired.com/story/bezos-phone-hack-mbs-saudi-arabia/ .................................................................................8

Ghada Oueiss, *I'm a female journalist in the Middle East. I won't be silenced by online attacks*, Wash. Post (July 8, 2020), https://www.washingtonpost.com/opinions/2020/07/08/im-female-journalist-middle-east-i-wont-be-silenced-by-online-attacks/ ............................................1

Restatement (Second) of Foreign Relations Law of the United States (1965) ...........................6, 7

# ARGUMENT

I. **Oueiss Pleads No Plausible Basis for Personal Jurisdiction Over the Crown Prince**

   A. **Oueiss Fails To Allege the Requisite Contacts Between the Crown Prince and the United States or Florida**

The gravamen of Oueiss's claims is that her phone was unlawfully accessed four times between October 2019 and August 2020. Photos of her smoking and drinking alcohol, allegedly taken from her phone, were posted to Twitter on April 19, 2020. Photos of her in a hot tub, allegedly derived from a video taken from her phone, were posted to Twitter on June 2. "Within just a few hours," the hot tub photos were "tweeted more than 40,000 times" by Twitter users worldwide. Ghada Oueiss, *I'm a female journalist in the Middle East. I won't be silenced by online attacks*, Wash. Post (July 8, 2020), *cited in* Am. Compl. ¶ 244; *see* Am. Compl. ¶¶ 191-192 (alleging that the hot tub photos were first posted to Twitter on June 2 and that, in "the next few days, pro-Defendant MBS Twitter accounts continued to repost and amplify the content until it reached a critical mass"). On June 9, a Florida resident (Sharon Van Rider) with approximately 300 Twitter followers retweeted the hot tub photos. *Id.* ¶ 200. On June 10 and 11, a California resident (Annette Smith) with approximately 400 Twitter followers also retweeted the hot tub photos. *Id.* ¶ 221. Oueiss also alleges that two other U.S. residents (Sam Jundi and Christanne Schey) tweeted disparaging comments about her. She does not allege that Jundi or Schey shared any unlawfully accessed material. *Id.* ¶¶ 209-215, 228-230.[1]

Those claims have no meaningful connection with the United States or with Florida. There are no allegations that the alleged phone access occurred in the United States. There are no allegations that the initial posting of Oueiss's photos to Twitter occurred in the United States. There are no allegations that Oueiss, a Lebanese national and Qatari resident, suffered any injury in the United States. The only alleged nexus to the United States is that two U.S. residents retweeted the hot tub photos three times – which, on Oueiss's own account, happened only after those photos had already been retweeted tens of thousands of times by others. Oueiss cites no

---

[1] Because Oueiss does not bring a claim against the Crown Prince for libel, *see* Am. Compl. Count V, tweets by the U.S. Defendants that do not share unlawfully accessed material are irrelevant to personal jurisdiction over the Crown Prince. In any event, even if all tweets by the U.S. Defendants mentioning her were somehow relevant, they would still be no more than 0.23% of the total tweets purportedly targeting her globally (and no more than 0.14% for the Florida Defendants). *See* Crown Prince Br. 4.

case where any court has exercised specific jurisdiction on such threadbare forum connections. She fails to show "a strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021).[2]

Oueiss errs (at 28-30) in arguing that specific jurisdiction exists because the Crown Prince conspired with the U.S. Defendants and "personally directed" them to retweet the hot tub photos. *First*, Rule 4(k)(2) does not permit attribution of contacts based on conspiracy. *See* Crown Prince Br. 9. *Second*, the allegations of personal direction are "vague and conclusory," *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006), and the Court should reject them. There are no concrete allegations that the Crown Prince ever communicated with any of the U.S. Defendants or even knew who they were. Beyond conclusory allegations on information and belief, there are also no allegations as to how the U.S. Defendants were purportedly recruited into the conspiracy or what incentive they would have to participate. *See* Crown Prince Br. 9; Opp. 28-29 (summarizing allegations relating to Crown Prince). It is facially implausible that the Crown Prince of Saudi Arabia would have conspired with two U.S. residents, each with modest Twitter followings, and directed them to retweet photos already posted to Twitter 40,000 times by other users. *Third*, even if the Court were to credit Oueiss's conclusory allegations, the alleged connection with the United States (three retweets) or Florida (a single retweet) would still be too thin for specific jurisdiction.

Oueiss fails to bolster her claims by falsely asserting (at 28) that "[i]ndependent media reports have described the conspiracy against Plaintiff as 'an effort led by [the Crown Prince] to target any online critics'" (quoting Am. Compl. ¶ 142). The news article on which she relies does not state that the Crown Prince was involved in the purported campaign against Oueiss and certainly does not describe any co-conspirators or agents of the Crown Prince working in the United States. Instead, it refers to the Crown Prince only in describing an earlier 2019 article about a "so-called troll farm in Riyadh."[3] Also false is Oueiss's assertion (at 55) that paragraph

---

[2] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), cited by Oueiss (at 32-33), is inapposite. In *Keeton*, the plaintiff alleged that the defendant committed libel by directly disseminating libelous magazines into New Hampshire. 465 U.S. at 772. In libel cases, "[t]he strength of th[e] connection" with the forum is "largely a function of the nature of the libel tort," because libel "actually occur[s]" in the place of "publication." *Walden v. Fiore*, 571 U.S. 277, 287-88 (2014). Oueiss does not assert a libel claim against the Crown Prince.

[3] Florence Dixon, *Al Jazeera journalists targeted in misogynistic 'Saudi-linked' Twitter smear campaign*, The New Arab (June 10, 2020), *cited in* Am. Compl. ¶ 142 & n.47.

2

84 of the Amended Complaint alleges that the Crown Prince "direct[ed] the other Defendants to create and utilize multiple social media accounts to spread disinformation about Ms. Oueiss." That paragraph does not mention the Crown Prince at all, let alone allege that he directed anyone else to tweet about Oueiss. *See* Am. Compl. ¶ 84. Finally, Oueiss points (at 29) to her allegation that the Crown Prince directed the unlawful access of Oueiss's phone. As shown below, that allegation is conclusory and unsupported by alleged facts. *See infra* pp. 7-8. In any event, it cannot support personal jurisdiction because none of the alleged access occurred in the United States and the U.S. Defendants had no alleged involvement in that access.[4]

### B. Personal Jurisdiction Would Conflict with Traditional Notions of Fair Play and Substantial Justice

"[T]raditional notions of 'fair play and substantial justice'" do not support jurisdiction. *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1221 (11th Cir. 2009) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). Oueiss's assertion (at 33) that adjudication of this case in Florida would be "efficient" is unsupported. Her claims concern alleged unlawful access to her phone by Defendants in Saudi Arabia and the UAE, targeting a Qatari resident. Nearly all potential witnesses reside abroad. Despite her claim that Florida has an "interest in providing redress" based on "tortious activity emanating from [Florida]," *International Underwriters AG v. Triple I: Int'l Invs., Inc.*, 2007 WL 9701852, at *6 (S.D. Fla. May 30, 2007), she fails to show any such emanation. None of the alleged access, and only a single tweet containing any purportedly accessed material, came from Florida. *See* Crown Prince Br. 4, 12.[5]

## II. The Crown Prince Is Immune from Suit

### A. Status-Based Immunity Bars Oueiss's Claims Against the Crown Prince

Oueiss does not dispute the facts entitling the Crown Prince to status-based immunity: He is the son of and designated successor to the King, the only Saudi official who can exercise

---

[4] Oueiss's references (at 34-35) to actions the Crown Prince purportedly took against Jamal Khashoggi and Jeff Bezos are entirely irrelevant because her legal claims do not "arise out of or relate to" those alleged contacts, as required for specific jurisdiction. *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1780 (2017) (brackets omitted).

[5] Oueiss falsely asserts (at 33) that the Crown Prince is "currently availing himself of" the "American legal system" as a plaintiff in *Sakab Saudi Holding Co. v. Aljabri*, No. 1:21-cv-10529-NMG (D. Mass.). The Crown Prince is not a party to that case.

sovereign power alongside or on behalf of the King, and holds numerous high-ranking positions in Saudi Arabia's government including Minister of Defense.

Oueiss asserts (at 19-20) that the Court should not grant status-based immunity because the State Department has yet to issue a Suggestion of Immunity. Saudi Arabia's request for a Suggestion of Immunity in a separate action remains pending; it has not been rejected, as Oueiss implies. When the State Department "does not grant a suggestion of immunity, the [court] is authorized" independently to decide the issue. *Lewis v. Mutond*, 918 F.3d 142, 145-46 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020).[6] In suggesting otherwise, Oueiss misquotes *United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997), which makes clear that "courts should make an independent determination regarding immunity when the Executive Branch neglects to convey clearly its position on a particular immunity request." *Id.* at 1212.[7]

Oueiss errs in contending (at 19) that the Crown Prince is not entitled to immunity because President Biden once said he would speak only with the King. *See* Am. Compl. ¶ 67. The President also described the Crown Prince as "acting head of state," and federal agencies have recognized him as "chief of state" and "head of government." Crown Prince Br. 15-16.

Finally, Oueiss also errs in relying (at 20) on two cases concluding that status-based immunity does not continue past an officeholder's time in office. *See Doe*, 860 F.2d at 45; *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 193-94 (D.D.C. 2014). That point is irrelevant because the Crown Prince is currently in office.

### B. Conduct-Based Immunity Bars Oueiss's Claims Against the Crown Prince

Because Oueiss's claims arise from the Crown Prince's alleged "acts . . . [in] exercising the powers of [his] office,"[8] the Crown Prince has conduct-based immunity. The recent decision

---

[6] Oueiss points (at 19) to one case that, after concluding the Crown Prince was entitled to conduct-based immunity, "decline[d] to reach th[e] issue" of head-of-state immunity. *Aldossari ex rel. Aldossari v. Ripp*, --- F. Supp. 3d ---, 2021 WL 1819699, at *17 (E.D. Pa. May 6, 2021), *appeal pending*, No. 21-2080 (3d Cir.). That court acknowledged that it "ha[d] the authority to determine whether the Crown Prince is entitled to head of state immunity." *Id.*

[7] In *Noriega*, the Eleventh Circuit cited *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988), for the proposition that "[s]ome courts have held that absent a formal suggestion of immunity, a putative head of state should receive no immunity." 117 F.3d at 1212. Oueiss omits the beginning of the quoted sentence to suggest that the Eleventh Circuit has adopted that rule, which it has not.

[8] Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 2 (Dec. 17, 2012)

4

in *Aldossari* is on point and persuasive. *Aldossari* found the Crown Prince immune from a claim that he had interfered with a contract by allegedly ordering the arrest of his predecessor. *See* 2021 WL 1819699, at *13-15. The court observed that, "[i]n his roles as Deputy Prime Minister, Minister of Defense, and Chairman of the Council of Political and Security Affairs," the Crown Prince "oversees criminal prosecutions and national security." *Id.* at *15. Therefore, "[a]n executive decision to conduct a criminal investigation, including ordering an arrest and directing an asset seizure, . . . is one that can only be made by one acting with official authority" and "an official's exercise of police powers against its own citizens that has not been disavowed by the sovereign is conduct that is official in nature." *Id.*

The actions Oueiss alleges were within the scope of the Crown Prince's national-security authority (or would have been if he had committed them), including his role as Minister of Defense. As the Ninth Circuit explained in *Broidy Capital Management, LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2704 (2021), the type of conduct alleged here is "cyberespionage" and involves powers "peculiar to sovereigns." *Id.* at 592, 594.[9] That is particularly true here because the conduct took place in the context of Saudi Arabia's dispute with Qatar, *see* Crown Prince Br. 2, and because the Amended Complaint alleges that Saudi Arabia had acquired "Pegasus spyware" used "through the Saudi Royal Guard," Am. Compl. ¶ 144. Indeed, Oueiss first alleged that all of the Crown Prince's alleged actions were in an official capacity, before abruptly reversing course after she reviewed the Crown Prince's initial motion to dismiss and realized that she had pleaded herself out of court.[10]

Oueiss does not meaningfully engage with the State Department's settled policy that conduct-based immunity is warranted when a foreign official "exercis[es] the powers of [his]

---

("*Ragsdale* Letter"), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012).

[9] Oueiss's attempt (at 22 n.3) to distinguish *Broidy* by noting that it involved the Foreign Sovereign Immunities Act ("FSIA") is unpersuasive. *Broidy* explained that cyberespionage efforts are uniquely sovereign. That reasoning applies whether a case involves the FSIA or not.

[10] Oueiss insists that she is "permitted to revise her allegations even if her revisions are deemed inconsistent with earlier allegations." Opp. 23 n.4 (emphasis omitted). But when a plaintiff revises her allegations after the filing of a motion to dismiss for the clear purpose of attempting "to avoid a dispositive defense" raised in that motion, a court need not – and should not – ignore the plaintiff's "manipulat[ion]." *Fernandez v. School Bd. of Miami-Dade Cty.*, 201 F. Supp. 3d 1353, 1361 n.1 (S.D. Fla. Aug. 19, 2016) (citing *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007)).

5

office." *Ragsdale* Ltr. 2; *see also* Crown Prince Br. 17. She claims (at 22-23) that the alleged conduct of the Crown Prince, if true, would have been performed in a personal, not official, capacity, because the Crown Prince purportedly undertook acts against her "to further personal vendettas." Am. Compl. ¶ 3. Her allegations of motive are not only conclusory, but also irrelevant to the immunity analysis, as illustrated by the cases cited in the Crown Prince's opening brief (at 20 & n.21). Oueiss fails to address that authority.

Further, Saudi Arabia has not disavowed any alleged actions taken by the Crown Prince relating to Oueiss. Her sweeping assertion (at 23) that "[t]he Kingdom of Saudi Arabia has categorically disclaimed responsibility for the class of conduct at issue" is without support. Oueiss cites only to a single paragraph in her Amended Complaint that discusses the Crown Prince's denial of any involvement in the murder of Jamal Khashoggi. *See* Am. Compl. ¶ 75. That denial has nothing to do with this case.

Oueiss also asks the Court (at 21-22) to apply an alternative standard described in § 66(f) of the Restatement (Second) of Foreign Relations Law of the United States (1965) ("Second Restatement"). Neither the Supreme Court nor the Eleventh Circuit has ever adopted that alternative standard.[11] To the contrary, the Supreme Court has long held the view that a court's independent determination regarding conduct-based immunity should be made "in conformity to the principles accepted by the department of the government charged with the conduct of our foreign relations." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945); *see Samantar v. Yousuf*, 560 U.S. 305, 312 (2010). For its part, the Executive Branch – "the department of the government charged with the conduct of our foreign relations," *Hoffman*, 324 U.S. at 35 – has described reliance on § 66(f) as "misplaced." Br. for the United States as Amicus Curiae at 14, *Mutond v. Lewis*, No. 19-185 (U.S. May 26, 2020), 2020 WL 2866592; *see id.* at 14-17.

Even if the Court were to apply § 66(f) rather than follow the State Department's policy, the Crown Prince still would be entitled to conduct-based immunity. *See* Crown Prince Br. 19-20. He is undisputedly a "public minister, official, or agent" of Saudi Arabia, and, as set forth

---

[11] Nor has the D.C. Circuit. Both cases cited by Oueiss (at 22) expressly declined to resolve that issue. *See Lewis*, 918 F.3d at 146 (explaining that, because "both parties assume[d] § 66 accurately sets out the scope of common-law immunity for current or former officials," the court would "proceed on that understanding without deciding the issue"); *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 803 (D.C. Cir. 2021) ("It is unclear whether the Restatement articulates the correct standard.").

above, is being sued for purported "acts performed in his official capacity." Second Restatement § 66(f). Moreover, Oueiss seeks damages and a broad injunction against the Crown Prince and other foreign officials and employees acting at his direction. She complains of the Crown Prince and other government officials' purported cyberespionage activity, and asks the Court to order them to stop. Any such judgment would enforce a rule of law against Saudi Arabia. *See Doğan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (concluding that exercising jurisdiction over damages claims against the former Israeli Defense Minister "would be to enforce a rule of law against the sovereign state of Israel," where the allegations concerned the Defense Minister's exercise of his official powers at the instructions of Israel's Prime Minister); *Lewis*, 918 F.3d at 146-47 (enforcing a judgment against an official is "tantamount to enforcing a rule of law against the [state] itself" when the judgment will "force the state to take specific action").

### III.     The Amended Complaint Fails To State a Federal Statutory Claim

#### A.     The Amended Complaint Fails To Allege Plausibly That the Crown Prince Was Responsible for Accessing Oueiss's Phone

Both of Oueiss's federal statutory claims – the Computer Fraud and Abuse Act of 1986 and the Alien Tort Statute ("ATS") – seek relief for alleged unauthorized access to Oueiss's phone. Am. Compl. ¶¶ 250-253, 259-265. She fails to allege a plausible basis to attribute any such access to the Crown Prince. She has alleged no communication, direction, or contact between the Crown Prince and the alleged Saudi "threat actor group" or DarkMatter. *Id.* ¶¶ 161, 167. Nor does she allege that the Crown Prince gave anyone direction to do anything to her. Oueiss purports to identify (at 40-41) support for her assertion that the Crown Prince personally directed the access to her phone, but her attempts fall short.

*First*, the Amended Complaint does not allege (as Oueiss contends at 40) that "[f]orensic evidence . . . reveal[ed]" that the Crown Prince or any other Defendant was "responsible for the hacking." Neither the paragraphs Oueiss cites, *see* Am. Compl. ¶¶ 29, 158, nor any other allegations describe forensic evidence that points to the Crown Prince or any other Defendant.

*Second*, the Amended Complaint does not allege that "[t]he hack follows the same pattern and tactics used in other hack and leak attacks by [the Crown Prince]." Opp. 40. The only so-called tactic Oueiss describes involves the Crown Prince supposedly sending Jeff Bezos

7

a WhatsApp message infected with malware. *See* Am. Compl. ¶ 72.[12] There is no allegation that the Crown Prince sent Oueiss any infected messages or ever communicated with her at all.

*Third*, Oueiss fails to show that the allegation that her phone received a suspicious WhatsApp message, *id.*¶ 168, ties that message to the Crown Prince. Oueiss herself alleges that "WhatsApp servers and vulnerabilities" have been used at least 1,400 times to "spread . . . spyware." *Id.* ¶ 146. The alleged use of a common intrusion technique does not support a plausible inference that a specific Defendant was personally involved.

*Fourth*, and finally, the Amended Complaint does not support Oueiss's assertion (at 41) that "[a]llies of [the Crown Prince] have identified [her] as [his] enemy." Oueiss cites Paragraph 23 of her Amended Complaint, which states that a Saudi citizen with no alleged ties to the Crown Prince posted threatening or insulting tweets about her. Am. Compl. ¶ 23. She does not allege that these tweets mentioned or were sent on behalf of the Crown Prince.

In sum, Oueiss's efforts to tie the alleged access to the Crown Prince are nowhere near "enough to raise a right to relief above the speculative level," *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1301 (11th Cir. 2010), and so do not "unlock the doors of discovery," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### B. Oueiss Fails To State a Valid ATS Claim for Additional Reasons

Oueiss's ATS claim fails because the conduct she alleges does not violate "international law norms that are 'specific, universal, and obligatory.'" *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004)). Oueiss cites no court that has ever recognized a cause of action under the ATS for so-called "cybercrime." She cites only the Budapest Convention, which has been adopted by only a third of the world's nations (65 at the time of the opening brief, now 66) and which is not self-executing. *See* Crown Prince Br. 24. As a result, that convention does not set forth any "specific, universal, [or] obligatory" standards. Oueiss asserts (at 37-38) that three other nations (Saudi Arabia, Qatar, and UAE) have adopted domestic laws that prohibit "cybercrime." But a mere showing that conduct is commonly prohibited by the domestic laws of many nations – or even all nations, which Oueiss has not shown here – does not establish the obligatory norm of international law

---

[12] The article on which Oueiss bases her allegation about Bezos's phone, *see* Am. Compl. ¶¶ 72-73 & nn.22-24, itself describes the evidence against the Crown Prince as "not definitive" and "not certain." Louise Matsakis & Lily Hay Newman, *Everything We Know About the Jeff Bezos Phone Hack*, Wired (Jan. 22, 2020).

required for an ATS claim. *See Prince Hotel, SA v. Blake Marine Grp.*, 433 F. App'x 706, 707 (11th Cir. 2011) (per curiam) (reasoning that, even though every nation prohibits "tortious conversion of . . . property," that tort "is no part of the 'law of nations'"); *Estate of Amergi ex rel. Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1360 (11th Cir. 2010) (finding no obligatory international norm against murder).[13]

Even if unlawful computer access could form the basis for an ATS claim (and it cannot), Oueiss's claim still falls short because "the conduct relevant to the statute's focus" did not "occur[ ] in the United States." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936 (2021). Oueiss contends (at 37) that the ATS embraces a ban against "cybercrime" or "hacking." *See also* Am. Compl. ¶ 127 (Budapest Convention "addresses cybercrime (such as the hacking of Ms. Oueiss' mobile device)"). But she has abandoned any claim that any unauthorized access to her device occurred in the United States. Although she argues (at 39) that "United States citizens act[ed] in furtherance of the Conspiracy in the United States," the only actions she can point to are the retweeting and commenting on materials that were obtained abroad and that had already been posted more than 40,000 times before by others located abroad. *See supra* pp. 1-2. Oueiss does not and cannot contend that disparaging tweets or reposting of publicly available material violate a universal, specific, and obligatory norm of international law.

**IV.    Oueiss Fails To State Common-Law Claims Against the Crown Prince**

Oueiss fails to plead plausible claims against the Crown Prince for intrusion, intentional infliction of emotional distress ("IIED"), or civil conspiracy. These claims rest on some combination of the following conduct: the alleged phone access, the release of unlawfully obtained or doctored photographs, and disparaging tweets. As explained above, Oueiss fails to plausibly allege involvement by the Crown Prince in the access or the U.S. Defendants' tweets. *See supra* pp. 2-3, 7-8.

She further alleges that the "Doctored Financial Photo" was published by Middle East News. Am. Compl. ¶ 179. Oueiss attempts to tie this conduct to the Crown Prince by asserting (at 8-9) that the Crown Prince "directs and controls" Middle East News and that Middle East News is a "mere instrumentalit[y] of" the Crown Prince. But Oueiss's conclusory allegations

---

[13] Oueiss also fails (at 37 n.11) to distinguish *Broidy*. Although *Broidy* itself did not involve the ATS, the court's conclusion that unlawful computer access had "not been shown to violate . . . applicable international law," 982 F.3d at 592, is relevant to the ATS inquiry.

9

are insufficient as a matter of law to attribute the conduct of Middle East News to the Crown Prince.  *See* Crown Prince Br. 28-29; Middle East News Reply Br. 5.  Oueiss's effort to tie the Crown Prince to the anonymous social media accounts that leaked the smoking and hot tub photos is equally threadbare.  Her assertion (at 9) that unspecified "agents" of the Crown Prince operated these accounts is supported by nothing more than a conclusory allegation that the Crown Prince "directed" others to create these accounts.  Am. Compl. ¶ 184.

Oueiss's Amended Complaint is likewise bare of allegations plausibly suggesting that the Crown Prince conspired with anyone else to commit any of the alleged conduct.  *See supra* pp. 2-3.  In arguing that the so-called "Recruiting Defendants" conspired with the Crown Prince, she points to no concrete allegations tying them to the Crown Prince other than that they frequently "prais[ed]" him on Twitter.  *See* Opp. 10-12.  But tweets praising a political leader cannot plausibly support an inference of an unlawful conspiracy.  And although Oueiss alleges that Al Qahtani and Al Asaker are or were the Crown Prince's advisors, she alleges no meetings, directions, or communications among them relating to her.  *See* Am. Compl. ¶¶ 77-88.

In addition, as set forth in greater detail in other Defendants' reply briefs, Oueiss fails to plead multiple elements of her common-law claims.  *See* MiSK Reply Br. 8-9 (Part III.A) (Oueiss fails to allege "severe emotional distress," as necessary for IIED claim); DarkMatter Reply Br. 8-9 (Part III.C) (Oueiss fails to plead severe emotional distress, extreme and outrageous conduct, or actual malice for intrusion claim); *id.* at 10 (Part III.D) (Oueiss fails to plead intrusion into a "private quarter" or "place," as necessary for intrusion claim); U.S. Defendants' Reply Br. 9-10 (Oueiss fails to plead civil conspiracy).

## CONCLUSION

The Court should dismiss all of Oueiss's claims against the Crown Prince.

Dated:    October 14, 2021

Michael K. Kellogg (*pro hac vice*)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (*pro hac vice*)
**KELLOGG, HANSEN, TODD, FIGEL**
  **& FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
grapawy@kellogghansen.com
ashen@kellogghansen.com

Respectfully submitted,

/s/ *Benjamin H. Brodsky*
Benjamin H. Brodsky (Fla. Bar No. 73748)
**BRODSKY FOTIU-WOJTOWICZ,**
  **PLLC**
200 S.E. 1st Street, Suite 400
Miami, Florida 33131
(305) 503-5054
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

*Attorneys for Defendant Mohammed bin Salman bin Abdulaziz Al Saud*

**CERTIFICATE OF SERVICE**

  I certify that on October 14, 2021, I electronically filed the foregoing DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS AMENDED COMPLAINT, using the ECF system, which sent notice of filing in this matter to all counsel of record.

            /s/ *Benjamin H. Brodsky*
            Benjamin H. Brodsky, Esq.
            *Attorney for Defendant*
            *Mohammed bin Salman bin Abdulaziz*
            *Al Saud*