# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 1:20-cv-25022-KMM

GHADA OUEISS,

      Plaintiff,

v.

MOHAMMED BIN SALMAN
BIN ABDULAZIZ AL SAUD, *et al.*,

      Defendants.

_____/

## <u>OMNIBUS ORDER</u>

THIS CAUSE came before the Court upon nine (9) motions to dismiss on behalf of the following fifteen (15) Defendants in this matter: (1) Mohammed bin Salman bin Abdulaziz Al Saud, (ECF No. 161); (2) Sharon Van Rider, Christanne Schey, Sam Jundi, and Annette Smith, (ECF No. 162); (3) Faisal Al Menaia, Awwad Al Otaibi, Turki Al-Owerde, and Tarek Abou Zeinab, (ECF No. 163); (4) Saud Al Qahtani, (ECF No. 164); (5) DarkMatter, (ECF No. 165); (6) Prince Mohammed Bin Salman Abdulaziz Foundation, (ECF No. 166); (7) Bader Al-Asaker, (ECF No. 167); (8) Masharea wa Enjazat IT Corporation LLC, (ECF No. 168); and, (9) Middle East News FZ-LLC, (ECF No. 169) (collectively with (ECF Nos. 161–168), the "Mots. to Dismiss"). Plaintiff Ghada Oueiss filed an Omnibus Response in Opposition. ("Resp.") (ECF No. 172). Defendants filed replies. (ECF Nos. 175–183). The Motions to Dismiss are now ripe for review.

## I.    BACKGROUND[1]

This case arises under the Court's federal question jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.   Am. Compl. ¶ 121. Plaintiff's state law claims arise under this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.  *Id.*

On December 9, 2020, Plaintiff filed a Complaint against eighteen (18) named defendants, both foreign and domestic, and twenty (20) John Does, alleging claims of (1) hacking Plaintiff's mobile device in violation of the ATS; (2) violation of the CFAA; (3) violation of the Stored Communication Act, 18 U.S.C. §§ 2701–2712; (4) intentional infliction of emotional distress under Florida law; (5) intrusion under Florida law; (6) public disclosure of private facts under Florida law; (7) libel under Florida law; and (8) civil conspiracy under Florida law.  *See generally* (ECF No. 1).  The case was reassigned to the undersigned, (ECF No. 16), and thereafter, defendants moved to dismiss and to stay all pretrial proceedings pending the resolution of their motions to dismiss.  *See* (ECF Nos. 83–87, 89–90, 97).  On April 5, 2021, the Court granted the defendants' motions to stay, thereby staying "all pretrial obligations in this matter, including discovery."  (ECF No. 130) at 6.  On June 14, 2021, Plaintiff filed her Amended Complaint asserting six claims against the fifteen (15) Defendants.  *See generally* Am. Compl.  Therein, Plaintiff alleges as follows.

### A.  The Parties.

The Court begins with a brief description of each Party, beginning with Plaintiff.

---

[1]  The following background facts are taken from the Amended Complaint ("Am. Compl.") (ECF No. 135) and are accepted as true for purposes of ruling on the motions to dismiss.  *Fernandez v. Tricam Indus., Inc.*, No. 09-22089-CIV, 2009 WL 10668267, at *1 (S.D. Fla. Oct. 21, 2009).

<u>Plaintiff.</u>

Plaintiff is Ghada Oueiss ("Plaintiff")—an international journalist, anchor, and presenter for *Al Jazeera*, a news organization headquartered in Doha, Qatar, and a contributor to *The Washington Post*, George Washington University, and Publications International Press Institute. Am. Compl. ¶¶ 1, 35.  In her Amended Complaint, Plaintiff asserts claims under the ATS, the CFAA, and Florida law, specifically, intentional infliction of emotional distress, intrusion, libel, and civil conspiracy, against fifteen (15) named Defendants and twenty (20) John Does.  Four Defendants are residents of the United States, with two residing in Florida.  The remaining eleven (11) Defendants all appear to be based abroad.

<u>The U.S. Defendants.</u>

The four named Defendants residing in the United States are Sharon Van Rider ("Van Rider"),[2] Sam Jundi ("Jundi"), Annette Smith ("Smith"), and Christanne Schey ("Schey") (collectively, the "U.S. Defendants").  Van Rider and Jundi are residents of Florida, residing in the Miami and Orlando areas, respectively.  Am. Compl. ¶¶ 39, 47.  Smith is a resident of California. *Id.* ¶ 52.  Schey is a resident of Texas.  *Id.* ¶ 57.  The Amended Complaint also identifies three additional U.S.-resident nonparties who, upon information and belief, contribute "at least in part" to the conspiracy that is the subject of this action, which is further described below.  *Id.* ¶¶ 62, 64. These three individuals are not named as defendants in this case.

<u>The Foreign Defendants.</u>

The Foreign Defendants are Mohammed bin Salman bin Abdulaziz Al Saud (the "Crown Prince" or "MBS"), DarkMatter, Saud Al Qahtani ("Al Qahtani"), Bader Al-Asaker

---

[2] Van Rider was previously identified as "Sharon Collins" in Plaintiff's original Complaint, *see generally* (ECF No. 1), but is identified in the Amended Complaint by her maiden name.  *See* Am. Compl. ¶ 39 n.15.

("Al-Asaker"), Middle East News FZ-LLC ("Al Arabiya"), Masharea wa Enjazat IT Corporation LLC ("Saudi 24 TV"), Prince Mohammed Bin Salman bin Abdulaziz Foundation ("MiSK" or "MiSK Foundation"), Tarek Abou Zeinab ("Zeinab"), Faisal Al Menaia ("Al Menaia"), Turki Al-Owerde ("Al-Owerde"), and Awwad Al Otaibi ("Al Otaibi") (collectively, the "Foreign Defendants"). Certain Foreign Defendants are also identified in the Amended Complaint as "Recruiting Defendants," as further explained below. They are Defendants Zeinab, Al Menaia, Al-Owerde, and Al Otaibi (collectively, the "Recruiting Defendants").

Defendant Mohammed bin Salman bin Abdulaziz Al Saud is the current Crown Prince of the Kingdom of Saudi Arabia. *Id.* ¶ 66. He is sued in his personal capacity for all claims asserted against him in the Amended Complaint for allegedly coordinating, directing, and supervising a network of agents to silence his critics. *Id.* ¶¶ 66, 68, 75. The Amended Complaint asserts that he has "effectively been in a position of power since he pushed aside all rivals in 2017" through brutal crackdowns. *Id.* ¶ 66. The Crown Prince is a citizen of Saudi Arabia residing in Saudi Arabia. *Id.* According to the Amended Complaint, Defendants Al Arabiya, Saudi 24 TV, and MiSK Foundation are all alter egos of the Crown Prince in his personal capacity. *Id.* ¶ 133.

Defendant DarkMatter is an Emirati cybersecurity company founded in either 2014 or 2015, based in the United Arab Emirates. *Id.* ¶ 76. According to the Amended Complaint, DarkMatter controls a sophisticated hacking group known as "Project Raven," which is a secret Emirati intelligence program that utilizes Pegasus spyware against perceived critics of the Saudi and Emirati regimes. *Id.*

Defendant Saud Al Qahtani is the former royal court advisor and media advisor to the Crown Prince, former chair of the Saudi Federation for Cybersecurity Programming and Drones, and former General Supervisor for the Center for Studies and Media Affairs. *Id.* ¶ 77. At one

point, Al Qahtani was also a member of the board of the Crown Prince's non-profit foundation, MiSK Foundation, which is further described below. *Id.* ¶ 83. Al Qahtani is a citizen of Saudi Arabia. *Id.* ¶ 77. According to the Amended Complaint, Al Qahtani facilitates and oversees hack and leak campaigns on behalf of the Crown Prince and uses "bot" networks to spread disinformation on social media. *Id.* ¶¶ 78–81. The Amended Complaint alleges that Al Qahtani also spearheaded the conspiracy against Plaintiff. *Id.* ¶ 83. As discussed below, Al Qahtani, upon information and belief, manages a masked Twitter account with the handle "@KateStewart22" alongside an unidentified nonparty residing in the United Kingdom. *Id.* ¶ 84.

Defendant Bader Al-Asaker is the head of the Private Office for the Crown Prince. *Id.* ¶ 85. By Saudi royal decree, Al-Asaker holds the rank of Minister within the government of the Kingdom of Saudi Arabia. *Id.* As recently as May 20, 2020, Al-Asaker also served as the Secretary General of the Crown Prince's foundation, MiSK Foundation. *Id.* Al-Asaker is sued in his capacity as Secretary General of MiSK Foundation and as being under the direction and control of the Crown Prince in the Crown Prince's personal capacity. *Id.* ¶ 88. Al-Asaker is a citizen of Saudi Arabia. *Id.* ¶ 85.

Defendant Al Arabiya is a broadcast and internet news network operator, which according to the Amended Complaint, is controlled by and functions as an alter ego of the Crown Prince. *Id.* ¶ 89. Al Arabiya is a wholly owned subsidiary of Middle East News FZ-LLC; the Crown Prince owns an approximately 60 percent majority share of ownership in Al Arabiya. *Id.* ¶ 134. Al Arabiya operates offices in both Saudi Arabia and the United States, including a studio in Washington, D.C. with reporters assigned to the White House press pool. *Id.* ¶ 89. According to the Amended Complaint, Al Arabiya is one of the Crown Prince's propaganda arms. *Id.* ¶ 134.

Defendant Saudi 24 TV is a broadcast and internet news network with offices in the United States and Saudi Arabia, and is owned and operated by Masharea wa Enjazat IT Corporation LLC. *Id.* ¶ 91.   Plaintiff claims, upon information and belief, that Saudi 24 TV is dominated and controlled by the Crown Prince, for whom Saudi 24 TV serves as a propaganda arm.  *Id.* ¶¶ 92, 136.  Defendant Zeinab is an employee of Saudi 24 TV.  *Id.* ¶ 92.  Like Al Arabiya, Saudi 24 TV operates a studio in Washington, D.C. with reporters assigned to the White House press pool.  *Id.* ¶ 91.

Defendant MiSK Foundation is a non-profit founded by the Crown Prince in his personal capacity.  *Id.* ¶ 93.  According to the Amended Complaint, MiSK Foundation operates under the guise of providing educational initiatives and opportunities to Saudi Arabian citizens, but in reality, carries out secretive operations in the United States on behalf of the Crown Prince.  *Id.* ¶ 138.  Until May of 2020, Defendant Al-Asaker was the Secretary General of MiSK Foundation.  *Id.* ¶ 94.  Defendant Al Qahtani also previously served as a member of MiSK Foundation's board.  *Id.* Plaintiff alleges, upon information and belief, that MiSK Foundation serves as a front for the Crown Prince, Al Qahtani, and Al-Asaker in their efforts to create networks of foreign and domestic agents, including the conspiracy that is the subject matter of this case.  *Id.*

Defendant Tarek Abou Zeinab is a citizen of Lebanon who has been employed by Saudi TV 24 as a radio and TV broadcaster in Lebanon since, upon information and belief, 2018.  *Id.* ¶¶ 96, 98.  As noted above, Zeinab is a Recruiting Defendant.

Defendant Faisal Al Menaia is a citizen of Saudi Arabia.  *Id.* ¶ 104.  The Amended Complaint does not indicate where Al Menaia resides, beyond noting that he has studied in the United States and the United Kingdom.  *Id.*  As noted above, Al Menaia is a Recruiting Defendant.

Defendant Turki Al-Owerde is a national of Saudi Arabia.  *Id.* ¶ 108.  Al-Owerde is the Editor-in-Chief of *The Herald Report*, which, according to the Amended Complaint, is a news agency based in the United Arab Emirates.  *Id.*  As noted above, Al-Owerde is a Recruiting Defendant.

Defendant Awwad Al Otaibi is a citizen of Saudi Arabia.  *Id.* ¶ 114.  The Amended Complaint does not indicate where Al Otaibi resides, beyond noting that he studied in the United States until 2017 and works in the "Information Technology and Security field."  *Id.*  The Amended Complaint indicates that Al Otaibi is a close ally of the Crown Prince and the Saudi royal family. *Id.* ¶ 119.  Al Otaibi is identified as a Recruiting Defendant, as noted above.

Last, the Amended Complaint states that, upon information and belief, twenty (20) John Does, not named in the Amended Complaint "participated with, conspired with and aided and abetted each of the other Defendants" as agents, alter egos, and employees of the other Defendants. *Id.* ¶ 120.

**B.  Allegations and Claims.**

At a high level, Plaintiff alleges that the Crown Prince spearheaded a conspiracy to hack her mobile device and then, through a network of agents located in the United States and abroad, defamed and harassed Plaintiff on the internet for her reporting on the Crown Prince's approval of the high-profile killing of international journalist Jamal Khashoggi, a critic of Saudi Arabia and the Crown Prince (the "Conspiracy").  *See id.* ¶¶ 1–34.  The Amended Complaint asserts that the Crown Prince was motivated by a desire to "whitewash his public image in the eyes of the American government and its citizens," *id.* ¶ 4, and Plaintiff is just the Crown Prince's most recent victim, *id.* ¶¶ 16, 30.

According to the Amended Complaint, the hack and leak Conspiracy against her has

followed a similar methodology to what the Crown Prince has employed against his other critics. Al Qahtani has allegedly used Saudi-based Twitter "bot" accounts to conduct cyber-attacks on the Crown Prince's critics, including the ongoing smear campaign directed at Plaintiff. *Id.* ¶¶ 141-142. Plaintiff claims that the Saudi Royal Guard, on behalf of Saudi Arabia, acquired advanced hacking tools from the Israeli cyber firm NSO Group Technologies Limited ("NSO Group") and the Italian cyber firm Hacking Team. *Id.* ¶ 144. The Amended Complaint alleges that this allowed the Crown Prince in his personal capacity to increase the effectiveness of his cyber influence campaigns against his critics. *Id.*

According to Plaintiff, Saudi Arabia acquired NSO Group's "Pegasus" spyware in November of 2017, and shortly thereafter in 2018, the Crown Prince acquired use of the spyware. *Id.* Plaintiff contends that the Crown Prince personally used this spyware technology to hack *The Washington Post* owner and former Amazon CEO Jeff Bezos's mobile device through the WhatsApp messaging platform. *Id.* ¶ 145. The Amended Complaint alleges that the same methodology used against Mr. Bezos, among others, was later used to hack Plaintiff's device. *Id.* ¶¶ 145–146. Likewise, DarkMatter, through its control over the advanced hacking group known as Project Raven, has engaged in similar tactics against targets of Saudi and Emirati interest. *Id.* ¶¶ 147–151.

The Amended Complaint alleges that the Conspiracy against Plaintiff had three phases: a recruiting stage, a hacking stage, and a dissemination stage, as set forth below. *See id.* ¶ 155.

<u>Recruitment</u>

The first stage of the Conspiracy alleged involves the creation of what Plaintiff terms the "Network." Plaintiff alleges that the Crown Prince, and at his direction and under his control, Al Qahtani and Al-Asaker, hatched a scheme to develop a cohesive network of U.S. agents and

other foreign actors on Twitter to disseminate propaganda favorable to the Crown Prince and attack his critics (the "Network"). *Id.* ¶ 38. The Crown Prince, in his personal capacity, is alleged to "coordinate[], direct[], and supervise[]" this network of agents to "silence his critics and brutally attack his personal enemies." *Id.* ¶ 68. According to the Amended Complaint, the Crown Prince recruited Al Qahtani and Al-Asaker to assist with the recruitment and hacking stages of the Conspiracy. *Id.* ¶ 293.

Plaintiff contends that the Crown Prince instructed Al Qahtani and Al-Asaker to "begin recruiting individuals to develop an infrastructure on Twitter" in furtherance of the Conspiracy. *Id.* ¶ 294. It is alleged that Zeinab, Al-Owerde, Al Menaia, and Al Otaibi entered into agreements with Al Qahtani and Al-Asaker to create the Network. *Id.* Al Qahtani, as a "trusted friend" of the Crown Prince, is alleged to have spearheaded the Conspiracy, leading to the creation of botnets on Twitter and using his position as a board member of MiSK Foundation to organize the recruitment and establishment of the Network at the Crown Prince's behest. *Id.* ¶ 83. Al-Asaker, also in his role as an officer of MiSK Foundation, is alleged to have recruited Al Otaibi into the Network, *id.* ¶ 88, who then served as a Recruiting Defendant.

The Amended Complaint provides the following detail regarding Al Otaibi's association with MiSK Foundation: he received an "Interview Skills Program with Distinction" certificate co-issued by Fullbridge Inc. and MiSK Fellowship & Trainership. *Id.* ¶¶ 114, 116, 298. Otherwise, Al Otaibi allegedly maintains the Twitter handle "@awwadsalotaibi" through which he interacts with the named Defendants in the Network, posts pro-Crown Prince propaganda, and attacks the Crown Prince's critics. *Id.* ¶ 117. Al Otaibi and his family also hosted Van Rider for dinner in Riyadh, Saudi Arabia in December of 2019. *Id.* ¶ 118.

9

Plaintiff alleges that Recruiting Defendant Zeinab, in his capacity as a Saudi 24 TV employee, recruited the named U.S. Defendants to the Network, among other Americans, in 2018 "at the direction of, and under the control, of Defendants MBS, Al Qahtani, Al-Asaker, as well as high-ranking officers of" Saudi 24 TV. *Id.* ¶¶ 92, 103, 295. Specifically, the Amended Complaint alleges that Zeinab has "expressly acknowledged the establishment of a media initiative aimed at amplifying pro-Defendant MBS content." *Id.* ¶ 99. Zeinab operates the Twitter handle "@tareklebanon1" through which he personally attacked and defamed Plaintiff, posted pro-Crown Prince propaganda, and interacted with the other named Defendants. *Id.* ¶¶ 96, 98, 101. The Amended Complaint alleges that Zeinab "has (publicly and privately) instructed numerous members in the Network to post pro-Defendant MBS propaganda videos." *Id.* ¶ 102.

Upon information and belief, Plaintiff claims that Al Menaia agreed to join the Network either in or around May of 2018. *Id.* ¶ 297. According to the Amended Complaint, Al Menaia maintains the Twitter handle "@al_menaia", which he uses to instruct and interact with the other named Defendants in concert with Zeinab, post pro-Crown Prince propaganda, and defame Plaintiff. *Id.* ¶¶ 104–106.

Plaintiff alleges, also upon information and belief, that Al-Owerde agreed to join the Network either in or around May of 2018. *Id.* ¶ 296. Plaintiff claims that Al-Owerde maintains the Twitter handle "@Turki_AlOwerde" through which he interacts with and directs the other named Defendants in the Network, promotes pro-Crown Prince propaganda, and attacks Plaintiff. *Id.* ¶¶ 110–113. According to Plaintiff, Al-Owerde is also a contributor to *The Milli Chronicle*, whose Twitter account, upon information and belief, is run by Al-Owerde. *Id.* ¶ 112. He allegedly "engaged the U.S.-based Defendants throughout the fall of 2018, indoctrinating them by challenging their religious beliefs and influencing them over time." *Id.* ¶ 109.

Plaintiff alleges upon information and belief that Van Rider, Jundi, Smith, and Schey are paid in connection with their activities in furtherance of the Conspiracy. *Id.* ¶ 300. Each allegedly was recruited into the Network and agreed to take part in the Network's propaganda efforts, with Van Rider, Jundi, and Schey being recruited in May of 2018 "by one or more of the Recruiting Defendants," which for Van Rider and Jundi includes Zeinab. *Id.* Smith was allegedly recruited into the Network in September of 2018. *Id.*

Van Rider operates a Twitter account with the handle "@305local".[3] *Id.* ¶ 39. Before 2018, Van Rider's Twitter account, @305local, was not geared toward any political agenda. *Id.* ¶ 40. But, according to Plaintiff, @305local began to post pro-Crown Prince propaganda starting in the summer of 2018 and the account began to inexplicably "interact" on Twitter with the other named Defendants. *Id.* ¶¶ 41–42. Van Rider also visited Riyadh, Saudi Arabia in December of 2019 where she was hosted by Al Otaibi and his family. *Id.* ¶¶ 43–45. Plaintiff contends that, upon information and belief, this trip was funded by "one or more" of the Recruiting Defendants. *Id.* ¶ 46.

Jundi operates a Twitter account with the handle "@SamJundi". *Id.* ¶ 47. The Amended Complaint alleges that, like Van Rider and the other U.S. Defendants, Jundi began to post pro-Crown Prince propaganda on Twitter starting from the summer of 2018 and began to interact with the other named Defendants on Twitter. *Id.* ¶¶ 49, 51.

Smith operates a Twitter account with the handle "@orchardcitygal". *Id.* ¶ 52. The Amended Complaint alleges that, beginning in October of 2018, her Twitter account began to post pro-Crown Prince propaganda despite the lack of any apparent connection between Smith and the

---

[3] The Twitter handle was later changed to "@usamabroad", then to "@305local2", before being changed to "@305local". Am. Compl. ¶ 39.

Crown Prince.  *Id.* ¶ 54.  Like Van Rider and Jundi, Smith allegedly interacts with the other named Defendants on Twitter, where they all praise Saudi Arabia, the Crown Prince, and the Crown Prince's acolytes, and attack their critics.  *Id.* ¶ 56.

Schey operates Twitter accounts with the handles "@ScheyChris", "@christannes", and "@haiya20117586".  *Id.* ¶ 57.  According to the Amended Complaint, Schey's account @ScheyChris has been fervently pro-Crown Prince since April of 2018 where it previously was not before, and routinely interacts with the other named Defendants.  *Id.* ¶¶ 59–60.  When Schey's account @ScheyChris was suspended by Twitter in January of 2021, she continued posting pro-Crown Prince propaganda using @haiya20117586.  *Id.* ¶ 61.

Hacking

The second stage of the Conspiracy alleged involved the hack of Plaintiff's mobile device. According to the Amended Complaint, the Crown Prince, Al Qahtani, and Al-Asaker "hatched a plan to invade [Plaintiff's] privacy, steal her personal and private information, and disseminate such personal information to the public with a false narrative."  *Id.* ¶ 156.  Plaintiff contends that her mobile device, an iPhone XS Max, was hacked four times in furtherance of this scheme by exploiting vulnerabilities associated with WhatsApp, iMessage, and WebKit to establish remote access to her phone and her iCloud.  *Id.* ¶¶ 157–159.  Specifically, Plaintiff contends that her phone was hacked on or about November 20, 2019; April 14, 2020; July 6, 2020; and July 15, 2020.  *Id.* ¶ 159.

Plaintiff asserts that the hacks on November 20, 2019; July 6, 2020; and July 15, 2020 were carried out using a similar methodology, the technical details of which are set out in the Amended Complaint, and, notably involved the use of Pegasus spyware technology associated with a server in Saudi Arabia.  *Id.* ¶¶ 160, 164–165.  These three hacks were carried out by a "threat actor group

12

operating in Saudi Arabia" at the direction of the Crown Prince, Al Qahtani, and Al-Asaker. *Id.* ¶¶ 161–163. Plaintiff alleges that these hacks are corroborated by the timeline in which personal photographs stolen from her device were leaked on social media. *Id.* ¶ 166.

In contrast, the Amended Complaint alleges upon information and belief that the fourth hack, on April 14, 2020, was effectuated by DarkMatter using a Moroccan phone number; Plaintiff asserts upon information and belief that this fourth hack was coordinated with the Crown Prince. *Id.* ¶¶ 167–172.

The content stolen from Plaintiff's phone included, among other things, personal photographs of herself smoking a cigarette and drinking alcohol with friends, *id.* ¶ 176, and a private video of Plaintiff in a hot tub that her husband had recorded and which, prior to being disseminated, was doctored to make her appear nude, *id.* ¶ 177.

Dissemination and Defamation

In the third stage of the Conspiracy, Plaintiff asserts that her stolen photographs were later leaked to and disseminated by the Network—the amplification of which was intended to defame, harass, and/or intimidate her. For example, Plaintiff alleges that, on February 17, 2020, Al Arabiya posted purportedly leaked documents to its Twitter account that supposedly showed that Plaintiff, and other *Al Jazeera* journalists, had been paid large financial bonuses by the Emir of Qatar. *Id.* ¶¶ 179–180. Plaintiff contends that these photographs were falsified and doctored, and that Al Arabiya posted them at the behest and under the control of the Crown Prince with the purpose of harming Plaintiff's integrity. *Id.* ¶¶ 180–182.

In addition, Plaintiff asserts that the Crown Prince directed Al Qahtani and Al-Asaker to create "bot" social media accounts to spread leaked and doctored content about her, including the photographs of her smoking and drinking alcohol, by among other means, posting the same to

Twitter, responding to Plaintiff's tweets, and reposting links to these tweets on a social media platform called Telegram. *Id.* ¶¶ 184–189. According to the Amended Complaint, eight months after the Crown Prince, Al Qahtani, and Al-Asaker orchestrated the hack of Plaintiff's phone, these same bot accounts posted and amplified the doctored screenshots of the video of Plaintiff in a hot tub until they had been seen by thousands, with the indication that there was more that would be leaked. *Id.* ¶¶ 190–194.

According to Plaintiff, the Crown Prince, Al Qahtani, and Al-Asaker then utilized the Network which, under the instructions of the Recruiting Defendants, spread the content leaked by the bot social media accounts by, principally, retweeting each other's tweets. *Id.* ¶¶ 195–197. For example, Plaintiff contends that Van Rider took part by replying to Plaintiff's tweets with what Plaintiff contends are defamatory statements, and by retweeting the smoking, drinking, and hot tub photographs, all under the "directed strategy of Defendants MBS, Al Qahtani, and Al-Asaker." *Id.* ¶¶ 198–205. Plaintiff alleges that Van Rider's tweets in furtherance of the Conspiracy were intended to defame, embarrass, and harass her. *Id.* ¶¶ 206–207.

Similar to Van Rider, Plaintiff contends that Jundi has attacked Plaintiff's tweets containing her opinions about Saudi Arabia's human rights record by, among other means, responding with praise for Saudi Arabia, posting a fabricated tweet purportedly tweeted by Plaintiff, attacking third parties for tweeting in support of Plaintiff, tweeting about Plaintiff's father, and calling Plaintiff a traitor and hypocrite. *Id.* ¶¶ 210–217, 308.

Analogous allegations are lodged against Smith. Plaintiff contends that Smith, using Twitter, has accused Plaintiff of choosing a "mercenary path" against Saudi Arabia; postulated that Plaintiff is lucky she has not suffered the same fate as a Saudi Arabian woman who was imprisoned and tortured for driving a car; posted the stolen photographs of Plaintiff drinking,

smoking, and in a hot tub; tweeted that Plaintiff is a "propagandist"; and, retweeted the tweets of other members of the Network. *Id.* ¶¶ 220–224, 308.  Like Van Rider and Jundi, Plaintiff asserts that Smith engaged in the foregoing activities all at the instruction of the Recruiting Defendants under the direction of the Crown Prince, Al Qahtani, and Al-Asaker. *Id.* ¶ 225.

Plaintiff contends that Schey also engaged in the same conduct, including by tweeting that Plaintiff is a "troll" for "terrorists" and by retweeting numerous allegedly defamatory tweets posted by the @KateStewart22 Twitter account, which upon information and belief is run by Al Qahtani. *Id.* ¶¶ 228–232, 308.  And, as to the @KateStewart22 account, Plaintiff alleges that whoever is behind the account has harassed her on Twitter since 2019, which ultimately led Plaintiff to block the account on Twitter. *Id.* ¶ 236.

Because of Defendants' conduct, Plaintiff contends that she has suffered harassment and threats from Defendants' "social media influence army," and has had to block over 300 foreign numbers due to scam and harassment calls. *Id.* ¶ 243.  Plaintiff claims that she has suffered reputational harm, loss of business opportunities, and income as a result, and is now afraid to visit her family in Florida. *Id.* ¶¶ 245, 310.

Plaintiff's Claims

Based on the foregoing, Plaintiff's Amended Complaint asserts six claims, two arising under federal law and four arising under Florida common law.  *See generally id.*  Plaintiff's **first claim** relates to the hack of her cell phone and subsequent dissemination of materials stolen therefrom.  This claim is brought under the Alien Tort Statute, 28 U.S.C. § 1350, against the Crown Prince, Al Qahtani, and Al-Asaker. *Id.* ¶¶ 249–257.

Plaintiff's **second claim** arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(b), 1030(a)(2)(C), and is based on largely the same alleged hacking conduct as that

forming the basis of her first claim.   Plaintiff asserts this claim against the Crown Prince, DarkMatter, Al Qahtani, and Al-Asaker.  *Id.* ¶¶ 258–268.

Plaintiff's **third claim** is for intentional infliction of emotional distress, arising under Florida law.   It is brought against all Defendants.   *Id.* ¶¶ 269–274.   Specifically, Plaintiff's intentional infliction of emotional distress claim is brought against the Crown Prince, Al Qahtani, Al-Asaker, and DarkMatter for allegedly intentionally hacking her mobile device to obtain her personal data and files.  *Id.* ¶ 270.  This claim is also brought against Al Arabiya, Saudi 24 TV, Zeinab, Al-Owerde, Al Menaia, Al Otaibi, Van Rider, Jundi, Smith, and Schey for their repeated harassment and intimidation of Plaintiff on the internet.  *Id.* ¶ 270.

Plaintiff's **fourth claim** is for intrusion, arising under Florida law.  It is brought against the Crown Prince, DarkMatter, Al Qahtani, and Al-Asaker for overseeing the alleged "hacking, theft, and doctoring of images and personal information" from Plaintiff's mobile device, which was then disseminated to others without Plaintiff's consent.  *Id.* ¶¶ 275–280.

Plaintiff's **fifth claim** is for libel, arising under Florida law.  It is brought against Van Rider, Jundi, Smith, Schey, Al Arabiya, Al-Owerde, Al Menaia, and Al Otaibi for various alleged defamatory actions occurring on the internet.  *Id.* ¶¶ 281–291.

Last, Plaintiff's **sixth claim** is for civil conspiracy, arising under Florida law.  It is brought against all Defendants based on the Crown Prince's ongoing "scheme to intimidate, defame and otherwise silence" Plaintiff for her reporting on the Crown Prince's role in the high-profile killing of Jamal Khashoggi.  *Id.* ¶¶ 292–311.

Now, Defendants move to dismiss the Amended Complaint on various grounds, including (1) lack of personal jurisdiction, (2) lack of subject matter jurisdiction, and (3) for failure to state a claim.  *See generally* Mots. to Dismiss.

## II.    LEGAL STANDARDS

### A.  Personal Jurisdiction.

Federal Rule of Civil Procedure 12(b)(2) provides that a court may dismiss a complaint for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  In assessing whether a nonresident is subject to exercise of personal jurisdiction, federal courts must determine "whether the exercise of jurisdiction (1) comports with the long-arm statute of the forum . . . ; and (2) does not violate the Due Process Clause of the Fourteenth Amendment."  *Virgin Health Corp. v. Virgin Enters. Ltd.*, 393 F. App'x 623, 626 (11th Cir. 2010).

Federal courts engage in a three-part burden-shifting analysis when a defendant asserts lack of personal jurisdiction.  *See Diulus v. Am. Express Travel Related Servs. Co., Inc.*, 823 F. App'x 843, 848 (11th Cir. 2020).  "First, the plaintiff 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'"  *Id.* (quoting *Mazer*, 556 F.3d at 1274).  "Second, if the complaint alleged sufficient facts, and 'the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting its jurisdiction.'"  *Id.* (quoting *Mazer*, 556 F.3d at 1274).  "Third, 'where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'"  *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010)).  The Court must assess its personal jurisdiction over each defendant

separately.  *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

### B.  Subject Matter Jurisdiction.

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.*  (internal citations omitted).  Such jurisdiction must be proven by a preponderance of the evidence.  *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2010).  "Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms": facial and factual attacks.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam).  "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion, meaning that the court must consider the allegations of the complaint to be true."  *Fru Veg Mktg., Inc. v. Vegfruitworld Corp.*, 896 F. Supp. 2d 1175, 1179 (S.D. Fla. 2012).  "Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings."  *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).  The burden is on the party seeking to invoke the Court's jurisdiction to establish that jurisdiction exists.  *Kokkonen*, 511 U.S. at 377.  If the Court determines that it lacks subject matter jurisdiction, it must dismiss the claim.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

### C.  Failure to State a Claim.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.    DISCUSSION

The Court begins by noting that it must first satisfy itself of its jurisdiction. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co.*, 523 U.S. at 93–102). While "jurisdictional questions ordinarily must precede merits determinations in dispositional order . . . there is no mandatory 'sequencing of jurisdictional issues.'" *Id.* at 431 (quoting *Ruhrgas*, 526 U.S. at 584). Rather, "[i]n appropriate circumstances . . . a court may dismiss for lack of personal jurisdiction without first establishing subject-matter jurisdiction." *Id.* (citing *Ruhrgas*,

526 U.S. at 578).  Both *Steel Co.* and *Ruhrgas* recognize that a federal court may "choose among threshold grounds for denying audience to a case on the merits."  *Ruhrgas*, 526 U.S. at 585; *Steel Co.*, 523 U.S. at 100–01 n.3.  Accordingly, where jurisdictional grounds are raised for dismissal concurrent with arguments that the Amended Complaint fails to state a claim, the Court begins by addressing a moving defendant's jurisdictional arguments.

To that end and to the extent applicable, the Court first addresses personal jurisdiction arguments for each Defendant who raises the issue.  Here, all Foreign Defendants seek dismissal on personal jurisdiction grounds.  *See generally* (ECF Nos. 161, 163–169).  As is further set forth below, the Court finds that it lacks personal jurisdiction over the four Foreign Defendants against whom Plaintiff asserts claims arising under federal law.  *See infra* III.A.  Because all other claims against the remaining Defendants, both foreign and domestic, arise under this Court's supplemental jurisdiction, the Court declines to exercise supplemental jurisdiction and dismisses the Amended Complaint without prejudice.  *See infra* III.B.

A.      **Personal Jurisdiction Over the Foreign Defendants.**

The following Defendants move to dismiss for lack of personal jurisdiction: the Crown Prince, Al Menaia, Al Otaibi, Al-Owerde, Zeinab, Al Qahtani, DarkMatter, MiSK Foundation, Al-Asaker, Al Arabiya, and Saudi 24 TV.  *See generally* (ECF Nos. 161, 163–169).  Plaintiff asserts that this Court has personal jurisdiction over the Foreign Defendants in this case because each Foreign Defendant "(1) committed a tortious act within the state of Florida personally or through an agent and (2) engaged in intentional tortious conduct which was directed at and occurred in the United States."  Resp. at 26.  The Court begins its analysis by reviewing relevant principles applicable to this Court's personal jurisdiction.

### 1.   Personal Jurisdiction Principles.

As noted earlier, in assessing whether a nonresident defendant is subject to the exercise of personal jurisdiction, federal courts must determine "whether the exercise of jurisdiction (1) comports with the long-arm statute of the forum . . . ; and (2) does not violate the Due Process Clause." *Virgin Health Corp.*, 393 F. App'x at 626.

### a.   Long-Arm Statutes.

Plaintiff's Amended Complaint asserts that this Court has personal jurisdiction over the following Foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2): the Crown Prince, DarkMatter, Al Arabiya, Saudi 24 TV, Al Qahtani, Al-Asaker, MiSK Foundation, Zeinab, Al-Owerde, and Al Otaibi.  Am. Compl. ¶ 124.  In the alternative, Plaintiff asserts that this Court has personal jurisdiction over all Defendants pursuant to Florida's long-arm statute.  The Court reviews principles applicable to both Florida's long-arm statute and Rule 4(k)(2) below, starting first with Florida's long-arm statute.

### i.   *Florida's Long-Arm Statute.*

Under Federal Rule of Civil Procedure 4(k)(1)(A), federal courts apply the long-arm statute of the forum-state—in this case, Florida.  "Florida's long-arm statute provides for both general and specific personal jurisdiction." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013) (citing § 48.193(1)–(2)).  The Eleventh Circuit has explained that

> [a] defendant can be subject to personal jurisdiction under Florida's long-arm statute in two ways: first, section 48.193(1)(a) lists acts that subject a defendant to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida, Fla. Stat. § 48.193(1)(a); and second, section 48.193(2) provides that Florida courts may exercise *general* personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in "substantial and not isolated activity" in Florida, *id.* § 48.193(2).

*Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203–04 (11th Cir. 2015) (emphasis in original).

Florida's long-arm statute's provision for specific personal jurisdiction reads in pertinent part as follows[4]:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
> [ . . .]
> 2. Committing a tortious act within this state.

Fla. Stat. § 48.193.

"The reach of the Florida long-arm statute is a question of Florida law." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1271 (11th Cir. 2002) (cleaned up) ("[F]ederal courts are required to construe [such law] as would the Florida Supreme Court." (alterations in original)). As used in § 48.193(1)(a), "the term 'arising from' is somewhat broader than the concept of proximate cause," thus, "under Florida law there must nevertheless be some 'direct affiliation,' 'nexus,' or 'substantial connection' between the cause of action and the activities within the state." *St. Martinus Univ., NV v. Caribbean Health Holding, LLC*, No. 19-22278-CIV, 2020 WL 956301, at *10 (S.D. Fla. Feb. 27, 2020), *appeal dismissed sub nom. St. Martinus Univ. v. Caribbean Health Holding, LLC*, No. 20-11991-EE, 2020 WL 7018197 (11th Cir. Sept. 28, 2020). Courts strictly construe Florida's long-arm statute in favor of the nonresident defendant.

---

[4] The reach of Florida's long-arm statute's provision for general personal jurisdiction "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) (citing *Woods v. Nova Cos. Belize*, 739 So.2d 617, 620 (Fla. Dist. Ct. App. 1999)). Plaintiff does not contend that this Court has general personal jurisdiction over the Foreign Defendants under Florida's long-arm statute. *See generally* Am. Compl.; Resp.

*Stonepeak Partners, LP v. Tall Tower Cap., LLC*, 231 So. 3d 548, 552 (Fla. Dist. Ct. App. 2017). "[U]nder Florida law, a nonresident defendant commits 'a tortious act within [Florida]' when he commits an act outside the state that causes injury within Florida." *Louis Vuitton*, 736 F.3d at 1353 (quoting *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). The Florida long-arm statute also permits the exercise of personal jurisdiction over nonresident co-defendants in civil conspiracy cases, as discussed in further detail below. *See Parisi v. Kingston*, 314 So. 3d 656, 660–61 (Fla. Dist. Ct. App. 2021).

ii.     *Federal Rule of Civil Procedure 4(k)(2).*

Federal Rule of Civil Procedure 4(k)(2) provides that, "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). "A district court is not required to analyze the laws of all fifty states to ascertain whether any state court of general jurisdiction has jurisdiction over the defendant." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.22 (11th Cir. 2009). Rather, as the Eleventh Circuit has recognized, "[i]f . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* (alterations in original).

**b.     Due Process Clauses of the Fifth and Fourteenth Amendments.**

The Court's exercise of personal jurisdiction over a nonresident defendant must also comport with the due process requirements of the United States Constitution. As the Eleventh Circuit has observed, "decisions interpreting the Fourteenth Amendment's Due Process Clause guide [courts] in determining what due process requires in the Fifth Amendment jurisdictional

context." *Oldfield*, 558 F.3d at 1219 n.25.  Where jurisdiction is invoked under Federal Rule of Civil Procedure 4(k)(2), the relevant forum is the United States instead of Florida under the Fourteenth Amendment.  *See Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010) (discussing contacts with the United States).

Due Process limits the power of a court to exercise personal jurisdiction over a defendant. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)).  Federal courts in the Eleventh Circuit apply a three-prong due process test in specific personal jurisdiction cases, "which examines (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposely availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)).  "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a "compelling case" that the exercise of jurisdiction would violate the traditional notions of fair play and substantial justice.'" *Id.* (quoting *Diamond Crystal Brands*, 593 F.3d at 1267).  The Due Process requirements in specific personal jurisdiction cases are, generally, not as strict as in general personal jurisdiction cases because, in general personal jurisdiction cases, "there is no requirement of a connection between the defendant's activities and the cause of action." *See Exhibit Icons, LLC v. XP Companies, LLC*, 609 F. Supp. 2d 1282, 1295 (S.D. Fla. 2009).

> i.      *Prong One: "Arising Out of" or Relatedness.*

"'[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must

arise out of or relate to at least one of the defendant's contacts with the forum.'"  *Louis Vuitton*, 736 F.3d at 1355 (quoting *Fraser*, 594 F.3d at 850).  "[F]or a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum."  *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1781 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendants unconnected activities in the [forum]."  *Id.* "What is needed . . . is a connection between the forum and the specific claims at issue."  *Id.*  The connection need not be causal in nature.  *See Ford Motor Co.*, 141 S. Ct. at 1026 ("None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do.").  Nonetheless, the "relationship among the defendant, the forum, and the litigation" must be strong.  *Id.* at 1028 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

### ii.     Prong Two: Purposeful Availment.

"In intentional tort cases, there are two applicable tests for determining whether purposeful availment occurred."  *Louis Vuitton*, 736 F.3d at 1356 (emphasis omitted).  There is the "effects test," which derives from *Calder v. Jones*, 465 U.S. 783 (1984).  *See id.*  Under this test, the exercise of personal jurisdiction in the context of an intentional tort is proper where the tort: "(1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state."  *Id.* (alterations incorporated) (quoting *Licciardello*, 544 F.3d at 1285–86, 1287–88).

There is also the traditional minimum contacts test, where courts "assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the

plaintiff's cause of action; (2) involve some act by which the defendant purposely availed himself of the privileges of doing business with the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357 (citing *SEC v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997)). "In specific jurisdiction cases, the 'fair warning requirement is satisfied if the defendant has purposely directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Diamond Crystal Brands*, 593 F.3d at 1267 (quoting *Burger King*, 471 U.S. at 472–73). "[N]either merely contracting with a forum resident nor the forum resident's unilateral acts can establish sufficient minimum contacts. . . . Jurisdiction is often found where further contacts or plus factors connect the defendant to the jurisdiction." *Id.* at 1268 (citing to several factors courts consider in the context of contractual relationships and finding that the "plus factors and further contacts are not talismans," but that they "indicate that the defendant deliberately affiliated with the forum . . . and thus should reasonably anticipate defending a suit there") (internal quotation marks and citation omitted). "[T]he minimum contacts analysis is 'immune to solution' by checklist." *Id.* at 1267–68 (quoting *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007)).

   *iii. Prong Three: "Fair Play and Substantial Justice"*

   In assessing whether the exercise of personal jurisdiction "comports with fair play and substantial justice," courts consider the following factors: "(1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the judicial system's interest in resolving the dispute." *Louis Vuitton*, 736 F.3d at 1358 (internal quotation marks and citations omitted).

### 2.   Application

For those Foreign Defendants against whom Plaintiff asserts federal law claims, the Court addresses each defendant's arguments that the Court lacks personal jurisdiction over them in turn, starting with the Crown Prince.

### a.   The Crown Prince.

Plaintiff's Amended Complaint asserts five claims against the Crown Prince: two federal claims (one under the ATS and the other under the CFAA), and three state law claims arising under Florida law (intentional infliction of emotional distress, intrusion, and civil conspiracy). *See generally* Am. Compl.   The Court concludes that it lacks personal jurisdiction over the Crown Prince for all claims asserted against him in the Amended Complaint for the reasons set forth below.

The Court begins its analysis by addressing whether the Florida long-arm statute authorizes the exercise of personal jurisdiction over the Crown Prince.   Concluding that it does not, the Court nonetheless addresses whether the exercise of personal jurisdiction would comport with the requirements of the Due Process Clause of the Fourteenth Amendment.   The Court also finds that the exercise of personal jurisdiction over the Crown Prince as to Plaintiffs' federal claims, likewise, would, in any event, not comport with the requirements of Federal Rule of Civil Procedure 4(k)(2) and the Due Process Clause of the Fifth Amendment.

### i.   *Florida Long-Arm Statute*

This Court does not have personal jurisdiction over the Crown Prince under the Florida long-arm statute.   Plaintiff rests her hat on civil conspiracy-based personal jurisdiction under the Florida long-arm statute as to all Defendants.   *See* Resp. at 28–30.   Florida's long-arm statute

permits the exercise of personal jurisdiction over nonresident defendants for civil conspiracy claims as follows:

> If a plaintiff has successfully alleged a cause of action for conspiracy among the defendants to commit tortious acts toward the plaintiff, and if the plaintiff has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of Florida through its long-arm statute.

*Parisi*, 314 So. 3d at 660–61 (alterations incorporated) (citations omitted).  Courts in Florida will "decline to apply the co-conspirator theory to extend jurisdiction over nonresidents if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy involving the defendants."  *Id.* at 661.

Under Florida law, "[t]o plead civil conspiracy, a plaintiff must allege '(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'"  *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (quoting *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014)).

Here, the allegations in the Amended Complaint that U.S. Defendants Jundi and Van Rider agreed to participate in the Conspiracy are either speculative, conclusory, or both.  There are no nonconclusory facts in the Amended Complaint that provide context or a factual predicate for the alleged recruitment of Van Rider and Jundi into the Conspiracy.  Rather, the Amended Complaint asserts in a conclusory fashion that Jundi and Van Rider agreed to "take part in the Network's propaganda efforts," and vaguely alleges only when both were recruited into the Network "by ***one or more*** of the Recruiting Defendants, including Defendant Zeinab."  Am. Compl. ¶¶ 300, 302,

305, 306, 308 (emphasis added); *see Meridian Tr. Co. v. Batista*, No. 17-23051, 2018 WL 4693533, at *6 (S.D. Fla. Sept. 26, 2018) (dismissing civil conspiracy claim as conclusory where there was no "factual predicate to demonstrate that [defendant] 'agreed' with other defendants to defraud Plaintiffs" because the majority of allegations were made upon information and belief); *see also Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551, 557) (observing that courts may decline to take as true conclusory allegations made "upon information and belief"). Notably, however, the Amended Complaint earlier alleges ***upon information and belief*** that Zeinab recruited the U.S. Defendants into the Conspiracy. Am. Compl. ¶ 92. This is not the only allegation made upon information and belief that Plaintiff asserts in support of her civil conspiracy claim. It is alleged upon information and belief that Van Rider disseminated images of Plaintiff with the intent to further the Conspiracy. *Id.* ¶ 306. The Amended Complaint also alleges that Van Rider attended dinner with Al Otaibi and his family in Riyadh, Saudi Arabia in December of 2019, which occurred over a year after she allegedly agreed to join the Conspiracy.[5]  *Id.* ¶¶ 118. But it is speculated earlier in the Amended Complain upon information and belief that "one or more" of the Recruiting Defendants paid for this trip in furtherance of the Conspiracy. *Id.* ¶ 46. As discussed below, it is also speculated, upon information and belief, that the U.S. Defendants are paid for their activities in furtherance of the Conspiracy. *Id.* ¶ 300. And it is also speculated upon information and belief that two other Recruiting Defendants—Al Menaia and Al-Owerde—agreed to be members of the Conspiracy. *Id.* ¶¶ 296–297.

---

[5]  The Amended Complaint does not allege that Al Otaibi recruited Van Rider into the Conspiracy. Rather it vaguely asserts, as noted above, that she was recruited "by one or more of the Recruiting Defendants, including Defendant Zeinab."

In short, the Amended Complaint offers no nonconclusory allegations that the two U.S. Defendants residing in Florida—Jundi and Van Rider—agreed to participate in the Conspiracy. For this reason, Plaintiff cannot establish that this Court has personal jurisdiction over the Crown Prince, or any Defendant for that matter, based on the activities of alleged co-conspirators Jundi and Van Rider in Florida.

Nor is this Court authorized to exercise personal jurisdiction over the Crown Prince under Florida's long-arm statute under an alter ego theory of personal jurisdiction. The Amended Complaint alleges that Al Arabiya, Saudi 24 TV, and MiSK Foundation are all alter egos of the Crown Prince in his personal capacity. *Id.* ¶ 133. Specifically, the Amended Complaint alleges that the Crown Prince extorted a 60 percent majority ownership in Al Arabiya. *Id.* ¶ 134. As to Saudi TV 24, the Amended Complaint speculates upon information and belief that the Crown Prince "directs and controls the commercial activities and employees of Defendant Saudi 24 TV." *Id.* ¶ 136. As to MiSK Foundation, the Amended Complaint alleges that MiSK Foundation was created by the Crown Prince in his personal capacity. *Id.* ¶ 137.

"Florida law is clear that, generally, 'the actions of a corporation cannot be imputed to its shareholders for purposes of establishing long arm personal jurisdiction over the shareholder.'" *Mother Doe I v. Al Maktoum*, 632 F. Supp. 2d 1130, 1140 (S.D. Fla. 2007) (quoting *Suroor v. First Inv. Corp.*, 700 So.2d 139, 141 (Fla. Dist. Ct. App. 1997)). To overcome this rule, "[a] nonresident shareholder of a corporation ***doing business in Florida*** may be subject to long-arm jurisdiction under an alter ego theory" where the plaintiff alleges "both that the resident corporation was a mere instrumentality of its shareholders, and that the corporation was used for improper conduct." *Id.* (emphasis added) (quoting *Aldea Commc'ns, Inc. v. Gardner*, 725 So. 2d 456, 457 (Fla. Dist. Ct. App. 1999); *Bellairs v. Mohrmann*, 716 So. 2d 320, 323 (Fla. Dist. Ct. App. 1998)).

Here, however, the Amended Complaint does not assert that any of the Crown Prince's alleged alter egos are based in Florida, let alone that they conduct business in Florida.  *See generally* Am. Compl.  According to the Amended Complaint, MiSK Foundation serves as a front to further the Crown Prince, Al Qahtani, and Al-Asaker's objectives in "creating a network of foreign and domestic agents willing to carry out unlawful discrete operations here in the U.S., including the Conspiracy against [Plaintiff]." *Id.* ¶ 94.  However, the Amended Complaint does not allege that the two U.S. Defendants residing in Florida, let alone any U.S. Defendant, were recruited through MiSK Foundation, much less that MiSK Foundation operates in Florida.  Rather, the only Defendant in this case alleged to have been recruited through MiSK Foundation is Al Otaibi and there is no indication that his recruitment occurred in Florida or was in any way connected to Florida.[6] *Id.* ¶¶ 298–299.  As to Saudi 24 TV, the Amended Complaint alleges that Saudi 24 TV maintains a studio in Washington, D.C., and alter ego jurisdiction over the Crown Prince through Saudi 24 TV appears to be based on the tweets and activities of one of its Lebanon-based broadcasters.[7] *Id.* ¶¶ 91, 96.  Likewise, Al Arabiya does not maintain any studios

---

[6] Further, as discussed below, Al-Asaker, MiSK Foundation's Secretary General, does not have contacts with Florida.  The same is true for Al Qahtani, who is identified as a previous board member of MiSK Foundation, setting aside that it is not clear based on the Amended Complaint **when**, specifically, Al Qahtani previously served as a board member of MiSK Foundation, Am. Compl. ¶¶ 83, 94, and also setting aside whether Al Qahtani's conduct can be imputed to MiSK Foundation in his role as a **board member**, as opposed to an officer.

[7]  In addition to speculating, upon information and belief, that the Crown Prince dominates Saudi 24 TV, Am. Compl. ¶ 136, the Amended Complaint also claims upon information and belief that Zeinab, who works for Saudi 24 TV **in Lebanon**, *id.* ¶ 96, acted at the direction of the Crown Prince in furtherance of the conspiracy and instructed the Network to post defamatory tweets about Plaintiff, *id.* ¶ 100.  To whatever extent the Amended Complaint purports to assert that this Court has personal jurisdiction over the Crown Prince via Saudi 24 TV based on its Lebanon-based broadcaster's Twitter interactions with Van Rider and Jundi, the Court notes that the Amended Complaint specifically alleges that Zeinab used his own Twitter account "to personally attack" Plaintiff.  *Id.* ¶ 98.  Further, beyond a tabulation of the number of Twitter "interactions" Zeinab had with the Network, the only direct example of Zeinab's interactions with Van Rider and Jundi

or offices in Florida and there is no indication that it otherwise does business in this state. *See id.* ¶ 89.

The Court also finds that Plaintiff's allegations that two U.S. Defendants residing in Florida were instructed to "personally attack Ms. Oueiss on Twitter" by the Recruiting Defendants, "operating under the directed strategy" of the Crown Prince, *id.* ¶¶ 204, 216, are not enough to establish that Van Rider and Jundi are agents of the Crown Prince in Florida. Given the number of layers alleged in the Conspiracy and the lack of any alleged direct communications between the U.S. Defendants and the Crown Prince, it is not clear what level of control, if any, the Crown Prince actually maintained over the U.S. Defendants. *See Jackson-Davis v. Carnival Corp.*, No. 17-24089-CIV, 2018 WL 1468665, at *4 (S.D. Fla. Mar. 23, 2018) ("The elements of an actual agency relationship are (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."); *see also Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) (noting the relevance of agency relationships to specific personal jurisdiction); *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1241 (S.D. Fla. 2015) (noting that, in the context of corporate parents and subsidiaries, "[j]urisdictional contacts will not be imputed in the absence of such a high degree of control").

Further, the Amended Complaint's consistent references to the U.S. Defendants' failure to register with the U.S. Department of Justice under the Foreign Agent Registration Act makes it difficult to reconcile Plaintiff's assertions that the U.S. Defendants are agents of the Crown Prince in his personal capacity. *See, e.g.*, Am. Compl. ¶¶ 39, 195, 246–248. The Amended Complaint

---

provided in the Amended Complaint is that Zeinab helped Van Rider edit a pro-Crown Prince video—as opposed to any defamatory materials related to Plaintiff. *Id.* ¶ 102.

speculates upon information and belief that the U.S. Defendants are paid for their activities in furtherance of the Conspiracy by "Defendant MBS and his agents." *Id.* ¶¶ 247, 300. Yet, Plaintiff's persistent references to the Crown Prince's spearheading the Conspiracy in his personal capacity is muddied by her own allegations, which include that Van Rider's "failure to register under the Foreign Agents Registration Act, is in direct conflict with [the Act's] purpose of ensuring that the American people can fully evaluate ***political communications sponsored by a foreign state***." *Id.* ¶ 39 (emphasis added). In any event, the repeated references to Van Rider and Jundi as agents of the Crown Prince are conclusory, and the Court need not credit these allegations in assessing whether it has personal jurisdiction over the Crown Prince under the Florida long-arm statute. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006). In short, the Amended Complaint's muddied allegations and the number of layers in the alleged Conspiracy make it difficult for the Court to find that the U.S. Defendants were in an agency relationship with the Crown Prince in his personal capacity, in which he exercised a high degree of control.

Nor is it clear that the Crown Prince committed a tort in Florida, which the Court discusses in further detail below within the context of the Due Process analysis.

For all these reasons, the Court finds that it lacks personal jurisdiction over the Crown Prince under Florida's long-arm statute.

### ii.    *Fourteenth Amendment Due Process.*

Independently, Plaintiff fails to establish that the exercise of personal jurisdiction over the Crown Prince satisfies the protections of the Fourteenth Amendment Due Process Clause. To the extent Plaintiff invokes personal jurisdiction over the Crown Prince pursuant to the Florida long-arm statute, Am. Compl. ¶ 129, the Fourteenth Amendment Due Process Clause applies, and the relevant forum is Florida, *see* Fed. R. Civ. P. 4(k)(1)(A). Thus, the Court must look to whether

the Crown Prince's contacts with Florida permit the exercise of personal jurisdiction over him as to Plaintiff's federal and state law claims.

As noted above, the Court must determine "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposely availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355 (quoting *Burger King*, 471 U.S. at 474–75).

The Court first makes the following observations. Generally, a court "may not ascribe the forum contacts of one co-defendant to another in determining the existence of personal jurisdiction." *Fraser*, 594 F.3d at 852 (citing *Rush v. Savchuk*, 444 U.S. 320, 331–33 (1980)); *see also Rush*, 444 U.S. at 332 ("Naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum. The requirements of *International Shoe*, however, must be met as to each defendant over whom a state court exercises jurisdiction."). This is because "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden v. Fiore*, 571 U.S. 277, 286 (2014). As the United States Supreme Court has explained, "[t]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum." *Id.* at 284 (emphasis in original) (citing *Burger King*, 471 U.S. at 475). Further, "'minimum contacts' analysis looks to the defendant's contacts with the forum . . . itself, not the defendant's contacts with persons who reside there." *Id.* at 285. The Supreme Court recently reiterated that a defendant's "contacts must be the defendant's own choice

and not 'random, isolated, or fortuitous.'" *Ford Motor Co.*, 141 S. Ct. at 1025 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).

With these principles in mind, the Court looks to the Crown Prince's contacts with Florida as alleged in the Amended Complaint. The Court finds none.

First, Plaintiff's claims against the Crown Prince do not arise out of or relate to the Crown Prince's Florida contacts because, as discussed below, the Crown Prince lacks Florida contacts.

Second, the allegations in Plaintiff's Amended Complaint are insufficient to establish that the Crown Prince purposefully availed himself of Florida. Plaintiff's Omnibus Response makes clear that the Crown Prince's contacts with Florida are predicated entirely on the actions of others. Specifically, Plaintiff contends that there is personal jurisdiction over the Crown Prince because co-Defendant Van Rider, a Florida resident, engaged in overt acts in furtherance of the alleged Conspiracy within Florida, which Plaintiff claims were only possible because of alleged hacks done at the behest of the Crown Prince. Resp. at 29. Accordingly, Plaintiff argues that her claims relate to the Crown Prince's contacts with Florida via Van Rider. *Id.* at 31. Plaintiff also argues that all Foreign Defendants named in the Amended Complaint, including the Crown Prince, purposefully availed themselves of Florida because all Defendants actively sought the participation of Florida residents in the Conspiracy, either directly or through other Defendants.[8] *Id.* at 31–32.

However, the Crown Prince lacks minimum contacts with Florida under the traditional minimum contacts test. In that test, courts "assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action;

---

[8] Plaintiff also contends that exercising personal jurisdiction would not offend traditional notions of fair play and substantial justice because Florida has an interest in providing redress for persons injured by tortious conduct emanating from Florida, and because the Conspiracy was "hatched on behalf of one of the most powerful individuals in the world." Resp. at 33.

(2) involve some act by which the defendant purposely availed himself of the privileges of doing business with the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357 (citing *SEC v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997)). Here, the Crown Prince has no direct or personal contacts with Florida. The Amended Complaint does not assert that the Crown Prince—or any Foreign Defendant—planned or orchestrated the four alleged hacks in Florida, oversaw the hacks from or even directed the hacks at Florida, used hacking tools or means acquired in Florida or from Florida-based persons or organizations, directed Florida-based persons or organizations or any person or organization with a connection to Florida to conduct the hacks, used Florida-based servers to perpetrate these hacks, or personally disseminated Plaintiff's private information within Florida. *See generally* Am. Compl. Nor was Plaintiff present in Florida when any of the alleged hack and leaks occurred.[9]

Rather, the advanced hacking tools allegedly used against Plaintiff and her mobile device were also allegedly acquired by the Saudi Royal Guard from Israeli and Italian cyber firms, and three of the four hacks were linked to a server in Saudi Arabia. *Id.* ¶¶ 144, 160. Further, as to the November 20, 2019 hack of her phone, "persistent access . . . was maintained by a threat actor group operating within Saudi Arabia." *Id.* ¶ 161. The July 6, 2020 hack "was carried out by a threat actor group in Saudi Arabia." *Id.* ¶ 162. Further, "[l]ike the first two attacks, a threat actor group operating within Saudi Arabia" carried out the July 15, 2020 hack. *Id.* ¶ 163. The fourth hack on April 14, 2020 by the Emirati company DarkMatter was allegedly effectuated via a Moroccan phone number. *Id.* ¶ 168.

---

[9] Rather, based on the Amended Complaint, it does not seem that Plaintiff has been to Florida since 2014. *See* Am. Compl. ¶ 36 (noting that Plaintiff traveled to Florida in 2014 to visit family members, and has "been to the *U.S.* as recently as the fall of 2019" (emphasis added)).

Even assuming Plaintiff's Amended Complaint adequately pleaded the inclusion of Van Rider and Jundi in the Conspiracy, Plaintiff would, in any event, not be able to establish that conspiracy-based personal jurisdiction over the Crown Prince satisfies the requirements of Due Process. Although the Amended Complaint alleges that the Crown Prince intended that the Recruiting Defendants recruit members of the Network "from major U.S. cities, such as Miami, Florida,"[10] Am. Compl. ¶ 208, there is no indication that the Crown Prince was aware of any act in furtherance of the Conspiracy that took place or would take place in Florida. *See Walden*, 571 U.S. at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State."); *cf. Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, No. 06-80966-CIV, 2007 WL 9701852, at *5 (S.D. Fla. May 30, 2007) (finding personal jurisdiction proper where there was "knowledge that overt acts in furtherance of the conspiracy would and did take place in Florida"). Plaintiff argues that the inclusion of the Miami, Florida telephone area code—305—in Defendant Van Rider's Twitter handle (@305local), put the Crown Prince and others on notice of the Conspiracy's connection to Florida. Resp. at 31. Plaintiff cites no case holding that a telephone area code presented in this manner might provide sufficient notice such that a court can exercise jurisdiction over a foreign defendant. This argument borders on frivolous.

In short, the Crown Prince does not have contacts with Florida sufficient to satisfy the traditional minimum contacts test.[11]

---

[10]  The Amended Complaint includes Miami, Florida as an example of a major U.S. city. Am. Compl. ¶ 208.

[11]  It is true, as noted above, that for purposes of Florida's long-arm statute courts in Florida are authorized to exercise personal jurisdiction over nonresident co-defendants in a civil conspiracy

Nor does the Crown Prince satisfy the effects test. Under this test, the exercise of personal jurisdiction in the context of an intentional tort is proper where the tort: "(1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Louis Vuitton*, 736 F.3d at 1356 (alterations incorporated). Here, there is no indication that the conduct underpinning Plaintiff's intrusion and intentional infliction of emotional distress claims against the Crown Prince—his participation in the hacks, *see* Am. Compl. ¶¶ 270, 276—was aimed at Florida. As noted above, Plaintiff's phone was not hacked or otherwise accessed in Florida. Nor did the hacks employ any Florida-based instrumentalities (*e.g.*, agents, servers, resources, etc.). And the Crown Prince did not personally oversee the alleged hacking, theft, and doctoring of the information retrieved from her phone from Florida. *Cf. id.* ¶ 277 (attributing this conduct to all Defendants).[12] Moreover, Plaintiff is an international journalist from Lebanon who is based in Qatar, *id.* ¶ 35, and the Crown Prince is not alleged to have known of the existence or potential existence of Florida co-conspirators. While, if the allegations are true, it would have been reasonable for the Crown Prince to assume that the effects of his conduct would be felt in various fora, it is less reasonable to assume that the effects

---

where "any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy." *Parisi v*, 314 So. 3d at 660–61. However, Plaintiff points to no Eleventh Circuit case, let alone Supreme Court case, that establishes that this Court can maintain personal jurisdiction over a nonresident defendant based on the in-forum conduct of a forum-resident co-conspirator where the nonresident defendant has no knowledge that overt acts in furtherance of the conspiracy did or would take place in the forum. *Walden*'s reiteration of each defendant's particular contacts tends to suggest the opposite. *See Walden*, 571 U.S. at 285. In any event, even if personal knowledge was not required, the Crown Prince's alleged contacts are precisely the kind of random, fortuitous, or attenuated contacts that are insufficient to satisfy the minimum contacts test.

[12] As an aside, Plaintiff's civil conspiracy claim asserts that Van Rider and Jundi's defaming Plaintiff constituted at least one step in furtherance of the conspiracy within Florida. Am. Compl. ¶ 306. However, Plaintiff does not assert her libel claim against the Crown Prince. *See id.* ¶¶ 281-291.

would be felt in Florida, a forum where Plaintiff does not reside. *Cf. Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1159 (S.D. Fla. 2017) (finding the exercise of personal jurisdiction reasonable under the "effects test" as to defamation claims based on injury to Florida-based plaintiff).

For these reasons, the Court finds that it lacks personal jurisdiction over the Crown Prince under Florida's long-arm statute and the Fourteenth Amendment.

> ii.     *Rule 4(k)(2) and Fifth Amendment Due Process Clause.*

Plaintiff also invokes this Court's personal jurisdiction over the Crown Prince pursuant to the "national long-arm statute," Federal Rule of Civil Procedure 4(k)(2). The exercise of jurisdiction pursuant to the Rule 4(k)(2) is limited to claims arising under federal law, here, Plaintiff's ATS and CFAA Claims. *See* Fed. R. Civ. P. 4(k)(2); *Fraser*, 594 F.3d at 848–49 ("Rule 4(k)(2) permits a court to aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claims must 'arise under federal law;' and, (2) the exercise of jurisdiction must be 'consistent with the Constitution and laws of the United States.'" (quoting Fed. R. Civ. P. 4(k)(2)).

The Amended Complaint does allege the Crown Prince has contacts with the United States that were not discussed above. The Amended Complaint contains allegations that the Crown Prince or others working at his behest targeted U.S. news agencies and hacked *The Washington Post* owner and then-Amazon CEO Jeff Bezo's mobile phone in the United States after the high-profile killing of Jamal Khashoggi. Am. Compl. ¶¶ 13, 70–73; *see also* Resp. at 34–35. According to Plaintiff, the repetition of the methodology used against Mr. Bezos, now used against Plaintiff, is sufficient to establish the requisite contacts between the Crown Prince and the United States. Resp. at 35.

First, The Court fails to see how Plaintiff's ATS and CFAA claims against the Crown Prince arise out of or relate to the hack of Mr. Bezo's phone. *See Bristol-Myers Squibb*, 137 S. Ct. at 1781. Second, the alleged evidence of prior methodology against nonparties such as Mr. Bezos is not evidence of minimum contacts in the instant case. Third, Rule 4(k)(2) does not permit the exercise of conspiracy-based personal jurisdiction. *See, e.g.*, *Ofisi v. Al Shamal Islamic Bank*, No. CV 15-2010, 2019 WL 1255096, at *5 n.8 (D.D.C. Mar. 19, 2019). Fourth, as noted above, it is not clear to the Court that the U.S. Defendants were in an agency relationship with the Crown Prince. And fifth, even assuming Saudi 24 TV, Al Arabiya, and MiSK Foundation's U.S. contacts could be imputed to the Crown Prince, Plaintiff's ATS and CFAA claims do not arise from those alleged U.S. contacts. Rather, Saudi 24 TV, Al Arabiya, and MiSK Foundation's U.S. contacts are either entirely unrelated to any claim in this case, or are related to facilitating recruitment and dissemination, which are separate stages of the alleged three-stage Conspiracy.[13] *See* Am. Compl. ¶¶ 89, 92, 94.

For these reasons, the Court finds that it lacks personal jurisdiction over the Crown Prince. Accordingly, the Crown Prince's motion to dismiss is granted for lack of personal jurisdiction, and all claims against him are dismissed without prejudice. Having found that the Court lacks personal jurisdiction over the Crown Prince, the Court need not address the Crown Prince's subject matter jurisdiction or failure to state a claim arguments. *See Sinochem Int'l*, 549 U.S. at 431.

### b.    DarkMatter.

The Court finds that it lacks personal jurisdiction over DarkMatter for reasons largely similar to why this Court lacks personal jurisdiction over the Crown Prince. The Court begins by

---

[13]   Notably, Al Arabiya, Saudi 24 TV, and MiSK Foundation's contacts with the U.S. are based on the conduct of other Defendants which the Amended Complaint seeks to impute to them.

noting that Plaintiff's Amended Complaint asserts four claims against DarkMatter: a CFAA claim arising under federal law and claims for intentional infliction of emotional distress, intrusion, and civil conspiracy arising under Florida law. *See* Am. Compl. ¶¶ 258–280, 292–311. Plaintiff invokes personal jurisdiction over DarkMatter under both the Florida long-arm statute and Rule 4(k)(2). *Id.* ¶¶ 124, 129.

Most of the allegations against DarkMatter are made upon information and belief, including the allegation that DarkMatter acted in furtherance of the conspiracy by hacking Plaintiff's mobile device. *Id.* ¶¶ 167, 171, 264, 304(b), 308(b).

First, this Court lacks personal jurisdiction over DarkMatter under Florida's long-arm statute and the Fourteenth Amendment Due Process Clause. Like the Crown Prince, Plaintiff fails to establish that this Court has personal jurisdiction over DarkMatter based on civil conspiracy-based personal jurisdiction under the Florida long-arm statute. *See supra* III.A.2.a.i. Nor does the Amended Complaint allege that DarkMatter has any agents in Florida. All claims against DarkMatter are predicated on its alleged hack of Plaintiff's mobile device. Am. Compl. ¶¶ 259, 262, 264, 270, 276. 282, 304(b), 308(b). However, none of these allegations indicate in any way that DarkMatter committed these alleged torts in Florida. The sum total of Plaintiff's allegations in the Amended Complaint against DarkMatter, none of which contains any indication that DarkMatter directed its conduct toward Florida, are as follows: DarkMatter is an Emirati cybersecurity company founded in either 2014 or 2015 and controls the hacking group known as "Project Raven," which was responsible for the hack of nonparty Hamad bin Thamer Al Thani's (the Qatari Chairman of *Al Jazeera*) personal mobile phone in June of 2017 using Pegasus spyware. *Id.* ¶¶ 76, 148. DarkMatter took over Project Raven from a Baltimore, Maryland-based company named CyberPoint International, which had hired former U.S. National Security Agency

employees to work in the United Arab Emirates for Project Raven. *Id.* ¶ 150. DarkMatter, working in concert with the Crown Prince, has conducted offensive cyber operations against nonparties abroad. *Id.* ¶¶ 151–153. **Upon information and belief**, DarkMatter agreed to and did commit one of the four hacks of Plaintiff's mobile device in furtherance of the Conspiracy. *Id.* ¶¶ 126, 158-159, 167, 171, 264, 304(b), 308(b).

Plaintiff's allegations against DarkMatter in the Amended Complaint all relate to its participation in the hack of Plaintiff's mobile device and the employment of Project Raven against foreign nonparties. However, as noted above, Plaintiff does not claim that she or her mobile device were present in Florida when any of the alleged hacks occurred. *See id.* ¶ 36. Nor does the Amended Complaint contain any allegations that any Florida-based employees, resources, servers, or instrumentalities were used in furtherance of DarkMatter's alleged hack. Even assuming the existence of the Conspiracy, there is no indication that DarkMatter was aware that any overt act in furtherance of the Conspiracy would or did take place in Florida. *See Walden*, 571 U.S. at 286; *cf. Int'l Underwriters*, 2007 WL 9701852, at *5. And the Court observes that it would not have been reasonable for DarkMatter to assume that the effects of hacking the mobile device of a Qatar-based journalist from Lebanon would be felt in Florida for the same reasons noted above, especially given that both DarkMatter and Plaintiff are located abroad. *See* Am. Compl. ¶ 36; *cf. Gubarev*, 253 F. Supp. 3d at 1159.

In short, the Amended Complaint contains no allegations demonstrating that DarkMatter, an Emirati company with its principal place of business in the United Arab Emirates, (ECF No. 165) at 6 n.2, has any contacts with Florida, either sufficient for the Florida long-arm statute or under the Fourteenth Amendment.

Second, Plaintiff fails to establish that that this Court has personal jurisdiction over DarkMatter under Rule 4(k)(2). The exercise of jurisdiction pursuant to Rule 4(k)(2) statute is limited to Plaintiff's CFAA claim against DarkMatter. *See Fraser*, 594 F.3d at 848–49. The Court finds that Plaintiff's Amended Complaint contains no allegations establishing that DarkMatter had any contacts with the United States, and Plaintiff's Omnibus Response points to no conduct by DarkMatter that is directed at the United States. *See* Resp. at 34–35. As noted above, Plaintiff's references to methodology, *id.*, are unavailing because prior methodology is not evidence of U.S. contacts in the instant case. Nor can Plaintiff's references to Jamal Khashoggi, the Qatari chairman of *Al Jazeera*, and Jeff Bezos establish personal jurisdiction in this case because, whatever DarkMatter's involvement, Plaintiff's claims in this case do not arise out of or relate to that conduct. Plaintiff does not establish that DarkMatter purposefully availed itself of the United States in her discussion of Project Raven—the Amended Complaint expressly states that a U.S. company was contracted to operate Project Raven in the United Arab Emirates, and Project Raven was transferred to DarkMatter in the United Arab Emirates sometime thereafter. Am. Compl. ¶¶ 149–150. Further, as noted above, Rule 4(k)(2) does not contemplate the exercise of conspiracy-based personal jurisdiction, *see, e.g.*, *Ofisi*, 2019 WL 1255096, at *5 n.8, and in any event, there is no indication that DarkMatter was aware of any of the alleged U.S.-based co-conspirators.

For these reasons, the Court finds that it lacks personal jurisdiction over DarkMatter. Accordingly, DarkMatter's motion to dismiss is granted for lack of personal jurisdiction, and all claims against it are dismissed without prejudice. Having found that the Court lacks personal jurisdiction over DarkMatter, the Court need not address its subject matter jurisdiction or failure to state a claim arguments. *See Sinochem Int'l*, 549 U.S. at 431.

####   c.      Al-Asaker.

The Court finds that it lacks personal jurisdiction over Al-Asaker for reasons largely similar to why this Court lacks personal jurisdiction over the Crown Prince.  As it did earlier, the Court begins by noting that Plaintiff's Amended Complaint asserts five claims against Al-Asaker: ATS and CFAA claims, both arising under federal law, and claims for intentional infliction of emotional distress, intrusion, and civil conspiracy arising under Florida law.  *See* Am. Compl. ¶¶ 258–280, 292–311.  Plaintiff invokes personal jurisdiction over Al-Asaker under both the Florida long-arm statute and Rule 4(k)(2).  *Id.* ¶¶ 124, 129.

First, this Court lacks personal jurisdiction over Al-Asaker[14] under Florida's long-arm statute and the Fourteenth Amendment Due Process Clause.  As with the Crown Prince and DarkMatter, Plaintiff fails to establish that this Court has personal jurisdiction over Al-Asaker based on civil conspiracy-based personal jurisdiction under the Florida long-arm statute.  *See supra* III.A.2.a.i.  Like the Crown Prince and DarkMatter, Al-Asaker's contacts with Florida also are either nonexistent or predicated entirely on the actions of others.

The Amended Complaint alleges that Al-Asaker's role in the Conspiracy included "assist[ing] in the coordination of the various (successful) campaigns (with Defendant Al Qahtani) to unlawfully hack [Plaintiff's] mobile device, and then subsequently orchestrat[ing] the dissemination of the private photographs of [Plaintiff] via Twitter."  Am. Compl. ¶ 88.  However, as noted at length above, none of the conduct related to the hacking of Plaintiff's mobile device by

---

[14]  The Amended Complaint alleges that Al-Asaker is a Saudi Arabian citizen serving as the head of the Private Office of the Crown Prince with the rank of Minister in the Saudi Arabian government, pursuant to a royal decree.  Am. Compl. ¶ 85.  Al-Asaker is the Secretary General of MiSK Foundation.  *Id.*  The Amended Complaint alleges that Al-Asaker acted in his role as Secretary General of MiSK Foundation, not in his capacity as a government official within the Government of the Kingdom of Saudi Arabia.  *Id.* ¶ 88.

any Defendant allegedly involved in that hacking bears any connection to the United States, let alone Florida. *See id.* ¶¶ 156–174. There is also no indication that any of the social media "bot" accounts allegedly created by Al-Asaker at the behest of the Crown Prince for the purpose of spreading disinformation about Plaintiff either operated in or were directed at the United States or Florida. *See id.* ¶¶184–194. In short, to whatever extent Al-Asaker committed a tort through hacking or the creation of a bot network, that conduct did not occur in Florida.

Further, Al-Asaker is not alleged to have directly instructed the Network to spread disinformation. *Id.* ¶ 196. The Amended Complaint does not allege that Al-Asaker personally recruited, communicated with, or spoke to any of the four U.S. Defendants, let alone the two U.S. Defendants residing in Florida. Rather, the Amended Complaint states in conclusory fashion that Van Rider and Jundi were "instructed by the Recruiting Defendants" and that they "operat[ed] under the directed strategy of" the Crown Prince, Al Qahtani, and Al-Asaker. *Id.* ¶¶ 204, 216. Despite the Amended Complaint's inclusion of statistics describing the number of the U.S. Defendants' Twitter followers self-reporting their location as Florida, *id.* ¶ 240, there is no indication that Al-Asaker knew of the existence of Van Rider and Jundi, and in any event, Van Rider and Jundi are not alleged to have been ***Al-Asaker's*** agents, however the Amended Complaint intends the word to be understood. *See, e.g.*, *id.* ¶¶ 22 ("Defendant MBS and his agents"), 34 ("This case is brought to address the unlawful conduct undertaken *personally* by Defendant MBS, his foreign agents, and his U.S. mercenaries . . . (emphasis in original)), 38 ("U.S. agents of Defendants MBS, Al Qahtani and Al-Asaker, among others."), 68, 74. In short, Al-Asaker lacks contacts with Florida sufficient to satisfy the Florida long-arm statute.

Al-Asaker's alleged conduct also does not satisfy the Due Process Clause. As it did earlier, the Court rejects the suggestion in Plaintiff's Amended Complaint and her Omnibus Response that

the intent to recruit members to the Network "from major U.S. cities" and Van Rider's inclusion of the telephone area code for Miami, Florida in her Twitter handle are sufficient to establish that Al-Asaker was on notice that any act in furtherance of the Conspiracy could be or was performed in Florida. *Id.* ¶ 208. Rather, the Amended Complaint contains no indication that Al-Asaker was aware that any overt act in furtherance of the Conspiracy would or did take place in Florida. *See Walden*, 571 U.S. at 286; *cf. Int'l Underwriters AG*, 2007 WL 9701852, at *5. Further, this Court finds that it cannot obtain personal jurisdiction over Al-Asaker under the effects test for the reasons stated above in its analysis of the same for the Crown Prince. *See supra* III.A.2.a.i.

In short, the Amended Complaint lacks allegations that would support the exercise of personal jurisdiction over Al-Asaker consistent with the Florida long-arm statute and the Fourteenth Amendment.

Likewise, Plaintiff fails to establish that that this Court has personal jurisdiction over Al-Asaker under Rule 4(k)(2). The exercise of jurisdiction pursuant to Rule 4(k)(2) is limited to Plaintiff's ATS and CFAA claims against Al-Asaker. *See Fraser*, 594 F.3d at 848–49. As noted above, Plaintiff's references to past methodology, *see* Resp. at 34–35, are unavailing because prior methodology is not evidence that her claims arise out of Al-Asaker's alleged contacts with the United States in the instant case. Nor can Plaintiff's references to Jamal Khashoggi and Jeff Bezos establish personal jurisdiction over Al-Asaker in this case because, whatever Al-Asaker's alleged involvement, Plaintiff's claims in this case do not arise out of or relate to that conduct. *See Bristol-Myers Squibb*, 137 S. Ct. at 1781. To the extent the Amended Complaint asserts that the U.S. Department of Justice charged two former Twitter employees with spying for Saudi Arabia and those two criminal defendants reported directly to Al-Asaker, Am. Compl. ¶ 86, there is, again, no indication that Plaintiff's federal claims against Al-Asaker in the instant case arise out of or

relate to those U.S.-based contacts, or that those contacts have any connection to Florida. To the extent the Amended Complaint alleges that Al-Asaker traveled to the United States in March, April, and September of 2018, when the U.S. Defendant co-conspirators were being recruited, *id.* ¶ 87, the Amended Complaint does not indicate how Plaintiff's claims arise out of those visits. Further, the Amended Complaint alleges that the Recruiting Defendants, not Al-Asaker, recruited the U.S. Defendants. *See id.* ¶ 46 n.17, 62, 295, 300, 308(e). Last, as noted above, Rule 4(k)(2) does not contemplate the exercise of conspiracy-based personal jurisdiction. *See, e.g.*, *Ofisi*, 2019 WL 1255096, at *5 n.8. In short, Plaintiff's Amended Complaint does not contain allegations sufficient to demonstrate that this Court has personal jurisdiction over Al-Asaker under Rule 4(k)(2) and the Fifth Amendment.

For these reasons, the Court finds that it lacks personal jurisdiction over Al-Asaker. Accordingly, Al-Asaker's motion to dismiss is granted for lack of personal jurisdiction, and all claims against him are dismissed without prejudice. Having found that the Court lacks personal jurisdiction over Al-Asaker, the Court need not address his subject matter jurisdiction or failure to state a claim arguments. *See Sinochem Int'l*, 549 U.S. at 431.

### d.    Al Qahtani.

The Court finds that it also lacks personal jurisdiction over Al Qahtani. Plaintiff's Amended Complaint asserts five claims against Al Qahtani: ATS and CFAA claims, both arising under federal law, and claims for intentional infliction of emotional distress, intrusion, and civil conspiracy arising under Florida law. *See* Am. Compl. ¶¶ 258–280, 292–311. Plaintiff invokes personal jurisdiction over Al Qahtani under both the Florida long-arm statute and Rule 4(k)(2). *Id.* ¶¶ 124, 129.

First, this Court lacks personal jurisdiction over Al Qahtani[15] under Florida's long-arm statute and the Fourteenth Amendment Due Process Clause for much the same reasons as Al-Asaker, DarkMatter, and the Crown Prince.   Like the Crown Prince and Al-Asaker, Al Qahtani's contacts with Florida are either nonexistent or predicated entirely on the actions of others.   For the reasons discussed above in the Court's analysis of the Crown Prince's contacts with Florida, Plaintiff fails to establish that this Court has personal jurisdiction over Al Qahtani based on civil conspiracy-based personal jurisdiction under the Florida long-arm statute.  *See supra* III.A.2.a.i.

Further, this Court does not have personal jurisdiction over Al Qahtani based on his alleged Twitter activity.   The Amended Complaint alleges that Al Qahtani had 1,691 "interactions" on Twitter with Van Rider, and 186 Twitter interactions with Jundi, Am. Compl. ¶¶ 42, 51, among his other alleged Twitter interactions with the U.S. Defendants.  *Id.* ¶¶ 56, 60.  Notably, the Amended Complaint does not expressly define what a Twitter "interaction" is beyond stating that Defendants' Twitter interactions "relate[d] to praising Saudi Arabia, Defendant MBS, or other acolytes of MBS, while the remainder of the interactions involve[d] attacks on Defendant MBS's critics."[16]  *See, e.g.*, *id.* ¶¶ 42, 51, 101.  This, of course, assumes that it was in fact Al Qahtani operating the Twitter account the Amended Complaint alleges he used.

---

[15]  The Amended Complaint alleges that Al Qahtani is a Saudi Arabian citizen, former royal court advisor to the Crown Prince, former Chairman of the Saudi Federation for Cybersecurity Programming and Drones, the Crown Prince's former media consultant, and the former General Supervisor of the Center for Studies and Media Affairs.  Am. Compl. ¶ 77.

[16]  Based on the Amended Complaint, Twitter interactions seem at least to include the Defendants retweeting each other's tweets, replying to each other's tweets, and/or tagging each other's Twitter handles or mentioning their names in tweets.  *See generally* Am. Compl.

However, the Amended Complaint claims that, upon information and belief, Al Qahtani and an unidentified nonparty residing in England created and managed the Twitter account "@KateStewart22," which Al Qahtani allegedly used to interact with Van Rider and Jundi as discussed above. *Id.* ¶¶ 84, 233. However, it is not clear that Al Qahtani actually used this Twitter account, as opposed to the unidentified nonparty residing in England, especially considering the Amended Complaint asserts that "discovery will reveal the ***true identity*** of the ***user(s)*** of this account." *Id.* ¶ 84 (emphasis added). The Court need not credit this speculative assertion for purposes of determining whether it has personal jurisdiction over Al Qahtani. *See Mann*, 713 F.3d at 1315.

Further, Al Qahtani's Twitter interactions do not permit the exercise of personal jurisdiction under Florida's long-arm statute even assuming Al Qahtani does in fact operate the @KateStewart22 Twitter account. Only 85 of @KateStewart22 Twitter followers report their location as Florida. Am. Compl. ¶ 238. On this basis, the Amended Complaint concludes that Al Qahtani's @KateStewart22 tweets were accessed in Florida. However, the Florida long-arm statute requires more than this. *See Catalyst Pharms., Inc. v. Fullerton*, 748 F. App'x 944, 947 (11th Cir. 2018) (citing *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1203 (Fla. 2010)) (noting that Florida law does not consider posting defamatory material on a website accessible in Florida a tortious act within Florida for purposes of the long-arm statute). In any event, Plaintiff does not assert her libel claim against Al Qahtani, *see* Am. Compl. ¶¶ 281–291, and her intentional infliction of emotional distress claim against Al Qahtani is based on his "intentional access of [Plaintiff's] mobile device to obtain personal data and files," *id.* ¶ 270, which, as discussed above bears no connection to Florida. Likewise, Plaintiff's intrusion claim is predicated on the hack of Plaintiff's phone. *Id.* ¶¶ 275–280. However, as noted at length above, none of the conduct related to the

hacking of Plaintiff's mobile device by any Defendant allegedly involved in that hacking bears any connection to the United States, let alone Florida. *See id.* ¶¶ 156–174.

Further, Al Qahtani is not alleged to have directly instructed the Network to spread disinformation. *Id.* ¶ 196. Nor does the Amended Complaint allege that Al Qahtani personally recruited, communicated with, or spoke to any of the four U.S. Defendants, let alone the two U.S. Defendants residing in Florida. There is also no indication that Al Qahtani knew of the existence of the U.S. Defendants, let alone Van Rider and Jundi, who in any event, are not alleged to have been ***Al Qahtani's*** agents, however that is defined or is to be understood, as noted above in the Court's analysis into Al-Asaker's contacts with Florida.

For these reasons, this Court lacks personal jurisdiction over Al Qahtani pursuant to the Florida long-arm statute.

Independently, the exercise of personal jurisdiction over Al Qahtani would not comport with the protections of the Fourteenth Amendment Due Process Clause. As noted at length above, Al Qahtani lacks Florida contacts. And, as it did earlier, the Court continues to reject that intending to recruit members to the Network "from major U.S. cities" and Van Rider including the telephone area code for Miami, Florida in her Twitter handle is sufficient to establish that Al Qahtani was on notice that any act in furtherance of the Conspiracy could be or was performed in Florida. Am. Compl. ¶ 208. Rather, the Amended Complaint contains no indication that Al Qahtani was aware of any Florida connection or that any overt act in furtherance of the Conspiracy would or did take place in Florida. *See Walden*, 571 U.S. at 286; *cf. Int'l Underwriters AG*, 2007 WL 9701852, at *5. Further, assuming this Court could exercise personal jurisdiction over Al Qahtani for his @KateStewart22 tweets, and assuming Plaintiff asserted a cause of action against Al Qahtani based on those tweets, doing so would violate Due Process given that only 85 of the account's

followers report their location as Florida. *Compare* (ECF No. 164) at 4 (noting that the @KateStewart22 Twitter account had approximately 24,400 followers in total), *with Miller v. Gizmodo Media Grp.*, 383 F. Supp. 3d 1365, 1374 (S.D. Fla. 2019) (finding that a defendant's "contacts with Florida do not rise to the level of Hustler's contacts with the forum in *Keeton* because less than one percent of Menaker's audience was in Florida, and Menaker did not profit from posting the Tweet"). *See also Bioheart, Inc. v. Peschong*, No. 13-60304-CIV, 2013 WL 1729278, at *4 (S.D. Fla. Apr. 22, 2013) ("While Bioheart does not describe the message board in detail, there is no evidence that it particularly facilitated interactions with or otherwise targeted a Florida audience."). In short, Al Qahtani lacks contacts with Florida sufficient to satisfy the traditional minimum contacts test. Further, this Court finds that it cannot obtain personal jurisdiction over Al Qahtani under the effects test for the reasons stated above in the Court's analysis of the Crown Prince's contacts. *See supra* III.A.2.a.i.

In sum, the Amended Complaint lacks allegations that would support the exercise of personal jurisdiction over Al Qahtani consistent with the Florida long-arm statute and the Fourteenth Amendment.

Likewise, Plaintiff fails to establish that that this Court has personal jurisdiction over Al Qahtani under Rule 4(k)(2). The exercise of jurisdiction pursuant to Rule 4(k)(2) is limited to Plaintiff's federal claims against Al Qahtani. *See Fraser*, 594 F.3d at 848–49. As discussed at length above with respect to the Crown Prince, DarkMatter, and Al-Asaker, none of the conduct attributed to Al Qahtani that gives rise to Plaintiff's ATS and CFAA against him is directed at the United States. And, as has previously been noted, Rule 4(k)(2) does not contemplate the exercise of conspiracy-based personal jurisdiction. *See, e.g.*, *Ofisi*, 2019 WL 1255096, at *5 n.8.

For these reasons, the Court finds that it lacks personal jurisdiction over Al Qahtani. Accordingly, Al Qahtani's motion to dismiss is granted for lack of personal jurisdiction, and all claims against him are dismissed without prejudice.  Having found that the Court lacks personal jurisdiction over Al Qahtani, the Court need not address his subject matter jurisdiction or failure to state a claim arguments.  *See Sinochem Int'l*, 549 U.S. at 431.

**B.**      **Remaining Defendants.**

The remaining Foreign Defendants—Al Menaia, Al-Otaibi, Al-Owerde, Zeinab, MiSK Foundation, Saudi 24 TV, and Al Arabiya—like the Crown Prince, DarkMatter, Al Qahtani, and Al-Asaker, moved to dismiss for lack of personal jurisdiction and for lack of subject matter jurisdiction.  *See generally* (ECF Nos. 163, 166, 168, 169).  The U.S. Defendants—Van Rider, Schey, Jundi, and Smith—moved to dismiss for failure to state a claim upon which relief can be granted.  *See generally* (ECF No. 162).

The Court notes that there are no federal claims remaining in this case.  Plaintiff's Amended Complaint asserts only two federal claims: her claim under the ATS and her claim under the CFAA.  *See generally* Am. Compl.  These two federal claims are brought against only the Crown Prince, Al Qahtani, Al-Asaker, and DarkMatter.  *Id.* ¶¶ 249–268.  As noted above, the Court has granted the Crown Prince's, Al Qahtani's, Al-Asaker's, and DarkMatter's motions to dismiss because this Court lacks personal jurisdiction over them; thus, all claims against them, including Plaintiff's ATS and CFAA claims, are dismissed without prejudice.  Further, as also noted earlier, Plaintiff invokes this Court's federal question jurisdiction for her ATS and CFAA claims, pursuant to 28 U.S.C. § 1331.  *Id.* ¶ 121.  For her state law intentional infliction of emotional distress, intrusion, libel, and civil conspiracy claims arising under Florida law, Plaintiff invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.  *Id.*  Because no federal claims remain,

the U.S. Defendants urge the Court to decline to exercise supplemental jurisdiction over Plaintiff's state law claims if this Court finds that it lacks personal jurisdiction over the Foreign Defendants named in Plaintiff's federal claims.[17]  (ECF No. 162) at 7–8.

Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction, "in any civil action of which the district courts have original jurisdiction, . . . over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, this Court is afforded the discretion to decline to exercise supplemental jurisdiction over such a claim where the Court has "dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3); *Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1350 (11th Cir. 1998). "It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  The Eleventh Circuit encourages district courts to dismiss any remaining state claims when the federal claims are dismissed prior to trial.  *See, e.g., Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) (per curiam).  Dismissal of state law claims should usually be done without prejudice so that plaintiff may seek relief in state court.  *See Vibe Micro, Inc.*, 878 F.3d at 1296 (citing *Crosby v. Paulk*, 187 F.3d 1339, 1352 (11th Cir. 1999)).

---

[17]  The U.S. Defendants argue that they are "tethered to this lawsuit simply as Plaintiff's tool to manufacture personal jurisdiction and venue in this Court."  (ECF No. 162) at 1.

Here, Plaintiff explicitly invokes this Court's supplemental jurisdiction over her state law claims—no other basis of jurisdiction is invoked over the state law claims and no federal law claims remain.[18]   Accordingly, at this juncture the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims against the remaining Defendants and will dismiss those claims without prejudice.

## IV.   CONCLUSION

Accordingly, UPON CONSIDERATION of the Motions to Dismiss, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that:

1) Defendant Mohammed bin Salman bin Abdulaziz Al Saud's Motion to Dismiss Amended Complaint (ECF No. 161), Defendant Saud Al Qahtani's Motion to Dismiss the Amended Complaint (ECF No. 164), Defendant DarkMatter's Motion to Dismiss the Amended Complaint (ECF No. 165), and Defendant Bader Al-Asaker's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 167) are GRANTED for lack of personal jurisdiction.

2) Defendants Sharon Van Rider, Christanne Schey, Sam Jundi, and Annette Smith's Motion to Dismiss Amended Complaint for Failure to State a Claim (ECF No. 162), Defendants Faisal Al Menaia, Awwad Al Otaibi, Turki Al-Owerde, and Tarek Abou Zeinab's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 163), Defendant Prince Mohammed Bin Salman Abdulaziz Foundation's Motion to Dismiss Plaintiff's

---

[18]  Plaintiff cannot invoke this Court's alienage jurisdiction.  *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 860 (11th Cir. 2000) ("It is a standard rule that federal courts do not have diversity jurisdiction over cases where there are foreign entities on both sides of the action, without the presence of citizens of a state on both sides.").

Amended Complaint (ECF No. 166), Defendant Masharea Wa Enjazat IT Corporation

LLC's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 168), and

Defendant Middle East News FZ-LLC's Motion to Dismiss Plaintiff's First Amended

Complaint (ECF No. 169) are GRANTED for the reasons set forth above.

3)  Plaintiff's Amended Complaint is DISMISSED WITHOUT PREJUDICE in its entirety

as to all Defendants.

4)  The Clerk of Court is INSTRUCTED to CLOSE this case.

5)  All pending motions, if any, are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this *28th* day of March, 2022.


K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE


c:  All counsel of record